**2014-1370**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆

ETHICON ENDO-SURGERY, INC. and ETHICON ENDO-SURGERY, LLC,

*Plaintiffs-Appellants,*

— v. —

COVIDIEN, INC. and COVIDIEN LP,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION IN CASE NO. 11-CV-871
JUDGE TIMOTHY S. BLACK

## BRIEF FOR PLAINTIFFS-APPELLANTS

WILLIAM F. CAVANAUGH, JR.
CHAD J. PETERMAN
R. JAMES MADIGAN III
HELEN P. O'REILLY
JEREMY A. WEINBERG
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC certify the following:

1. The full name of every party or amicus represented by me:

    Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Not Applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Johnson and Johnson; Ethicon, Inc.; Ethicon, LLC; Ethicon PR Holdings

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    William F. Cavanaugh, Jr., Chad J. Peterman, R. James Madigan III, Helen P. O'Reilly, Jeremy A. Weinberg
    PATTERSON BELKNAP WEBB & TYLER LLP

    Charles D. Hoffman
    HOFFMANN MARSHALL STRONG LLP

    David Edward Schmit
    FROST BROWN & TODD, LLC

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF RELATED CASES ............................................... 1

STATEMENT OF JURISDICTION ................................................... 1

INTRODUCTION .................................................................................. 2

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE ............................................................ 6

STATEMENT OF FACTS ................................................................... 7

I.      THE PARTIES .......................................................................... 7

II.     THE PATENTS-IN-SUIT ..................................................... 8

        A.    The '501 Patent ............................................................ 8

        B.    The '275 Patent .......................................................... 10

        C.    The Design Patents ................................................... 12

III.    THE ACCUSED SONICISION DEVICE ..................... 15

IV.   THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT ......... 18

SUMMARY OF ARGUMENT ......................................................... 19

STANDARD OF REVIEW ............................................................... 20

ARGUMENT ......................................................................................... 21

I.      THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INDEFINITENESS ON THE '501 PATENT ................... 22

II.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT ON THE '275 PATENT .......... 29

        A.    The District Court Erred In Its Construction of "Configured to Loosely Contact" the Transmission Rod ............................................. 30

i

# TABLE OF CONTENTS
## (CONTINUED)

Page

B. Even Under Its Construction, the District Court Erred In Granting Summary Judgment of Non-Infringement ........................... 32

C. The District Court Erred In Finding That Sonicision's Sleeve Is Not "Adapted to Absorb Undesired Vibrations" ................................. 36

    1. Covidien Admitted That Sonicison's Sleeve Was Designed To Prevent Metal-to-Metal Contact, a Form of Undesired Vibrations .............................................................. 36

    2. Covidien's "Droplet" Tests Demonstrated Undesired Vibrations ................................................................................. 38

III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INVALIDITY AND NON-INFRINGEMENT ON THE DESIGN PATENTS .............................................................. 39

A. The District Court Erred In Granting Summary Judgment of Invalidity ........................................................................ 40

    1. Whether the Patented Designs Are Dictated by Function Is a Disputed Issue of Fact ....................................... 41

    2. The District Court Erred In Its Application of the Other Factors Identified In *Berry* ....................................... 47

B. The District Court Erred In Granting Summary Judgment Of Non-Infringement of the Design Patents ............................................ 50

    1. The District Court Erred In "Factoring Out" Elements of the Design Patents Based On Functionality ............................. 50

    2. The District Court Erred In Failing to Consider the Prior Art In Its Infringement Analysis ............................... 52

CONCLUSION ......................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................20, 29, 44

*Apple, Inc. v. Samsung Elecs. Co.*,
11 Civ 1846, 2011 U.S. Dist. LEXIS 139049 (N.D. Cal. Dec. 2, 2011)............51

*Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*,
501 F.3d 1314 (Fed. Cir. 2007) ........................................................56

*Aventis Pharma SA v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) ........................................................30

*Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.*,
853 F.2d 1557 (Fed. Cir. 1988) ....................................................46, 49

*Banks v. Wolfe Cnty. Bd. of Educ.*,
330 F. 3d 888 (6th Cir. 2003) .....................................................20, 22

*Berry Sterling Corp. v. Pescro Plastics, Inc.*,
122 F.3d 1452 (Fed. Cir. 1997) ................................................41, 46, 47

*Bright v. Westmoreland Co.*,
380 F.3d 729 (3d Cir. 2004) ...........................................................21

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) ........................................................49

*Crown Packaging Tech., Inc. v. Ball Metal Bev. Container Corp.*,
635 F.3d 1373 (Fed. Cir. 2011) ...............................................29, 34, 39

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ..........................................................21

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) (en banc) ....................................passim

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Ergo Licensing, LLC v. CareFusion Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012) ........................................................29

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
   527 U.S. 627 (1999)..........................................................................35

*Good Sportsman Mktg. LLC v. Li & Fung Ltd.*,
   07 Civ 395, 2010 U.S. Dist. LEXIS 65458 (E.D. Tex. June 29, 2010)..............51

*Gorham Co. v. White*,
   81 U.S. 511 (1871)............................................................................52

*High Point Design LLC v. Buyer's Direct, Inc.*,
   730 F.3d 1301 (Fed. Cir. 2013) ........................................39, 40, 41, 45

*HIL-ROM v. Stryker*,
   ___ F.3d ___, 2014 U.S. App. LEXIS 12105 (Fed. Cir. June 27, 2014) ...........30

*Hilgraeve Corp. v. McAfee Assocs., Inc.*,
   224 F.3d 1349 (Fed. Cir. 2000) ..................................................34, 39

*Honeywell Int'l Inc. v. ITC*,
   341 F.3d 1332 (Fed. Cir. 2003) ..................................................27, 28

*Hupp v. Siroflex of Am., Inc.*,
   122 F.3d 1456 (Fed. Cir. 1997) ............................................40, 45, 47

*In re GPAC Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995) ..........................................................26

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
   988 F.2d 1117 (Fed. Cir. 1993) ....................................................46, 51

*Lexion Med., LLC v. Northgate Techs., Inc.*,
   641 F.3d 1352 (Fed. Cir. 2011) ........................................................20

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
   744 F.3d 1272 (Fed. Cir. 2014) (en banc) ...........................................21

iv

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*,
  730 F.2d 1452 (Fed. Cir. 1984) ..........................................................21

*Med. Inst. Of Minn. v. Nat'l Ass'n of Trade & Technical Schools*,
  817 F.2d 1310 (8th Cir. 1987) ...........................................................20

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
  527 F.3d 1330 (Fed. Cir. 2008) ...........................................29, 34, 39

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. ___, 2014 U.S. LEXIS 3818 (June 2, 2014)................................passim

*Nordock, Inc. v. Sys., Inc.*,
  927 F. Supp. 2d 577 (E.D. Wis. 2013) ..............................................51

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
  806 F.2d 1565 (Fed. Cir. 1986) ..........................................................26

*Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
  739 F.3d 694 (Fed. Cir. 2014) ...........................................................53

*PHG Techs., LLC v. St. John Cos.*,
  469 F.3d 1361 (Fed. Cir. 2006) ...........................................41, 44, 46

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................30

*Revision Military, Inc. v. Balboa Mfg. Co.*,
  700 F.3d 524 (Fed. Cir. 2012) ......................................................52, 55

*Richardson v. Stanley Works*,
  597 F.3d 1288 (Fed. Cir. 2010) ....................................................50, 51

*Rosco, Inc. v. Mirror Lite Co.*,
  304 F.3d 1373 (Fed. Cir. 2002) .......................................40, 41, 45, 49

*Savage v. Gee*,
  665 F.3d 732 (6th Cir. 2012) ............................................................20

v

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*,
  190 F.3d 1360 (Fed. Cir. 1999) ........................................................40

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co*.,
  655 F.3d 1364 (Fed. Cir. 2011) ........................................................28

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................30

*Wellman, Inc. v. Eastman Chem. Co*.,
  642 F.3d 1355 (Fed. Cir. 2011) ........................................................28

STATUTES

28 U.S.C. § 1295(a)(1) ..........................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1338(a) ..............................................................................1

35 U.S.C. § 171 ...................................................................................40

OTHER AUTHORITIES

FED. CIR. R. 32(b) ...............................................................................59

FED. CIR. R. 47.5 ..................................................................................1

FED. R. APP. P. 4(a)(1)(A) ....................................................................1

FED. R. APP. P. 32 ...............................................................................59

FED. R. CIV. P. 56(a) ...........................................................................20

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiffs-Appellants states there are no related cases to this case and there are no other cases that will be directly affected by the Court's decision in this case.

## STATEMENT OF JURISDICTION

The district court had jurisdiction in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Notice of Appeal from the Final Judgment entered on March 4, 2014 was timely filed on March 19, 2014 in accordance with FED. R. APP. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

**INTRODUCTION**

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC (collectively "Ethicon") appeal from the district court's decisions granting Covidien, Inc. and Covidien LP (collectively "Covidien") summary judgment of: (1) invalidity on U.S. Patent No. 8,182,501 ("'501 Patent"), (2) non-infringement on U.S. Patent No. 5,989,275 ("'275 Patent"), and (3) invalidity and non-infringement on U.S. Design Patent Nos. D661,801 ("'801 Patent"), D661,802 ("'802 Patent"), D661,803 ("'803 Patent"), and D661,804 ("'804 Patent") (collectively, the "Design Patents").

The patents at issue in this appeal cover important advances in the field of ultrasonic surgical instruments. In granting summary judgment of invalidity and non-infringement, the district court ignored disputed issues of material fact and failed to view the evidence in the light most favorable to Ethicon.

<u>First</u>, the district court erred in granting summary judgment that the asserted claims of the '501 Patent are invalid as indefinite. The '501 Patent relates to surgical devices that apply ultrasonic energy and force/pressure through a clamping arm that clamps down on blood vessels. The inventors unexpectedly found that, when the clamping arm is fully engaged, a particular range of clamping forces/pressures produces more reliable vessel sealing. The '501 Patent claims devices/methods operating within those ranges.

2

The district court's ruling is at odds with the Supreme Court's recent holding in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. ___, 2014 U.S. LEXIS 3818 (June 2, 2014). In granting summary judgment of invalidity, the district court ignored relevant portions of the specification when it stated that the patent provides "no guidance" as to the method of measuring clamping forces/pressures for purposes of the claims. (A0099, A0101) In fact, the specification provides the guidance that the district court said was missing. The district court also ignored Ethicon's expert's opinion that the scope of the claimed invention would have been reasonably clear to a person of skill in the art. At a minimum, there are disputed fact issues that make summary judgment of invalidity inappropriate under *Nautilus*.

Second, the district court erred in granting summary judgment that the accused Covidien Sonicision device does not infringe the '275 Patent. The '275 Patent relates to a damping sheath "configured to loosely contact the transmission rod" to absorb undesired vibrations along the rod during use of the ultrasonic surgical device. The district court erred by reading into its claim construction a requirement that the sheath's "loose contact" with the transmission rod must be at points other than at so-called "fixed support points." That requirement is not part of the ordinary meaning of the claim term and is not justified by any re-definition or disclaimer by the patentees.

After adopting this erroneous construction, the district court compounded its error on summary judgment by ignoring disputed issues of material fact on whether the accused Sonicision product meets the elements of the claim as so construed. For example, CT scans taken by Ethicon's expert show the contact necessary under the district court's claim construction. Covidien's expert disagreed with that interpretation of the scans. The district court's failure to treat this evidence as creating a triable issue of fact is reversible error.

Finally, the district court erred in granting summary judgment that Ethicon's Design Patents are invalid and not infringed. The four Design Patents claim the design of the trigger (handle), rotation knob, and activation button of ultrasonic devices. The district court invalidated these patents by finding that they were all "dictated by function." In doing so, the district court again failed to view the evidence in the light most favorable to Ethicon. In finding that the designs were dictated by function, the district court rejected fact and expert evidence showing that the designs were not "dictated by function," including evidence of alternative designs that could function as well as the patented designs.

The district court also erred in its infringement analysis. Having found the designs functional in its invalidity analysis, the district court repeated that error in its infringement analysis by factoring out the shape and placement of the handle, rotation knob and trigger, thereby distorting the proper analysis of whether the

4

accused devices are substantially similar to the patented designs. The district court also erred by failing to consider the patented designs and accused designs in the context of the prior art. Ethicon's patented designs, which Sonicision sought to reproduce, represent a departure from prior art designs of triggers, rotation knobs, and activation buttons.

For all of these reasons, the grants of summary judgment should be reversed.

## STATEMENT OF THE ISSUES

1.    As to the '501 Patent: Did the district court err in granting summary judgment that the '501 Patent is invalid as indefinite where there are disputed issues of material fact under *Nautilus, Inc. v. Biosig Instruments, Inc.* as to whether the scope of the asserted claims would be reasonably clear to a skilled artisan at the time of the patent application?

2.    As to the '275 Patent: Did the district court err in granting summary judgment of non-infringement where: (a) the district court's claim construction erroneously imported a limitation into the asserted claim, and (b) there are disputed issues of material fact as to whether the accused product meets the requirements of the claims, even under the district court's incorrect claim construction?

3.    As to the Design Patents: (a) Did the district court err in granting summary judgment of invalidity where there are disputed issues of material fact on whether the claimed designs are dictated by function; and (b) Did the district court

err in granting summary judgment of non-infringement when it factored out elements that it erroneously considered to be functional and failed to consider the patented and accused designs in the context of the prior art with which an ordinary observer would reasonably be familiar?

## STATEMENT OF THE CASE

Ethicon filed this patent infringement action on December 14, 2011. The district court issued its claim construction ruling on April 25, 2013. (A0001-A0024)

On October 21, 2013, Covidien filed the three summary judgment motions at issue here. (A1975; A2435; A2784) In response, Ethicon presented evidence, including declarations from experts in the relevant art, that presented disputed issues of material fact warranting the denial of summary judgment. (*See, e.g.*, A0177-A0180; A3595-A3606; A3617-A3618; A3649-A3651; A3659; A3684-A3688; A4281-A4282; A4356; A4394-A4427; A4807-A4818; A5570-A5576)

On January 22, 2014, the district court granted summary judgment. Copying Covidien's opening briefs almost word-for-word and without addressing much of the evidence that Ethicon presented, the district court granted summary judgment that: (1) the asserted claims of the '501 Patent are invalid as indefinite; (2) the asserted claims of the '275 Patent are not infringed; and (3) the asserted claims of

the Design Patents are invalid and not infringed.  (A0025-A0051; A0052-A0109;

A0110-A0143)

Final Judgment was entered on March 4, 2014.  (A0150-A0152)  Ethicon

timely filed a Notice of Appeal on March 19, 2014.  (A6147)

## STATEMENT OF FACTS

The patents-in-suit involve energy-based instruments, in particular, devices

that use ultrasonic energy to cut tissue and blood vessels, and seal those blood

vessels to prevent bleeding.[1]  (A0154-A0214)

## I.     THE PARTIES

Ethicon develops, manufactures, and sells innovative medical devices,

including ultrasonic surgical instruments, which it markets under the HARMONIC

brand.  (A0230; A4656)  Ethicon has been the market leader in ultrasonic surgical

devices for decades.  (A3652/131:5-18; A4235; A4664/63:18-A4665/64:6)  In

2011, Covidien launched its Sonicision brand, a competing ultrasonic surgical

instrument.  (A3520; A3639/17:25-A3642/20:14, A3643/30:12-A3646/33:6;

A4661/57:1-16)

---

[1] Ultrasonic instruments use a blade vibrating at very high frequencies of
approximately 55,000 times per second to cut and coagulate tissue.  (A2481/¶31;
A2545/¶38)

7

## II.    THE PATENTS-IN-SUIT

The patents-in-suit reflect some of Ethicon's pioneering work in the field of ultrasonic surgical instruments.

### A.    The '501 Patent

Prior art devices typically used low clamping forces, corresponding to low clamping pressures, to cut and seal blood vessels.  (A0177/1:27-52)   Conventional wisdom was that using higher clamping forces would lead to a degradation in coagulation performance (i.e., the seal on the end of the coagulated blood vessel would be weaker and more susceptible to bursting open).  (*Id.*)

Defying conventional wisdom, Ethicon engineers discovered that the use of higher clamping forces, corresponding to higher clamping pressures, actually resulted in superior performance.  (A0177/2:23-54)  The '501 Patent claims Ethicon's novel method of using the higher clamping forces/pressures and devices capable of operating at such forces/pressures.  (A0179-A0180)

Claim 17 is a representative claim.  Italics have been added to indicate the portions of the claim that the district court held were indefinite:

**17**.  An ultrasonic surgical shears comprising:

a) an ultrasonic surgical blade;

b) a clamping arm operable to open and close toward the blade;

c) a tissue pad attached to the clamping arm, wherein the blade and
    tissue pad define a clamping surface area so that the applied clamp

force does not exceed a *clamping pressure of 210 psi at the clamping surface area*; and

d) means for limiting a user applied clamping force on the clamping arm creating *an average predetermined clamping pressure between and including 60 psi and 210 psi* on tissue disposed between the tissue pad and the blade.

(A0180/7:15-26)

The specification provides guidance sufficient to allow a person of skill in the art to determine the forces and pressures (e.g., "clamping pressure . . . at the clamping surface area" and the "average . . . clamping pressure") recited in the asserted claims. In particular, the specification states:

> Ultrasonic surgical instruments are known which include ultrasonic surgical shears having an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade . . . and a device for exerting a 1.5 pound clamping force on the clamping arm which creates a clamping pressure of 45 psi (pounds per square inch) on a blood vessel which is positioned between the clamping surface area of the tissue pad and the blade. *It is noted that the clamping surface area is the area where the blade and the tissue pad are in close proximity when the clamping arm is in a closed position.*
>
>                \* \* \*
>
> The ultrasonic surgical shears also includes a device for exerting a clamping force on the clamping arm creating an *average clamping pressure* between and including 60 psi and 210 psi on tissue positioned between the tissue pad and the blade.
>
> Applicants experimentally found that applying an ultrasonic surgical shears *coaptation pressure ranging from 60 psi to 210 psi* (corresponding to a *fully-engaged clamping surface area* of 0.033 square inches and a clamping force ranging from 2 to 7 pounds) on 4.5 mm to 5 mm diameter blood vessels resulted in successful blood-vessel sealing . . . .

9

* * *

It is noted that *pressure is force per unit area . . . .* The pressures discussed herein are pressures seen by tissue when the entire clamping surface area is in contact with the tissue. *As previously mentioned, a clamping surface area is the area where the blade and the tissue pad are in close proximity when the clamping arm is in a closed position.*

(A0177/1:27-38, A0177/2:10-14, A0177/2:32-37; A0178/4:17-27; A4424-

A4427 (emphasis added))

## B.    The '275 Patent

When ultrasonic cutting devices are operated, energy is generated at the

transducer and transmitted to the blade by a transmission rod.  The transmission of

energy generates ultrasonic vibrations that travel in many directions around the

rod.  Only some of the vibrations are desirable, specifically, axial or longitudinal

vibrations (i.e., vibrations that move directly forward and backward along the

transmission rod toward the surgical blade).  (A0162/1:17-25)  Vibrations moving

in other directions lead to non-optimal performance and potential damage to the

device.  (A0162/1:17-30; A0166/9:60-64)



Prior to the '275 Patent, various methods were used to reduce undesirable vibrations from the transmission rod, including the use of dampening fluids or O-rings placed on the transmission rod. (A0162/1:31-59) The prior art methods had limitations and drawbacks, including generating too much heat and being inconvenient or impractical. (*Id.*)

The '275 Patent improves on the prior art by using a dampening member that "loosely contacts" a portion of the transmission rod. This allows the desirable vibrations to move to the blade while reducing the undesired vibrations. (A0162/2:1-60) Claim 1 is the sole asserted independent claim. Italics have been added to indicate the limitations that the district court held were not present in the accused device:

> **1.** An ultrasonic surgical device comprising:
>
> a transducer assembly adapted to vibrate at an ultrasonic frequency in response to electrical energy;

a mounting device having a first end and a second end, the mounting device adapted to receive ultrasonic vibration from the transducer assembly and to transmit the ultrasonic vibration from the first end to the second end of the mounting device, the first end of the mounting device coupled to the transducer assembly;

a transmission rod having a first end and a second end, the transmission rod adapted to receive ultrasonic vibration from the mounting device and to transmit the ultrasonic vibration from the first end to the second end of the transmission rod;

a damping member surrounding at least a portion of the transmission rod, *the damping member configured to loosely contact the transmission rod over a portion of the transmission rod*, *the damping member adapted to absorb undesired vibrations along the transmission rod* without the use of a fluid; and

an end effector having a first end and a second end, the end effector adapted to receive the ultrasonic vibration from the transmission rod and to transmit the ultrasonic vibration from the first end to the second end of the end effector, the second end of the end effector being disposed near an antinode and the first end of the end effector coupled to the second end of the transmission rod.

(A0169/16:50-A0170/17:10)

## C. The Design Patents

In 2005, Ethicon redesigned its flagship HARMONIC ACE product. The design team set out to improve upon the ergonomics of the predecessor ACE device and to create a "new signature look" for Ethicon's HARMONIC line of products. (A4567/42:7-10) As the project's lead industrial designer described it, the team sought to create a design that would "reposition the whole [HARMONIC] brand" and create a "brand look" that was "compelling" and "unique."

12

(A4567/42:5-19; *see also* A4576/69:5-8; A4582/93:14-16 ("[W]e spent a lot of time on really trying to come up with a beautiful device."))

The new design, like the old one, had to include three elements: (i) a means to open and close the jaws of the device; (ii) a means to activate ultrasonic energy; and (iii) a means to rotate the device's blade and clamp arm. The team considered numerous different design approaches to these three elements and to the device as a whole. (A5023-A5029) The end result of a two-year long process was the HARMONIC ACE-E line of products. The ACE-E features a trigger shaped like a shepherd's hook or an inverted "U" to open and close the device, immediately beneath a rounded activation button, which itself is beneath a rotation knob with six rounded flutes. All three of these elements are placed in a line at the distal end of the device's housing.



FIG. 2

As shown in the images below, and as further discussed below (*infra* pp. 52-53), prior to the invention of the Design Patents, the clamping arm of almost all

13

ultrasonic surgical devices was controlled by a thumb-ring or a loop-shaped trigger.

(A5573/¶20, A5575/¶¶28-30; A4656-A4657; A4662/61:8-24; A5008-A5009;

A5361-A5363)



Ethicon sought design patent protection for its unique designs.  Recognizing

that Ethicon's designs were original, non-obvious, and ornamental, the United

States Patent Trademark Office ("USPTO") issued the Design Patents.  A figure

from the '804 Patent, which is representative of each of the Design Patents, is

shown below:



FIG. 1

(A0211)

The solid lines in the drawing represent the claimed elements while the dotted lines are unclaimed elements. As shown in the drawing, the '804 Patent claims the trigger handle, activation button, and rotation knob.[2]

## III.    THE ACCUSED SONICISION DEVICE

In 2011, Covidien introduced the accused Sonicision ultrasonic energy device.

_____

[2] The three other Design Patents use the same drawing, just with a different combination of claimed elements. The '801 Patent claims the trigger only (A0181-A0188); the '802 Patent claims the trigger and rotation knob (A0189-A0196); and the '803 Patent claims the trigger and activation button (A0197-A0205).



Relevant for purposes of the appeal of summary judgment of non-infringement of the '275 Patent, Sonicision has a transmission rod (or waveguide) for transmitting ultrasonic vibrations to the surgical blade.  (A1985-A1986; A1999-A2000; A2173/49:18-A2174/50:8; A3544-A3545; A3560; A3595-A3602)  That rod has four raised nodes along its length and is surrounded by a clear (Teflon) damping sheath or sleeve, all shown below.  (A1985-A1986; A3560; A3595-A3602; A3649/49:3-13)  The sheath is not tightly fitted to any portion of the transmission rod.  (A3561; A3595-A3601; A3604)







The difference in diameter between the sleeve and the non-raised nodal portions of the transmission rod is quite small (0.015 inches), and both the sleeve and transmission rod are flexible. (A3560-A3561; A3599-A3602) The sleeve makes contact with both the raised nodes and points on the transmission rod other than the raised nodes. (A3595; A3599-A3604; A3617-A3618)

Relevant for purposes of the appeal of summary judgment of non-infringement of the Design Patents, Covidien designed Sonicision to have a "U"-shaped trigger, activation button, and rotation knob like the patented design rather than the prior art designs shown above.

17



'804 Patent                    Sonicision

## IV.   THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT

After the close of discovery, Covidien moved for summary judgment on various issues.  Ethicon opposed the motions by presenting detailed evidence, including fact and expert witness testimony, which demonstrated that there are disputed issues of material fact.  (*See, e.g.*, A3595-A3606; A3617-A3618; A3649-A3651; A3659; A3684-A3688; A4394; A4356; A4395-A4396; A4807-A4818; A5570-A5576)

The district court did not address much of this evidence.  Instead, the district court's opinions on summary judgment are virtually word-for-word copies of Covidien's opening summary judgment briefs,[3] with little or no discussion of the evidence that Ethicon presented in opposing summary judgment.  (*Compare*

---

[3] As to the '275 Patent, the district court's opinion also copied Covidien's reply brief.  (*Compare* A0043-A0045, A0046-A0050 *with* A5585-A5587, A5589-A5593)

A0099-A0109 *with* A2462-A2471 ('501 Patent); *compare* A0041-A0043, A0045-A0046, A0050-A0051 *with* A1988-A1990, A1990-A1991, A1991-A1992 ('275 Patent); and *compare* A0126-A0131, A0131-A0143 *with* A2812-A2816, A2818-A2830 (Design Patents))

## SUMMARY OF ARGUMENT

Rather than identify triable issues of fact, the district court used Covidien's summary judgment motions to resolve disputed issues of fact and conflicting expert opinions in Covidien's favor. The district court's opinions largely ignore Ethicon's evidence.

As described below, Ethicon's argument and supporting expert opinion on indefiniteness, at a minimum, create a disputed issue of fact as to whether a person of ordinary skill would have understood how to determine whether the clamping arm was providing the force/pressure required by the claims of the '501 Patent. For this reason, the district court's holding of indefiniteness should be reversed.

The district court also erred in its claim construction of claim 1 of the '275 Patent by improperly importing a claim limitation. Even under the district court's erroneous claim construction, Ethicon provided sufficient evidence of infringement to warrant a trial on the merits.

Finally, the district court erred in its approach both to invalidity and infringement on the Design Patents. On a summary judgment record containing

conflicting expert opinions and ample evidence that there were equally effective alternative design options, the district court nonetheless found that Ethicon's Design Patents were "dictated by function." This error infected both its invalidity and infringement analysis.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment under the law of the regional circuit. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011). The Sixth Circuit reviews an order granting summary judgment de novo. *Savage v. Gee*, 665 F.3d 732, 737 (6th Cir. 2012).

A court should only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a summary judgment motion, the court must "view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F. 3d 888, 892 (6th Cir. 2003) (citations omitted); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The court's role on summary judgment is "not . . . weigh[ing] the evidence and determin[ing] the truth of the matter, but … determin[ing] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Med. Inst. Of Minn. v. Nat'l Ass'n of Trade & Technical Schools*, 817 F.2d 1310, 1315 (8th Cir. 1987) ("A judge does not sit as a trier of

fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury.").

This Court reviews claim construction de novo.  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-66 (Fed. Cir. 2014) (en banc).

## ARGUMENT

The district court largely copied Covidien's opening briefs without further analysis.[4]  As a result, it failed to address much of the evidence that Ethicon presented in response.  As discussed below, the evidence that the district court ignored creates disputed issues of material fact—particularly when viewed in a light most favorable to the non-movant, Ethicon.

---

[4] This Circuit and others have questioned this practice.  *See, e.g.*, *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co*., 730 F.2d 1452, 1457-1458 (Fed. Cir. 1984) (reversing district court's factual findings as clearly erroneous where the findings adopted by the district court were proposed by a party before trial, warning that "an apparent absence of personal attention [by the district court] need not be disregarded" and "the language in an opinion . . . may indicate that numerous harmful errors of law produced an erroneous conclusion"); *Bright v. Westmoreland Co*., 380 F.3d 729, 732 (3d Cir. 2004) ("When a court adopts a party's proposed opinion as its own, [it] vitiates the vital purposes served by judicial opinions."); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990) ("Judicial adoption of an entire brief . . . withholds information about what arguments, in particular, the court found persuasive, and why it rejected contrary views. Unvarnished incorporation of a brief is a practice we hope to see no more.").

## I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INDEFINITENESS ON THE '501 PATENT

The district court's grant of summary judgment of invalidity of the '501

Patent is error under the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig*

*Instruments, Inc.*, 572 U.S. ___, 2014 U.S. LEXIS 3818 (June 2, 2014).  Under

*Nautilus*, "the definiteness inquiry trains on the understanding of a skilled artisan at

the time of the patent application, not that of a court viewing matters *post hoc*."

2014 U.S. LEXIS 3818, at *23.  Applying the standard that the Supreme Court

adopted in *Nautilus*, summary judgment of indefiniteness is improper unless the

undisputed evidence—viewed with "all reasonable inferences [drawn] in favor of

the nonmoving party," *Banks*, 330 F. 3d at 892—establishes that "[the] claims, read

in light of the specification delineating the patent, and the prosecution history, fail

to inform, with reasonable certainty, those skilled in the art about the scope of the

invention."  *Nautilus*, 2014 U.S. LEXIS 3818, at *6.  As the Court concluded, "the

certainty which the law requires in patents is not greater than is reasonable, having

regard to their subject matter."  *Id.* at *22.

Under *Nautilus*, the understanding of those skilled in the art, in view of the

claims and the specification, is central to the indefiniteness inquiry.  *Id.* at *23.

Here, the evidence from experts on that subject was very much in dispute.

Each claim of the '501 Patent requires the method/device to operate within a

range of clamping forces/pressures.  (A0179-A0180)  The district court held that

the claims were indefinite because there is: (1) "ambiguity of . . . [the answer to] the question of where along the length of the clamping arm the force measurements should be made" (A0101) and, (2) ambiguity of the proper "distance between the clamp and blade" when the force measurement is taken (A0103). The district court found that, depending on how these questions are answered, the measurements will "yield[] significantly different results." (A0102)

The district court's finding of "ambiguity" ignores the language in the specification, the prior art, and the opinion of Ethicon's expert on how a skilled artisan would understand the scope of the claims of the '501 Patent at the relevant time period. Quoting from Covidien's opening summary judgment brief, the district court stated that there was "no disclosed method of measurement [of clamping forces/pressures] in the patent and no guidance as to whether the value determined was applicable to the patent claims." (A0099) This is incorrect. The specification provides the guidance that the district court said was missing. A skilled artisan reading the specification and claims would understand that measurements are to be taken: (1) when the clamp arm and blade are in a closed position, and (2) in a manner that reflects the average pressure or force of the clamping surface area, such as the midpoint of the clamping arm.

The specification expressly states that the force/pressure is measured when the clamping arm is in a closed position:

> The pressures discussed herein are pressures seen by tissue when the
> entire clamping surface area is in contact with the tissue. *As
> previously mentioned, a clamping surface area is the area where the
> blade and the tissue pad are in close proximity when the clamping
> arm is in a closed position.*

(A0178/4:23-27 (emphasis added))

Ethicon's engineering expert, Mark Schafer, Ph.D., testified that a skilled

artisan, reading the intrinsic record, would understand that the measurements under

the '501 Patent are to be taken when the clamp arm and blade are in a closed

position. (A4281-A4282; A4394/¶¶145-46; A4395-A4396/¶149; A4400/¶158) Dr.

Schafer also testified that a skilled artisan would understand how to measure the

force/pressure in order to calculate the average pressure or force of the clamping

surface area,[5] by using the midpoint of the clamping arm:

> The claim and descriptions tell one of skill in the art that the pressure
> of interest is the average pressure applied across the clamping surface
> area when the clamping arm is in its closed position. A recognized
> method for determining average force is to measure the clamping
> force at the middle of the clamp arm (e.g., Whipple, Col. 13:7-12).
> Average pressure is determined by dividing average force by the
> clamping surface area. ('501 Patent, Col. 4:17-18).

(A4427/¶¶247-48) In his opinion as to how one of skill in the art would

understand the claims, Dr. Schafer relied on the references to "average"

pressure and "closed position" in the patent. He also relied on the Whipple

Patent cited by Dr. Schafer refers to U.S. Patent No. 5,947,984 ("'984

___

[5] Pressure is force divided by area. (A0178/4:17)

24

Patent"), prior art to the '501 Patent, which discloses the use of the midpoint

of the clamping arm for measuring force/pressure. (A4427/¶247) Dr.

Schafer, relying on the '984 Patent and the laws of physics, opined that:

> [O]ne of skill in the art knows that the force measurement is generally
> linear with distance along the lever arm, thus taking the force at the
> midpoint of the active portion of the clamping arm would be
> representative of the average forces delivered by the clamping arm.
> Thus, it makes common sense to take the force measurement and
> calculate pressure based on measurements at the midpoint.

(A4356/¶102)

In response, Covidien's expert argued that there were numerous ways

to measure clamping force/pressure and that these "different ways" would

lead to varying results. But as Dr. Schafer explained:

> I do not dispute that there are a number of different ways to measure
> clamping force in general, but the '501 [P]atent is directed towards a
> specific inquiry of finding average clamping pressure at the clamping
> surface area when the clamp jaw is in the closed position. Most of the
> methodologies that he identifies are not relevant to that inquiry. For
> example, measuring force with the clamp jaw open at an angle (¶¶
> 494, 496, 497, 499, 500) provides a clamping force, but does not lead
> to the average pressure as required under the patent. One of skill in
> the art would also understand th[at] taking a measurement at the tip of
> the clamp arm does not provide the average clamping pressure (¶ 495,
> Covidien's method).
>
> * * *
>
> [T]he specific words of the claims and specification make clear that
> the average pressure is the average pressure seen at the surface area
> when the clamp arm is closed.
>
> * * *

25

> The midpoint of the clamping arm is a point that has been recognized by those of skill in the art as an appropriate place to measure force to determine average clamping pressure. . . . [T]he use of the midpoint will provide information about the average of the pressures seen across the clamping surface area.

> \* \* \*

> [Covidien's expert Dr.] Durfee's tests, which show variable results, are based on parameters which are outside of the bounds of the patent, which focuses specifically on average clamping pressures with the clamp arm fully closed.

(A4427/¶¶248-49, A4431/¶261, A4432/¶264)

The district court improperly resolved disputes on these issues between the two experts in Covidien's favor rather than Ethicon's, and in doing so ignored much of Ethicon's evidence.  For example, the district court completely ignored Dr. Schafer's reference to the '984 Patent as being reflective of what a skilled artisan would understand about determining the average.  The omission of any discussion of the '984 Patent indicates the district court's failure to evaluate definiteness from the perspective of a skilled artisan fully informed of all relevant art within the field.  *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc*., 806 F.2d 1565, 1576 (Fed. Cir. 1986) ("Whether a claim is invalid . . . for indefiniteness requires a determination whether those skilled in the art would understand what is claimed."); *see also In re GPAC Inc*., 57 F.3d 1573, 1579 (Fed. Cir. 1995) ("The

person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art.").

In addressing Dr. Schafer's opinion regarding the use of the midpoint, the district court stated:

> [W]hen asked to point to where in the '501 patent this "midpoint measurement" appeared – Plaintiffs' expert, Dr. Schafer had no answer. This attempt to interject a measurement at the midpoint in the claims when no location is disclosed in the patent is improper. *See Honeywell*, 341 F.3d at 1340-41 (rejecting expert's use of a single method when "the intrinsic evidence cannot be construed to eliminate all other known methods" applicable to obtaining the claimed measurements).

(A0106 (some citations omitted))

But this ignores Ethicon's evidence that a skilled artisan would understand, based on the teaching of the prior art such as the '984 Patent, where to measure clamp pressure. The indefiniteness inquiry is not limited to what is specifically disclosed in the specification, but encompasses the knowledge of the skilled artisan as well. *See Nautilus*, 2014 U.S. LEXIS 3818, at *6.

The district court's reliance on *Honeywell International Inc. v. ITC*, 341 F.3d 1332, 1341 (Fed. Cir. 2003), also is misplaced. In *Honeywell*, which did not involve a dispute of material facts,[6] this Court held that a patent must specify the

---

[6] *Honeywell* is premised on undisputed facts. *Honeywell*, 341 F.3d at 1339 ("The [lower court made] a finding of fact that the choice of sample preparation method is critical to discerning whether a particular product is made by a process that

appropriate standard or method of measurement if—without such instructions in the patent—a skilled artisan would otherwise be unable discern the proper methodology for practicing a claimed invention.  *Honeywell*, 341 F.3d at 1340-43. Importantly, this Court does not require invalidation of a patent *simply* because a patent fails to fully delineate a method of measurement.  The omission of details about how to implement the method will invalidate the claim *only if* a skilled artisan could not infer those details from industry standards or professional judgment.[7]

*Nautilus* recognized how fundamental the understanding of the skilled artisan is in assessing definiteness.  Here, Dr. Schafer provided a detailed, reasoned opinion grounded in the intrinsic record and the common knowledge of a skilled artisan.  The fact that Covidien and its expert disagreed with Dr. Schafer's opinion is a "conflict in [expert] declarations [which] created a genuine issue of material

infringes the '976 patent claims. Honeywell does not challenge that finding on appeal."); *id*. at 1336 ("No one challenges those findings on appeal.").

[7] This Court has repeatedly reversed district courts that rely on *Honeywell* to invalidate patents without considering whether a person of ordinary skill in the art can discern how to take measurements specified in a claim.  *See Wellman, Inc. v. Eastman Chem. Co*., 642 F.3d 1355, 1367 (Fed. Cir. 2011) (reversing a ruling of indefiniteness where it determined that "industry guidance" would have indicated to a person of ordinary skill how to conduct measurements specified in the patent);  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co*., 655 F.3d 1364, 1374 (Fed. Cir. 2011) (upholding the validity of a claim even though the patent did not specify quantitative limits because a person of ordinary skill "would possess adequate understanding to manipulate these variables" to practice the claimed invention).

fact that made summary judgment inappropriate." *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008); *see also Crown Packaging Tech., Inc. v. Ball Metal Bev. Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate.").

In sum, the district court ignored the disputed issues of material fact and failed to draw reasonable inferences in Ethicon's favor. *See Anderson*, 477 U.S. at 255. As this Court has recognized, all "close questions of indefiniteness . . . are properly resolved in favor of the patentee." *Ergo Licensing, LLC v. CareFusion Inc.*, 673 F.3d 1361, 1367 (Fed. Cir. 2012) (internal quotation marks omitted). For these reasons, the holding of indefiniteness should be reversed.

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT ON THE '275 PATENT

The district court held that Sonicision does not infringe the sole asserted independent claim of the '275 Patent because it failed to meet the limitation that "the damping member [is] *configured to loosely contact* the transmission rod over a portion of the transmission rod." (A0169/16:64-A0170/17:2 (emphasis added)) The district court's non-infringement finding was based on an erroneous claim construction. Even under the erroneous construction, summary judgment was

29

improper in light of disputed issues of material fact.  The district court also found

no infringement because Sonicision did not meet the limitation of having a

"damping member adapted to absorb undesired vibrations along the transmission

rod without the use of a fluid."  (A0045, A0051)  The existence of disputed issues

of material facts makes this finding erroneous as well.

### A.   The District Court Erred In Its Construction of "Configured to Loosely Contact" the Transmission Rod

The district court erroneously imported a limitation into the construction of

"configured to loosely contact" the transmission rod.  "It is a 'bedrock principle' of

patent law that 'the claims of a patent define the invention to which the patentee is

entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (en banc) (citation omitted).  This Court "will only interpret a claim

term more narrowly than its ordinary meaning under two circumstances: '1) when

a patentee sets out a definition and acts as his own lexicographer, or 2) when the

patentee disavows the full scope of a claim either in the specification or during

prosecution.'"  *Aventis Pharma SA v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir.

2012) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365

(Fed. Cir. 2012)); *see also HIL-ROM v. Stryker*, ___ F.3d ___, 2014 U.S. App.

LEXIS 12105, at *4 (Fed. Cir. June 27, 2014).

Instead of adopting a construction of "configured to loosely contact" that is

consistent with its ordinary meaning—such as Ethicon proposed: "[c]ontacting or

capable of contacting portions of the transmission rod, but not tightly fitted" (A1625-A1626)—the district court read in an extraneous requirement. Accepting Covidien's construction, the district court construed "configured to loosely contact" to mean "structured to have contact *other than at fixed support points*, but not tightly fitted." (A0014-A0015 (emphasis added))  This requirement excludes portions of the transmission rod that are in contact with the sheath.  However, this is not part of the ordinary meaning of the phrase "configured to loosely contact," nor is such a limitation supported by any redefinition or disclaimer by the two patentees.

The specification distinguishes between loose contact of the invention in the '275 Patent and the prior art's use of silicon rings *attached* to the transmission rod at the nodes (locations on the transmission rod which the district court refers to as "fixed support" points).  (A0166/10:7-17)  What the district court failed to recognize is that the prior art silicon rings are distinguished in the '275 Patent specification based on the type of contact involved (the rings were tightly fitted or attached) rather than where on the transmission rod the contact occurs.  The following quotes make this clear: *Compare* A0162/1:31-40 ("Isolation mounts, such as O-rings, may be mounted around the periphery of the acoustic assembly at positions of minimal axial ultrasonic activity (i.e. nodes) . . . .  The shaft . . . has . . silicone rings disposed near nodes of the shaft . . .") *with* A0166/9:58-60 ("The

31

damping sheath 160 is preferably in light contact with the transmission rod 86 to absorb unwanted ultrasonic energy from the transmission rod 86."); *see also* A0166/10:7-13 ("The damping sheath 160 is more effective than using silicone rubber rings located only at nodes of longitudinal vibration because the damping sheath 160 can dampen transverse motion occurring near multiple antinodes of the unwanted vibration which are located randomly along the length of the transmission rod 86 relative to the nodes and antinodes of the desired longitudinal vibration."))

The intrinsic record simply does not limit where the "loose contact" can occur. The district court's construction confuses the concept of type of the contact (attached/tight versus loose) with the location of the contact (fixed support points).

Absent this imported claim limitation, it is undisputed that Sonicision's sleeve is "configured to loosely contact the transmission rod." It contacts the transmission rod and is not tightly fitted. (A1988; A3561/¶¶73-78; A3595/¶57-A3602/¶61, A3604/¶67) Covidien admitted and the district court found that the "sleeve is structured to have contact with the waveguide . . . at the nodal ribs." (A0043; A1988; A5586)

## B. Even Under Its Construction, the District Court Erred In Granting Summary Judgment of Non-Infringement

Even under the district court's incorrect claim construction, there are genuine issues of fact that preclude summary judgment as to whether Sonicision's

sleeve is "structured to have contact other than at fixed support points, but not tightly fitted."

Ethicon's expert Dr. Schafer opined that Sonicision's sleeve is "structured to have contact other than at fixed support points, but not tightly fitted," as required by the district court's construction. (A3600-A3602; A3604/¶67) Dr. Schafer relied on, among other things, two sets of high-resolution CT scans. In his opinion, both sets showed loose contact between Sonicision's sleeve and transmission rod at both the raised nodal points (the "fixed support points") and at points "other than the fixed support points." (A3562-A3563; A3602/¶61-A3603/¶65; A3617-A3618; A3684/¶5-A3687/¶12)

Dr. Schafer explained in his report that the first set of CT images showed that Sonicision's sleeve "made contact with the transmission rod at several places on the transmission rod, including at points . . . where the transmission rod was a nominal diameter"—that is, at points other than the fixed support points. (A3603; A3617-A3618) As to the second set of CT scans he performed, Dr. Schafer explained that "[t]hese scans confirm the contact [he] saw and reported in [his] initial report." (A3687/¶12)

Covidien's expert, Dr. Durfee, corroborated Dr. Schafer's finding of contact in CT image 9(e), one of the images in Dr. Schafer's first set of scans, admitting that "the sheath touches in one location" other than a fixed support point.

33

(A3671/¶107; *see also* A3618; A3526-A3527; A3562)  Dr. Durfee tried to explain away this infringing contact, arguing that, in his opinion, it resulted from a wrinkled sleeve, "a nonconforming component that resulted from misassembly or mishandling."  (A3671-A3672)  Yet Dr. Durfee admitted in his deposition that he had no evidence supporting his "wrinkle" theory.  He never discussed it with any of Covidien's engineers, never gathered any information concerning Covidien's manufacturing quality control procedures, and never gathered any data concerning the frequency with which Sonicision devices are produced with "wrinkles." (A3630/81:13-A3631/82:11)

Dr. Durfee also took CT scans.  In his opinion, they do not show the requisite contact.  But, Dr. Schafer disagreed, testifying that "some of Dr. Durfee's images show contact."  (A3687/¶11)  This is a classic "battle of the experts" making summary judgment improper.  *Hilgraeve Corp. v. McAfee Assocs., Inc.*, 224 F.3d 1349, 1352-53 (Fed. Cir. 2000) (vacating grant of summary judgment of no infringement when "conflicting allegations of experts le[ft] material factual questions unanswered"); *see also Metro. Life,* 527 F.3d at 1338-39; *Crown Packaging*, 635 F.3d at 1384.

The district court ignored Dr. Durfee's admission that one of the scans showed the requisite contact and failed to consider the second set of scans from Dr. Schafer, stating without explanation that they were not "material to the Court's

resolution of the relevant dispositive motions." (A6146) To the contrary, the scans were highly material evidence that provided additional visual proof of the contact between the sleeve and transmission rod.

The district court also relied on Covidien's self-serving assertion that the sleeve in Sonicision was "specifically designed to avoid contact" at locations other than the fixed support points. (A0042; A0044) Therefore, the district court found it was not "structured" to be in loose contact with the transmission rod.

What Covidien supposedly intended to do has no bearing on the actual structure and performance of its accused device. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 645 (1999) ("Actions predicated on direct patent infringement . . . do not require any showing of intent to infringe . . . ."). The question is, as configured, does the sleeve contact the transmission rod. Ethicon submitted credible expert testimony that the structure of the sleeve resulted in the required contact.

As Ethicon demonstrated, the Sonicision is designed with a flexible sleeve into which a flexible, vibrating transmission rod is placed and the clearance between the two is very small (0.015 inches). (A3529; A3561/¶¶72-78; A3599-A3602/¶61, A3604/¶67) As Ethicon's expert explained, given the structure of Sonicision, the requisite contact is not just possible, but inevitable. (*Id.*) Indeed, the requisite contact was found in every Sonicision that Ethicon tested. (A3526-

A3527; A3562-A3563; A3602-A3604; A3617-A3618; A3684/¶5-A3687/¶12)

Based on this record, summary judgment should not have been granted.

### C. The District Court Erred In Finding That Sonicision's Sleeve Is Not "Adapted to Absorb Undesired Vibrations"

The district court also erred in finding that Sonicision's sleeve is not

"adapted to absorb undesired vibrations" as required by claim 1 of the '275 Patent.

Ethicon presented substantial evidence that the sleeve in Sonicision is adapted to

absorb undesired vibrations.

#### 1. Covidien Admitted That Sonicison's Sleeve Was Designed To Prevent Metal-to-Metal Contact, a Form of Undesired Vibrations

Covidien's own witnesses confirmed that Sonicision's transmission rod

experiences undesired vibrations, which in the absence of the sleeve would result

in metal-to-metal contact.  According to Patrick Dumbauld, a Covidien engineer,

the Teflon sleeve is "designed to contact" the waveguide—or transmission rod—in

order to "prevent the waveguide from touching the inner diameter of the inner

tube."  (A3649/49:9-16)  Metal-to-metal contact occurs when the transmission rod

vibrates into the inner tube.  (A3531; A3564/¶¶93-94; A3604/¶69-A3606/¶73;

A3649/49:9-A3651/51:24; A3659/42:6-11)  As Mr. Dumbauld explained, this is

because "the waveguide *vibrates* and it's made of titanium, and the inner tube is

made of steel," the sleeve is necessary to "reduce the probability of any squealing

associated with those two touching each other."  (A3649/49:17-25 (emphasis

added))  This explanation was confirmed by Robert Stoddard, another Covidien engineer, who testified that the purpose of the sleeve is "[p]rimarily to prevent contact of the nodal ribs directly with the inner tube to prevent squealing or rubbing of those two parts where it became an audible -- an audible nuisance to the user."  (A3659/42:6-11; *see also* A3650/50:18-A3651/51:14 (confirming that squealing results from the metal-to-metal contact caused by the waveguide vibrating into the inner tube))

Covidien also admitted that the express purpose of the sleeve in Sonicision is to "act as a buffer that prevents direct metal-to-metal contact between the waveguide's [transmission rod] raised nodal ribs and the surrounding inner tube."  (A5586; A2006/¶57; A2172/42:6-11)  This is an admission that the sleeve is adapted to absorb undesired vibrations.

Echoing Covidien's witnesses, Dr. Schafer confirmed that, absent the sheath, undesired vibrations would cause metal-to-metal contact: "[m]etal to metal contact between the vibrating transmission rod and the stationary inner tube would be caused by the transmission rod vibrating in an undesired way (i.e., vibrating into the inner tube)."  (A3606; *see also* A3564/¶73)  From this, Dr. Schafer concluded that "Covidien's use of the damping sheath absorbs these unwanted vibrations." (A3606)

The district court erred in completely ignoring Ethicon's evidence that showed the Sonicision's transmission rod produced undesired vibrations.

### 2. Covidien's "Droplet" Tests Demonstrated Undesired Vibrations

In an effort to prove non-infringement, Covidien performed tests in an effort to show the absence of any undesired vibrations. (A1991; A2004/¶50; A2167-A2168) Droplets of water or glycerin were placed on Sonicision's transmission rod while it vibrated. (A2167-A2168) According to Covidien's expert, the theory behind the tests was that if the droplet did not splatter off of the transmission rod, then Sonicision did not experience undesired vibrations. (*Id.*) If the droplet did splatter, then Sonicision did experience undesired vibrations. (*Id.*)

Covidien's expert claimed that none of these tests showed signs of undesired vibrations. (*Id.*) Ethicon's expert, Dr. Schafer disagreed. Dr. Schafer noted that Covidien's expert had overlooked a portion of one of the videos that clearly showed the test fluid splattering off of the transmission rod. (A3565/¶102; A3688/¶16) Dr. Schafer observed that the videos of Dr. Durfee's droplet tests "show that there are undesired vibrations in Sonicision" since they "show[] the test fluid flying directly off of the transmission rod." (A3688/¶16) Thus, as Dr. Schafer opined, "[t]his is evidence of the existence of undesired vibrations in Sonicision." (*Id.*) But Dr. Schafer did not stop there. He repeated Dr. Durfee's

droplet tests, and again "observed the test fluid flying off tangentially from the transmission rod."  (A3688/¶17)

Here, as elsewhere, the district court resolved a basic fact dispute in Covidien's favor when it stated that "Defendants' water droplet testing[] demonstrates that Sonicision does not experience significant unwanted transverse vibrations to be absorbed."  (A0050)  The district court ignored Dr. Schafer's testimony regarding Covidien's tests and also ignored the results of Dr. Schafer's own droplet tests.  This evidence creates issues of material fact making summary judgment inappropriate.  *See Hilgraeve*, 224 F.3d at 1352-53; *Metro. Life*, 527 F.3d at 1338-39; *Crown Packaging*, 635 F.3d at 1384.

## III.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF INVALIDITY AND NON-INFRINGEMENT ON THE DESIGN PATENTS

The district court also erred in granting summary judgment that the Design Patents are invalid and not infringed.  Essentially, the district court confused the fact that the designs *have* functions (a requirement for design patentability) as meaning that they are *dictated by* function (and are therefore invalid).  *See High Point Design LLC v. Buyer's Direct, Inc.*, 730 F.3d 1301, 1316 (Fed. Cir. 2013) ("[T]he fact that the article of manufacture serves a function is a prerequisite of design patentability, not a defeat thereof." (citation omitted)) (reversing a judgment of invalidity).  This error infected both the validity and infringement analysis.

39

In addition, the district court's infringement analysis improperly applied the "ordinary observer" test as articulated by *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc), by neglecting to compare the patented and accused designs in the context of the prior art.  As described below, for both validity and infringement, the district court ignored Ethicon's evidence and improperly resolved disputed fact issues.

**A.    The District Court Erred In Granting Summary Judgment of Invalidity**

A design patent may be granted to "[w]hoever invents any new, original and ornamental design for an article of manufacture."  35 U.S.C. § 171.  To be protectable, "the design must not be governed solely by function, i.e., that this is not the only possible form of the article that could perform its function."  *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002) (quoting *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1368 (Fed. Cir. 1999)).  A design patent is invalid if the design is "'dictated by' the utilitarian purpose of the article." *High Point*, 730 F.3d at 1315; *see also Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed. Cir. 1997) ("A design or shape that is entirely functional, without ornamental or decorative aspect, does not meet the statutory criteria of a design patent.").

"[V]arious factors may help determine whether a claimed design, as a whole, is 'dictated by' functional considerations." *High Point*, 730 F.3d at 1315. Relevant factors include:

> [1] whether the protected design represents the best design, [2] whether alternative designs would adversely affect the utility of the specified article; [3] whether there are any concomitant utility patents; [4] whether the advertising touts particular features of the design as having specific utility; [5] and whether there are any elements in the design or overall appearance clearly not dictated by function.

*Id.* (quoting *PHG Techs., LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006), in turn quoting *Berry Sterling Corp. v. Pescro Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997)).

A paramount consideration is whether alternative designs exist that would function as well as the patented design. "[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional." *Rosco*, 304 F.3d at 1378.

As described below, Ethicon submitted ample evidence that the patented designs were *not* dictated by function.

### 1. Whether the Patented Designs Are Dictated by Function Is a Disputed Issue of Fact

In granting Covidien summary judgment of invalidity, the district court ignored Ethicon's evidence that alternative designs would work as well as the Design Patents—evidence that the Design Patents are not dictated by function.

Ethicon's expert, Alan Ball, a practicing industrial designer with experience

designing hand-held medical devices, opined that "there are many different designs

that would function just as well" as the patented designs. (A4807-A4808; A4812-

A4813; A4817; *see also* A4809-A4812; A4814-A4816; A4818) In fact, Mr. Ball

opined that he was "confident that either [he] or [Covidien's expert] Mr. Kemnitzer

could design a *better* trigger for a handheld surgical device with improved

functionality and an entirely different appearance than the asserted design."

(A4810 (emphasis added))

For example, Mr. Ball opined that the following designs would work *better*

*than* Ethicon's patented trigger design by providing a surer grip and more surface

area against which to apply force in a distal direction:



(A4808, A4811-A4812)

Mr. Ball also identified the following prior art designs for hand-held surgical

device triggers, which function just as well as the claimed designs:



(A4809, A4811)

There are also many other alternative designs for hand-held surgical devices featured in the prior art, some of which feature a "U"-shaped trigger of the type the district court found functional. For example:



(A4808, A4814, A4828-A4829/¶70.a)

The lead inventor of the Design Patents, Dan Price, agreed that there are alternative designs that have functional advantages over the patented designs. He stated that "some of the design concepts [Ethicon] did not choose work better in certain respects than the concepts [Ethicon] chose." (A5573) Specifically, Mr.

Price identified the perceived or actual advantages of other designs related to the shape of the trigger (A5573-A5574), the size and location of the rotation knob (A5574-A5575), and the nature of the activation button (A5575).

Even Mr. Kemnitzer, Covidien's expert, pointed out that "there's always options to make changes in the way something looks" (A5185/92:19-21), admitting that "it's possible to make -- to design another handle that would work, that would work well, would function well" yet "look different" (A5214/199:21-A5215/200:25), and in fact that there are "a number of examples" of different looking triggers having the same functional aspects as the patented design (A5209/182:17-A5210/183:12).[8]

Whether a design is entirely functional and lacking any ornamental or decorative aspect typically is a question of fact. *PHG Techs.*, 469 F.3d at 1365. The issue is not suitable for resolution on summary judgment where, as here, there are disputed fact issues as to "functionality" when viewing the evidence in the light most favorable to Ethicon. *Anderson*, 477 U.S. at 255.

Ignoring the alternative designs identified by Ethicon's expert, the district court instead compared the various features covered by the Design Patents (the

---

[8] Market research showed that some consumers thought alternate designs worked better than the patented designs. (A5496) For instance, Covidien's pre-market prototype testing indicated that some users did not like the U-shaped trigger and preferred a loop trigger. (A4896, A4911; A4925)

44

trigger, rotation knob, activation button) to a single alternative (each found in a

prior Ethicon device), and then concluded that the asserted designs worked better.

(A0127-A0128)

But the mere fact that the asserted designs function better than a *particular*

device does not prove that the patented designs are *dictated* by functional

considerations. *Rosco*, 304 F.3d at 1378 ("The mere fact that the invention

claimed in the design patent exhibited a superior field of view over a single

predecessor mirror . . . does not establish that the design was 'dictated by'

functional considerations . . . .").

By ignoring the evidence that alternative designs could achieve the same

function, the district court committed an error that this Court has cautioned against:

confusing the fact that a design has a function with the idea that the design itself is

*dictated* by its function. *High Point*, 730 F.3d at 1316; *Hupp*, 122 F.3d at 1460

("[T]he fact that the article of manufacture serves a function is a prerequisite of

design patentability, not a defeat thereof. The function of the article itself must not

be confused with 'functionality' of the design of the article."). Although the

Design Patents show a design for a useful object—for example, a trigger that can

be used to open and close the jaws of a handheld ultrasonic surgical device—"a

distinction exists between the functionality of an article or features thereof and the

functionality of the particular design of such article or features thereof that perform

45

a function." *Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1563 (Fed. Cir. 1988).

As Ethicon's evidence and alternative designs demonstrated (*see supra* pp. 40-43), even though the components shown in the Design Patents have functions, this does not mean that they could not be designed to look different and yet have the same functionality. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) (the fact that elements of a design perform functions "does not mean that the specific design of each element, and the combination of these elements into the patented design, is dictated by primarily functional considerations").

Moreover, Covidien's reliance on the functionality of a few components of the design in advertising does not render the *entire* design incapable of design patent protection. What matters is the overall appearance. *See PHG Techs.*, 469 F.3d at 1366 ("'[T]he determination of whether the patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its overall appearance.'" (quoting *Berry*, 122 F.3d at 1455)). Ethicon's advertising emphasizes the aesthetics of the patented designs through multiple large, close-up, high-resolution color photographs of the device. (A3192-A3204) Referring to functional advantages of certain elements of the product does not demonstrate that the *overall* design is dictated by function.

46

The district court's finding that "each and every aspect claimed in the Design Patents is clearly dictated by function" (A0131) ignores Ethicon's evidence.  For example, Ethicon demonstrated that the use of curves in the design of the trigger is not dictated by function.  As Mr. Price testified, many of the curved forms on the trigger were chosen because they lent a more "graceful look" to the design, giving it "a more aesthetic, artistic gracefulness." (A4603/271:22-23) Moreover, he acknowledged that other approaches are possible without sacrificing ergonomics.  (A4603/271:24-A4604/272:13 ("[M]y feeling was that a very, you know, curvy device fits better in your hand and it has more of a graceful look to it, it has a more aesthetic, artistic gracefulness quality to it.  But there's other designers that would take a different approach. And you can have some very nice designs that are, you know, a lot more linear.  And you can . . . make that ergonomically good."); A4611/279:20-A4612/280:18 (noting that many of the curves were added to the design to create a "unity" of design, "more of a friendly, welcoming kind of overall feel," and a "visual impression of the aesthetics [that] is inviting"))  In sum, conflicting evidence on whether the designs in question are dictated solely by function should not have been resolved on summary judgment.

## 2.     The District Court Erred In Its Application of the Other Factors Identified In *Berry*

The district court also erred in its analysis of the other factors identified in *Berry*, 122 F.3d at 1456.  For example, the district court concluded that the Design

Patents "embody the optimal design" for an ultrasonic surgical product. (A1027)

But Covidien's own expert conceded there is no "best design" for a product such

as this. (A5172/33:13-A5173/34:2 ("[O]ne of the misunderstood concepts of

ergonomics is that there is one solution that is ideal . . . ."); A5177/38:15-

A5178/39:2 ("I don't think there's an ultimate design for anything . . . .");

A5213/186:2-23; A5223/276:10-22; *see also* A4806-A4807; A4999/273:18-

A5000/274:13)

The fact that Ethicon preferred the patented designs over other designs it

tested does not make the chosen design objectively the "best design" or make the

alternative designs identified by Ethicon's expert irrelevant. Ethicon selected the

designs reflected in the Design Patents not because no other design could work as

well, but rather because Ethicon concluded that surgeons may prefer the selected

designs, visually and ergonomically. (A4596/214:17-A4597/215:25; A5573-

A5574/¶¶19-22)

This does not make other design alternatives irrelevant nor does it make the

design selected the "best." As noted above, Ethicon's expert testified that the

alternative designs he identified would not adversely affect the utility of the device.

In his view, the alternative designs would have performed *better* than the patented

designs. (*See supra* Section III.A.1.; A4808, A4811-A4812; *see also* A5574/¶24)

Rather than grapple with this evidence, the district court simply concluded that the

48

Design Patents are more functional than Ethicon's predecessor design. (A0127-A0128) This Court addressed a nearly identical scenario in *Rosco* and reversed the district court's finding of invalidity. 304 F.3d at 1378 (holding that a design is not dictated by function merely because it has functional advantages over "a single predecessor").

The district court also relied on the fact that Ethicon sought utility patents on its devices. But the existence of a pair of utility patent applications does not make the Design Patents "entirely functional." (A1028) In fact, it is common for a product to be covered by both a utility patent and a design patent. *See Avia*, 853 F.2d at 1563 ("[A] distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture, or to obtain both design and utility patents on the same article.") (citations omitted); *see also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1297 (Fed. Cir. 2010) (noting utility and design patent protection for same article).

An invention can be protected by both utility and design patents so long as its usefulness can be achieved via different looking designs. The alternative designs identified by Ethicon's expert show that different designs could achieve the same functionality. Moreover, the claims of the utility patent applications do

49

not describe the particular proportions or specific design of the elements claimed in the design patents. There are many different looking designs that would fit the language of the utility applications that the district court cited. (A3018/¶124 (describing "one embodiment" of the claimed invention; A3019/¶128 (same); A3020/¶131 (same))

### B. The District Court Erred In Granting Summary Judgment Of Non-Infringement of the Design Patents

#### 1. The District Court Erred In "Factoring Out" Elements of the Design Patents Based On Functionality

The district court's errors, discussed above, regarding the "functionality" of the Design Patents also infected its infringement analysis. Having found the "shape and placement" of the trigger, knob, and button (essentially, the entirety of the patent claims) functional, the district court "factored out" these elements of the claimed design for infringement purposes.

This was an error. Akin to the invalidity analysis, elements should not be read out of the claim for infringement analysis unless those design elements are *dictated* by some functional requirement. In *Richardson v. Stanley Works*, 597 F.3d 1288 (Fed. Cir. 2010), this Court made clear that it is only the portions of a design patent's drawings that are *dictated* by function that can be excluded in an infringement analysis. The *Richardson* court described the "factored out" elements of the patented tool design as "driven purely by utility," "dictated by their

50

functional purpose," and "purely functional." *Richardson*, 597 F.3d at 1294.

Furthermore, *Richardson* approvingly cited *L.A. Gear*, the seminal case for the

proposition that just because an element of a design serves a useful function does

not mean that it is ineligible for design patent protection. *Id.* at 1294.

The district court, however, applied a dramatically different standard by

"factoring out" any features of the patent that were "*informed by*" or "*based on*

functional considerations." (A0133 (emphasis added)) That standard has no basis

in this Court's precedents. *See Nordock, Inc. v. Sys., Inc.*, 927 F. Supp. 2d 577,

604-05 (E.D. Wis. 2013) ("An aspect of a design patent is non-ornamental only if

the design is dictated by its functionality ('de jure functional') and there are not

alternative designs that could perform the same function."); *Apple, Inc. v.*

*Samsung Elecs. Co.*, 11 Civ 1846, 2011 U.S. Dist. LEXIS 139049, at *31 (N.D.

Cal. Dec. 2, 2011) ("*Richardson* instructs the district court to identify the aspects

of the design that are 'dictated by' function . . . ."); *Good Sportsman Mktg. LLC v.*

*Li & Fung Ltd.*, 07 Civ 395, 2010 U.S. Dist. LEXIS 65458, at *10 (E.D. Tex. June

29, 2010) ("While the identified components may have functions, they need not be

excluded simply because they perform functions.").

As described above (*supra* pp. 40-43), Ethicon showed that alternative

designs could meet the functional needs of the user. This same evidence creates an

issue of material fact as to infringement. The elements of the Design Patents

identified by the district court are not dictated by function and therefore should be considered in analyzing whether the accused devices infringe. The judgment of non-infringement should be reversed.

### 2. The District Court Erred In Failing to Consider the Prior Art In Its Infringement Analysis

Infringement of a design patent exists where "'in the eye of an ordinary observer, giving such attention as a purchaser usually gives, [the] two designs are substantially the same.'" *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012) (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871)). In applying this test, "'the background prior art, provides . . . a frame of reference and therefore often is useful in the process of comparison.'" *Id.* (quoting *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 677 (Fed. Cir. 2008) (en banc)).

Considering whether the patented and accused designs are substantially the same should have been done in the context of the prior art with which an ordinary observer would reasonably be familiar. *See Egyptian Goddess*, 543 F.3d 665. The district court's failure to do so is error and requires reversal of the non-infringement ruling.

In *Egyptian Goddess*, this Court, sitting en banc, explained that consideration of the prior art is necessary to the "ordinary observer" test because "if the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more

52

likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Id.* at 677. As this Court explained, the prior art provides a useful "frame of reference" for the infringement analysis. *Id.* at 676-77; *see also Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 701 (Fed. Cir. 2014) (stating that infringement analysis in design patent cases focuses on the perspective of one "familiar with the prior art").

The district court held that the patented and accused designs at issue here are so "plainly dissimilar" that the court need not consider the "frame of reference" provided by the prior art. This was error. The designs (shown below) are not so manifestly different to justify ignoring the prior art.



       '804 Patent                                 Sonicision

Using the prior art as context would be particularly important in this case. As discussed above (*supra* pp. 12-13), before the invention of the design that led to the Design Patents, the clamping arm of almost every ultrasonic surgical device

was controlled by a thumb-ring or a loop-shaped trigger.  (A5573/¶20,

A5575/¶¶28-30; A4656-A4657; A4662/61:8-24; A5008-A5009; A5361-A5363)

For example:



The prior art here shows how closely Covidien sought to mirror the patented

design and distinguish Sonicision from the prior art.

It is exactly in cases like this, where the patented design was unique in the

field until the accused product launched, that the "frame of reference" provided by

the prior art is so crucial.  Under these circumstances, infringement is more likely

because "the accused design has copied a particular feature of the claimed design

that departs conspicuously from the prior art."  *Egyptian Goddess*, 543 F.3d at 677.

In *Revision Military*, the district court took the same erroneous approach that the district court followed here.  In that case, as here, the district court "did not consider the prior art context in which the ordinary observer test is applied," because, in its view, the accused product and asserted design were too dissimilar to require it to view the designs in the context of the prior art.  *Revision Military*, 700 F.3d at 527.  This Court reversed and remanded the case to the district court for reconsideration of the infringement question.[9]  *Id.*  The same result is appropriate here.

The district court also erred in concluding that a surgeon is not an ordinary observer for purposes of infringement because surgeons are "not involved in purchasing negotiations, and [are] not expending any money."  (A0134)[10]  This was error.  One need not be the person who pays for the accused product to be an "ordinary observer" for an infringement analysis:  one must merely be "sufficiently interested in" the item and have "the capability of making a reasonably discerning

---

[9] *Egyptian Goddess* is not confined to cases where there are no perceptible differences in the protected and the accused design.  In such instances, resort to prior art would be unnecessary, because substantial similarity would be so abundantly clear.

[10] The district court never actually identified who the ordinary observer was.  It just noted that a number of entities were involved in the purchasing process, stating: "While the surgeon may have some input to a hospital into which devices he or she prefers, the surgeon is not involved in purchasing negotiations, and is not expending any money.  As it is the hospital or supply company that is ultimately putting out the money for these devices, they will heavily scrutinize the details of the purchase process."  (A0134-A0135)

decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent." *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007).  In fact, Covidien's proffered expert agreed that surgeons qualify here as ordinary observers.  (A5216/268:17-18)

Once again, the district court improperly resolved disputed fact issues on summary judgment.  The grant of summary judgment of infringement of the Design Patents should be reversed.

## CONCLUSION

For all of the above reasons, this Court should reverse the orders granting

summary judgment for the patents-in-suit.

July 21, 2014

Respectfully submitted,


*/s/ William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr.
Chad J. Peterman
R. James Madigan III
Helen P. O'Reilly
Jeremy A. Weinberg
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel. 212-336-2000
Fax 212-336-2222
wfcavanaugh@pbwt.com
cjpeterman@pbwt.com
jmadigan@pbwt.com
horeilly@pbwt.com
jweinberg@pbwt.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2014, I caused the foregoing **BRIEF FOR PLAINTIFFS-APPELLANTS** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

In addition, two copies of the brief will be sent via express mail on the same date as above to the following:

Drew M. Wintringham, III, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4520
drew.wintringham@dlapiper.com

*Attorneys for Defendants-Appellees*

July 21, 2014

By:    */s/ Helen P. O'Reilly*
          Helen P. O'Reilly

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B).  The brief contains 11,499 words, as calculated by the word count of the word processing system used in preparing it, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6).  The brief has been prepared in Microsoft Word 2010 in Times New Roman 14 point font.

July 21, 2014

*/s/ William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr.

# ADDENDUM

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ETHICON ENDO-SURGERY, INC, *et al.*,    :      Case No. 1:11-cv-871

        Plaintiffs,             :      Judge Timothy S. Black

                               :

vs.                               :

COVIDIEN, INC., *et al.*,           :

        Defendants.          :

## ORDER ON CLAIM CONSTRUCTION

The parties have submitted briefs in support of their proposed claim constructions. (Docs. 66, 67, 74, and 75). Additionally, the Court held a *Markman* hearing on April 12, 2013.

## I. THE PATENTS AT ISSUE

### A. The '055 Patent

The '055 patent, filed in 1993, relates to an ultrasonic surgical device that includes a clamp for pushing body tissues towards an ultrasonic blade, thus allowing the tissue to be cut and/or coagulated during surgical procedures. The clamping mechanisms claimed in the '055 patent give the surgeon direct control over how much to open and close the clamp in order to produce the desired surgical results. The '055 patent overcame shortcomings associated with prior art systems without clamps. The prior art systems required the surgeon to press the blade directly against the tissue with sufficient pressure

to achieve the desired surgical result, and made it difficult for surgeons to grasp tissue. (Doc. 65-3 at 11). Today, the use of surgeon controlled clamps built into in ultrasonic surgical cutting devices is widespread.

**B.     The '275 Patent**

The '275 patent, filed in 1997, relates to components for damping (*i.e.*, reducing) undesired vibrations that occur during the operation of ultrasonic cutting devices. When operated, the devices generate ultrasonic vibrations traveling in many directions. Only some of the vibrations are desirable, specifically axial or longitudinal vibrations (*e.g.*, vibrations that move directly forward and backward towards the surgical blade). (Doc. 64-5 at 10). The undesirable vibrations lead to non-optimal performance and potential damage to the device. (*Id.*)

Prior to the '275 patent, various methods had been used to reduce undesirable vibrations, including O-rings mounted within the device and damping fluids. (*Id.*) The prior art methods have limitations and drawbacks, including generating too much heat and being inconvenient or impractical. (*Id.*) The '275 patent improves on the prior art by using a damping member that surrounds a portion of the transmission rod within the device, allowing the desirable vibrations to move to the blade while reducing the undesired vibrations. (*Id.*) The damping member of the '275 patent works without the use of fluid and without other drawbacks associated with the prior art. (*Id.*)

2

A0002

### C.     The '569 Patent

The '569 patent, filed in 1997, relates to power generation within ultrasonic

surgical devices.  More specifically, the patent relates to an electrical system for ensuring

that the generator is maintained in an optimal state during system operation.  As noted

above, the generator supplies power to a transducer which, in turn, produces the

ultrasonic vibrations.  The generator needs to operate in an optimal state for the overall

device to work in its intended, optimal manner.  During device operation, there are a

number of factors (including temperature and environmental conditions) that might cause

the generator to operate in a suboptimal manner.  (Doc. 65-18 at 10).  The '275 patent

discloses a generator that includes circuitry to detect a suboptimal state and take

corrective action to return the system to an optimal state.  (*Id.*)

### D.     The '501 Patent

The '501 patent, with a priority date of February 2004, relates to devices and

methods for sealing blood vessels using ultrasonic surgical cutting devices.  More

specifically, the patent relates to the optimal amount of clamping pressure that should be

used during surgical procedures to seal blood vessels.  Prior art methods and devices

typically used low clamping forces (approx. 1.5 pounds), corresponding to low clamping

pressures (approx. 45 psi (pounds per square inch)), to cut and seal blood vessels.  (Doc.

64-5 at 7).  The conventional thought was that using higher clamping forces would lead

to a degradation in coagulation performance (*i.e.*, the seal on the end of the coagulated

3

blood vessel would be weaker and more susceptible to bursting open). (*Id.*) Defying conventional wisdom, Plaintiffs discovered that the use of higher clamping forces (2 to 7 pounds), corresponding to clamping higher pressures (60 to 210 psi), actually resulted in superior performance. (*Id.*) The '501 patent claims Plaintiffs' novel method of using the higher clamping forces/pressures and devices capable of operating at such forces/pressures.

## II.    THE CLAIM TERMS AT ISSUE

The claim terms at issue in the '055 Patent are (1) "means for selectively displacing said clamp toward and away from said blade," (2) "means extending along said tube and operable from said housing for displacing said clamp toward and away from said blade," (3) "means for pivoting said clamp toward and away from said blade," (4) "means for pivoting said clamp toward and away from said blade," and (5) "means for isolating the ultrasonic vibration transmitted from said ultrasonic element along said extender to said blade from said tube including means engageable between said tube and said extender."

The claim term at issue in the '725 Patent is "configured to loosely contact."

The claim terms at issue in the '569 Patent are (1) "detector circuitry to detect a non-resonant condition of the phase lock loop" and (2) "an input signal to the phase lock loop of a desired condition."

4

The claim terms at issue in the '501 Patent are (1) "means for limiting a user

applied clamping force," (2) "limiting the clamping art to exert between 60 psi and 210

psi on the blood vessel," (3) "clamp(ing) [pressure/force] [of/between and including] . . .

a value," and (4) "average coaptation pressure . . . between and including . . . a value."

## III.    STANDARD OF REVIEW

Claim construction is a matter of law to be decided exclusively by the court.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*),

*aff'd*, 517 U.S. 370.

"The appropriate starting point [...] is always with the language of the asserted

claim itself." *Comark Comm, Inv. v. Harris Corp.*, 156 F.3d 1186 (Fed. Cir. 1998).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to

exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111,

1115 (Fed. Cir. 2004).

Claim terms are "generally given their ordinary and customary meaning." *Phillips

v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  "The ordinary and customary

meaning of a claim term is the meaning that the term would have to a person of ordinary

skill in the art in question at the time of the invention, i.e., as of the effective date of the

patent application." *Id.* at 1313.

In the event of ambiguity regarding claim terms, courts must first look to the

intrinsic evidence (*i.e.*, the claim itself, the specifications, the prosecution history, and

5

prior art cited in the patent) to resolve any ambiguities. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* Indeed, "[w]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

The court may also consider "the prosecution history of the patent, if in evidence." *Vitronics,* 90 F.3d at 1582. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

In most circumstances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. However, if the intrinsic evidence does not resolve ambiguities, extrinsic evidence may be considered. Extrinsic evidence "can shed light on the relevant art,' but is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (*quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

6

A0006

## IV. THE COURT'S CONSTRUCTION OF THE CLAIMS

### A. Joint Claim Constructions

The Court adopts the joint claim constructions proposed by the parties in the Agreed Upon Claim Constructions charts found in Doc. 64-1 at 1-5.

### B. The Disputed Terms

#### 1. The '055 Patent

##### i. *"means for selectively displacing said claim toward and away from said blade"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| 112 ¶6 Structure<br><br>Scissors-like gripping handles or grips, with thumb and finger grips, that, when squeezed, engage an actuator to move the clamp jaw toward the clamp-closed position and into engagement with the blade. When the grips are separated, the clamp jaw is moved away from the blade. Equivalents are also included. | 112 ¶6 Structure<br><br>Actuator rod and single distal pin in hole of clamp jaw - displaced forwardly to move clamp toward blade by pivoting thumb grip toward finger grip about pin to cause link to pivot ring in a clockwise direction about pivot pins to advance rod and thereby pivoting clamp towards blade about pivot pin – displaced rearwardly to move clamp away from the blade by pivoting thumb grip in the opposite direction to rotate ring about pivot pins in a counterclockwise direction to retract rod, thereby pivoting clamp away from blade about pivot pin. |

The parties agree that this is a means-plus-function element governed by 35 U.S.C. § 112 ¶6 and agree that the function is "to selectively displace the clamp toward and away from the blade." (Doc. 66 at 9; Doc. 67 at 17).

7

A0007

Plaintiffs argue that their proposed structure is identified in the specification and clearly linked with the function of selectively displacing the clamp toward and away from the blade, as the specification uses language similar to what Plaintiffs propose in describing the type of structure used to displace the clamp. (*Id.* at 14). Plaintiffs argue that Defendants' proposed construction is a "subset" of Plaintiffs' proposed construction and is incorrect because it ignores the broader configuration represented in the specification. (*Id.*)

Defendants urge that Plaintiffs' argument that the corresponding structure is limited to the thumb grip and actuator rod because the patent on occasion refers to these structures without mentioning the distal pin, pivot pins, link and pivot ring is flawed because the only embodiment showing the use of the thumb grip and actuator rod for "selectively displacing the clamp" discloses a direct connection to the distal pin along with the pivot pins, link and pivot ring and shows why they are necessary for the claimed function. (Doc. 74 at 8). Defendants point out that the thumb grips and an actuator rod alone cannot perform the clamp displacing function as, without the distal pin, the clamp would not even be connected to either the scissor grips or the actuator rod. (*Id.* at 6-7). According to Defendants, the pivot pins, link, and pivot ring are all integral to performing the selectively displacing function and thus must be included in the corresponding structure. (*Id.* at 7).

8

A0008

The Court agrees with Defendants that the actuator rod and distal pin along with the pivot pins, link and pivot ring are required corresponding structure. "If a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof." *Mettler–Toledo, Inc. v. B-Tek Scales, LLC,* 671 F.3d 1291, 1296 (Fed. Cir. 2012). The Federal Circuit has consistently required the inclusion of structures that are necessary to perform the claimed function. *Gemstar–TV Guide Int'l., Inc. v. Int'l Trade Comm'n,* 383 F.3d 1352, 1363 (Fed.Cir.2004); *see also IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1431 (Fed Cir. 2000) (because interface means required transferring data to a tape cassette and receiving data from the RAM through the PIA, the tape cassette and the PIA must be included within the means for interfacing corresponding structure); *Engineered Prods. Co. v. Donaldson Co., Inc.,* 147 Fed. Appx. 979, 985 (Fed. Cir. 2005) (unpublished) ("the district court construed 'means for selectively disengaging' too broadly by not identifying all of the structure necessary to perform the stated function"; the corresponding structure could not be as broad as just pushing the button that initiated the disengagement process but must also include the flange and bottom wall "that actually causes the interengagable notches to disengage"). In the '055 patent, to accomplish the function of selectively displacing the clamp toward and away from the blade, the specification discloses that the actuator rod and the single distal pin in conjunction with thumb grip, link, pivot ring and pivot pins, are all necessary to move the clamp toward and away from the blade.

9

Therefore, the Court adopts Defendants' construction, which properly includes all of the integral structures for this claim term.

ii. **"means extending along said tube and operable from said housing for displacing said clamp toward and away from said blade"**

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| 112 ¶6 Structure | 112 ¶6 Structure |
| An actuator operable from the housing that moves the clamp jaw toward and away from the blade, and equivalents. | Actuator rod with single distal pin as incorporated in the means for selectively displacing the clamp toward and away from the blade, where actuator rod extends along the length of tube and is operable from housing. |

The parties agree that this is a means-plus-function element governed by 35 U.S.C. § 112 ¶6 and agree that the function is "displacing the clamp toward and away from the blade." (Doc. 66 at 11; Doc. 67 at 19).

Plaintiffs argue that their proposed construction is supported by the same section of the specification they cite in support of their construction of the prior term in Section IV.B.1.i, *supra*. Plaintiffs argue that the specification clearly identifies the actuator as the element to displace the clamp toward and away from the blade and that Defendants' construction is an overly-narrow subset of Plaintiffs' proposed construction. (Doc. 67 at 15-16).

Defendants argue that their construction of the structure properly reflects the structures disclosed in the '055 patent for performing the claimed function. (Doc. 66 at

10

7). They argue that Plaintiffs' construction would improperly broaden the claim element and permit any structure connecting any actuator to a clamp to be encompassed, but that the specification only provides one structure – the single distal pin connecting the actuator rod.

As with the previous term, all of the structure necessary to perform a claimed function must be included with regard to a means-plus-function term. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002). The Court agrees with Defendants that Plaintiffs' proposed construction omits necessary structure. Plaintiffs' construction improperly recites any "actuator" and omits the necessary distal pin.

Accordingly, the Court adopts Defendants' construction because it comports with the corresponding structures disclosed by the '055 patent specification in keeping with the applicable means-plus-function law.

> iii. *"means for pivoting said clamp toward and away from said blade"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| 112 ¶6 Structure | 112 ¶6 Structure |
| Scissors-like gripping handles or grips, with thumb and finger grips, that, when squeezed, engages an actuator to pivot the clamp jaw toward the clamp-closed position and into engagement with the blade. When the grips are separated, the clamp jaw is pivoted away from the blade. Equivalents are also included. | Actuator rod with single distal pin movable forwardly to engage clamp jaw at pin joint and pivot jaw about pivot pin in a clockwise direction to close the jaw and actuator rod and pin in pin joint engaging clamp jaw as moved rearwardly to pivot jaw about pivot pin in a counterclockwise direction to open the jaw. |

11

The parties agree that this is a means-plus-function element governed by 35 U.S.C. § 112 ¶6 and agree that the function is "to pivot the jaw (clamp) between the open and closed positions." (Doc. 66 at 12; Doc. 67 at 20).

Plaintiffs advance the same evidence and arguments in favor of a broader construction that they cited in support of their constructions of the previous two claim terms, arguing that Defendants' proposed construction is an overly-narrow subset of Plaintiffs' proposed construction. (Doc. 67 at 20-21).

Defendants again argue that their proposed construction accurately reflects the structure and thus comports with the requirements of 35 U.S.C. § 112 ¶ 6. Defendants' construction includes the actuator rod with the single distal pin to engage the clamp of the jaw and pivot it about a pivot pin to close the jaw. By contrast, Plaintiffs' construction does not provide any corresponding structure for the pivoting function and includes only the gripping handles and an actuator. Defendants urge that this fails (1) because the gripping handles are not linked to the pivoting function described in the specification, (2) because the patent identifies only an actuator rod (not any actuator) as part of the pivoting mechanism, and (3) because the specification identifies additional structures essential for the pivoting function, namely the distal pin to engage the clamp of the jaw and pivot it around a pivot pin to close the jaw. (Doc. 66 at 13); *see Chicago Bd. Options Exchange, Inc. v. Int'l Sec. Exchange, LLC*, 677 F.3d 1293, 1367 (Fed. Cir. 2012); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 398 F.3d 1370, 1377-78 (Fed. Cir.

12

2004). The Court agrees with Defendants that the additional elements included in their proposed construction are necessary to perform the recited function and thus must be included in the Court's construction.

Accordingly, the Court adopts Defendants' construction of this claim term as well, because it properly includes the actuator rod, single distal pin, and pivot pin for the corresponding structure to the pivoting means.

> iv. *"means for isolating the ultrasonic vibration transmitted from said ultrasonic element along said extender to said blade from said tube including means engageable between said tube and said extender"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| 112 ¶6 Function | 112 ¶6 Function |
| To isolate the ultrasonic vibration transmitted from the ultrasonic element along the extender to the blade from the tube extending about and radially spaced from the extender. | To minimize or eliminate dissipation of the ultrasonic longitudinal vibration of the extender by contact with the tube. |

The parties agree that this is a means-plus-function element governed by 35 U.S.C. § 112 ¶6 and agree that the structure is "a plurality of longitudinally spaced rings located at the node points of the extender." (Doc. 66 at 14; Doc. 67 at 21).

Plaintiffs argue that they have proposed the only construction that gives force to the entirety of the claim because it is taken from the claim language itself, and identify the claim language as the most important source in construing a claim. (Doc. 67 at 22-23); *see Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1254 (Fed.

13

Cir. 2010). Plaintiffs argue that Defendants propose a construction based on cobbling together language in the claim with additional terms that do not appear in it. (*Id.* at 22).

Defendants argue that Plaintiffs' proposed construction impermissibly broadens the scope in violation of 35 U.S.C. § 112 by omitting the contact with the tube when the specification states that the rings minimize or dissipate ultrasonic vibration "by contact with the tube." (Doc. 66 at 14). The Court agrees that the construction cannot include a corresponding function that would not contemplate contact with the tube.

Accordingly, because Plaintiffs' proposed construction neglects to include both contact with the tube and minimizing or eliminating dissipation of the ultrasonic longitudinal vibration of the extender as disclosed in the claim and specification, the Court adopts Defendants' more complete (and hence accurate) proposed construction.

### 2. The '275 Patent

#### i. *"configured to loosely contact"*

| Ethicon's proposed construction | Covidien's proposed construction |
| --- | --- |
| Contacting or capable of contacting portions of the transmission rod, but not tightly fitted. | Structured to have contact other than at fixed support points, but not tightly fitted. |

The parties' disagreement regarding the term "configured to loosely contact" focuses on where the damping sheath contacts the transmission rod and whether it is structured to contact or is simply "capable of contacting" the transmission rod. (Doc. 66 at 15). The primary difference between the proposed constructions is the concept of "fixed support points" in Defendants' construction. (Doc. 75 at 4).

14

Plaintiffs argue that their proposal tracks the claim language, which makes it clear that the damping member only needs to be configured to loosely contact a portion of the transmission rod. (Doc. 67 at 24). Plaintiffs claim that Defendants propose to add a limitation, requiring that to "loosely contact" be "contact other than at fixed support points," that does not appear in the claim. (*Id.*)

Defendants argue that their construction is guided by the '275 patent specification which differentiates between two types of contact, only one of which corresponds to "configured to loosely contact." (Doc. 66 at 15). Defendants urge that Plaintiffs' construction is inconsistent with the patent's description because it neglects to distinguish loose contact from the contact at fixed points. (*Id.*) Defendants further argue that Plaintiffs' construction would include embodiments where the damping sheath need not be specifically structured for contact with the transmission rod, but that the specification in fact indicates actual contact. (*Id.*)

The Court agrees with Defendants that their proposed construction is appropriately consistent with the patent specification by distinguishing loose contact from attachment at fixed support members, and tracks the claim language by making clear that the damping member makes actual contact with the transmission rod.

Accordingly, the Court adopts Defendants' proposed construction as Plaintiff's proposed construction is, again, inappropriately broad.

15

**A0015**

### 3. The '569 Patent

> i. *"detector circuitry to detect a non-resonant condition of the phase lock loop"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| Supervisory circuitry to detect if there is a nonresonant condition of the phase lock loop. | Supervisory circuitry outside the phase lock loop and separate from the processing unit that monitors and determines if the phase lock loop fails to maintain a resonant condition. |

As with previous terms, Plaintiffs argue that their construction is appropriate because it directly follows the claim language. (Doc. 67 at 25). Plaintiffs argue that Defendants, on the other hand, add two restrictions that are not supported by the claim language or by the intrinsic record: that the supervisory circuitry must be outside of the phase lock loop ("PLL") and that it must be separate from the processing unit. (*Id.*)

Defendants argue that Plaintiffs' construction omits key distinctions made by the patent and the prosecution history in distinguishing the patent's circuitry from the prior art PLL. Defendants argue that Plaintiffs' construction improperly suggests that the detector circuitry could be the internal circuitry inherent in any PLL that detects if the PLL is in a nonresonant condition, when the '569 patent specification makes it clear that the detector circuitry is, in fact, separate and distinct from the prior art PLL. (Doc. 74 at 24). As the claim language indicates that the detector circuitry is separate from the processing unit ("a processing unit *coupled to* detector circuitry") and the patent specification places the claimed detector circuitry outside of the PLL, the Court agrees

16

that Plaintiffs' proposed construction inappropriately conflates the prior art with the new technology disclosed by the '569 patent. (Doc. 66 at 13).

Accordingly, the Court adopts Defendants' proposed construction as it properly incorporates the distinction the patentee made between the claimed invention and the prior art.

### ii. *"an input signal to the phase lock loop of a desired condition"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| An input signal to the phase lock loop to cause the phase lock loop to reach a resonant condition. | An override voltage control signal to the voltage controlled oscillator of the phase lock loop corresponding to a last known or most recently stored resonant frequency. |

Defendants argue that Plaintiffs' construction improperly broadens this claim term beyond what is disclosed as the patent does not identify any other possibilities for the input signal other than an override voltage control signal, and only as a signal going to the voltage controlled oscillator. (Doc. 66 at 18). Defendants further urge that Plaintiffs' construction impermissibly encompasses all types of signals going to any part of a PLL and improperly encompasses what was disclaimed during prosecution because Plaintiffs previously distinguished the invention from the prior art by pointing to the use of the last known or most recently stored resonant frequency. (*Id.* at 18-19).

Plaintiffs argue that their proposal directly follows the claim language and that requiring the input signal to be an "override voltage control signal" that "correspond[s] to a last known or most recently stored resonant frequency" contemplates limitations that do

17

not appear in the claim and are not required by the intrinsic record. (Doc. 67 at 26).

Plaintiffs urge that the inclusion of examples involving voltage controlled oscillators and override voltage control systems in the specification does not impose limitations on the claim itself. *See Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'"). Plaintiffs further urge that Defendants also do not cite any statement in the prosecution history that approaches the "clear and unmistakable disavowel of [claim] scope" necessary for disclaimer. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (quoting *Purdue Pharma L.P. v. Endo Pharms, Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)).

The Court agrees that both the claim and the prosecution history are devoid of evidence of any clear intent to limit the claim term as Defendants' proposed construction does and that the limitations that Defendants include are, in fact, only examples of possible embodiments of the claim.

Accordingly, the Court adopts Plaintiffs' proposed construction as it appropriately omits limitations that are not required by the claim.

4. **The '501 Patent**

> i. *"means for limiting a user applied clamping force" and "limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| 112 ¶6 Function<br><br>To limit a user applied clamping force to exert between and including 60 psi and 210 psi on the blood vessel.<br><br>112 ¶6 Structure<br><br>Each of the following alone or in combination: (1) a motor which rotates either the clamp arm or the blade relative to the other and is preselected to cause a known-size clamping surface area to exert the desired pressure on tissue large enough to cover the clamping surface area, (2) a variable torque motor with user settings to set the value or range of the force; (3) a substantially constant force spring, while applied a predetermined force to the clamp arm; and (4) a physical stop limiting the range of motion of the actuator rod. Equivalents to (1), (2), (3), and (4) are also included. | 112 ¶6 Function<br><br>To limit a user applied clamp force.<br><br>Covidien contends that the part of the claim element stating "between and including 60 psi and 210 psi on the blood vessel" is indefinite.<br><br>112 ¶6 Structure<br><br>A conventional torque wrench; element 40 as positioned between the scissor-like grips in Figure 3. |

The parties agree that both of these claim elements are governed by 35 U.S.C. § 112 ¶6 and agree that the function includes "to limit a user applied clamp force." (Doc. 66 at 20; Doc. 67 at 27). The parties also agree that "means for limiting a user applied clamping force" is a means-plus-function term and "limiting the clamping arm to exert

19

A0019

between and including 60 psi and 210 psi on the blood vessel" is a step-plus-function term and that they share common functions and corresponding structures under § 112 ¶6 and therefore they should be construed together. (Doc. 66 at 25 n.2).

Plaintiffs argue that their proposed construction for the structure includes all structures within the specification that "limit a user applied clamp force." (Doc. 67 at 27). Plaintiffs urge that the specification illustrates that the structures that limit force go beyond the single structure that Defendants include in their proposed construction (torque wrench/element 40). (*Id.*) Plaintiffs argue that the specification discloses the three other structures found in their proposed construction and describes them as force creating means, but that they clearly "limit a user applied clamping force" as well, and thus are properly included as force limiting means. (*Id.*)

Defendants argue that their proposed construction for the structure properly limits these force-limiting means to the corresponding structures in the patent specification and that Plaintiffs' construction improperly imports structures that are not linked in the patent specification to the force limiting function. (Doc. 66 at 20); s*ee Med. Instrumentation & Diagnostics Corp. v. Elektra AB*, 344 F.3d 1205, 1213 (Fed. Cir. 2003). Defendants urge that Plaintiffs' construction also includes a fourth structure (a physical stop limiting the range of motion of the actuator rod), but that no such structure is even described, let alone linked to the description of the force-limiting means in the patent. *See Med. Instrumentation*, 344 F.3d at 1218 (finding software was not part of the corresponding

20

structure because "the two structures clearly linked by the specification to the converting function are depicted in the figures of the patent, while software for digital-to-digital conversion is not"). The Court agrees that Plaintiffs' proposed construction identifies structures not clearly linked to the claimed function.

With regard to function, the only difference between the parties is whether "to exert between and including 60 psi and 210 psi on the blood vessel" should be included in the description of the function. As Defendant argues that the disputed language is indefinite, this question will be addressed as part of the analysis in the following section.

Accordingly, the Court adopts Defendants' proposed construction as Plaintiffs have not established the required linkage between the additional structures they include in their proposed construction and the function in question.

### ii.    *"clamp(ing) [pressure/force] [of/between and including] . . . a value"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| Clamping arm exerts a clamp(ing) [pressure/force] [of/between and including] a value when the clamping arm is fully engaged by the user. | Indefinite. |

### iii.    *"average coaptation pressure . . . between and including . . . a value"*

| Ethicon's proposed construction | Covidien's proposed construction |
|---|---|
| Clamping arm exerts an average coaptation pressure . . . between and including . . . a value when the clamping arm is fully engaged by the user. | Indefinite. |

21

A0021

The '501 patent has a variety of claim elements relating to (1) clamping force measurements (e.g., how much force or pressure is exerted by the clamp arm of the ultrasonic cutting instrument) and (2) coaptation force measurements (e.g., how much force or pressure is exerted by the clamp arm of the ultrasonic cutting instrument on a blood vessel). (Doc. 67 at 30). The parties have divided the allegedly indefinite terms into two groups commonly represented by one term each. (*Id.*) This Court need only decide if the common term is capable of construction or is indefinite. (*Id.*)

To prevail on their indefiniteness claim, Defendants must demonstrate by clear and convincing evidence that the claim terms at issue are "not amenable to construction" or "insolubly ambiguous." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008).

Defendants argue that there is a distinct lack of guidance as to how such force and pressure are measured to ascertain whether a device falls within the claimed numeric values. (Doc. 66 at 22). Defendants further argue that neither the specification, nor the claims, nor the file history provide any guidance for measuring force or pressure or any objective standard known in the art for measuring clamping pressure and force. (*Id.* at 23). Finally, Defendants argue that Plaintiffs' proposed constructions fail to address how, where, and when clamping force/pressure is measured. (*Id.*)

Plaintiffs argue that their constructions make use of the claim term language and that the added specificity of "when the clamping arm is fully engaged" comes from the

22

specification itself, which explains that the pressure/force measurements correspond to a "fully engaged clamping surface area." (Doc. 67 at 31). Plaintiffs point out that the patent went through eight rounds of examination by the Patent Examiner, who used the terms in question himself when discussing prior art. (*Id.*) Plaintiffs urge that as the ultimate issue is whether someone in the relevant technical field could understand the bounds of a claim, the Patent Examiner's use of the terms demonstrates that one with ordinary skill in the art understands the meaning of these terms. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984))("[USPTO is] a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents").

The Court agrees with Plaintiffs that there is evidence in the intrinsic record to allow for construction, that one of skill in the art knows what clamping force/pressure means, that the specifications define when to measure the pressure ("when the clamping arm is fully engaged"), and that Defendants have failed to meet their high burden of "showing by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton*, 514

23

**A0023**

F.3d at 1249-50.

Accordingly, the Court finds that the terms in question are not indefinite and adopts Plaintiffs' proposed constructions.

## V.    CONCLUSION

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Therefore, the parties shall construe the contested terminology of the patents in suit as set forth in this Order.

**IT IS SO ORDERED.**


Date:  April 25, 2013                                         *s/ Timothy S. Black*
                                                              Timothy S. Black
                                                              United States District Judge

24

**A0024**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ETHICON ENDO-SURGERY, INC., *et al.*, | : | Case No. 1:11-cv-871 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COVIDIEN, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,989,275 (Doc. 101)**

This civil action is before the Court on Defendants' Motion for Summary

Judgment of Non-Infringement of U.S. Patent No. 5,989,275 (Doc. 101) and the parties'

responsive memoranda (Docs. 111 and 119).

## I.    BACKGROUND

Plaintiffs assert infringement of independent claim 1 and dependent claim 3 of

U.S. Patent No. 5,989,275 (the "'275 patent"). (Doc. 101-1 at ¶¶ 6-8). The '275 patent,

entitled "Damping Ultrasonic Transmission Components," was filed on February 28,

1997, issued on November 23, 1999, and is assigned to Plaintiff. (*Id.* at ¶ 1).

The ultrasonic surgical instrument described in the '275 patent converts electrical

energy into mechanical motion, which results in high frequency longitudinal waves of

ultrasonic energy that propagate down the length of the instrument's acoustic assembly to

the end effector at the distal end. (*Id.* at ¶¶ 2-4). The longitudinal waves of ultrasonic

energy result in axial or longitudinal (*i.e.*, forward and backward) vibrational motion of

the end effector at the distal end of the acoustic assembly. (*Id.* at ¶¶ 3, 39). The end effector is placed in contact with the tissue of the patient to transfer ultrasonic energy to the tissue. (*Id.* at ¶¶ 3-5). The transfer of vibrational ultrasonic energy from the end effector to the tissue causes, among other things, mechanical cutting of the tissue. (*Id.* at ¶ 5).

Defendants now move for summary judgment on the basis that Plaintiffs have failed to raise any genuine issue of material fact with respect to alleged infringement of the '275 patent's only asserted claims: independent claim 1 and dependent claim 3. (Doc. 101 at 5). Independent claim 1, from which claim 3 depends, teaches a "damping member surrounding at least a portion of the transmission rod." (*Id.*) The '275 patent also refers to the claimed "damping member" as a "damping sheath." (*Id.*) According to the patent, the damping sheath dampens or "absorb[s] unwanted ultrasonic energy from the transmission rod," particularly "unwanted transverse vibrations." (*Id.*) Defendants argue that no genuine issue exists as to whether the Sonicision sleeve meets the "configured to loosely contact" or "adapted to absorb undesired vibrations" limitation of claims 1 and 3, and that summary judgment of no infringement is therefore warranted. (*Id.* at 7-8).

## II.    UNDISPUTED FACTS[1]

1. The '275 patent, entitled "Damping Ultrasonic Transmission Components," was filed on February 28, 1997, issued on November 23, 1999, and is assigned to Plaintiff. (Doc. 102-1 at 2).

---

[1] (*See* Doc. 101-1 and Doc. 111 at 22-45).

2. The '275 patent states that "[i]n a typical ultrasonic transmission device, a generator sends electrical energy to a transducer. The transducer converts electrical energy into mechanical motion at ultrasonic frequencies. The vibrational motion is transmitted to the distal end of an acoustical assembly of the transmission device." (*Id.* at 10).

3. Referring to the surgical system illustrated in Figure 1, the '275 patent states, after "converting the electrical energy into mechanical motion":

> The mechanical motion results in longitudinal waves of ultrasonic energy that propagate through the acoustic assembly 80 in an acoustic standing wave to vibrate the acoustic assembly 80 at a selected frequency and amplitude. An end effector 88 at the distal end of the acoustic assembly 80 is placed in contact with tissue of the patient to transfer the ultrasonic energy to the tissue. The cells of the tissue in contact with the end effector 88 of the acoustic assembly 80 will move with the end effector 88 and vibrate.

(*Id.* at 11).

4. In a section entitled "Description of the Preferred Embodiments," the '275 patent explains that after high frequency longitudinal waves of ultrasonic energy are produced, "the ultrasonic energy is transmitted through the acoustic assembly 80 to the end effector 88." (*Id.* at 12).

5. In a section entitled "Description of the Preferred Embodiments," the '275 patent explains that "[t]he transfer of vibrational ultrasonic energy from the end effector to the tissue causes other effects including mechanical tearing, cutting, cavitation, cell disruption, and emulsification." (*Id.* at 11).

6. When Plaintiffs' expert, Dr. Mark Schafer, was asked the following question at his October 7, 2013 deposition regarding the Expert Report of Mark E. Schafer, Ph.D., dated August 19, 2013 ("Schafer Infringement Report"): "is it correct that this is your expert report concerning infringement of the '27 – what I'm going to refer to as the '275 and '501 patents in this case?", Dr. Schafer testified: "Yes, ma'am." (*Id.* at 26-28).[2]

---

[2] Plaintiffs admit only that No. 6 quotes a portion of the Schafer Dep. Tr.

7. Paragraph 21 of the Schafer Infringement Report states, in relevant part: "It is my opinion based upon the materials that I have reviewed, and my knowledge and experience, that Sonicision infringes the following claims of the following patents: '275 patent: claims 1 and 3." (*Id.* at 37).[3]

8. During the October 8, 2013 deposition of Defendants' expert, Dr. William Durfee, counsel for Plaintiffs stated the following: "And by asserted claims, Ethicon has asserted that Sonicision infringes Claims 1 and 3 of the '275 patent. So I just want to make sure you have that understanding." (*Id.* at 54).

9. Asserted claim 3 of the '275 patent depends from independent claim 1 and incorporates all the claim limitations of independent claim 1. (*Id.* at 17-18).

10. Independent claim 1 of the '275 patent requires a "damping member surrounding at least a portion of the transmission rod." (*Id.*)

11. The '275 patent refers to the claimed "damping member" as a "dampening member" or "damping sheath." (*Id.* at 14).

12. In describing ultrasonic surgical instruments, the Schafer Infringement Report states that "[o]ther physical components such as an extender (also referred to as a transmission rod or waveguide) are coupled to the horn section to deliver the vibrational waves to the blade/waveguide, causing the blade to vibrate ultrasonically." (*Id.* at 38).[4]

13. The '275 patent states the following:

> Conventional ultrasonic devices may also dampen unwanted vibration by the use of a water layer between a transmission component and a sheath. For example, U.S. Pat. No. 5,248,296 discloses an ultrasonic device having sheath that surrounds a wire. A small annular space or passageway is formed between the sheath and the wire. The passageway is filled with a pressurized fluid, such as water or saline solution. Although the fluid may effectively dampen unwanted vibrations of the wire, the fluid usually tends to cause dissipation of desired longitudinal vibration.

(*Id.* at 10).

---

[3] Plaintiffs admit only that No. 7 quotes a portion of the Schafer Infringement Report.
[4] Plaintiffs admit only that No. 12 quotes a portion of the Schafer Infringement Report.

4

14. The '275 patent states the following:

> The damping sheath 160 is more effective than using silicone rubber rings located only at nodes of longitudinal vibration because the damping sheath 160 can dampen transverse motion occurring near multiple antinodes of the unwanted vibration which are located randomly along the length of the transmission rod 86 relative to the nodes and antinodes of the desired longitudinal vibration. The damping sheath 160 can also effectively absorb the unwanted ultrasonic energy without using a damping fluid, which is more efficient and is advantageous in situations where the use of fluid may be inconvenient or impractical.

(*Id.* at 14).

15. The Schafer Infringement Report includes a claim chart setting forth Dr. Schafer's opinions regarding infringement of the '275 patent, which states: "Sonicision's transmission rod is surrounded by a damping sheath (sleeve)." (*Id.* at 41).[5]

16. In referring to the Sonicision, the Schafer Infringement Report states that

> the nominal clearance between the flexible sheath and the transmission rod is small. The inner diameter of the flexible sheath is 0.16 inches (Dep. Exs. 2005, 2100) and it is made of extruded PTFE; and the outer diameter of the semi-flexible, titanium transmission rod varies between 0.157 at the nodes/flanges, and 0.145 in between the flanges (Dep. Exs. 2004, 2101).

(*Id.* at 48).[6]

17. The '275 patent's independent claim 1 requires a "damping member configured to loosely contact the transmission rod over a portion of the transmission rod." (*Id.* at 17-18).

18. In its April 25, 2013 Order on Claim Construction ("Claim Construction Order"), the Court construed the claim term "configured to loosely contact" to mean "structured to have contact other than at fixed support points, but not tightly fitted." (Doc. 81 at 14-15).

---

[5] Plaintiffs admit only that No. 15 quotes a portion of the Schafer Infringement Report.

[6] Plaintiffs admit only that No. 16 quotes a portion of the Schafer Infringement Report.

19. In its Claim Construction Order, the Court stated: "The Court agrees with Defendants that their proposed construction is appropriately consistent with the patent specification by distinguishing loose contact from attachment at fixed support members, and tracks the claim language by making clear that the damping member makes actual contact with the transmission rod." (*Id.* at 15).

20. In referring to the embodiments shown in Figures 5 and 6, the '275 patent states that "the damping sheath 160 of the surgical instrument 150 loosely surrounds at least a portion of the transmission rod 86." (Doc. 102-1 at 14).

21. In referring to the embodiments shown in Figures 5 and 6, the '275 patent states that the damping sheath is "coupled or attached to the transmission rod 86 near one or more nodes." (*Id.*)

22. In referring to the embodiments in Figures 5 and 6, the '275 patent specification states that "the damping sheath 160 is coupled to or maintained on the transmission rod 86 by compliant members such as, for example, fenders or O-rings" and that "[t]he compliant members 190a, 190b, and 190c are preferably disposed around the transmission rod 86 near nodes in order to minimize damping of the desired longitudinal vibration energy." (*Id.* at 15).

23. The '275 patent defines a node as "[a] minimum or zero crossing in the vibratory motion standing wave," "where axial motion is usually minimal." (*Id.* at 12).

24. Plaintiffs' expert, Dr. Schafer, testified at his deposition that "nodal locations are points at which there is minimal longitudinal vibration." (*Id.* at 30).[7]

25. Plaintiffs' expert, Dr. Schafer, testified at his deposition that a "fixed support point" is "fixed in terms of its location." (*Id.* at 29).[8]

26. Plaintiffs' expert, Dr. Schafer, testified at his deposition that nodal points are "well-established" and "fixed locations." (*Id.* at 30).[9]

27. In referring to the Sonicision, the Schafer Infringement Report states that "the outer diameter of the semi-flexible, titanium transmission rod varies between 0.157 at the nodes/flanges, and 0.145 in between the flanges." (*Id.* at 48).[10]

---

[7]  Plaintiffs admit only that No. 24 quotes a portion of the Schafer Dep. Tr.
[8]  Plaintiffs admit only that No. 25 quotes a portion of the Schafer Dep. Tr.
[9]  Plaintiffs admit only that No. 26 quotes a portion of the Schafer Dep. Tr.
[10]  Plaintiffs admit only that No. 27 quotes a portion of the Schafer Infringement Report.

6

A0030

28. Engineering Change Form, EC Title: Issue of new revision of DRW, RTS, and MNP's for the Milwaukee Disposable (DRW-00223-00R06, RTS-00223-00R09, MNP-00011- 00R07, MNP-00022-00R08, MNP-00023-00R06 and MNP-00024-00R08), dated December 7, 2010 (Bates numbered COV0374362-454) (*Id.* at 60-61) depicts the following diagrams, at COV0374363-64:

| ITEM NO. | PART # | Title | QTY |
|---|---|---|---|
| 1 | DRW-00150-00 | Handle Left, USG1 | 1 |
| 2 | DRW-00151-00 | Handle Right, USG1 | 1 |
| 3 | DRW-00156-00 | Nozzle, USG1 | 2 |
| 4 | DRW-00157-00 | Button Pad, USG1 | 1 |
| 5 | DRW-00159-00 | Bobbin, USG1 | 1 |
| 6 | DRW-00160-00 | Slider, USG1 | 1 |
| 7 | DRW-00161-00 | Nut, USG1 | 1 |
| 8 | DRW-00162-00 | Yoke, USG1 | 1 |
| 9 | DRW-00163-00 | Link, USG1 | 2 |
| 10 | DRW-00164-00 | Trigger, USG1 | 1 |
| 11 | DRW-00168-00 | Batt Conn Seal, USG1 | 1 |
| 12 | DRW-00170-00 | Outer Tube, USG1 | 1 |
| 13 | DRW-00171-00 | Inner Tube, USG1 | 1 |
| 14 | DRW-00172-00 | Jaw, USG1 | 1 |
| 15 | DRW-00173-00 | Jaw Liner, USG1 | 1 |
| 16 | DRW-00174-00 | Distal Seal, USG1 | 1 |
| 17 | DRW-00175-00 | Sleeve, USG1 | 1 |
| 18 | DRW-00176-00 | Probe, USG1 | 1 |
| 19 | DRW-00177-00 | Torque Adapter, USG1 | 1 |
| 20 | DRW-00193-00 | Force Spring, USG1 | 1 |
| 21 | DRW-00194-00 | Opening Spring, USG1 | 1 |
| 22 | DRW-00203-00 | Dowel Pin, USG1 | 2 |
| 23 | DRW-00207-00 | Torquer Male, USG1 | 1 |
| 24 | DRW-00208-00 | Torque Female, USG1 | 1 |
| 25 | DRW-00213-00 | Distal O-Ring, USG1 | 1 |
| 26 | DRW-00218-00 | Flex Harness, USG1 | 1 |
| 27 | DRW-00227-00 | TAG Conn Seal, USG1 | 1 |
| 28 | DRW-00266-00 | Puck, USG1 | 2 |
| 29 | DRW-00282-00 | Lockout Clip, USG1 | 1 |
| 30 | DRW-00283-00 | Lockout Torsion Spring, USG1 | 1 |
| 31 | DRW-00284-00 | Lockout Spring, USG1 | 1 |
| 32 | DRW-00285-00 | Lockout Pin, USG1 | 1 |
| 33 | DRW-00287-00 | Buzzer Seal, USG1 | 1 |
| 34 | DRW-00323-00 | Translucent Paste PST-511 | .002 |
| 35 | DRW-00327-00 | Lockout Pawl, Lubricated, USG1 | 1 |



SHEET 2 of 2

7

A0031

29. The Schafer Infringement Report contends that "Figure 9(d) of the MTR is an example of an image showing contact between the sheath and the transmission rod at a raised nodal location." (*Id.* at 49).[11]

30. When asked about CT Scan 9(d) from Exhibit A of the Schafer Infringement report, taken at a nodal rib location, Dr. Schafer testified that "it was not my point to show contact at the rib. That's not what the patent requires in terms of lose [sic] contact. It has to have contact other than fixed locations." (*Id.* at 32).[12]

31. Defendants' expert, Dr. Durfee, states the following in the Rebuttal Expert Report of William Durfee, Ph.D, dated September 23, 2013 ("Durfee Rebuttal Report"): "Dr. Schafer's report identifies at least one CT scan taken at location (d) in Figure 9(f) of his Exhibit A, which is the location of the furthest nodal rib on the Sonicision waveguide. Specifically, Dr. Schafer in his Paragraph 64 points to location (d) and the corresponding CT scan '(d) Run #4 on Unit CT-2 (Y_005)' at page 10 of his Exhibit A as evidencing contact between Sonicision's sleeve and waveguide." (*Id.* at 152).

32. The '275 patent's independent claim 1 requires a "damping member adapted to absorb undesired vibrations along the transmission rod without the use of fluid." (*Id.* at 17-18).

33. The Schafer Infringement Report states that "[t]ransverse vibration modes are generally undesirable in ultrasonic cutting systems as they can lead to blade damage, and the generation of excessive heat and noise." (*Id.* at 40).[13]

34. The Schafer Infringement Report states that "transverse modes" are "vibrations that occur perpendicular to the longitudinal axis of desired motion." (*Id.*)[14]

35. The Schafer Infringement Report states that "[l]ongitudinal vibration is the desired vibratory mode." (*Id.*)[15]

36. The '275 patent distinguishes between transverse vibrations and longitudinal vibrations. (*Id.* at 10, 14).

---

[11] Plaintiffs admit only that No. 29 quotes a portion of the Schafer Infringement Report.
[12] Plaintiffs admit only that No. 30 quotes a portion of the Schafer Dep. Tr.
[13] Plaintiffs admit only that No. 33 quotes a portion of the Schafer Infringement Report.
[14] Plaintiffs admit only that No. 34 quotes a portion of the Schafer Infringement Report.
[15] Plaintiffs admit only that No. 35 quotes a portion of the Schafer Infringement Report.

37. The '275 patent describes transverse vibrations as "non-axial" and "unwanted." (*Id.* at 14).

38. The '275 patent describes longitudinal vibrations as "desired." (*Id.* at 10, 14).

39. The '275 patent states that "unwanted transverse motion may reduce axial (i.e. forward and backward) motion of the distal end of the acoustic assembly and may produce fatigue in the assembly." (*Id.* at 10).

40. The '275 patent states that "the damping sheath 160 is preferably in light contact with the transmission rod 86 to absorb unwanted ultrasonic energy from the transmission rod 86." (*Id.* at 14).

41. The '275 patent states that "the damping sheath 160 may be positioned around the transmission rod 86 to dampen or limit transverse side-to-side vibration of the transmission rod 86 during operation." (*Id.*)

42. The '275 patent states that "[t]he damping sheath 160 reduces the amplitude of non-axial vibrations of the transmission rod 86, such as unwanted transverse vibrations associated with the longitudinal frequency of 55,500 Hz as well as other higher and lower frequencies." (*Id.*)

43. The '275 patent states that "the present invention relates to a surgical instrument that effectively dampens undesired or unwanted vibration of a transmission component while allowing desired ultrasonic energy to propagate to the distal end of the transmission component." (*Id.* at 10).

44. The '275 patent states that "[t]he damping sheath 160 is constructed of a polymeric material, preferably with a low coefficient of friction to minimize dissipation of energy from the axial motion or longitudinal vibration of the transmission rod 86." (*Id.* at 14).

45. The '275 patent states that "[t]he damping sheath 160 is more effective than using silicone rubber rings located only at nodes of longitudinal vibration because the damping sheath 160 can dampen transverse motion occurring near multiple antinodes of the unwanted vibration which are located randomly along the length of the transmission rod 86 relative to the nodes and antinodes of the desired longitudinal vibration." (*Id.*)

46. When asked at his deposition: "With regard to your prior experience, do you have experience with measuring transverse ultrasonic vibrations?", Dr. Schafer

9

A0033

testified: "Yes. I have measured transverse ultrasonic vibrations. (*Id.* at 22-23).[16]

47. When asked at his deposition: "What methods have you used in your prior experience to measure transverse vibration of an ultrasonic instrument?", Dr. Schafer testified: "We've used optical methods. You can use, again, laser vibrometer. Some devices are actually designed to use transverse vibration as their – part of their mechanism of action. And I've worked on several devices like that where we used either vibrometer; we used high-speed camera – I have a high-speed camera set up in my laboratory, and we can actually – with a proper magnification, you can actually detect transverse motion. But, again, typically, laser vibrometer would be one way and high-speed cameras." (*Id.* at 23-24).[17]

48. When asked the following questions at his deposition, Dr. Schafer provided the following testimony: Question – "And you – am I correct that you mentioned you have the high- speed camera set up in your laboratory now?"; Testimony – "It's packed up at the moment. But, yes, I have one"; Question – And what about the laser vibrometer; do you have access to that technology?"; Testimony – "I do not have it, but I have colleagues who do, and I've used – called them up and said, 'Hey, can you do a laser vibrometer test for me?' And they say, 'Sure. Bring it in.'" (*Id.* at 25).[18]

49. When asked at his deposition: "Is it correct that, in the context of the '275 patent analyses you did with respect to Sonicision, you did not test for the appearance of any transverse vibrations?", Plaintiffs' expert, Dr. Schafer, testified: "That is correct, nor did I feel that I needed to. But I did not test for it." (*Id.* at 31).[19]

50. The Durfee Rebuttal Report explains that Defendants performed water and glycerin droplet tests in an effort to detect the existence of transverse vibrations in the Sonicision device. (*Id.* at 154-55).

51. When asked at his July 18, 2013 deposition why he thinks the Sonicision device has not experienced problems of transverse vibration, Defendants' engineer, Robert Stoddard, testified: "By design – there are several things that were put in the design to prevent it from happening, and so I think the design considerations that were put in made it work." (Doc. 102-2 at 4-5).

---

[16] Plaintiffs admit only that No. 46 quotes a portion of the Schafer Dep. Tr.
[17] Plaintiffs admit only that No. 47 quotes a portion of the Schafer Dep. Tr.
[18] Plaintiffs admit only that No. 48 quotes a portion of the Schafer Dep. Tr.
[19] Plaintiffs admit only that No. 49 quotes a portion of the Schafer Dep. Tr.

10

52. When asked at his deposition to identify the "design considerations" associated with preventing transverse vibrations, Stoddard testified: "Primarily symmetry of the transducer and waveguide, and a second is making sure that the system only drives at the longitudinal resonant frequency." (*Id.* at 5).

53. The Schafer Infringement Report states that "[t]ransverse modes occur for a variety of reasons, including driving the waveguide at an inappropriate frequency, and imbalances (e.g., asymmetry, curvature, loading) in the waveguide/blade of the system." (Doc. 102-1 at 40).[20]

54. Engineering Change Form, EC Title: Issue of Disposable DFMEA, dated December 3, 2010 (Bates Numbered COV0531844- 918) (Doc. 102-2 at 27), includes a "Failure Modes and Effect Analysis," which depicts the following chart at COV0531863:



55. The "Failure Modes and Effects Analysis" chart depicted on COV0531863 lists "Dampens waveguide" as a "Failure Mode" of "Sleeve-DRW00175." (*Id.*)

---

[20] Plaintiffs admit only that No. 53 quotes a portion of the Schafer Infringement Report.

11

56. The "Failure Modes and Effects Analysis" chart depicted on COV0531863 lists an "Item Function" of "Sleeve-DRW00175" as "Prevents waveguide from touching inner tube." (*Id.*)

57. When asked at his July 18, 2013 deposition: "What's the purpose of the sleeve?", Stoddard testified: "Primarily to prevent contact of the nodal ribs directly with the inner tube to prevent squealing or rubbing of those two parts where it became an audible – an audible nuisance to the user." (*Id.* at 3).

58. In Plaintiffs' Supplemental Response to Interrogatory No. 2, Plaintiffs identified the following Harmonic ACE "curved shears" products as being covered by one or more claims of the '275 patent:

| Product Code | Product Description |
|---|---|
| ACE14S | HARMONIC ACE® CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 14 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE23E | HARMONIC ACE® ERGONOMIC GRIP - CURVED SHEAR, 23 CM LENGTH |
| ACE23J | HARMONIC ACE CURVED SHEARS WITH ERGONOMIC HANDLE AND HAND CONTROL |
| ACE23P | HARMONIC ACE® CURVED SHEARS WITH PISTOL HANDLE AND HAND CONTROL - 23 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE23S | HARMONIC ACE® CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 23 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE36E | HARMONIC ACE® ERGONOMIC GRIP - FINGER ACTIVATION CURVED SHEAR, 36 CM LENGTH |
| ACE36J | HARMONIC ACE CURVED SHEARS WITH ERGONOMIC HANDLE AND HAND CONTROL |
| ACE36P | HARMONIC ACE® CURVED SHEARS WITH PISTOL HANDLE AND HAND CONTROL - 36 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE36S | HARMONIC ACE® CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 36 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE45E | HARMONIC ACE® ERGONOMIC GRIP - CURVED SHEAR, 45 CM LENGTH |

(*Id.* at 105).

59. When asked the following question at his June 13, 2013 deposition: "And the damping sheath, is that used to dampen transverse vibrations, longitudinal vibrations, or both -- according to the patent?", Plaintiffs' 30(b)(6) witness, Mr. Kevin Houser, testified: "as I understand it, it's used to dampen out transverse vibrations without damping out longitudinal vibrations. And the whole – the whole idea behind this is to allow the device to work in the intended manner, which is longitudinally, and prevent spurious transverse modes from absorbing energy." (*Id.* at 140).[21]

---

[21] Plaintiffs admit only that No. 59 quotes a portion of the Deposition of Kevin Houser.

12

60. Defendants' Interrogatory No. 11, contained in Defendants' First Set of
    Interrogatories Propounded on Ethicon Endo-Surgery, Inc. and Ethicon Endo-
    Surgery, LLC, dated September 6, 2012, Interrogatory No. 11 requests:

    > Describe the circumstances of the testing, evaluation and inspection of
    > the Sonicision device with regard to the absorption of undesired
    > vibrations along the transmission rod by the damping sheath, including
    > but not limited to Ethicon's basis for its statements in its initial
    > infringement contentions that the transmission rod includes raised nodes
    > that contact the clear damping sheath and that the damping sheath
    > absorbs undesired vibrations along the transmission rod without the use
    > of a fluid, including but not limited to protocols and methods for testing,
    > evaluation and inspection, person(s) performing such tests, evaluations
    > and inspections, the data and results of the tests, evaluations and
    > inspections, other devices and/or prototypes used as comparison or
    > control for such testing, evaluation and inspection and the data and
    > results thereof.

    (*Id.* at 149).

61. Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories,
    dated October 18, 2012, provided the following Response to Interrogatory No. 11,
    in relevant part:

    > Subject to and without waiving its General or Specific Objections, or
    > any applicable privilege or protection from disclosure, Plaintiffs respond
    > that counsel for Plaintiffs, with assistance from an EES engineer,
    > inspected the Sonicision device and concluded, on the basis of basic
    > scientific principles and its knowledge of ultrasonic devices, that the
    > Sonicision's damping sheath absorbs undesired vibrations along the
    > transmission rod. This conclusion is supported by the physical
    > characteristics of the Sonicision device including, among other things,
    > the length of the transmission rod, the frequency of ultrasonic
    > vibrations, and the placement of the nodes.

    (*Id.* at 167-68).

13

62. Plaintiffs' Supplemental Responses to Interrogatory Nos. 3, 6, 10 and 11, dated December 10, 2012, provided the following Supplemental Response to Interrogatory No. 11:

> In addition to its objections and responses set forth in Plaintiffs' original response to this Interrogatory, Plaintiffs state that prior to submitting its initial infringement contentions, Plaintiffs' counsel, with assistance from Kevin Houser, an EES engineer, inspected the Sonicision device both assembled and disassembled (including inspection of the transmission rod and damping sheath). By visual inspection, it can be seen that Sonicision's transmission rod includes raised nodes and that the raised nodes contact the clear dampening sheath when the device is assembled. Visual inspection also confirmed the absence of fluid in the device. During operation of the device, in both clamping an object and without contact with an object, minimal undesired vibrations were observed. Based on scientific principles and experience in design of ultrasonic devices, it is clear that Sonicision's damping sheath absorbs undesired vibrations along the transmission rod.

(*Id.* at 178-79).

63. When asked the following question at his July 16, 2013 deposition: "So other than what has been provided in interrogatory responses, you're not going to testify about the testing done on the sheath today?", Houser, testified: "No." (*Id.* at 182).[22]

64. Exhibit D to Plaintiffs' Disclosure of Asserted Claims and Infringement Contentions, dated June 13, 2012, includes a claim chart that provides the following contentions with respect to claim 1 of the '275 patent:

| a damping member surrounding at least a portion of the transmission rod, the damping member configured to loosely contact the transmission rod over a portion of the transmission rod, the damping member adapted to absorb undesired vibrations along the transmission rod without the use of a fluid; and | The transmission rod is surrounded by a damping sheath. *See* Fig. 6. The transmission rod includes raised nodes that contact the clear damping sheath. *Id.* The damping sheath absorbs undesired vibrations along the transmission rod without the use of a fluid. |
|---|---|

(*Id.* at 215).

---

[22] Plaintiffs admit only that No. 63 quotes a portion of the Deposition of Kevin Houser.

14

65. Exhibit B to Plaintiffs' Supplemental Disclosure of Asserted Claims and
    Infringement Contentions, dated June 10, 2013, includes a claim chart that
    provides the following contentions with respect to claim 1 of the '275 patent:

| | |
|---|---|
| a damping member surrounding at least a portion of the transmission rod, the damping member configured to loosely contact the transmission rod over a portion of the transmission rod, the damping member adapted to absorb undesired vibrations along the transmission rod without the use of a fluid; and | Sonicision's transmission rod is surrounded by a damping sheath. *See* Fig. 6. The damping sheath is a flexible polymeric sheath that is structured to have contact with the transmission rod other than at fixed support points and is not tightly fitted to the transmission rod. The damping sheath readily slides on and off of the transmission rod, thus demonstrating that it is not tightly fitted. The transmission rod includes raised nodes that contact the damping sheath. *Id.* There is no attachment between the damping sheath and the transmission rod at the raised nodes or at any part of the transmission rod. The nodes are not fixed support points. In addition, the sheath is structured to contact the transmission rod in the areas between the raised nodes. The damping sheath absorbs undesired vibrations along the transmission rod without the use of a fluid. |

(*Id.* at 245).

66. Figure 5 of the '275 patent depicts the following, which includes transmission rod
    (86) and damping sheath (160):



FIG. 5

15

### III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

Summary judgment of non-infringement consists of two steps. The Court must (1) first interpret the claim, and (2) then compare the properly construed claims to the alleged infringing device. *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1268 (Fed. Cir. 2007). To establish literal infringement, a plaintiff must prove that each and every limitation in a claim is literally met by the accused product. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001). Thus, if the accused product fails to meet even a single claim limitation, then there can be no literal infringement as a

16

**A0040**

matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

## IV.    ANALYSIS

### A.    "Configured to Loosely Contact the Transmission Rod Other than at Fixed Support Points"

The Sonicision sleeve is not configured to loosely contact portions of the transmission rod other than at fixed support points, as required by the '275 patent's independent claim 1 and dependent claim 3 under the Court's claim construction. (Doc. 101-1 at 3-4).

Before bringing suit and throughout fact discovery, Plaintiffs made no effort to determine whether the Sonicision sleeve contacts the waveguide anywhere besides the nodal ribs and offered no evidence to demonstrate contact elsewhere. (*Id.* at 14-16). Defendants do not dispute that contact between the sleeve and waveguide occurs at the nodal ribs. (*Id.* at 8). Under the Court's claim construction, contact only at the waveguide's nodal rib locations, and nowhere else, cannot satisfy the limitations of independent claim 1 and dependent claim 3. (*Id.* at 4-8). That is because the nodal ribs constitute fixed support points for the sleeve. Indeed, Plaintiffs' expert, Dr. Mark Schafer, conceded this point for the first time at his deposition, admitting that contact between the sleeve and a nodal rib "is not what the patent requires in terms of lose [sic] contact," because "[i]t has to have contact other than fixed locations." (*Id.* at 8).

17

Because the Court has excluded fixed support points from the locations where loose contact must occur, and because Sonicision's nodal ribs are fixed support points for the sleeve, Plaintiffs must show, among other things, contact between the sleeve and waveguide at other locations to prove infringement. Plaintiffs cannot make this showing in light of the record evidence. Plaintiffs do not, because they cannot, dispute that, by design, there is a clearance between the sleeve and waveguide. (*Id.* at 4). Plaintiffs also cannot dispute that the nodal ribs, where the sleeve makes contact, have an increased diameter in comparison to the rest of the waveguide. (*Id.* at 4, 6). As a result of this design, the clearance between the sleeve and waveguide is greatest between the nodal ribs, and contact between the sleeve and other portions of the waveguide is thereby avoided. (*Id.* at 4).

The evidence demonstrates an intentional lack of contact between the Sonicision sleeve and waveguide at locations other than the nodal ribs. Plaintiffs cannot prove otherwise through the record evidence. Low-resolution CT scan images, offered for the first time with Dr. Schafer's opening report, represent the only evidence of alleged contact between the sleeve and waveguide at locations besides the nodal ribs. Defendants' expert Dr. Durfee performed similar CT scans of the device, which confirm that the nodal ribs are the only portions of the Sonicision waveguide contacting the sleeve. (Doc. 102-2 at 153). At best, Dr. Schafer's blurry CT scans confirm contact at the waveguide's raised nodal ribs and are inconclusive on contact elsewhere. (Doc. 102-

18

1 at 47). At worst, these images show an air gap between the sleeve and waveguide at locations other than the nodal ribs. (Doc. 102-2 at 152).

Even assuming there were some evidence to suggest that the Sonicision sleeve is capable of contacting the transmission rod other than at fixed support points under certain conditions, summary judgment of non-infringement is still appropriate because there is no proof that the Sonicision sleeve is "configured to" make this contact, as claim 1 requires. Plaintiffs contend that "Sonicision's sleeve meets this requirement because it contacts the transmission rod at points other than fixed support points and is not tightly fitted." (Doc. 111 at 8). Under this Court's claim construction, however, there cannot be infringement merely because the sleeve might make some incidental contact with the waveguide at locations other than the nodal ribs. Rather, the sleeve must be "structured to have contact" at those locations. (*Id.* at 28). *SIPCO, LLC v. Abb, Inc.*, No. 6:11-CV-0048 LED-JDL, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012) ("Interpreting 'configured to' as requiring only mere capability would eliminate any meaningful limits to the claims").

There is no evidence to suggest that the Sonicision sleeve is structured to have contact with the waveguide other than at the nodal ribs. In fact, the evidence demonstrates that the sleeve is structured to contact the waveguide only at the raised nodal ribs. (Doc. 111 at 39-40). Documents reflect that the sleeve is designed to avoid dampening the waveguide. (*Id.*) If the sleeve were actually structured to loosely contact

19

**A0043**

the waveguide at points other than the nodal ribs, then this dampening effect could not be avoided.  To prevent dampening of desired longitudinal vibrations along the waveguide, the sleeve is structured to have contact with the waveguide only at the nodal ribs, where amplitudes of longitudinal vibration are minimal.  (*Id.* at 29).  By configuring the sleeve in this way, the sleeve acts as a buffer that prevents direct metal-to-metal contact between the waveguide's raised nodal ribs and the surrounding inner tube, without unnecessarily absorbing longitudinal vibrations along the waveguide that are essential to the effective operation of the device.  (*Id.* at 29, 31, 33-34, 40).

Plaintiffs contend that design considerations with respect to the sleeve's contact points are irrelevant, because intent is not an element of direct infringement.  (*Id.* at 12).  Defendants are not relying on evidence of design consideration to argue that there is no infringement because Defendants do not intend to infringe, however.  Here, elements of design purpose and function are inherent in the claim language (*i.e.*, "configured to loosely contact") and reflected in this Court's claim construction (*i.e.*, "structured to have contact").  Evidence demonstrating that the Sonicision sleeve is specifically designed to avoid contact with the transmission rod at points other than the nodal ribs and to perform a particular function is essential to determining whether the sleeve is "structured to have contact other than at fixed support points" as the asserted claims require.  *SIPCO*, 2012 WL 3112302 at *11 ("the claims mandate that the devices are 'configured to' perform particular functions. . . . Accordingly, the Court finds that 'configured to' means 'actually

20

**A0044**

programmed or equipped with hardware or software to'").

In sum, even if the evidence suggests that the Sonicision sleeve is capable of contacting the waveguide at the requisite locations under certain conditions, Plaintiffs have failed to raise any genuine issue of fact as to whether the Sonicision sleeve is actually "structured to" do so. Rather, the evidence demonstrates that, by design, contact between the sleeve and portions of the waveguide other than the nodal ribs is purposely avoided. Therefore, under the Court's claim construction, and in light of the record evidence, Sonicision does not literally infringe claims 1 and 3 of the '275 patent as a matter of law.

## B.    "Adapted to Absorb Undesired Vibrations"

Even if Plaintiffs could show evidence that the Sonicision sleeve is structured to contact the transmission rod "other than at fixed support points," Sonicision still does not infringe the '275 patent's claims 1 and 3 as a matter of law, because the sleeve is not "adapted to absorb undesired vibrations along the transmission rod" (*i.e.*, waveguide). There is no evidence to show that contact between the sleeve and the waveguide – anywhere along the waveguide's length – would result in the absorption of unwanted transverse vibrations, as described in the patent. Plaintiffs have failed to measure any degree of transverse vibrations in the Sonicision device or identify any point along the waveguide where such vibrations might occur – through testing, experimentation, or otherwise. (Doc. 101-1 at 11, 14-16).

21

The evidence shows that the Sonicision device is actually designed to avoid generating any transverse vibrations. Because asymmetry results in the occurrence of transverse vibrations, the Sonicision waveguide is designed to be symmetrical. (*Id.* at 11-12). Thus, by mechanical design, Sonicision avoids the transverse vibrations that the patent describes as "unwanted." Electrically, the Sonicision system is designed to only resonate at its longitudinal mode, which also serves to avoid unwanted transverse vibrations. (*Id.* at 11-12). Defendants performed water and glycerin droplet tests in an effort to detect the existence of transverse vibrations along the Sonicision waveguide where Dr. Schafer contends that the sleeve contacts. (*Id.* at 11). The results of those tests support the testimony of Defendant's engineer Stoddard, that the Sonicision device does not experience any problems with transverse vibrations. (*Id.*) Plaintiffs have failed to contradict this evidence with any showing that transverse vibrations actually occur in the Sonicision. (*Id.* at 11, 14-16).

Plaintiffs submit the Schafer Declaration in support of their opposition in which Dr. Schafer states that he recently performed tests, after his deposition, which "evidence" undesired vibrations in Sonicision. (Doc. 111 at 174). Dr. Schafer's declaration does not attach or reference any corroborating documentation or data relating to these purported tests. Dr. Schafer's unsupported statement is thus insufficient to create an issue of material fact on summary judgment. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080-81 (Fed. Cir. 2005) ("A party does not manufacture more than a merely

22

colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion").[23]

Consistent with Plaintiffs' position throughout fact discovery, and at all times prior to Dr. Schafer's deposition, the '275 patent's asserted claims call for the actual presence and absorption of undesired (*i.e.*, unwanted transverse) vibrations. If claim 1 is not specifically directed to a device that experiences undesired vibrations, then there is no sense in requiring that the claimed damping sheath be "adapted to" absorb them. Furthermore, by arguing that undesired vibrations are not required by the claims, Plaintiffs raise a legal question rather than any genuine issue of fact sufficient to overcome summary judgment. Plaintiffs' position is legally unsustainable, however, because it improperly ignores the claim's functional limitation – to absorb undesired vibrations. "Th[is] functional language is, of course, an additional limitation in the claim." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (citing *Wright Medical Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443–44 (Fed. Cir. 1997)).

---

[23] *See also Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009) (affirming grant of summary judgment of non-infringement where expert declaration contained "no more than an unsupported conclusion of infringement that is not sufficient to raise a genuine issue of material fact"); *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("it is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact"); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998) (affirming summary judgment of non-infringement over expert declarations found "wholly conclusory, devoid of facts upon which the affiant[s'] conclusions, as experts, were reached"); *FTC v. Publishers Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact").

23

When claims include such functional language, that function must be interpreted as a limitation of the claim that must be met for infringement to occur. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) (affirming district court's holding that that the "'processor for executing said data collection application' requires that 'the recited function must be performed'").

Absorbing undesired vibrations is therefore a functional limitation of the claimed damping sheath. As such, it is an additional claim limitation that the Sonicision sleeve must actually satisfy to infringe. (*See id.*) Without the existence of undesired vibrations, this required function cannot be performed. Because there is no proof that Sonicision even experiences unwanted transverse vibrations, there is no proof that Sonicision actually absorbs undesired vibrations as the claims require. Accordingly, there can be no infringement as a matter of law.

Even if the Court accepts Plaintiffs' theory that the claims do not require proof of undesired vibrations, summary judgment of non-infringement is still appropriate, because without such proof, there is no evidence that the Sonicision sleeve is "adapted to absorb undesired vibrations" as the claims require. Plaintiffs contend that to infringe, the sleeve only needs to be able to absorb undesired vibrations, upon loose contact, should they occur. (Doc. 111 at 13). This position is legally untenable, however, because the claims require that the damping sheath be specifically designed or "adapted to" absorb undesired vibrations, not merely capable of absorbing them. Just as the sleeve is not "structured to

24

**A0048**

have contact other than at fixed support points," the sleeve is not "adapted to absorb

undesired vibrations." Indeed, courts have interpreted the term "adapted to" to mean

"designed to" or "configured to" – rather than "merely capable of" – when, as here, the

patent claims and written description describe a particular objective to be accomplished.[24]

Here, the '275 patent's asserted claims and written description identify and

describe a particular objective that the claimed damping sheath is designed to accomplish

– absorbing undesired vibrations. (Doc. 111 at 26, 34-36). As such, the Sonicision

sleeve must be configured or structured to absorb undesired vibrations in order to meet

the "adapted to absorb undesired vibrations" claim element. *See Aspex Eyewear*, 672

F.3d at 1349. There is no proof that the sleeve is configured or structured to absorb

undesired vibrations. Indeed, the proof is to the contrary. The Sonicision sleeve is

structured to have contact at the raised nodal ribs where contact, as conceded by

Plaintiffs' expert, is not relevant to these claims. (Doc. 111 at 32, 39-40, 166-75).

In any event, for the sleeve to be adapted (*i.e.*, structured or configured) to absorb

undesired vibrations, such unwanted vibrations have to actually exist. But the record

---

[24] *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012)
("Amended claim 23 refers to the arms and magnetic members as 'adapted to extend across
respective side portions' of a primary frame. In that context, the phrase 'adapted to' is most
naturally understood to mean that the arms and magnetic members are designed or configured to
accomplish the specified objective, not simply that they can be made to serve that purpose");
*Boston Sci. Corp. v. Cordis Corp.*, No. 02-01474 JW, 2006 WL 3782840, at *2-3 (N.D. Cal.
Dec. 20, 2006) (interpreting "adapted to" to mean "configured to" because that definition
"embraces the concept of a device intentionally and specifically made to act in a certain way,"
consistent with the patent's "written description . . . [which] discloses embodiments in which
specific types of materials and wire dimensions are used to make coils that act in certain ways");
*Sta-Rite Indus., LLC v. ITT Corp.*, 682 F. Supp. 2d 738, 753 (E.D. Tex. 2010) (construing "the
term 'adapted to' to mean 'designed or configured to'" rather than "having the capacity to").

evidence, such as Defendants' water droplet testing, demonstrates that Sonicision does not experience significant unwanted transverse vibrations to be absorbed. It is not Defendants' burden to demonstrate the absence of undesired vibrations in Sonicision devices; it is Plaintiffs' burden as the patentee to prove their existence, which they have failed to do. Because Sonicision does not experience problems with "unwanted transverse vibrations," even if there were contact between the sleeve and waveguide other than at the nodal ribs, such contact would not result in the absorption of undesired vibrations. Rather, such contact could have the adverse effect of absorbing desired, longitudinal vibrations essential to the proper functioning of the device. That is why dampening the waveguide is identified as a "failure mode" of the sleeve component. (*Id.* at 12). Thus, the Sonicision sleeve is specifically designed to avoid absorbing *any* vibrations along the waveguide.

Based on the foregoing, absent evidence of significant unwanted transverse vibration interrupting the device's operation, the Sonicision sleeve cannot be "adapted to absorb undesired vibrations along the transmission rod," regardless of whether the sleeve contacts the transmission rod other than at fixed support points. The evidence fails to show that the Sonicision experiences any transverse vibrations, let along undesired vibrations affecting the operation of the device. What the evidence does show, however, is that Sonicision is purposefully designed to avoid unwanted transverse vibrations, and that the device is constructed to avoid the sleeve's absorption of any vibrations along the

26

waveguide.  Therefore, in light of the record evidence, Plaintiffs have failed to raise any genuine issue as to whether the Sonicision sleeve is "adapted to absorb undesired vibrations along the transmission rod," and Sonicision does not literally infringe claims 1 and 3 of the '275 patent as a matter of law, for this reason as well.

## V.   CONCLUSION

Accordingly, for the reasons stated here, there being no genuine issues of material fact in dispute, and Defendants being entitled to entry of judgment as a matter of law, Defendants' Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 5,989,275 (Doc. 101) is hereby **GRANTED**.

**IT IS SO ORDERED.**

Date:  1/22/14                                          */s/ Timothy S. Black*
                                                                 Timothy S. Black
                                                                 United States District Judge

27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ETHICON ENDO-SURGERY, INC., *et al.*, | : | Case No. 1:11-cv-871 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COVIDIEN, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OF NON-INFRINGEMENT AND INVALIDITY
OF U.S. PATENT NO. 8,182,501 (Doc. 103)**

This civil action is before the Court on Defendants' Motion for Summary

Judgment of Non-Infringement and Invalidity of U.S. Patent No. 8,182,501 (Doc. 103)

and the parties' responsive memoranda.  (Docs. 113 and 125).

## I.     BACKGROUND

Plaintiffs assert infringement of independent claims 1, 12, 17, 22 and 23 and

dependent claims 2, 4, 5, 7, 8, 11, 13, 15, 16, 18, 20, and 21 of U.S. Patent No. 8,182,501

("the '501 patent").  (Doc. 103-1 at 2).  The '501 patent describes ultrasonic surgical

shears for sealing a blood vessel, having a clamp and blade at the distal end.  (*Id.*)  The

device claimed in the '501 patent provides or exerts a "predetermined" clamping force

on the clamping arm.  (*Id.* at 3).  As determined by the Court's construction, a

"predetermined" clamping force or clamping pressure is a force or pressure "set in

advance of operating the clamping arm" or "set by the user prior to operating the

clamping arm."  (*Id.*)

In addition to the requirement for a predetermined force, the claims of the '501 patent require two means-plus-function limitations: "means for limiting clamp force" (or "force-limiting means") (Claims 1, 12, 17, 22 and 23) and "means for providing/exerting clamp force" (or "force-creating means") (Claims 1 and 12). (*Id.* at 3-5).[1] Dependent claims 4, 5, 7, 8, and 11 depend either directly or indirectly from claim 1, and thus contain both the force-creating and force-limiting claim limitations. (*Id.* at 4, 6). Dependent claims 13, 15, and 16 depend either directly or indirectly from claim 12, and thus also contain both the force-creating and force-limiting claim limitations. (*Id.*) Dependent claims 18, 20, and 21 depend either directly or indirectly from claim 17, and thus contain the force-limiting claim limitation. (*Id.* at 4).

Defendants now move for summary judgment on the bases that (a) Plaintiffs have failed to raise any genuine issue of material fact with respect to alleged infringement of the '501 patent and (b) the '501 patent claims are insolubly ambiguous, and should therefore be found indefinite and invalid as a matter of law. (Doc. 103 at 8).

---

[1] If Defendants are found not to infringe the '501 patent's asserted independent claims, then they cannot be found to infringe the asserted dependent claims which incorporate all the independent claim limitations. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim"). Defendants' motion for summary judgment of non-infringement thus focuses on claim limitations contained in the '501 patent's asserted independent claims, incorporated into the asserted dependent claims.

## II.    UNDISPUTED FACTS[2]

1. The '501 patent, entitled "Ultrasonic Surgical Shears and Method for Sealing a Blood Vessel Using Same," was filed on February 24, 2005 and claims priority to Provisional Application No. 60/548,308, filed on February 27, 2004. (Doc. 103-3 at 2).

2. The '501 patent issued on May 22, 2012 and is assigned to Plaintiffs. (*Id.*)

3. Kevin L. Houser and Sarah A. Noschang are the named inventors on the '501 patent. (*Id.*)

4. When Plaintiffs' expert, Dr. Mark Schafer, was asked the following question at his deposition regarding the Expert Report of Mark E. Schafer, Ph.D., dated August 19, 2013 ("Schafer Infringement Report"): "With respect to Exhibit 2, your report on infringement, are all the opinions you currently hold on the '501 patent and the infringement of this patent contained within Exhibit 2?", Dr. Schafer testified: "I think I may have stated that earlier. But this is a summary of my opinions, but I reserve the right, as any additional information is disclosed, to update that opinion." (*Id.* at 13-14).

5. Plaintiffs assert infringement of independent claims 1, 12, 17, 22 and 23 and dependent claims 2, 4, 5, 7, 8, 11, 13, 15, 16, 18, 20, and 21 of the '501 patent. (*Id.* at 37).

6. The '501 patent "Abstract" describes an ultrasonic surgical shears with a clamp and blade for sealing a blood vessel as follows:

> An ultrasonic surgical shears includes an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm. A method for sealing a blood vessel of a patient includes obtaining an ultrasonic surgical shears and positioning the blood vessel between the blade and the tissue pad. The clamping arm is operated to exert an average coaptation pressure on the blood vessel between and including 60 psi and 210 psi. The blade is ultrasonically vibrated to transect and seal the blood vessel.

(*Id.* at 2).

---

[2] (*See* Doc. 103-1 and Doc. 113 at 32-79).

3

A0054

7. Figure 2 of the '501 patent depicts a clamp and blade at the distal end of an ultrasonic surgical instrument as follows:



FIG. 2

(*Id.* at 4).

8. In describing one enablement of the first embodiment of Figure 2, the '501 patent states: "the clamping-force creating means 28 includes a substantially constant force spring, which applies a predetermined force to the clamping arm." (*Id.* at 8).

9. In its April 25, 2013 Order on Claim Construction ("Claim Construction Order"), the Court adopted the parties' agreed-upon construction of the claim term "predetermined force" to mean "clamping force set in advance of operating the clamping arm or clamping force set by the user prior to operating the clamping arm." (Doc. 64-1 at 5; Doc. 81 at 7).

10. The Court adopted the parties' agreed-upon construction of the claim term "predetermined pressure" to mean "clamping pressure set in advance of operating the clamping arm or clamping pressure set by the user prior to operating the clamping arm." (*Id.*)

4

A0055

11. Independent claims 1, 12, and 17 of the '501patent include the following claim limitation: "means for limiting a user applied clamp force." (*Id.* at 9-10).

12. Dependent claims 4, 5, 7, 8, 11 13, 15, 16, 18, 20, and 21 incorporate the "means for limiting a user applied clamp force" claim limitation. (*Id.*)

13. Independent claims 22 and 23 of the '501 patent include the following claim limitation: "limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel." (*Id.*)

14. In referring to the "means for limiting user applied clamp force" and "limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel" claim limitations, the Court stated in its Claim Construction Order that "[t]he parties agree that both of these claim elements are governed by 35 U.S.C. § 112, ¶ 6 and agree that the function includes 'to limit a user applied clamp force.'" (Doc. 81 at 19).

15. In its Claim Construction Order, the Court stated that "[t]he parties also agree that 'means for limiting a user applied clamping force' is a means-plus-function term and 'limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel' is a step- plus-function term and that they share common functions and corresponding structures under § 112, ¶ 6 and therefore they should be construed together." (*Id.* at 19-20).

16. The Court adopted Defendants' proposed construction of the corresponding structure for the "means for limiting user applied clamp force" and "limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel" claim elements to be: "A conventional torque wrench; element 40 as positioned between the scissor-like grips in Figure 3." (*Id.*)

5

A0056

17. Figure 3 of the '501 patent depicts element 40 positioned between the scissor-like grips as follows:



FIG. 3

(Doc. 103-3 at 5).

18. Plaintiffs proposed the following construction of the corresponding structure for the "means for limiting user applied clamp force" and "limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel" claim elements, which the Court did not adopt:

> Each of the following alone or in combination: (1) a motor which rotates either the clamp arm or the blade relative to the other and is preselected to cause a known-size clamping surface area to exert the desired pressure on tissue large enough to cover the clamping surface area, (2) a variable torque motor with user settings to set the value or range of the force; (3) a substantially constant force spring, while applied a predetermined force to the clamp arm; and (4) a physical stop limiting the range of motion of the actuator rod. Equivalents to (1), (2), (3), and (4) are also included.

(Doc. 81 at 19).

19. In its Claim Construction Order, the Court found that "Plaintiffs' proposed construction identifies structures not clearly linked to the claimed function." (*Id.* at 20).

6

A0057

20. Independent claim 1 includes the following claim limitation: "means for providing a clamp force." (Doc. 103-3 at 9).

21. Dependent claims 4, 5, 7, 8, and 11 incorporate the "means for providing a clamp force" claim limitation. (*Id.*)

22. Independent claim 12 includes the following claim limitation: "means for exerting a predetermined clamping force on the clamping arm." (*Id.*)

23. Dependent claims 13, 15 and 16 incorporate the "means for exerting a predetermined clamping force on the clamping arm." (*Id.* at 9-10).

24. The Court adopted the parties' following agreed-upon construction of the function of the "means for providing a clamp force" and "means for exerting a predetermined clamping force on the clamping arm" claim terms: "to provide or exert a predetermined clamp force." (Doc. 64-1 at 5; Doc. 81 at 7).

25. The Court adopted the parties' following agreed-upon construction of the corresponding structure of the "means for providing a clamp force" and "means for exerting a predetermined clamping force on the clamping arm" claim terms:

> (1) motor which rotates one of the clamping arm and the blade relative to the other of the clamping arm and the blade, wherein the motor is preselected to cause a known-size clamping surface area to exert the desired pressure on tissue large enough to cover the clamping surface area, (2) user settings to set the value or range of the force or pressure, such settings operating to select a voltage or current to control a variable torque motor to cause a known-size clamping surface to exert the desired pressure or a pressure within a range of desired pressures, or (3) a substantially constant force spring which applies a predetermined force to the clamping arm.

(*Id.*)

26. The Schafer Infringement Report contends that, in the Sonicision device, "[t]he Force Spring meets the functional limitation (to provide or exert a predetermined clamp force) and structural limitation (a substantially constant force spring which applies a predetermined force to the clamping arm) for the means for providing a clamp force and the means for exerting a predetermined clamping." (Doc. 103-3

7

A0058

at 62).[3]

27. Neither the Schafer Infringement Report nor Plaintiffs' Infringement Contentions assert that Sonicision includes either of the following structures or their equivalents: (1) motor which rotates one of the clamping arm and the blade relative to the other of the clamping arm and the blade, wherein the motor is preselected to cause a known-size clamping surface area to exert the desired pressure on tissue large enough to cover the clamping surface area, (2) user settings to set the value or range of the force or pressure, such settings operating to select a voltage or current to control a variable torque motor to cause a known-size clamping surface to exert the desired pressure or a pressure within a range of desired pressures. (*Id.* at 49, 85-97).

28. The Schafer Infringement Report describes the Sonicision device as follows:

> Sonicision system is made of three primary, separable components: the disposable, the TAG ("Transducer and Generator"), and the battery. The disposable contains the portions of the device that actually operate on a patient (blade, clamping arm) and include the primary means for a surgeon to control the device (handle, activation button, and distal rotation knob). The TAG contains the transducer and generator, which produce the ultrasonic vibrations and provide various electronic control mechanisms for maintaining system resonance and indicating system status. The battery is a rechargeable battery that provides power to electrical energy to the TAG, which is then converted to ultrasonic energy.

(*Id.* at 40).[4]

29. The Schafer Infringement Report states that the Sonicision "disposable is made of numerous components including a probe/waveguide, damping sleeve, inner and outer tubes, jaw, trigger (handle), force spring, and activation button." (*Id.*)[5]

30. The Schafer Infringement Report states that "Sonicision cuts tissue using an ultrasonic surgical blade" and that "[a] clamp jaw, or arm, is operable to open and close toward the blade." (*Id.* at 49).[6]

---

[3] Plaintiffs admit only that No. 26 quotes a portion of the Schafer Infringement Report.
[4] Plaintiffs admit only that No. 28 quotes a portion of the Schafer Infringement Report.
[5] Plaintiffs admit only that No. 29 quotes a portion of the Schafer Infringement Report.
[6] Plaintiffs admit only that No. 30 quotes a portion of the Schafer Infringement Report.

A0059

31. The Schafer Infringement Report contends that "transmission rod connects the TAG and the blade," that "the transmission rod is attached to the acoustic mount," and that the transmission rod "receives ultrasonic vibrations from the acoustic mount at its first end, and it transmits the ultrasonic vibrations to its second end, where the blade is located." (*Id.* at 42).[7]

32. According to the Schafer Infringement Report, ultrasonic instruments "use a blade oscillating at frequencies of approximately 55,000 times per second to cut and coagulate tissue." (*Id.* at 38).[8]

33. The Schafer Infringement Report states:

> The blade/waveguide of an ultrasonic surgical cutting tool vibrates at approximately 55.5 kHz. Vibrations are transmitted through the blade/waveguide through a standing wave that originates from the transducer assembly into the waveguide. The vibration within the waveguide is transferred to the blade through the compression and expansion of small sections of the waveguide along the longitudinal axis of the waveguide. This is referred to as longitudinal motion.

(*Id.* at 39).[9]

34. Plaintiffs' Supplemental Disclosure of Asserted Claims and Infringement Contentions, dated June 10, 2013, states: "When using Sonicision, the surgeon clamps a target blood vessel between the surgical blade and tissue pad of the clamp jaw." (*Id.* at 86).

35. A publication that Plaintiffs' expert, Dr. Mark Schafer, relies on in the Schafer Infringement Report explains that heat released from the application of ultrasonic energy denatures proteins in tissue resulting in coagulation. (*Id.* at 103).

36. According to a publication that Plaintiffs' expert, Dr. Mark Schafer, relies on in the Schafer Infringement Report: "The desired effect of ultrasound energy on the tissue depends on the synergistically combined application of ultrasound energy and mechanical force (tension and/or pressure on the tissue)." (*Id.* at 104).

---

[7] Plaintiffs admit only that No. 31 quotes a portion of the Schafer Infringement Report.
[8] Plaintiffs admit only that No. 32 quotes a portion of the Schafer Infringement Report.
[9] Plaintiffs admit only that No. 33 quotes a portion of the Schafer Infringement Report.

A0060

37. The Schafer Infringement Report contends that, in the Sonicision, "[t]he clamp force is created by pressing on the trigger, which through the lever action on the link, causes the yoke to move backwards." (*Id.* at 62).[10]

38. The Schafer Infringement Report contends that, in the Sonicision, "[t]he yoke pulls back on the bobbin assembly (which includes the bobbin, the slider, the Force Spring, and the nut." (*Id.*)[11]

39. The Schafer Infringement Report contends that, in the Sonicision, "[t]he bobbin is mechanically coupled to the outermost sheath, which is attached via a pivot point to the jaw (clamp arm)." (*Id.*)[12]

40. The Schafer Infringement Report contends that, in the Sonicision, "[t]he clamping force that is applied between the clamp and the end effector or blade results from the force applied through the outermost sheath onto the clamp." (*Id.*)[13]

41. Defendants' expert, Dr. William Durfee, states the following in the Rebuttal Expert Report of William Durfee Ph.D., dated September 23, 2013 ("Durfee Rebuttal Report"):

> The outer tube is actuated between the forward and rearward positions as follows: As the trigger moves toward the battery, a pivotal link moves rearward towards a slidable yoke, and the yoke then moves rearward. This in turn moves the slide rearward against a coil spring which causes the bobbin to move rearward and the outer tube (connected by bosses to the bobbin) to move from the forward to the rearward position. At a point, the coil spring will compress and allow the slide to move rearward independently of the bobbin to prevent the clamp from becoming overstressed.

(*Id.* at 108).[14]

---

[10] Plaintiffs admit only that No. 37 quotes a portion of the Schafer Infringement Report.
[11] Plaintiffs admit only that No. 38 quotes a portion of the Schafer Infringement Report.
[12] Plaintiffs admit only that No. 39 quotes a portion of the Schafer Infringement Report.
[13] Plaintiffs admit only that No. 40 quotes a portion of the Schafer Infringement Report.
[14] Plaintiffs admit only that No. 41 quotes a portion of the Durfee Rebuttal Report.

42. Plaintiffs' Supplemental Response to Interrogatory No. 2, dated February 13, 2013, states that the following EES products are covered by one of more claims of the '501 patent:

| ACE14S | HARMONIC ACE* CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 14 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
|---|---|
| ACE23E | HARMONIC ACE* ERGONOMIC GRIP - CURVED SHEAR, 23 CM LENGTH |
| ACE23J | HARMONIC ACE CURVED SHEARS WITH ERGONOMIC HANDLE AND HAND CONTROL |
| ACE23P | HARMONIC ACE* CURVED SHEARS WITH PISTOL HANDLE AND HAND CONTROL - 23 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE23S | HARMONIC ACE* CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 23 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE36E | HARMONIC ACE* ERGONOMIC GRIP - FINGER ACTIVATION CURVED SHEAR, 36 CM LENGTH |
| ACE36J | HARMONIC ACE CURVED SHEARS WITH ERGONOMIC HANDLE AND HAND CONTROL |
| ACE36P | HARMONIC ACE* CURVED SHEARS WITH PISTOL HANDLE AND HAND CONTROL - 36 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE36S | HARMONIC ACE* CURVED SHEARS WITH SCISSOR HANDLE AND HAND CONTROL - 36 CM LONG, 15 MM ACTIVE BLADE, 5.5 MM DIAMETER |
| ACE45E | HARMONIC ACE* ERGONOMIC GRIP - CURVED SHEAR, 45 CM LENGTH |
| FCS17 | HS FOCUS 17 CM CURVED SHEAR |
| FCS9 | HARMONIC FOCUS* CURVED SHEARS, TORQUE WRENCH AND GRIP ASSIST |
| HAR23 | HARMONIC LAP 5MM SHEAR 23CM |
| HAR36 | HARMONIC LAP 5MM SHEAR 36CM |

(*Id.* at 134).

43. The following figure was provided in Exhibit A to the Schafer Infringement Report:

11



**Fig. 14**
Results of testing the Force Spring. Blue shaded area represents the range of spring travel in the
Sonicision device; Red shaded area represents the resulting range of force produced by the spring.

(*Id.* at 69).

44. When asked at deposition, "But if – let's take out the extreme of not engaging the
trigger at all and say the trigger was engaged at least partially. Do you understand
what I'm saying? It's not fully squeezed. Can you get a clamp-force measurement
if the trigger is in that partially squeezed position?", '501patent co-inventor Sarah
Noschang testified: "Potentially." (Doc. 103-4 at 15).[15]

45. Pressure is calculated by force per unit area. (Doc. 103-3 at 8).

---

[15] Plaintiffs admit only that No. 44 contains a quote from a portion of the Noschang Dep. Tr.

46. Mr. Kevin Houser, Plaintiffs' 30(b)(6) witness and '501patent inventor, testified as follows to the following question at his deposition: Question – "Based on your understanding of clamp jaw force and pressure, would you expect that the pressure at the proximal end of the jaw would be substantially the same as the pressure measured in the middle of the jaw?"; Testimony – "No, because the force is different." (Doc. 103-4 at 24).[16]

47. Ms. Noschang, Plaintiffs' employee and '501patent co-inventor, testified as follows to the following questions at her deposition: Question – And is the clamping arm pressure the same across the entire length of the tissue pad for the Ace device? Ms. Noschang testified – No; Question – How does it differ? Ms. Noschang testified – It's higher closer to the pivot and slightly lower on the tip. (Id. at 5).[17]

48. Plaintiffs' expert, Dr. Mark Schafer, states the following in his rebuttal Expert Report of Mark E. Schafer, Ph.D. ("Schaffer Rebuttal Report") with respect to Ex. 13 to the deposition of Kevin Houser: "Durfee points to page 4 of Houser Ex. 13 which allegedly states that the clamp force of SonoSurg was 4.4. lbs. (EESON00008428-8432 at EESON00008431.) I have reviewed the testimony of Kevin Houser concerning the document. From the testimony it is not clear how the force was measured for SonoSurg. Specifically, it is not clear how the force measurement was taken. Without knowing this specifically, it is improper to rely on the 4.4 lbs." (Id. at 33-34).[18]

49. Sarah Noschang is a current employee of Plaintiffs who was hired full-time in June 1999. (Id. at 3).

50. In response to the question, "Were there particular methods you used to test clamping force and clamping pressure," Noschang testified there were "multiple methods" and when asked: "How many of those do you think there were, how many methods," she responded "at least four." (Id. at 4).[19]

---

[16] Plaintiffs admit only that No. 46 quotes a portion of the Houser March Dep. Tr.

[17] Plaintiffs admit only that No. 47 quotes a portion of the Noschang Dep. Tr.

[18] Plaintiffs admit only that No. 48 quotes a portion of the Schafer Rebuttal Report.

[19] Plaintiffs admit only that No. 50 quotes a portion of the Noschang Dep. Tr.

51. In response to the question concerning Exhibit 5 (Bates numbers EESS0N00073311 through 73314), "So, in other words, there are, this study points out that there are variations in the measurements as between test methods; isn't that correct?"; Ms. Noschang testified: "It points out that there is variation in the test method." (*Id.* at 7, 12, 37-40).[20]

52. With respect to Exhibit 5 from the March 7, 2013 deposition of Ms. Sarah Noschang (Bates numbers EESS0N00073311 - EESS0N00073314) (*Id.* at 37-40), Ms. Noschang testified as follows to the following questions: Question – "Aren't the measurements here both measuring clamp force?"; Testimony – "At a distance away from the blade, yes."; Question – "Yes. And yet they're coming up with different values of clamp force for the same device, aren't they?"; Testimony – "The study is pointing out that there is variation in the techniques, yes." (*Id.* at 13-14).[21]

53. With respect to Exhibit 8 (Bates numbers EESS0N00071910 - EESS0N00071914), Ms. Noschang provided the following testimony in response to the following questions: Question – "What is the alternate clamp force measurement that is referred to there?" – Ms. Noschang testified "The clamp-force measurement is to a specific location with height, so to control the test method, that could vary, which would then change the within-device measurement but not change the distance or the pressure between the blade and the pad. Just where you've measured it changes."; Question – "Okay. So just to make sure I understand, you're saying that the alternate clamp-force measurement that's referred to here changes the location, the axial location along the clamp arm at which the force is measured? – Ms. Noschang testified "Or the height of the clevis."; Question – "Okay. And would that alternate axial location, for example, if it was the alternate axial location, would that change the value of, in pounds of clamp force that you would measure in one measurement versus the other measurement?" – Ms. Noschang testified "At one specific discrete location, potentially."; Question – And if it was the height, the clevis pin height that was changed between the method and this alternate method, would that change the absolute value in pounds that would be measured in this method as compared to the alternate clamp force method?" – Ms. Noschang testified "The previous Exhibit 5 showed the correlation on the clevis height to clamp-force measurement." Question – "So that was the one we were looking at, whereas when the clevis pin was shorter, there was one measurement of clamp force, and then I believe it's as the position increased, the height increased and the clamp force also

---

[20] Plaintiffs admit only that No. 51 quotes a portion of the Noschang Dep. Tr.
[21] Plaintiffs admit only that No. 52 quotes a portion of the Noschang Dep. Tr.

14

A0065

increased?" – Ms. Noschang testified "Correct." (*Id.* at 16-17).[22]

54. In response to the question "And if I understand you correctly, what you're saying is if the method of measuring clamp force changes, the number 6.6, plus or minus .7 pounds, that number would change to something different?", Ms. Noschang testified "For a discrete location, yes." (*Id.* at 18).[23]

55. Dr. Mark Schafer, expert for Plaintiffs, stated in his Schafer Rebuttal Report that "the only way to generate force and pressure data that can be directly compared with the limits proscribed in the '501 patent is to conduct the measurements in the same manner as described in the patent." (*Id.* at 33).[24]

56. Robert Stoddard testified for the Defendants: "The way that we measure jaw clamping force on our device is specifically measured at .192 inches from the distal end of the waveguide." (*Id.* at 43).

57. When asked "And which of these measurements, if either, is most similar to the measurements that were used in the '501 patent?", Ms. Noschang testified "I can't say. I don't know." (*Id.* at 11).[25]

58. Claim 1 of the '501 patent states:

> A method for sealing a blood vessel of a patient comprising the steps of:
> a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, a tissue pad attached to the clamping arm, means for providing a clamp force and means for limiting a user applied clamp force, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; b) disposing the blood vessel between the blade and the tissue pad; c) operating the clamping arm to exert a predetermined average coaptation pressure on the blood vessel between and including 60 psi and 210 psi; and d) ultrasonically vibrating the blade to transect and seal the blood vessel.

(Doc. 103-3 at 9).

---

[22] Plaintiffs admit only that No. 53 quotes portions of the Noschang Dep. Tr.

[23] Plaintiffs admit only that No. 54 quotes a portion of the Noschang Dep. Tr.

[24] Plaintiffs admit only that No. 55 quotes a portion of the Schafer Rebuttal Report.

[25] Plaintiffs admit only that No. 57 quotes a portion of the Noschang Dep. Tr.

59. Claim 12 of the '501 patent states:

> An ultrasonic surgical shears comprising: a) an ultrasonic surgical blade; b) a clamping arm operable to open and close toward the blade; c) a tissue pad attached to the clamping arm; d) means for exerting a predetermined clamping force on the clamping arm, wherein the blade and tissue pad define a clamping surface area so that the clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; and e) means for limiting a user applied clamping force.

*(Id.)*

60. Claim 17 of the '501 patent states:

> An ultrasonic surgical shears comprising: a) an ultrasonic surgical blade; b) a clamping arm operable to open and close toward the blade; c) a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; and d) means for limiting a user applied clamping force on the clamping arm creating an average predetermined clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad and the blade.

*(Id.* at 10).

61. Claim 22 of the '501 patent states:

> A method for sealing a blood vessel of a patient comprising the steps of: a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a predetermined clamping pressure of 210 psi at the clamping surface area; b) disposing the blood vessel between the blade and the tissue pad; c) limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel; and d) ultrasonically vibrating the blade to transect and seal the blood vessel.

*(Id.)*

16

**A0067**

62. Claim 23 of the '501 patent states:

> A method for sealing a blood vessel of a patient comprising the steps of: a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a predetermined clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; b) disposing the blood vessel between the blade and the tissue pad; c) limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel; and d) ultrasonically vibrating the blade to transect and seal the blood vessel for no more than 4.5 secs.

> (*Id.*)

63. Claims 1, 17 and 23 of the '501 patent include "the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area." (*Id.* at 9-10).

64. Claim 22 of the '501 patent includes "the applied clamp force does not exceed a predetermined clamping pressure of 210 psi at the clamping surface area." (*Id.* at 10).

65. Claim 12 of the '501 patent includes "the clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area." (*Id.*)

66. Claim 8 of the '501 patent includes "exerts a clamping force on the clamping arm between and including 2 pounds and 7 pounds." (*Id.* at 9).

67. Claims 16 and 21 of the '501 patent include "the clamping force is between and including 2 pounds and 7 pounds." (*Id.* at 10).

68. The Court construed the phrase "clamp(ing) [pressure/force] [of/between and including] . . . a value" as "clamping arm exerts a clamp(ing) [pressure/force] [of/between and including] a value when the clamping arm is fully engaged by the user." (Doc. 81 at 21, 24).

69. The Court construed the phrase "average coaptation pressure . . . between and including . . . a value" as "clamping arm exerts an average coaptation pressure . . . between and including . . . a value when the clamping arm is fully engaged by the user. (*Id.*)

17

70. Plaintiffs' 30 (b)(6) witness, Kevin Houser, testified to the following questions as follows: Question – "The force you measured at the middle of the jaw, would you expect there to be similar values at the proximal end? I'll start with that." Mr. Houser testified – "No"; Question – "Would you expect there to be similar values at the distal end?" Mr. Houser testified – No." (Doc. 103-4 at 24-25).[26]

71. Plaintiffs' employee and inventor Sarah Noschang testified as follows to the following questions: Question – "So if you were to do this same Method 1 and measure clamp force instead of at the midpoint, at some point closer to the pivot point, would the clamp-force measurements increase?" Ms. Noschang testified – "The pound measurement would change, yes."; Question – "And if you were to measure clamp-force measurements more toward the distal end of the device instead of the midpoint, would the clamp-force measurements decrease?" Ms. Noschang testified "It would change, yes." (*Id.* at 6).[27]

72. Mr. Houser testified that Houser Exhibit 71 was Plaintiffs' business record. (*Id.* at 48).

73. Exhibit 71 contains the following figures at page EESSON00192639:



(*Id.* at 63).

---

[26] Plaintiffs admit only that No. 70 quotes a portion of the Houser March Dep. Tr.
[27] Plaintiffs admit only that No. 71 quotes a portion of the Noschang Dep. Tr.

18

74. Plaintiffs' expert, Dr. Schafer, presented the following Tables:

| Specimen ID | Load when jaw opened (lbf) | Mean | Standard Deviation | Coefficient of Variance |
|---|---|---|---|---|
| F 1 | 4.596 | 4.56 | 0.04 | 0.8% |
|  | 4.599 |  |  |  |
|  | 4.542 |  |  |  |
|  | 4.559 |  |  |  |
|  | 4.517 |  |  |  |
| F 2 | 4.503 | 4.46 | 0.02 | 0.5% |
|  | 4.468 |  |  |  |
|  | 4.438 |  |  |  |
|  | 4.456 |  |  |  |
|  | 4.454 |  |  |  |
| F 3 | 4.067 | 4.02 | 0.03 | 0.8% |
|  | 4.028 |  |  |  |
|  | 3.989 |  |  |  |
|  | 4.014 |  |  |  |
|  | 3.983 |  |  |  |
| All measurements | | 4.35 | 0.25 | 5.7% |

Table 1.

| Position | Load when jaw opened (lbf) | Mean | Standard Deviation | Coefficient of Variance |
|---|---|---|---|---|
| Distal | 3.367 | 3.34 | 0.03 | 0.8% |
|  | 3.314 |  |  |  |
|  | 3.364 |  |  |  |
|  | 3.33 |  |  |  |
|  | 3.316 |  |  |  |
| Proximal | 5.856 | 5.81 | 0.03 | 0.5% |
|  | 5.796 |  |  |  |
|  | 5.805 |  |  |  |
|  | 5.783 |  |  |  |
|  | 5.796 |  |  |  |
| Average of the two locations: | | 4.57 |  |  |

Table 2

(Doc. 103-3 at 68).

75. In response to the question "Would you agree that the force on tissue placed between the tissue pad and blade increases as you approach the pivot point?", Plaintiffs' expert Dr. Schafer testified "As – as this blade is con – as this clamp arm is constructed, yes. The force seen by something under the clamp arm is higher the closer you are to the pivot point. And I took measurements at multiple point on a clamp arm and demonstrated that, and that's also in the report." (*Id.* at

19

22).[28]

76. The '501 patent states "[t]he pressures discussed herein are pressures seen by tissue when the entire clamping surface area is in contact with the tissue." (*Id.* at 8).

77. In response to the question "So won't the measured force go up and up and up the more tissue is clamped between the – clamp and the blade?, Mr. Houser, Plaintiffs' 30(b)(6) witness, testified, "And as I said, that is why there is a range on all these pressures. We don't say only at this pressure. And it's not – and to be honest, let me finish the answer" and "That's okay. It's understandable. It also depends on what tissue you've got in there. You can have an enormous amount of tissue that's relatively – like, if it's fat, you're just gonna clamp right through it, so it also depends on the kind of tissue that you're clamping." (Doc. 103-4 at 28).[29]

78. The following questions and answers appear in the transcript of the March 8, 2013 deposition of Mr. Kevin Houser, Plaintiffs' 30(b)(6) witness:

> 22 Anyway, for the record, I'd like you to
> 23 look at what was marked yesterday as Exhibit 5. Do you
> 24 have that in front of you?
> 25 A. Yes, I do.
> 1 Q. And that bears Bates numbers
> 2 EESSON00073311 through 14. Are we looking at the same
> 3 thing?
> 4 A. Yes, we are.
> 5 Q. And what is this?
> 6 A. This appears to be an engineering study
> 7 done on the WAVE18S product.
> 8 Q. And what is the purpose of this study?
> 9 A. The purpose stated is -- the purpose of
> 10 this study is to test various potential contributors to
> 11 clamp-force measurement variation.
> 12 Q. Okay. And what do you mean by
> 13 "clamp-force measurement variation"?

---

[28] Plaintiffs admit only that No. 75 quotes a portion of the Schafer Dep. Tr.

[29] Plaintiffs admit only that No. 77 quotes a portion of the Houser March Dep. Tr. in response to a question about Dep. Ex. 5, an Engineering Study Form for WAVE18S (EESSON00073311-14).

20

14 A. I will have to look at the study.  And
15 I'm gonna apologize, because in the process of reading
16 this, I forgot your question.
17 Q. No problem.  What do you mean by
18 "clamp-force measurement variation"?
19 A. So it appears, at least as I look at a
20 portion of this, they're measuring – for instance, they
21 talk about the clevis pin and the clamp force as related
22 to the measured – excuse me, measured clamp force as
23 related to the clevis pin height away from the blade.
24 Q. Right.
25 A. And then they go on to say in this, you
1 know, which is, to me, it probably wasn't necessary to
2 do a test.  We probably could have done this with just
3 simple analysis.  As you clamp the device down for
4 higher and higher openings, you're getting further and
5 further into the springs, and the measured force is
6 going to go up as we discussed earlier.
7 Q. So won't the measured force go up and up
8 and up the more tissue is clamped between the –
9 A. And as I said –
10 Q. – clamp and the blade?
11 A. And as I said, that is why there is a
12 range on all these pressures.  We don't say only at this
13 pressure.  And it's not – and to be honest, let me
14 finish the answer.
15 Q. I didn't realize you hadn't finished.
16 A. That's okay.  It's understandable.  It
17 also depends on what tissue you've got in there.  You
18 can have an enormous amount of tissue that's
19 relatively – like, if it's fat, you're just gonna clamp
20 right through it, so it also depends on the kind of
21 tissue that you're clamping.

(*Id.* at 26-28).

21

**A0072**

79. Exhibit 5 from the deposition of Ms. Noschang is Plaintiffs' business record. (*Id.*
at 7-8).

80. Exhibit 5 from the deposition of Ms. Noschang contains the following figure at
page EESSON00073313:



**Figure 2: Clamp Force by Clevis Pin Height from Blade**

(*Id.* at 39).

81. The following questions and answers appear in the transcript of the March 7, 2013
deposition of Ms. Sarah Noschang:

> 17 Q. So you said, if I understand it, the pin
> 18 height is changed or set differently by different points
> 19 in this test. Looking, I'm just looking at Step 10 in
> 20 the test procedure.
> 21 A. Yes.
> 22 Q. What's the purpose of changing the pin
> 23 height?
> 24 A. To identify various potential
> 25 contributors to the measurement variation.

(*Id.* at 9).

22

82. The following questions and answers appear in the transcript of the March 7, 2013 deposition of Ms. Sarah Noschang:

    1 Q. All right.  So is it correct that when
    2 the clevis pin is at .0 – sorry. It's at 0.002, at
    3 that height, the clamp force measured is 5.46 pounds; is
    4 that correct?
    5 A. At .002 inches, it is 5.46 pounds.
    6 Q. Okay.  And if one were to measure with
    7 the same instrument, as you said, the single Swan
    8 Prototype, and set the clevis pin at 0.022 inches, the
    9 clamp force would then be 6.12 pounds; is that right?
    10 A. Correct.
    11 Q. Why does the force measurement change
    12 with the height of the clevis pin?
    13 A. The height of the clevis pin is the
    14 distance away from the blade that you are, so in contact
    15 between the blade and the pad would be the 0.002 is
    16 bringing it 2,000ths away from the blade, and .022 is
    17 22,000ths away from the blade, so you have to apply more
    18 force to remove it from the blade.

*(Id.* at 10).

83. Claims 13 and 18 of the '501 patent include "the average clamping pressure is between and including 120 psi and 180 psi." (Doc. 103-3 at 9-10).

84. Claim 17 of the '501 patent includes "creating an average predetermined clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad and the blade." *(Id.* at 10).

85. Claim 1 of the '501 patent includes "operating the clamping arm to exert a predetermined average coaptation pressure on the blood vessel between and including 60 psi and 210 psi." *(Id.* at 9).

86. Claim 2 of the '501 patent includes "the average coaptation pressure in step c) is between and including 120 psi and 180 psi." *(Id.)*

A0074

87. In response to the question "Does the '501 patent indicate whether one should use the middle clamping pressure as the clamping pressure to compare with the range in the patent?", Ms. Noschang testified "The patent only discussed an average clamping pressure," and in response to the question "And does the patent explain whether, which positions along the clamp arm length should be used to calculate the average?", Ms. Noschang testified "I do not recall seeing anything on that." (Doc. 103-4 at 19).[30]

88. When Plaintiffs' expert Dr. Schafer was asked "Can you point me to a line or lines in the specification where it directs the reader to measure clamp force at the midpoint of the clamp arm?", Dr. Schafer testified "I do not believe that it specifically instructs the reader to that." (Doc. 103-3 at 15).[31]

89. Plaintiffs' expert, Dr. Schafer, testified as follows to the following questions: Question – "So does the patent explain how thick the tissue should be with regard to the pressure measurements?" Dr. Schafer testified "The – I do not believe the patent gives an absolute value. However, it does, of course, relate to the coaptation, which is the closure pressure for a – a blood vessel. So one would know from that that we're not talking a piece of bone, or something like that, that would be 5 or 6 millimeters of solid tissue or solid material."; Question – "So aside from bone, is there any other tissue – thickness of tissue this patent rules out?", Dr. Schafer testified – "Well, it – again, it's describing blood vessels, and one skilled in the art would know that blood vessels collapse upon some level of pressure and flatten out. So it's not explicitly disclosed." (*Id.* at 17).[32]

90. When Dr. Schafer was asked "Is it your opinion that all blood vessels have the same compressibility?", he testified "Arteries and veins have different properties. Veins are more extensible. Arteries tend to be more rigid in their – in their structure." (*Id.* at 20).[33]

91. When Dr. Schafer was asked "Is it your opinion that all tissues have the same amount of compressibility?," he testified "no" in response. (*Id.* at 18).[34]

---

[30] Plaintiffs admit only that No. 87 quotes a portion of the Noschang Dep. Tr.
[31] Plaintiffs admit only that No. 88 quotes a portion of the Schafer Dep. Tr.
[32] Plaintiffs admit only that No. 89 quotes a portion of the Schafer Dep. Tr.
[33] Plaintiffs admit only that No. 90 quotes a portion of the Schafer Dep. Tr.
[34] Plaintiffs admit only that No. 91 quotes a portion of the Schafer Dep. Tr.

24

A0075

92. When Dr. Schafer was asked "Would you agree that different types of tissue have different types of compressibility?", he testified "That would follow logically, yes." (*Id.* at 19).[35]

93. When Dr. Schafer was asked "Turning back to the '501 patent, which has been premarked as Exhibit – Houser Exhibit 66. Is it true that you've taken the position that, for purposes of measuring clamp force for the '501, it should be measured at the midpoint of the clamp arm?", he testified, "It is my position that, in order to properly assess whether a product infringes this patent, that the measurement should be taken in a way consistent with that described in the patent so that we're measuring apples to apples. And from my review of the '501 and the – the predicate patents referred to here and others of this type, it's my opinion that a measurement taken at midpoint would be representative of a force measurement appropriate for determination of compliance – or interference with the '501 patent. Midpoint of the clamp arm. I should clarify that. Because one could have the midpoint of many things." (*Id.* at 14).[36]

94. The Schafer Infringement Report contends that "[t]he Sonicision device has a handle, which is a means for limiting a user applied clamp force." (*Id.* at 49).[37]

95. The Schafer Infringement Report contends: "There is an insubstantial difference between the handle in Sonicision and Element 40. Both are physical stops to limit the travel of the trigger. The shape and location of the handle in Sonicision and Element 40 are different, but they perform the exact same function of limiting travel of the trigger." (*Id.* at 65).[38]

---

[35] Plaintiffs admit only that No. 92 quotes a portion of the Schafer Dep. Tr.
[36] Plaintiffs admit only that No. 93 quotes a portion of the Schafer Dep. Tr.
[37] Plaintiffs admit only that No. 94 quotes a portion of the Schafer Infringement Report.
[38] Plaintiffs admit only that No. 95 quotes a portion of the Schafer Infringement Report.

25

96. The Schafer Infringement Report contends:

> The handle in the Sonicision device is a structure that is equivalent to
> Element 40 as positioned between the scissor-like grips in Figure 3 of
> the patent, and thus literally infringes. Element 40 is a physical stop or
> limit which prevents further travel of the trigger beyond a specified
> location. By changing the size and/or the location of Element 40, one
> can change the amount of travel of the trigger, and thereby change the
> maximum force which can be provided to the clamp arm. The handle in
> the Sonicision device works in an equivalent way by acting as a
> physical stop to prevent the trigger from traveling beyond a physical set
> point, and thereby limiting the maximum force which can be provided
> to the clamp arm.

(*Id.*)[39]

97. The Schafer Infringement Report also contends:

> The handle in Sonicision also meets the function/way/result test as
> compared to Element 40. The function of Element 40 is to limit the user
> applied clamping force. The function of the handle in Sonicision is to
> limit the user applied clamping force. The way that Element 40 limits
> the user applied clamping force is to limit the travel of the trigger. The
> way that the Sonicision handle limits the user applied clamping force is
> to limit the travel of the trigger. The result of both Element 40 and the
> handle in Sonicision is to limit the user applied clamping force. Thus,
> the handle in Sonicision literally meets (and also meets under the
> doctrine of equivalents), the means and step plus function elements
> regarding limiting clamp force.

(*Id.* at 65-66).[40]

---

[39] Plaintiffs admit only that No. 96 quotes a portion of the Schafer Infringement Report.

[40] Plaintiffs admit only that No. 97 quotes a portion of the Schafer Infringement Report.

26

98. Alan Ball, Plaintiffs' expert opining on design patent issues, provided the following picture of Sonicision in his Expert Report:



FIG. 2

(Doc. 103-4 at 90).

99. The '501 patent states: "In one enablement of the second embodiment of FIG. 3, the force-limitation means 40 includes a torque-limiting mechanism as in a conventional torque wrench." (Doc. 103-3 at 9).

100. The following questions and answers appear in the transcript of the March 8, 2013 deposition of Mr. Kevin Houser:

2 Q. What is 40? Actually, to be more
3 accurate, what's "means 40 for limiting a user-applied
4 clamping force"?
5 A. Well, 40 is shown in Figure 3, and then
6 you were referring to Column 5, correct, for the
7 specification portion of it?
8 Q. You can refer to anything you want.

27

9 A. No.  I'm asking, you were referring to
10 Column 5?
11 Q. My question is: What is the "means 40
12 for limiting a user-applied limiting clamping force,"
13 which is referenced in Column 5?
14 A. So means 40 is there's – 40 is
15 identified in Figure 3.  It says, "In one enablement ...
16 means 40 includes a torque-limiting mechanism as in
17 a" – and then there's "other equivalent."
18 Q. What is 40 that's shown in Figure 3?
19 A. I'm not sure I understand.  I mean, what
20 would – it's the force-limiting means or torque – or,
21 excuse me.  Is it force-limiting means that we refer to
22 it as? T orque-limiting means.  Sorry.  That's what it
23 is.  As defined by the specification, 40 is the
24 torque-limiting means.

(Doc. 103-4 at 23).

101. When asked the following question at his deposition, "Is the users squeezing
on the trigger to create the clamp force provided for within the Court's
construction?", Plaintiffs' expert, Dr. Schafer, testified: "In that case, no."
(Doc. 103-3 at 30).[41]

102. At his deposition, Dr. Schafer testified: "The – the use of the word
'predetermined' means that the clamping force will be set before the operation of
the device independent of the user's control in some sense. And it falls – and it is –
then it specifies a range in which that predetermined force should fall in order to
exercise the patent. So my opinion is use the of 'predetermined' is not so much
the range, per se, but is the device designed to work within that range independent
of operator control." (*Id.* at 28-29).[42]

103. At his deposition, Dr. Schafer testified that his opinion is: "That the predetermined
means that there is a fixed value for the device that is set in advance.  It may fall
within a range, but that value is fixed and set beforehand. (*Id.* at 33).[43]

---

[41] Plaintiffs admit only that No. 101 quotes a portion of the Schafer Dep. Tr.
[42] Plaintiffs admit only that No. 102 quotes a portion of the Schafer Dep. Tr.
[43] Plaintiffs admit only that No. 103 quotes a portion of the Schafer Dep. Tr.

28

A0079

104. When asked at his deposition: "Is it your opinion that Messerly discloses as predetermined clamping force?", Dr. Schafer testified: " No. It describes a range of clamping forces. It does not indicate a predetermined clamping force." (*Id.* at 27).[44]

105. At his deposition, Dr. Schafer testified to the following questions as follows: Question – "Okay. Well, is it – what – is there anything in contact with the clamping surface area when pressure is to be measured, as described in the '501 patent?"; Testimony – "The entire clamping surface area is in contact with the tissue, as mentioned here"; Question – "Okay. So the tissue is engaging the entire clamping surface area; is that correct?"; Testimony – "That would be the condition which relates to the pressures reported here." (*Id.* at 16).[45]

106. The '501 patent states:

> In one implementation of the method of the invention, the tissue pad has a clamping surface area of substantially 0.033 square inches. In one variation, step c) exerts a clamping force on the clamping arm between and including 2 pounds and 7 pounds. It is noted that pressure is force per unit area, and that for the same force applied by the clamping arm, the pressure on the engaged portion of a blood vessel that fully engages the entire clamping surface area is less than the pressure on the engaged portion of a blood vessel that, because of smaller diameter, engages only a fraction of the clamping surface area. The pressures discussed herein are pressures seen by tissue when the entire clamping surface area is in contact with the tissue.

> (*Id.* at 8).

107. In response to the following question at his deposition: "Is it your understanding that tissue in the jaw of the device described in Kramer would also affect whether the device would have a predetermined clamping pressure?", Dr. Schafer testified: "Again, the opening angle of the jaw angle of the jaw would effect it, again, depending on the amount of tissue. As you mentioned before, the compressibility of the tissue, how much it closes. Again, ultimately, how much force goes back on the blade so that it – because that's where the generator is sensing, is – is the load on the – the ultrasonic driving load on the generator. So I – I can't say that – I believe – the tissue is just one of the factors, I guess. That was your question. Would the tissue change what it's doing? I'd say yes, the tissue will change it.

---

[44] Plaintiffs admit only that No. 104 quotes a portion of the Schafer Dep. Tr.
[45] Plaintiffs admit only that No. 105 quotes a portion of the Schafer Dep. Tr.

It makes it difficult to say that it's predetermined." (*Id.* at 31-32).[46]

108. The Schafer Infringement Report contends: "There is an insubstantial difference between the force created by the Force Spring in the Sonicision device and a 'generic' constant force spring." (*Id.* at 63-64).[47]

109. When Dr. Shafer was asked: "And aside from this tissue substitute, did you measure the clamping force of the Sonicision with any type of animal tissue between the clamp pad and blade?," he testified: "No, I did not. I measured it without anything in between the clamp pad – clamp pad and blade and with the shammy and found no difference in the clamp force." (*Id.* at 21).[48]

110. When asked the following question at his deposition: "So it's your understanding that you could have a spring that obeys Hooke's law but would still be a constant-force spring?", Dr. Schafer testified: "No. What I – a spring that obeys Hooke's law, in and of itself, is not a constant-force spring because Hooke's law requires a variation in force with compression. Constant force would require no variation in force with compression. So as they sit there, a spring which obeys Hooke's law would not be construed as a constant-force spring." (*Id.* at 23-34).[49]

111. Defendants' expert, Dr. William Durfee, states in the Durfee Rebuttal Report: "A coil spring differs from a constant force spring because the deflection of the coil spring is proportional to the force. A constant force spring in contrast, does not provide a different amount of force depending on its deflection. (*Id.* at 109-110).[50]

112. When asked at his deposition: "Is there somewhere within the '501 patent that indicates how one takes a spring, such as the spring in Messerly, and creates a substantially constant-force spring?", Plaintiffs' expert, Dr. Schafer, testified: "I don't believe the '501 patent teaches how to take a spring and make it into a constant force – a Hooke's law-type spring and make it into a constant-force spring." (*Id.* at 26).[51]

---

[46] Plaintiffs admit only that No. 107 quotes a portion of the Schafer Dep. Tr.

[47] Plaintiffs admit only that No. 108 quotes a portion of the Schafer Infringement Report.

[48] Plaintiffs admit only that No. 109 quotes a portion of the Schafer Dep. Tr.

[49] Plaintiffs admit only that No. 110 quotes a portion of the Schafer Dep. Tr.

[50] Plaintiffs admit only that No. 111 quotes a portion of the Durfee Rebuttal Report.

[51] Plaintiffs admit only that No. 112 quotes a portion of the Schafer Dep. Tr.

A0081

113. When asked at his deposition: "Is there any information in the '501 patent which would provide information on the range of travel of a spring that would still – that would qualify it as a substantially constant-force spring?", Dr. Schafer testified: "I don't believe the patent speaks to that, no." (*Id.* at 25).[52]

114. Response G, dated November 29, 2011 was submitted to the United States Patent and Trademark Office ("PTO") in connection with the '501 patent application and states: "Specifically, independent claims, 1, 11, 16, 21 and 22 expressly recite 'a predetermined average coaptation pressure' (claim 1), 'means for exerting a predetermined clamping force' (claim 11 and similar recitation in claims 16, 21, and 22). Such a disclosure is neither disclosed nor suggested in Mastri alone or in combination with Messerly." (Doc. 103-4 at 93-101).

115. The Notice of Allowability for the '501 patent, mailed April 2, 2012, contains the following statement from the PTO Examiner: "The following is an examiner's statement of reasons for allowance: The prior art fails to disclose or suggest the method for sealing a blood vessel or an ultrasonic surgical shears where a predetermined pressure is exerted on the vessel between 60 and 210 psi as required by claims 1, 16, 21 and 22 (or not to exceed 210 psi as required by claim 11)." (*Id.* at 108).

## III.    STANDARD OF REVIEW

### A.    Summary Judgment

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be

---

[52] Plaintiffs admit only that No. 113 quotes a portion of the Schafer Dep. Tr.

construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## B.     Summary Judgment of Non-Infringement

Summary judgment of non-infringement consists of two steps.  The Court must (1) first interpret the claim, and (2) then compare the properly construed claims to the alleged infringing device. *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1268 (Fed. Cir. 2007).  To establish literal infringement, a plaintiff must prove that each and every limitation in a claim is literally met by the accused product. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001).  Thus, if the accused product fails to meet even a single claim limitation, then there can be no literal infringement as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

## C.     Infringement of Means-Plus-Function Claims

### 1.     Literal Infringement of Means-Plus-Function Claims

"Literal infringement of a § 112, ¶ 6 claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003).

32

First, there must be an "identity of function between the claimed function and that of the accused device." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1332 (Fed. Cir. 2001). Thus, the relevant structure in the accused device must perform the identical function to the structure identified in the patent. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) ("under § 112, ¶ 6 equivalence, functional identity is required; thus the equivalence (indeed, identity) of the 'function' of the assertedly substitute structure, material, or acts must be first established in order to reach the statutory equivalence analysis").

Second, the relevant structure in the device must also be identical to the corresponding structure disclosed in the patent or an equivalent. "To establish structural equivalence in the § 112, ¶ 6 literal infringement context, "[t]he assertedly equivalent structure must 'perform[] the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.'" *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1370 (Fed. Cir. 2010) (quoting *Odetics*, 185 F.3d at 1268)).

## 2. Infringement of Means-Plus-Function Claims Under the Doctrine of Equivalents

"An accused structure that does not literally infringe a means-plus-function claim may nevertheless infringe under the doctrine of equivalents." *Lockheed Martin*, 324 F.3d at 1320. Generally, "an accused device may infringe under the doctrine of equivalents if each element performs substantially the same function, in substantially the same way, to

33

**A0084**

achieve substantially the same result." *Id.* This is typically referred to as the "function-way-result" test for the doctrine of equivalents ("DOE").

Because literal infringement under § 112, ¶ 6 incorporates the concept of "structural equivalence," and therefore asks whether the accused structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure disclosed in the patent, the Federal Circuit has characterized the tests for structural equivalence under § 112, ¶ 6 and the tripartite DOE standard as "closely related." *See Odetics*, 185 F.3d at 1267-68 ("Structural equivalence under § 112, ¶ 6 is, as noted by the Supreme Court, 'an application of the doctrine of equivalents ... in a restrictive role'") (quoting *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28 (1997)). Accordingly a finding of no literal infringement can preclude application of the DOE to means-plus-function claims altogether. *See e.g., Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) ("Because the 'way' and 'result' prongs are the same under both the section 112, paragraph 6 and doctrine of equivalents tests, a structure failing the section 112, paragraph 6 test under either or both prongs must fail the doctrine of equivalents test for the same reason(s)"); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310 (Fed. Cir. 1998) (recognizing that "a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalents").

34

## D.    Indefiniteness

"The definiteness requirement of § 112, ¶ 2 focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the scope of the patentee's right to exclude." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (internal quotations and brackets omitted). "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008). Claims must "be sufficiently definite to inform the public of the bounds of the protected invention. . . . Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Id.* at 1249 (quoting *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996)).

While the burden for proving indefiniteness is clear and convincing evidence, the Federal Circuit has found numerous circumstances "where a person of ordinary skill in the art could not determine the bounds of the claims." *Id.* at 1249. One such circumstance is where the claim "includes a numeric limitation without disclosing which of multiple methods of measuring that number should be used." *Id.*; *see also Honeywell*, 341 F.3d at 1340. In these situations, because the results would "necessarily fall within or outside the claim scope depending on the sample preparation method chosen[],

35

[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Honeywell*, 341 F.3d at 1341; *see also Morton Intern., Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993) (claims indefinite where "the evidence shows that the claims at issue … are not sufficiently precise to permit a potential competitor to determine whether or not he is infringing").

## IV.   ANALYSIS

### A.   Non-Infringement

#### 1.   Force-Limiting Means

The '501 patent's independent claims 1, 12, 17, 22 and 23 require a force-limiting means. (Doc. 103-1 at 3-4). On claim construction, the parties agreed that the function of this claim element is "to limit a user applied clamp force," and the Court adopted this agreed upon construction. (*Id.* at 4). For the corresponding structure, the Court adopted Defendants' proposed construction, limiting this claim element to the particular structure disclosed in the patent specification linked to the force-limiting function: "A conventional torque wrench; element 40 as positioned between the scissor-like grips in Figure 3." (*Id.*)

Plaintiffs allege that Sonicision's handle satisfies claimed force-limiting means. (*Id.* at 25). Defendants argue the handle cannot infringe this "means-plus-function" limitation because it does not perform the claimed function: "to limit a user applied clamp force." (Doc. 103 at 18). Defendants also argue that the Sonicision handle is also

36

not the same as or structurally equivalent to the corresponding structure disclosed in the patent – "a conventional torque wrench; element 40 as positioned between the scissor-like grips in Figure 3." (*Id.*)

### a. Claimed Function

In analyzing infringement of a means-plus-function claim under § 112, ¶ 6, the first step is to establish that the accused device performs the identical function that is claimed. *Telemac*, 247 F.3d at 1332 ("[t]o find literal infringement of claim limitations written in means-plus-function form, a court must find, at a minimum, identity of function between the claimed function and that of the accused device."); *Odetics*, 185 F.3d at 1267 ("under § 112, ¶ 6 equivalence, functional identity is required").

Plaintiffs' expert describes the Sonicision handle as a physical stop to limit the travel of the trigger. (Doc. 103-1 at 25). Limiting the travel of the trigger, however, is not the claimed function of the force-limiting means. Rather, the claimed function is "to limit a user applied clamp force," which the Sonicision handle does not do. The Sonicision handle merely ends the path of the trigger squeezed by the user. Simply ending the path of the trigger does not limit the clamping force. If anything, the Sonicision coil spring – and not the handle – limits the clamping force applied by the user. (*Id.* at 10). Thus, while there is no dispute that the Sonicision handle functions to limit the travel or end the stroke of the trigger, there is no evidence that the handle also functions to limit user-applied clamp force, as the claims require.

37

### b. Corresponding Structure

Structurally, Plaintiffs liken the Sonicision handle to Element 40 shown in Figure 3 of the '501 patent. (*Id.* at 25).[53] Plaintiffs' expert admits, however, that the Sonicision handle is not identical in size or location to element 40 as shown in Figure 3 of the patent. (*Id.*) As such, Sonicision cannot have the identical corresponding structure. As shown in Figure 3, element 40 is a large piece that lies between two scissor handles in the device – the Sonicision has no such structure.



(Doc. 103-3 at 5; Doc. 103-4 at 90). Because Sonicision's handle and Element 40 are not the same structures, Plaintiffs thus must rely on a structural equivalence theory to establish literal infringement of the force-limiting means.

---

[53] Plaintiffs cannot defeat summary judgment with its expert's conclusory opinions of Element 40. "A party does not manufacture more than merely a colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion." *Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052, 1080-81 (Fed. Cir. 2005).

38

Sonicision's handle cannot be considered structurally equivalent to Element 40, because the Court's construction of the force-limiting means excludes a "travel stop" as corresponding structure. (Doc. 103-1 at 5, 25). Plaintiffs' expert opines that the Sonicision handle is equivalent to Element 40 because both are physical stops that limit the travel of the trigger. (*Id.* at 25-26). This infringement theory is incompatible with the Court's construction of the force-limiting means.

On claim construction, Plaintiffs urged the Court to construe the corresponding structure to include a physical stop that limits range of motion. (*Id.* at 5). The Court rejected this construction, however, recognizing that this would improperly include a structure not disclosed in the patent specification as clearly linked to the claimed function. (*Id.*) By identifying the Sonicision handle as the allegedly infringing structure, Plaintiffs are merely rearguing a claim construction of the corresponding structure that the Court has already rejected. As a result, Plaintiffs cannot establish infringement of the force-limiting means under the Court's construction by arguing that the Sonicision handle is equivalent to Element 40.

The Sonicision handle is also not structurally equivalent to Element 40 because it does not function in the same way to achieve the same result. The patent fails to describe the way in which Element 40 works. The patent merely depicts Element 40 as a large piece between the two scissor grip handles in Figure 3 that is purported to limit force. (*Id.* at 4-5, 26). It does not show Element 40 as limiting travel of the trigger, nor does it

39

describe Element 40 in this manner. Presumably, to limit clamp force applied by the user squeezing the scissors grip handles, Element 40 must be made of some compressible material, but the patent does not say for certain.[54] The only disclosure of Element 40 is in Figure 3, which shows Element 40 spread between the scissors grip handles with the clamp wide open. (*Id.* at 4-5). For there to be any effective clamping motion, Element 40 cannot be a physical travel stop, and instead must compress between the two scissor grips in some undisclosed manner.

The handle of the Sonicision, in contrast, is not the limiting factor for clamping force, and is not made of a compressible material. Rather, it is merely the end point for the stroke of the trigger. Similarly, Element 40 produces a different result than the Sonicision handle. Plaintiffs' expert opines that the "result" of Element 40 is to limit the user applied clamp force. (*Id.* at 25-26). For the reasons already described, however, the Sonicision handle cannot be considered to limit user applied clamp force.

## 2. Force-Limiting Means Under the Doctrine of Equivalents

The Federal Circuit has recognized that "[i]f an accused structure is not a section 112, paragraph 6 equivalent of the disclosed structure because it does not perform the

---

[54] Even though the patent specification links Element 40 in Figure 3 to the force-limiting function – and the Court thus included Element 40 within its construction of the force-limiting means – without any physical description of Element 40 in the patent, other than describing it as a "conventional torque wrench," it would be improper to interpret Element 40 as anything but a "conventional torque wrench." Indeed, when asked at his deposition to explain Element 40, '501 patent inventor and Plaintiffs' 30(b)(6) witness, Kevin Houser, could not provide any explanation other the patent's description of Element 40 as a torque-limiting mechanism. (Doc. 103-1 at 26-27). Plaintiffs do not contend that the Sonicision handle is a conventional torque wrench or its equivalent, and thus Sonicision also does not infringe the force-limiting means for this reason as well.

40

identical function of that disclosed structure and hence does not literally infringe, it may nevertheless still be an 'equivalent' under the doctrine of equivalents." *Kemco*, 208 F.3d at 1364. As the Sonicision handle does not perform the claimed force-limiting function, Plaintiffs must show that under the DOE, the Sonicision handle performs substantially the same function that is claimed. *Id.* at 1364. However, Plaintiffs have only contended that the function of Element 40 and the Sonicision handle are identical. (Doc. 103-1 at 25-26). As a result, the Sonicision cannot be found to infringe under the DOE without any evidence regarding an allegedly equivalent function.

Additionally, as already established, the accused Sonicision handle is not structurally equivalent to the "conventional torque wrench" or Element 40 corresponding structure under 112, paragraph 6. Consequently, Plaintiffs cannot fall back on the DOE to argue that the Sonicision handle infringes the force-limiting means. *Kemco*, 208 F.3d at 1364 ("Because the 'way' and 'result' prongs are the same under both the section 112, paragraph 6 and doctrine of equivalents tests, a structure failing the section 112, paragraph 6 test under either or both prongs must fail the doctrine of equivalents test for the same reason(s)").

### 3. Force-Creating Means

The '501 patent's independent claims 1 and 12 require a "means for providing/exerting" clamp force (i.e. a force-creating means). (Doc. 103-1 at 5-6). Under the Court's claim construction, the function of this claim element is "to provide or

41

exert a predetermined clamp force." (*Id.* at 6). The Court's claim construction also limits

this claim element to three particular structures disclosed in the patent specification

linked to this claimed function. (*Id.*) Of these three corresponding structures, only the

"substantially constant force spring" has been placed in issue by Plaintiffs, who allege

that Sonicision's coil spring meets the limitations of the force-creating means. (*Id.* at 7).

### a. Claimed Function

Based on the undisputed record evidence, the Sonicision spring does not perform

the identical function of "to provide or exert a predetermined clamp force" because it

does not provide or exert clamp force, nor does it do so in a predetermined manner. Both

parties agree that the Sonicision coil spring does not provide or exert any force; it merely

transfers force exerted by the user on the trigger to another structural component of the

device. (*Id.* at 9). Plaintiffs' own expert admits that clamp force is created by the user

pressing on the trigger, and testified that the user squeezing the trigger to create clamp

force does not qualify as a force-creating means under the Court's construction. (*Id.* at 9,

27). Plaintiffs' expert also agrees that the force created by the user squeezing the trigger

is then transmitted through parts of the device to produce the force seen at the jaw. (*Id.* at

9-10).

The Sonicision coil spring transmits force in the same way as the other

components of the device that participate in transferring the force created by the user's

hand on the trigger to the clamp. Therefore, because the claimed function is to "provide

42

or exert a predetermined clamp force," and it is undisputed that the Sonicision coil spring

transfers, rather than provides or exerts force, Sonicision does not infringe the force-

creating means as a matter of law.

Even if the Sonicision coil spring was found "to provide or exert" clamp force,

such force is not "predetermined" as required by the Court's construction. To qualify as

"predetermined," as that term has been construed, the clamp force provided must be "set

in advance of operating the clamping arm" or "set by the user prior to operating the

clamping arm." (*Id.* at 3).

Consistent with the Court's construction, Plaintiffs' expert admits that

predetermined means a specific, fixed value that is set in advance of the device's

operation. (*Id.* at 27). Plaintiffs' expert further admits that a device merely designed to

operate within a given range of clamping force is not predetermined. (*Id.* at 28). Rather,

Plaintiffs' expert opines that, to practice the patent's predetermined limitation, a device

must be set to a value within the claimed range, independent of user control. (*Id.* at 27).

Sonicision does not exert a fixed clamp force value that is set in advance of

operation and independent of user control. Rather, the clamp force will vary depending

on how hard the surgeon squeezes the trigger. (*Id.* at 28). Additionally, the claims of the

patent require some type of tissue placed in the jaw. (*Id.*) Sonicision's clamping force

and pressure varies depending on, among other things, what type of tissue and how much

tissue is placed in the jaw and how far the jaw is open as it clamps upon the tissue. (*Id.* at

43

**A0094**

11-14, 20-22, 24, 28-29; Doc. 103-4 at 37-40). In attempting to distinguish the '501 patent over a prior art reference, U.S. Patent Number 6,352,532, Plaintiffs' expert admitted that factors such as the amount and compressibility of tissue will impact whether a device's clamping force and pressure can be classified as predetermined. (*Id.* at 28-29). Thus, because the level of clamping force that Sonicision exerts can vary depending on multiple factors, it is not predetermined.

### b.    Corresponding Structure

In addition to failing to perform the required function of the force-creating means, the Sonicision lacks the corresponding structure for performing the function. The accused Sonicision spring is not the same as, or an equivalent structure to, the patent's "substantially constant force spring." *See Telemac*, 247 F.3d at 1332. Plaintiffs' expert admits that the accused Sonicision spring is not the same as a "'generic' constant force spring." (Doc. 103-1 at 29). Rather, it is a coil spring, and Plaintiffs thus must rely on a structural equivalence theory.

Based on the record evidence, there is no genuine issue as to whether a coil spring is the structural equivalent of a "substantially constant force spring," because a coil spring works in a fundamentally different way and achieves an entirely different result. As its name suggests, constant force spring provides constant force over a range of compression due to the spring's structural design. (*Id.*) The Sonicision coil spring operates in a completely different way, because unlike a constant force spring, the

44

deflection of the Sonicision spring is proportional to the force. (*Id.* at 29-30). Measurements performed by Plaintiffs' own expert demonstrate that the Sonicision spring force changes nearly one pound even once the clamp is closed against the blade if the user continues to squeeze the trigger. (*Id.* at 11).

The '501 patent only specifies a substantially constant force spring. It does not disclose any structures or mechanisms for converting a coil spring into a substantially constant force spring. (*Id.* at 30). Moreover, Plaintiffs' expert admits that the patent does not disclose a mechanism that limits a coil spring's path of travel to function as a substantially constant force spring, nor how limited the range of travel must be to qualify as a constant force spring. (*Id.*) Accordingly, there is no legal basis on which Plaintiffs can assert that the configuration of the Sonicision's coil spring functions in an equivalent manner to the corresponding structure under 35 U.S.C. § 112.

The Sonicision spring also provides a different result than a constant force spring, because the result of the substantially constant force spring in the patent is to achieve a constant clamping force and pressure that is set in advance of operation (i.e. "predetermined"). As already established, the clamping force and pressure of Sonicision are not predetermined, and instead vary depending on multiple factors, including how hard the surgeon squeezes the trigger and what type and amount of tissue is placed into the jaw. While the spring does not provide clamp force, as the force-creating means requires, even if it were construed to do so, it would not provide said force in a constant

45

manner.  Rather, the clamp force in question varies in proportion to the force applied.

Accordingly, the Sonicision spring is not structurally equivalent to a "substantially

constant force spring" under § 112, ¶ 6, and thus does not literally infringe the '501

patent's force-creating means claim limitation (Claims 1 and 12).

**4.     Force-Creating Means Under the Doctrine of Equivalents**

Because the Sonicision spring does not perform the claimed force-creating

function, Plaintiffs must show under the DOE that the Sonicision coil spring performs

substantially the same function.  *See Kemco*, 208 F.3d at 1364.  Plaintiffs cannot establish

that the Sonicision coil spring performs an equivalent function, however, because to do

so would read the "predetermined" limitation out of the claim element.

As already established, the accused Sonicision spring does not perform the

identical claimed function, in part because Sonicision does not provide or exert a

"predetermined" clamp force, *i.e.*, clamp force that is "set in advance of operating the

clamping arm" or "set by the user prior to operating the clamping arm."  As a result, the

Sonicision spring cannot be found to perform substantially the same function as the

force-creating means under the DOE, because this would entirely vitiate the claim

element, which requires the force to be predetermined.  *Lockheed Martin*, 324 F.3d at

1321 ("if a court determines that a finding of infringement under the doctrine of

equivalents 'would entirely vitiate a particular claim[ed] element,' then the court should

rule that there is no infringement under the doctrine of equivalents").  The Federal Circuit

**A0097**

has held that "[i]n the absence of an element that performs the properly construed functions, a finding of infringement under the doctrine of equivalents would entirely vitiate the limitations" of an asserted claim. *Id.*

Moreover, because the '501 patent applicants specifically added the "predetermined" claim limitation during prosecution to overcome the Examiner's rejection, Plaintiffs cannot now rely on the DOE to argue that an accused structure – not performing the "predetermined" function – is infringing. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 938 (Fed. Cir. 1987) ("Having secured claims only by including very specific functional limitations, Pennwalt now seeks to avoid those very limitations under the doctrine of equivalents. This it cannot do") (overruled on other grounds); *see Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429-30 (Fed. Cir. 1997) ("[w]here a patent claim recites a specific function for an element of the claim and the written description reiterates the importance of that particular function, a patentee may not later argue, during the course of litigation, that an accused device lacking that functionality is equivalent.")

Because the "way" and "result" prongs of the tripartite DOE test were already considered when analyzing structural equivalence in the § 112, ¶ 6 (literal infringement) context, and because the Sonicision coil spring is not structurally equivalent to the claimed "substantially constant force spring" for the purposes of literal infringement, summary judgment of non-infringement under the DOE is also warranted. *Kemco*, 208

47

F.3d at 1364.

Accordingly, based on the foregoing, Sonicision does not practice the claimed force-creating means or force- limiting means, and, therefore, as a matter of law, does not infringe the '501 patent's independent claims 1, 1, 12, 17, 22 and 23 or dependent claims 2, 4, 5, 7, 8, 11, 13, 15, 16, 18, 20, and 21 either literally or under the doctrine of equivalents.

**B.     Invalidity**

The claims of the '501 patent also fail to meet the statutorily-required standard that "the claims be sufficiently definite to inform the public of the bounds of the protected invention." *See Halliburton*, 514 F.3d at 1249. The claimed clamping force and pressure values are highly dependent on the methods used to measure force and pressure exerted by the clamping jaw. The results vary significantly depending on where along the clamp arm the measurements are taken, how much the surgeon squeezes the trigger and what type and how much tissue is placed between the blade and tissue pad. Yet the patent fails to disclose which of the various methods is applicable to the clamping force and pressure values recited in the claims. With no disclosed method of measurement in the patent and no guidance as to whether the value determined was applicable to the patent claims, one of ordinary skill in the art would arrive at a different result with each method. These circumstances vitiate the purpose of the definiteness requirement.

48

Each of the asserted independent claims, as well as several dependent claims, contain one or more claim elements that require a clamping force or pressure value:

the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area (claims 1, 17, 23)

the applied clamp force does not exceed a predetermined clamping pressure of 210 psi at the clamping surface area (claim 22)

the clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area (claim 12)

exerts a clamping force on the clamping arm between and including 2 pounds and 7 pounds (claim 8)

the clamping force is between and including 2 pounds and 7 pounds, (claims 16, 21)

(Doc. 103-1 at 15-17).

All of these force and pressure elements create insoluble ambiguity because different methods of measuring clamping force and pressure result in different numeric values. As Plaintiffs' expert explains, "the only way to generate force and pressure data that can be directly compared with the limits proscribed in the '501 patent is to conduct the measurements in the same manner as described in the patent." (*Id.* at 14). However, the '501 patent does not disclose any methods for measuring clamping force and pressure.

Plaintiffs' own witnesses and expert admit there is no industry standard for measuring clamping force. Plaintiffs themselves use four different methods for measuring clamp force and these methods yield different clamp force values. (*Id.* at 12-

49

A0100

14). Defendants have a separate and different method. (*Id.* at 14). None of these methods are disclosed in the '501 patent, and one of the inventors of the patent could not even determine if any of the methods would be applicable to the '501 patent. (*Id.* at 15). Absent a disclosed method of measurement, one of ordinary skill in the art would arrive at a different result with each method with no guidance as to whether the value determined was applicable to the patent claims.

One demonstration of the ambiguity of the clamping force and pressure terms is the question of where along the length of the clamping arm the force measurements should be made. Should the measurements be taken near the tip, at the middle, near the pivot point of the clamping arm or some combination? The patent does not identify a location. Nor does it indicate whether measurements should be taken only a single location or whether the forces and pressures stated must be met at different locations across the clamping surface.

The language of the claims adds further ambiguity. For example, claims 1, 12, 17, 22 and 23 indicate that the clamp force "does not exceed a [predetermined] clamping pressure of 210 psi at the clamping surface area." (*Id.* at 17). The phrase "at the clamping surface area" does not refer to any particular point or indicate whether it includes all locations encompassed by the clamping surface area. As such, these elements could mean that clamping pressure at all points on the clamping surface area does not exceed 210 psi, or that the clamping pressure at some particular, unspecified

50

point does not exceed 210 psi.  In another example, claims 16 and 21 refer to "clamping force is between and including 2 pounds and 7 pounds" but these claims do not identify a location at which this force is to be measured or indicate whether clamping force at all points must be in the claimed range.  (*Id.*)

The location of measurement for clamping force is crucial, however.  The testimony of Plaintiffs' own witnesses illustrates that measuring at different locations along the clamping surface area yields significantly different results.  Plaintiffs' 30 (b)(6) witness, Kevin Houser, also one of the inventors of the '501 patent, testified that the clamp forces at the proximal end (the tip) and distal end (near the pivot point) of the clamping surface area are not the same as the forces in the middle of the clamp.  The distal end experiences less force and the proximal end experiences greater force.  (*Id.* at 17-18).  Plaintiffs' employee and inventor, Sarah Noschang, similarly confirmed that measurements along the clamp surface would differ from the proximal to the distal end.  (*Id.* at 18).  Plaintiffs' business records reflect the same variability.  As pictured below, Plaintiffs' measurements across four locations on the jaw gave different measurement for each location.

51



(*Id.*; Doc. 103-4 at 63). Similarly, Plaintiffs' expert, Dr. Schafer, presented three different measurements for a single device when he measured clamp force at 3 different locations along the clamp jaw: 3.34, 4.56 and 5.81 lbs. (Doc. 103-1 at 18-19).

Another example of the ambiguity of the claims is the dependence on the amount of tissue placed between the tissue pad and blade. The patent states that "[t]he pressures discussed herein are pressures seen by tissue when the entire clamping surface area is in contact with the tissue." (*Id.* at 28). However, covering the entire clamping surface with tissue does not specify how much tissue or what type of tissue is in the jaw. For example, the clamping surface could be covered by a thin piece of membranous tissue or a thicker bundle of tissue. As the thickness and stiffness of tissue increases, the clamp arm is held further from the blade by the intervening tissue. Depending on what type of tissue is used, the distance between the clamp arm and the blade therefore differs. (*Id.* at 19-20). Plaintiffs' own documents and witnesses attest to the difference in clamp force measurements obtained when the distance between the clamp and blade is varied. For example, both inventors of the patent testified that Plaintiffs analyzed how clamp force

52

**A0103**

measurements vary when the height between the clamp and blade is changed, as shown by an exemplary figure from one of Plaintiffs' records below.



Figure 2: Clamp Force by Clevis Pin Height from Blade

(*Id.* at 13, 20-21; Doc. 103-4 at 39).

As inventor Noschang explained, the purpose of changing the height of the clevis pin separating the blade and clamp was "to identify various potential contributors to measurement variation." (Doc. 103-1 at 21-22). Mr. Houser, Plaintiffs' 30(b)(6) witness, further explained that as the height of the clamp increases, "the measured force is going to go up." (*Id.* at 20-21). He further noted that the measurement "depends on what tissue you've got in there." (*Id.*) Extremely small variations in height make a significant difference in clamp force. Changes in height between 0.002 and 0.022 inches (differing in two hundredths of an inch) change the force measurement. (*Id.* at 22). Despite these variations, however, the '501 patent does not specify how much tissue or what type of tissue should be placed in the jaw when measuring clamping force and pressure as recited

53

in the claims. (*Id.* at 23-24).[55]

An additional set of claim elements adds further ambiguity. This set of claim elements relating to clamping pressure incorporate the term "average":

> the average clamping pressure is between and including 120 psi and 180 psi (claims 13, 18)
>
> creating an average predetermined clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad and the blade (claim 17)
>
> operating the clamping arm to exert a predetermined average coaptation pressure on the blood vessel between and including 60 psi and 210 psi (claim 1)
>
> the average coaptation pressure in step c) is between and including 120 psi and 180 psi (claim 2)

(*Id.* at 22-23).

These claim elements suffer from the same flaws already described – *e.g.*, the failure to specify the location of measurement and the amount and type of tissue used for

---

[55] The ambiguities created by the '501 patent claims closely resemble the circumstances of *Honeywell*, 341 F.3d at 1332, where the court found the claims insolubly ambiguous and invalid. In *Honeywell*, the claims specified numeric ranges of melting point elevation and crystallinity for yarn. *Id.* at 1339. The court determined that "neither the claims, the written description, nor the prosecution history reference any of the four sample preparation methods that can be used to measure the MPE . . . and that the choice of sample preparation method is critical to discerning whether a particular product is made by a process that infringes the [] patent claims." *Id.* Moreover, the different methods did "not produce identical or even 'essentially identical results.'" *Id.* at 1341. As a result, the Federal Circuit concluded that the claims were insolubly ambiguous because "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." The claims therefore were indefinite and invalid. *Id.* Like in *Honeywell*, the failure of the '501 patent to specify what clamping force and pressure measurement methods the claims require to practice the invention renders the claims insolubly ambiguous and indefinite. The different methods of measurement, different locations of measurement, and different clamp heights produce different results. As such it is impossible to discern the boundaries of what is claimed by the patent.

54

measurement. In addition, the patent does not specify what method one of ordinary skill in the art should apply to arrive at the average clamping pressures. It does not disclose whether average refers to the average of repeated measurements at a single location or an average of measurements taken at many locations along the clamping surface. The patent also does not specify how much and what type of tissue should be placed in the jaw for purposes of obtaining an average. For example, does the average correspond to an average of measurements taken with different types and amounts of tissue or repeated measurements on a single tissue type? Neither the specification nor the claims provide an answer.

Plaintiffs' inventors and its expert do not even agree on how to arrive at an average clamping pressure. Plaintiffs' expert contends that he can estimate the clamping force at the midpoint of the clamp jaw. (*Id.* at 24). But inventor Noschang testified that the patent did not disclose measuring at the mid-point or explain which position along the clamp arm should be measured to calculate the average. (*Id.* at 23). Finally, when asked to point to where in the '501 patent this "midpoint measurement" appeared – Plaintiffs' expert, Dr. Schafer, had no answer. (*Id.*) This attempt to interject a measurement at the midpoint in the claims when no such location is disclosed in the patent is improper. *See Honeywell*, 341 F.3d at 1340-41 (rejecting expert's use of a single method when "the intrinsic evidence cannot be construed to eliminate all other known methods" applicable to obtaining the claimed measurements).

55

At claim construction, the Court construed terms that are contained within the claim elements currently at issue.  The Court construed the phrases "clamp(ing) [pressure/force] [of/between and including] . . . a value" and "average coaptation pressure . . . between and including . . . a value" to include pressure and force values "when the clamping arm is fully engaged by the user."  (Doc. 103-1 at 17).  However, "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251.

The clamping force and pressure elements, even with this construction, do not sufficiently provide "meaningfully precise claim scope."  The ambiguities due to the failure of the patent to specify, for example, a method of measurement, the location of measurement, and the type and amount of tissue used for the measurement of clamping force and clamping pressure still remain.  Even if the clamping pressure and force elements are interpreted to mean that the clamp arm is fully engaged, this does not provide guidance on, for example, where along the clamp arm clamp force and pressure are measured, what tissue is engaged in the clamp arm (which will determine the angle or spacing of the clamp arm and the clamping surface area), *etc.*  It does not change the fact that measuring at different locations along the clamp arm provides different force and pressure values.  (*Id.* at 17-19).  Moreover, when the clamp arm is fully engaged with

56

tissue, the tissue can be thin or thick, stiff or compressible, and depending on the type of tissue, the measurement of the clamping force and pressure will differ. (*Id.* at 20-24).

A court's construction of claim terms at the *Markman* stage does not preclude a later finding of indefiniteness. For example, in *Honeywell*, the initial claim construction construed the term "melting point elevation" as definite, but the court later found the term including the incorporated numeric ranges to be indefinite. 341 F.3d at 1337-38. The evidence collected demonstrates that multiple measurement methods available at the time of the patent yield significantly different clamping force and pressure values. The evidence further shows that the inventors knew that different methods gave different results. Nevertheless, the patentees failed to specify which method was applicable to the clamping force and pressure values claimed in the patent. This evidence provides ample reason to find the claims indefinite as this point in the proceedings. When claims do not meet the definiteness requirement, "competitors cannot avoid infringement, defeating the public notice function of patent claims." *Id.* at 1249 (quoting *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996)).

Consequently, based on the foregoing, the '501 patent claims are insolubly ambiguous and are therefore indefinite and invalid.

57

# V.    CONCLUSION

Accordingly, for the reasons stated here, there being no genuine issues of material

fact in dispute, and Defendants being entitled to entry of judgment as a matter of law,

Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity of U.S.

Patent No. 8,182,501 (Doc. 103) is hereby **GRANTED**.

   **IT IS SO ORDERED.**

Date:  1/22/14                                             */s/ Timothy S. Black*
                                                            Timothy S. Black
                                                            United States District Judge

58

**A0109**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ETHICON ENDO-SURGERY, INC., *et al.*,  :  Case No. 1:11-cv-871

       Plaintiffs,  :  Judge Timothy S. Black

vs.  :

COVIDIEN, INC., *et al.*,  :

       Defendants.  :

**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT WITH RESPECT TO PLAINTIFFS' CLAIMS OF
DESIGN PATENT INFRINGEMENT (Doc. 104)**

This civil action is before the Court on Defendants' Motion for Partial Summary

Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement (Doc. 104)

and the parties' responsive memoranda.  (Docs. 116 and 120).

## I.  BACKGROUND

Plaintiffs assert that Defendants' Sonicision infringes U.S. Des. Pat. Nos. D661,

801 ("the '801 Patent"), D661, 802 ("the '802 Patent"), D661,803 ("the '803 Patent"),

and D661,804 ("the '804 Patent") (collectively, "the Design Patents"), which purportedly

relate to the design of a hand-held surgical device used to perform dissection, transection,

and sealing of blood vessels.  (Doc. 104 at 9).

Defendants now move for summary judgment on the bases that (a) the Design

Patents are invalid as a matter of law because they claim only functional features and (b)

regardless, Plaintiffs have failed to raise any genuine issue of material fact with respect to

alleged infringement of the Design Patents.  (*Id.*)

## II.    UNDISPUTED FACTS[1]

1. Plaintiffs initiated this action alleging infringement of the Design Patents through an Amended Complaint filed June 12, 2012.  The Design Patents were all filed on September 26, 2011, all issued on June 12, 2012, all entitled "User Interface For A Surgical Instrument," and all relate to the configuration of a hand-held surgical device.  (Doc. 104-2 at 1; Doc. 104-3 at 2).

2. The Design Patents are directed to a line of devices called the "Harmonic Ace" series.  (Doc. 104-2 at 1; Doc. 104-3 at 43-44).

3. Plaintiffs sold the Harmonic Ace-P, an ultrasonic surgical device the design of which was different from the Design Patents, before 2008.  (Doc. 104-2 at 2; Doc. 104-3 at 47-92).

4. The Design Patents all claim priority to an earlier filed utility patent application, U.S. Ser. No. 12/245,158, which has an effective filing date of October 5, 2007 and is entitled "Ergonomic Surgical Instruments" ("the '158 Utility Application"). (Doc. 104-2 at 2; Doc. 104-3 at 94-197).

5. Plaintiffs amended the claims in the '158 Utility Application to specifically add a claim (Claim 35) directed to a surgical instrument including a trigger including a "proximal trigger portion" and a "distal trigger hook" where the length of the distal trigger hook has a length which is less than the length of the proximal trigger portion.  (Doc. 104-2 at 2; Doc. 104-3 at 199-209).

6. Besides the '158 Application, Plaintiffs filed another utility patent application covering the same product as the Design Patents, namely, U.S. Ser. No. 13/426,232, filed March 21, 2012 entitled "Ergonomic Surgical Instruments" ("the '232 Utility Application").  (Doc. 104-2 at 2; Doc. 104-4 at 2-103).

7. Plaintiffs published at least two advertisements for the Harmonic Ace-E line of products entitled "Feeling is Believing" that touted the ergonomic superiority of the design.  (Doc. 104-2 at 2; Doc. 104-4 at 107-113).

8. Plaintiffs created other marketing materials displayed on its website that specifically referenced the functional benefits of the U-Shaped Trigger, Rounded Button and Torque Knob.  (Doc. 104-2 at 2; Doc. 104-4 at 119).

---

[1] (*See* Doc. 104-1 and Doc. 116-1).

2

9. When Plaintiffs' lead inventor, Daniel Price, was asked, "of all those different alternative designs that were considered, Ethicon believed that the Harmonic ACE, what became the Harmonic ACE and the Harmonic Ace+, were the best design that could have been chosen from – well, the best design ergonomically that could have been chosen from all those alternatives?", he answered "yes." (Doc. 104-2 at 2; Doc. 104-3 at 213-14). Mr. Price testified that, in his opinion, "it was the best design that we came up with. I think there's lots of different ways [that] other designers might have approached it. … I feel like it was the optimization for the … overall goals, like I've said repeatedly, you know, like overall design, balancing the ergonomics, you know, the look, the new brand, you know, kind of platform look." (Doc. 116-4 at 48).

10. Daniel Price agreed that the Harmonic Ace would not have been as appealing to surgeons if it were changed to a "closed trigger design," if buttons were moved from "the front area back to the thumb area" and if the rotation knob was moved "from the front to the back." Kipp Rupp, another inventor of Plaintiffs', agreed that the Harmonic Ace would not have been as appealing to surgeons if "we moved those activation buttons to the rear portion of the device as they were in [a prior device]." (Doc. 104-2 at 2; Doc. 104-3 at 218-19, 246).

11. Daniel Price could not identify one element of the Design Patents that was entirely aesthetic. (Doc. 104-2 at 2; Doc. 104-3 at 212, 223-24).[2]

12. Defendants' expert, Ronald Kemnitzer, in his Supplemental Expert Report Regarding Invalidity dated September 27, 2013, found that a person of ordinary skill in the art cannot determine the character and contour of the surfaces of the Design Patents, nor can distinguish between any open and solid areas of the design. (Doc. 104-2 at 3; Doc. 104-4 at 122-24).[3]

13. Research has revealed that surgeons want certain features in ultrasonic hand-held surgical devices, such as an "open" trigger for easy access, and activation buttons and knobs which are intuitive and easy to reach in a variety of positions. (Doc.

---

[2] Plaintiffs note that in their view, "this statement is evidence that the Design Patents are *not* dictated by function, because they incorporate aesthetic design considerations and can be designed in different ways while functioning as well." (Doc. 116-1 at 5).

[3] Plaintiffs admit that Mr. Kemnitzer offered the above-stated opinion. Plaintiffs note, however, that Plaintiffs' expert, Alan Ball, offered the exact opposite opinion and pointed to evidence in the Design Patents themselves allegedly showing that Mr. Kemnitzer's interpretation is inconsistent with the drawings of the Design Patents. (Doc. 116-1 at 6; Doc. 116-4 at 16-18; Doc. 116-8 at 10-16).

3

104-2 at 3; Doc. 104-4 at 127-33).[4]

14. Plaintiffs' expert, Alan Ball, in his Expert Report dated August 16, 2013 opined that the purchase process for medical devices is a complicated process, and that the ultimate purchaser is a materials manager. (Doc. 104-2 at 3; Doc. 104-4 at 136-37).

15. Defendants' expert, Ronald Kemnitzer, in his Rebuttal Expert Report Regarding Non-Infringement dated September 23, 2013 found that the Sonicision did not infringe upon the asserted Design Patents. (Doc. 104-2 at 3; Doc. 104-4 at 141-56).[5]

16. Inventors Daniel Price and Carl Draginoff also generally agreed with visual differences in the claimed features between the claimed design and the Sonicision. (Doc. 104-2 at 2; Doc. 104-3 at 225-27, 236-39).[6]

17. Plaintiffs concluded after interviewing surgeons regarding the value of rotation that it was of significant importance, and that rotation was a "deciding factor" in choosing device configurations. (Doc. 104-2 at 3; Doc. 104-4 at 160).[7]

---

[4] Plaintiffs note that "many surgeons [also] prefer closed loop triggers for precise dissection." (Doc. 104-2 at 3; Doc. 104-4 at 132; Doc. 116-1 at 6; Doc. 116-9 at 32, 47). Plaintiffs also dispute that "activation mechanisms and rotation knobs which are intuitive and easy to reach in a variety of positions" dictate the designs depicted in the Design Patents. (Doc. 116-1 at 6).

[5] Plaintiffs admit that Mr. Kemnitzer offered the above-mentioned opinions. They also note that their expert, Alan Ball, offered the opposite opinion. (Doc. 116-1 at 7; Doc. 116-7).

[6] Plaintiffs also note that Price and Draginoff "testified that they design surgical instruments for a living and created the design shown in the Design Patents in particular, and thus are far more attuned to subtle visual differences than an ordinary observer would be." (Doc. 116-1 at 7; Doc. 116-4 at 59-60; Doc. 116-29 at 8-10).

[7] Plaintiffs allege this is irrelevant to the present motion, since rotation can be accomplished in many different ways. (Doc. 116-1 at 8).

4

A0113

## III.   STANDARD OF REVIEW

### A.   Summary Judgment

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

### B.   Summary Judgment In Design Patent Cases

Summary judgment is as appropriate in a design patent case as in any other case. Fed. R. Civ. P. 56(c); *Arminak and Assoc., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1327 (Fed. Cir. 2007) (granting summary judgment of non-infringement of a design patent); *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1549 (Fed. Cir. 1984) (granting summary judgment of invalidity of a design patent); *Oddzon*

5

*Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1401 (Fed. Cir. 1997).

Summary judgments of non-infringement are particularly appropriate in design

patent infringement cases because of the very limited scope of protection afforded to

design patents. The Federal Circuit has stated that "design patents have almost no scope

beyond the drawings." *Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d 1311,

1323 (Fed. Cir. 1998); *see also Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed.

Cir. 1995) (reversing denial of judgment of non-infringement as a matter of law because

no reasonable jury could have found infringement). Other courts have noted that cases

involving design patents "are relatively simple and the failure to grant summary judgment

when otherwise appropriate would be an absurd waste of time." *Spalding & Evenflo Co.,*

*Inc. v. Graco Metal Prods., Inc.*, No. 5:90CV0651, 1991 WL 148127, at *3 (N.D. Ohio

Mar. 1, 1991) (citations omitted). Courts frequently grant summary judgment of non-

infringement in design patent cases.[8]

---

[8] *See, e.g., Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc); *Arminak*, 501 F.3d at 1327; *Oddzon*, 122 F.3d at 1396; *Elmer*, 67 F.3d at 1578; *Schnadig Corp. v. Collezione Europa U.S.A.*, No. 01 C 1697, 2002 WL 31253750, at *14 (N.D. Ill. Oct. 4, 2002); *Puritan-Bennett Corp. v. Penox Tech., Inc.*, No. IP02–0762–C–M/S, 2004 WL 866618, at *26-27 (S.D. Ind. Mar. 2, 2004); *Child Craft Indus., Inc. v. Simmons Juvenile Products Co.*, 990 F. Supp. 638, 644 (S.D. Ind. 1998); *Richardson v. Stanley Works, Inc.*, No. CV08–1040–PHX–NVW, 2009 WL 943529, at *4 (D. Ariz. Apr. 6, 2009); *Minka Lighting, Inc. v. Maxim Lighting Int'l, Inc.*, No. 3:06-CV-995-K, 2009 WL 691594, at *7-8 (N.D. Tex. Mar. 16, 2009); *Arc'teryx Equip. Inc. v. Westcomb Outerwear, Inc.*, No. 2:07–CV–59 TS, 2008 WL 4838141, at *3 (D. Utah Nov. 4, 2008); *Rainworks Ltd. v. The Mill-Rose Co.*, 622 F.Supp.2d 650, 657 (N.D. Ohio 2009); *Pacific Handy Cutter, Inc. v. Quick Point, Inc.*, No. SA CV96–399GLT (EEX), 1997 WL 607501, at *4-5 (C.D. Cal. July 7, 1997); *HR U.S. LLC v. Mizco Int'l, Inc.*, No. CV-07-2394 (DGT)(JO), 2009 WL 890550, at *13 (E.D.N.Y. Mar. 31, 2009).

6

## C.    Design Patent Validity

A design patent must satisfy several requirements in order to be valid; it must be ornamental and not primarily functional, and include drawings sufficiently clear to allow a designer of ordinary skill in the art to make and use the product embodied by the design.

A patented design must be ornamental. 35 U.S.C. § 171.  A design is not patentable if it is dictated primarily by functional considerations. *PHG Tech. v. St. John Companies*, 469 F.3d 1361, 1366 (Fed. Cir. 2006).  When making a functionality determination, a court is to consider the following five factors: "whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function." *Id.* (quoting *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455-56 (Fed. Cir. 1997)).

In addition, a design patent must permit a designer of ordinary skill in the art to make and use the product embodied by the design.  35 U.S.C. § 112.  Where the drawings of a design patent are vague or unclear, the patent is invalid.  *See* Manual of Patent

7

Examining Procedure ("MPEP") § 1504.04 (8th Ed. 2010).[9]

### D.  Design Patent Infringement

Even if a design patent satisfies the above requirements for validity, a design

patent holder must still prove that a claimed design is infringed.  35 U.S.C. § 289.  The

burden is on the patent holder to prove infringement by a preponderance of the evidence.

*Oddzon*, 122 F.3d at 1405.

The infringement analysis is a two-step process.  First, the court must construe the

design patent claim.  *Arminak*, 501 F.3d at 1319.  The analysis of a design patent starts

with the construction of the single claim.  "[D]esign patents typically are claimed as

shown in the drawings and … claim construction is adapted accordingly."  *Egyptian*

*Goddess*, 543 F.3d at 679.  The court may look at the prosecution history of the design

patent and any rules about broken lines, which indicate expressly those features which are

not covered.  *Id.* at 680.

Just like when making a validity determination, the court is required to discard any

functional features in determining infringement.  *Id.* at 1321; *Richardson*, 597 F.3d and

1294 (approving a claim construction where the district court "factored out" the

functional aspects of the claimed design).  Next, the trier of fact compares the construed

claim to the accused product.  *Egyptian Goddess*, 543 F.3d at 1320; *Elmer*, 67 F.3d at

---

[9] The MPEP is published by the United States Patent and Trademark Office and commonly
relied upon by patent examiners on procedural matters.  *Litton Sys. Inc., v. Whirlpool Corp.*, 728
F.2d 1423, 1439 (Fed. Cir. 1984).  "While the MPEP does not have the full force of law, it is
entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not
in conflict therewith."  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995).

1577. This comparison involves application of the "ordinary observer" test. *Egyptian Goddess*, 543 F.3d at 670. A patent holder must satisfy the ordinary observer test by a preponderance of the evidence to prove infringement. *Arminak*, 501 F.3d at 1321.

Under the ordinary observer test, the accused product is compared to the claimed design to determine whether the two designs are substantially the same. If the similarities are such that an ordinary observer would be deceived into purchasing the accused design supposing it to be the patented design, then there is infringement. *Unette Corp. v. Unit Pack Co., Inc.*, 785 F.2d 1026, 1028 (Fed. Cir. 1986); *Gorham Mfg. Co. v. White,* 81 U.S. 511, 528 (1871). To determine whether an ordinary observer would be deceived, the trier of fact looks solely to features that are non-functional; features that are functional are not relevant to an ordinary observer test. *Elmer*, 67 F.3d at 1577; *Stanley Works*, 597 F.3d at 1294. It is entirely appropriate in the context of summary judgment for the court, acting as the "ordinary observer," to find non-infringement based solely on a side-by-side comparison of the design patent images and the images of the product. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302-04 (Fed. Cir. 2010); *Mizco*, 2009 WL 890550 at *12.

In *Egyptian Goddess*, the court stated:

[i]n some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear "substantially the same" to the ordinary observer, as required by *Gorham.* In other instances, when the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of

9

the claimed and accused designs with the prior art, as in many of the cases discussed above and in the case at bar.

543 F.3d at 678.

Courts have interpreted the above-cited language as establishing "two levels to the infringement analysis: a level-one or 'threshold' analysis to determine if comparison to the prior art is even necessary, and a second level analysis that accounts for prior art in less obvious cases." *Keurig, Inc. v. JBR, Inc.*, No. 11–11941–FDS, 2013 WL 2304171, at *5 (D. Mass. May 24, 2013); *WingShing Prods. (BVI) Co. v. Sunbeam Prods.*, 665 F. Supp. 2d 357, 362 (S.D.N.Y. 2009); *Minka Lighting*, 2009 WL 691594 at *3; *Great NeckSaw Mfrs., Inc. v. Star Asia U.S.A., LLC*, 727 F.Supp. 2d 1038, 1052 (W.D. Wash. 2010). Accordingly, where the allegedly infringing product and the patented design are "plainly dissimilar," a court need look no further in determining that no infringement has occurred. *Keurig*, 2013 WL 2304171 at *9 (summary judgment grated to defendant); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F.Supp.2d 997 (N.D. Ill. 2010) (same); *Minka Lighting*, 2009 WL 691594 at *8 (same). Importantly, the burden rests with the plaintiff to show that the claimed design and alleged infringing design are not "plainly dissimilar." *Egyptian Goddess*, 543 F.3d at 678; *Mizco*, 2009 WL 890550 at *10. Moreover, expert testimony cannot create a triable issue of fact where the accused design is clearly distinguishable from the patented design. *Schnadig Corp.*, 2002 WL 31253750 at * 11; *Mizco*, 2009 WL 890550 at *13.

10

In an infringement analysis, the "ordinary observer" is "not any observer, but one who, with less than the trained faculties of the expert, is 'a purchaser of things of similar design,' or 'one interested in the subject.'" *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir. 1933) (quoting *Gorham*, 81 U.S. at 511). As is the case here, the "ordinary observer" may be a commercial purchaser who is more sophisticated than a normal retail purchaser, and thus more attuned to subtle differences between the accused and patented designs. *Arminak*, 501 F.3d at 1314; *Spotless Enters., Inc. v. A & E Prods. Group, L.P.*, 294 F.Supp.2d 322, 347 (E.D.N.Y.2003); *Puritan-Bennett*, 2004 WL 866618 at *26 (ordinary observers for medical devices include medical equipment distributors, hospitals and physicians).

## IV.    ANALYSIS

### A.    Invalidity

Design patent drawings must fully and clearly depict the configuration of a design "with such certainty as to enable those skilled in the art to make the article." *Ex parte Sweeney*, 123 USPQ 506, 507 (BPAI 1959). In addition, a patent should not be issued for a design which is dictated primarily by functional considerations. 35 U.S.C. § 111; *PHG Tech.*, 469 F.3d at 1366.

#### 1.    Indefiniteness

As the Patent Examiner found and Plaintiffs' expert opined, the Design Patents claim a clear and definite design for a surgical device. Defendants' expert simply

11

disagrees. (Doc. 116-25 at 3-5). The evidence does not meet the "high standard" of

showing by clear and convincing evidence that the patents are "not amenable to

construction or are insolubly ambiguous," let alone the absence of a triable issue of fact.

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2013 U.S. Dist. LEXIS

13237, at *30, 32-34 (C.D. Cal. Jan. 29, 2013).

    A design patent, like a utility patent, must meet the requirements of 35 U.S.C.

§ 112, including the requirements of definite claiming and enablement. *Antonious v.*

*Spalding & Evenflo Cos., Inc.*, No. 98-1478, 1999 U.S. App. LEXIS 22984, at *20 (Fed.

Cir. Aug. 31, 1999) (citing *Litton*, 728 F.2d at 1440-41). To invalidate a patent based on

indefiniteness or non-enablement, the party challenging the patent must show by clear

and convincing evidence that the design patent's claims (namely, its drawings) are not

"amenable to construction" or are "insolubly ambiguous." *Apple*, 2013 U.S. Dist. LEXIS

13237 at *32-34 (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007)).

This is a "high standard, necessary to give effect to the statutory presumption of validity

afforded to issued patents." *Id.* at *30. A design patent need not be completely clear on

every detail to meet the definiteness and enablement requirements of 35 U.S.C. § 112.

*See id.* at *33-34; *Antonious*, 1999 U.S. App. LEXIS 22984 at *20-25. The fact that

design patent claims require interpretation does not render them indefinite or non-

enabling; in contrast, the fact that a design patent claim is amenable to construction

precludes a finding of indefiniteness and/or non-enablement, even if claim construction is

12

**A0121**

quite difficult. *Apple*, 2013 U.S. Dist. LEXIS 13237 at *33-34 (citing *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

Defendants contend that the Design Patents "fail to include any surface shading whatsoever." (Doc. 104 at 34). This is inaccurate. Each of the Design Patents shows the claimed design in standard orthographic format, using seven different perspectives to show the entirety of the design. (Doc. 116-34). The Design Patents all feature tangential edge line shading, which indicates tangency between surfaces of different curvature. (Doc. 116-8 at 7-10). This technique is illustrated in the figure below:



RENDERED   WITHOUT TANGENCIES   WITH TANGENCIES

Visually tangential edges are where two surfaces flow into each other. To put it another way it's when the surface of an object changes its character. Visually they do not appear to have definite edges and in line drawings they are a part of surface shading. Showing tangential edges may be the only way an examiner can understand the shape of an item.

Illustration courtesy of Bernadette Marshall, President,
NB Graphics & Associates, Inc. (www.nbgraphics.com)

(*Id.* at 8). As Plaintiffs' design expert, Alan Ball, opined, this shading clearly defines the surfaces and contours of the claimed designs, and enables a designer of ordinary skill to

13

**A0122**

reproduce the claimed designs without speculation. (*Id.* at 9-10; Doc. 119-4 at 16-18; Doc. 119-29 at 3).

Defendants also wrongly suggest that surface shading is required under 35 U.S.C. § 112. The U.S. Patent and Trademark Office amended its regulations in 1997, making it clear that surface shading is not required on patent drawings. Prior to 1997, 37 C.F.R. § 1.152(a) read in part, "Appropriate surface shading *must* be used to show the character or contour of the surfaces represented" (emphasis added). However, in 1997, that rule was changed to read "Appropriate surface shading *should* be used to show the character or contour of the surfaces represented" (emphasis added). *See* 62 Fed. Reg. 53132, 53164 (Oct. 10, 1997) ("The term 'must' has been replaced by the term 'should' to allow for latitude in the illustration of articles whose configuration may be understood without surface shading"). The MPEP acknowledges this. MPEP § 1503.02.10. Consistent with the USPTO's guidance, the Design Patents include tangential edge line surface shading, and the patent examiner found that they were sufficiently definite and enabling for the patents to issue.[10]

---

[10] The patent examiner here was acutely aware of the definiteness and enablement requirements of 35 U.S.C. § 112, initially rejecting the patent applications on these grounds on December 20, 2011, because of difficulty determining how lines shown in certain views related to lines in Figure 5. (Doc. 119-23 at 8, 17, 25-26, 34-35; Doc. 119-24 at 5, 21, 37). Plaintiffs responded to these non-final rejections and filed amended drawings on February 22, 2012. (Doc. 119-24). The notice of allowability issued on February 29, 2012. The examiner never raised the issue of surface shading.

14

Defendants' claim that a person of ordinary skill in the art could not distinguish between open and solid areas of the designs is also unavailing. Any notion that a surface of the U-Shaped Trigger on the design patents is "open" is quickly dispelled by simply examining the other figures in the patent, which clearly indicate a solid surface. (Doc. 119-4 at 16-18; Doc. 119-8 at 10-16); *see Antonious*, 1999 U.S. App. LEXIS 22984 at *24-25 (holding that uncertainty about a claimed design resulting from viewing a single drawing can be dispelled in light of other drawings that make the design clear). The following table indicates just a few ways in which Mr. Kemnitzer's interpretation of an "open" trigger is inconsistent with the drawings:



(Doc. 119-4 at 16-18; Doc. 119-8 at 10-16). Mr. Kemnitzer simply ignores the

16

inconsistencies between his interpretation and what the patent drawings show, suggesting that they are the result of draftsman error. Defendants do not cite any cases in which a patent was held to be indefinite because of insufficient surface shading. In the sole case Defendants cite where indefiniteness was found, the drawings within the patent were inconsistent with one another, the patent holder offered no facts or expert testimony in response to the indefiniteness argument, and the inventor himself admitted that he could not determine what was claimed in the patent based on the drawings. *Seed Lighting Design Co., Ltd. v. Home Depot*, No. C 04-2291, 2005 WL 1868152, at *8-9 (N.D. Cal. Aug. 3, 2005). This is a far cry from the situation here. *See Antonious*, 1999 U.S. App. LEXIS 22984 at *24-25 (reversing summary judgment that had invalidated design patents, explaining that despite discrepancies in the design patent drawings, a person of ordinary skill in the art would know to look to the figures that were consistent with one another and ignore the inconsistent outlier).

As a result, Defendants have not met their difficult burden of proving invalidity due to indefiniteness with clear and convincing evidence.

## 2.    Functionality

"If [a] patented design is primarily functional rather than ornamental, the patent is invalid." *PHG Tech.*, 469 F.3d at 1366. In determining whether a design is primarily functional, courts should consider: (1) whether the protected design represents the best design, (2) whether alternative designs would adversely affect utility, (3) whether there

17

are any concomitant utility patents, (4) whether the advertising touts particular features of the design as having specific utility, and (5) whether there are any elements in the design or an overall appearance clearly not dictated by function. *Id.* Each of these five factors are satisfied by the facts set forth below.

### a.     Best Design

Where a design clearly represents the "best design," functionality should be found. *PHG Tech.*, 469 F.3d at 1366. The evidence clearly demonstrates that the Design Patents embody the optimal design for Plaintiffs' Harmonic ACE product. Plaintiffs' own inventors agreed that "of all the different alternative designs" considered for the Harmonic ACE, the claimed design was "the best design ergonomically that could have been chosen." (Doc. 104-3 at 213-14). In addition, the feedback received in the course of testing the prototypes confirms that surgeons believed the Linus prototype, which eventually was adopted as the final Harmonic ACE design, was "preferred … the most overall." (Doc. 104-1 at 3; Doc. 104-4 at 127-33).

### b.     Adverse Utility of Alternative Designs

Further proof of functionality was provided by Plaintiffs' own inventors, who testified that alternative designs would not have worked as well as the design embodied by the asserted Design Patents. (Doc. 104-1 at 3; Doc. 104-3 at 211-47). Specifically, their testimony reveals that surgeons would have "run [Plaintiffs] out of town" if they moved the activation buttons to the rear of the device. (Doc. 104-3 at 218-19).

18

**A0127**

Plaintiffs' witnesses also testified that the "open trigger" design embodied by the Design Patents was surgeons' "preferred design," and to go back to a closed trigger design "would be a mistake, would not be as good." (*Id.* at 218). Earlier interviews with surgeons conducted by Plaintiffs had concluded that rotation is an issue "of significant importance" and was a "deciding factor" when surgeons were presented with different configuration options. (Doc. 104-1 at 4; Doc. 104-4 at 160). When asked how surgeons would react to various placements of the Torque Knob used to control rotation, Plaintiffs' lead inventor stated that "the forward position is the preferred." (Doc. 104-1 at 3; Doc. 104-3 at 220).

###### c. Utility Patents

The existence of two utility patents further demonstrates that the claimed aspects of the Design Patents are all entirely functional. First and most importantly, Plaintiffs pursued the '158 and '232 Utility Applications concomitantly with the applications that issued as the Design Patents. The Design Patents claimed priority to, included the same figures as, and related to the exact same design as the '158 and '232 Utility Applications. The fact that utility patent applications were sought by Plaintiffs to cover the exact same design comprises strong evidence that the claimed design is functional. *PHG Tech.*, 469 F.3d at 1366.

Additionally, the claims of the '158 and '232 Utility Applications are specifically directed to the exact features shown in the Design Patents, including "a handle extending

19

downwardly from [a housing with a] trigger pivotally attached to the housing," and a
"distal rotation knob... [with] a plurality of flutes." (Doc. 104-1 at 2; Doc. 104-3 at 94-
197; Doc. 104-4 at 2-103). These utility claims also describe a "proximal trigger portion
having a first length … [coupled to] a distal trigger hook … having a second length,
wherein the second length is less than the first length." (*Id.*) Because utility patents
cover only utilitarian features, claims submitted in a utility application constitute an
applicant's assertion of what they believe to be functional features of an invention.
*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005).
Because the claims submitted by Plaintiffs in the '158 and '232 Utility Applications are
identical to the claimed features of the Design Patents, these utility applications constitute
undisputed evidence that the Design Patents are functional.

Moreover, statements made by the inventors within the '158 and '232 Utility
Applications conclusively establish that all the features claimed in the Design Patents are
functional. For example, the '158 Utility Application describes the U-Shaped Trigger as
"ergonomically formed" and points out that the "longer lever of the elongated trigger
hook 124 allows the user to employ multiple fingers [which] allows the surgeon to exert
higher input forces on the trigger 120 [thus lessening] hand fatigue and strain…" (Doc.
104-1 at 2; Doc. 104-3 at 178-79, 181). Furthermore, "the user may release the trigger
120 by pushing outwardly in the distal direction against the elongated trigger hook 124
with the middle and/or lower fingers to open the jaws of the end effector assembly 112."

(Doc. 104-3 at 181). The shape and placement of the Rounded Button is described as enabling better access for shorter fingers. (*Id.* at 179). Finally, the shape and placement of the Torque Knob is described as permitting one finger operation, due to the placement of the knob at the front of the device and the size and number of the flutes. (*Id.* at 178, 180). These unequivocal statements by the inventors provide additional proof that the claimed design is primarily functional as a whole.

### d. Utility Advertisement

A finding of functionality is also bolstered by Plaintiffs' advertising of the Harmonic ACE. *PHG Tech.*, 469 F.3d at 1366. The "Feeling is Believing" advertisements specifically touted the functionality of the features claimed in the Design Patents; the Rounded Button and Torque Knob were identified as "intuitive controls" providing the user with the ergonomic benefit of "minimal index finger repositioning." (Doc. 104-1 at 2; Doc. 104-4 at 113). Another "Feeling is Believing" advertisement referenced the "open design" of the U-Shaped Trigger that "provides easy access." (Doc. 104-4 at 107). Other marketing materials highlighted the U-Shaped Trigger of the Harmonic ACE as "designed for optimum fit and comfort." (Doc. 104-1 at 2; Doc. 104-4 at 119). These advertisements are further proof of functionality.

### e. All Elements Dictated By Function

As noted above, Plaintiffs' witnesses confirmed that all of the features claimed in the Design Patents were dictated by functional considerations. When pressed, these

21

witnesses could not identify one element of the Design Patents which was entirely (or even primarily) aesthetic. (Doc. 104-1 at 3; Doc. 104-3 at 212, 223-24). Because each and every aspect claimed in the Design Patents is clearly dictated by function, this factor also favors a finding of functionality.

Accordingly, based on the foregoing, the Court concludes that the elements claimed in the Design Patents are all "dictated by function" and the Design Patents are invalid as functional.

## B.    Non-Infringement

The claimed design elements of the Design Patents are: (1) a U-Shaped Trigger, (2) a Torque Knob, and (3) a Rounded Button. The '804 Patent claims all three of these design elements in combination, whereas the other Design Patents claim combinations of less than all three of these design elements.

Even if Plaintiffs' Design Patents were valid, the Sonicision does not infringe them because the shape and placement of the U-Shaped Trigger, Torque Knob, and Rounded Button elements of the Design Patents are all based on functional considerations and therefore all of these elements must be "factored out" of the claimed design. As stated by the Federal Circuit in *Stanley Works*:

> If the patented design is primarily functional rather than ornamental, the patent is invalid. However, when the design also contains ornamental aspects, it is entitled to a design patent whose scope is limited to those aspects alone and does not extend to any functional elements of the claimed article… A claim to a design containing numerous functional elements … necessarily mandates a narrow construction.

22

597 F.3d at 1293-94.

The Federal Circuit has tasked the district courts with "usefully guid[ing] the finder of fact by addressing … such matters as … distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Egyptian Goddess*, 543 F.3d at 680. Functional aspects are then "factor[ed] out" for infringement purposes. *See Stanley Works*, 597 F.3d at 1293-95 ("[w]here a design contains both functional and nonfunctional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent"). Construing the Design Patents to factor out the functional aspects leaves nothing in common between the claimed and accused designs.

As discussed above, the (1) U-Shaped Trigger, (2) Torque Knob, and (3) Rounded Button are all dictated by functional considerations. The presence of 2 utility patent applications on the same exact device is proof of the functionality of the overall design. *PHG Tech.*, 469 F.3d at 1366 (the existence of "concomitant utility patents" shows functionality of a claimed design). Add to that Plaintiffs' advertising touting utility, admissions that the design is optimal ergonomically, and evidence that alternative designs would not have worked as well, and a finding of functionality is confirmed. (Doc. 104-1 at 2-3).

It is well established that when functionality, rather than an aesthetic design choice, informs a configuration of features, those features must be excluded from an

23

infringement analysis. In *Stanley Works*, for example, in construing a multi-function tool, the court determined that the configuration of the handle, hammerhead, jaw and crowbar features were informed by functional considerations and were thus not to be relied upon in an infringement analysis. 597 F. 3d at 1294. The shape and placement of the U-Shaped Trigger, Torque Knob, and Rounded Button elements of the Design Patents are similarly all based on functional considerations and therefore all of these elements must be "factored out" of the claimed design. When this is done, there is nothing left to compare to the Sonicision. Therefore in this case, there can be no infringement.

Even if something remained of the Design Patents once functional elements are "factored out," there still can be no infringement under the "ordinary observer" test. The test for infringement of a design patent is whether the ordinary observer, "giving such attention as a purchaser usually gives" and viewing any differences between the patented design and the accused product "in the context of the prior art," finds that the devices bear such resemblance as to deceive the observer, inducing him or her "to purchase one supposing it to be the other." *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham*, 81 U.S. at 511); *see id.* at 676 (discussing *Litton*, 728 F.2d at 1423). The appropriate method of analyzing the infringement of a design patent is to do a side-by-side study of the design patent drawings to the accused product. *Crocs*, 598 F.3d at 1304.

As set forth by the Supreme Court, the "ordinary observer" is a purchaser who "giv[es] such attention as a purchaser usually gives." *Gorham*, 81 U.S. at 528. More

24

specifically, "the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent." *Arminak*, 501 F.3d at 1323. In many cases, the "ordinary observer" is a commercial purchaser who is more sophisticated than a normal retail purchaser, and thus more attuned to subtle differences between the accused and patented designs. *Id.* In *Puritan-Bennett*, for example, the court found that the ordinary observer for liquid oxygen dispensers was the "the medical equipment distributor." 2004 WL 866618 at *26.

Here, Plaintiffs ignore the highly sophisticated ordinary observer and the highly complex medical device purchasing process. Plaintiffs do not dispute that the purchasing process for the devices in question is a "complicated process" that takes "between 3-9 months," and that the ultimate purchaser is a "materials manager or entity" (such as a hospital or medical device supplier). (Doc. 104-1 at 3; Doc. 104-4 at 136-37). Plaintiffs argue, however, that the "ordinary observer" is the surgeon who uses the devices. (Doc. 104-4 at 136). While the surgeon may have some input to a hospital into which devices he or she prefers, the surgeon is not involved in purchasing negotiations, and is not expending any money. As it is the hospital or supply company that is ultimately putting out the money for these devices, they will heavily scrutinize the details of the purchase

25

A0134

process. Furthermore, Plaintiffs have not conducted any consumer surveys, identified a single instance of actual confusion in the marketplace, or otherwise come forward with any evidence to support its conclusory allegations of substantial similarity. In fact, the only evidence Plaintiffs have offered in support of infringement is the testimony of its purported design expert. However, expert testimony cannot create a triable issue of fact where an accused design is clearly distinguishable from the patented design. *Schnadig Corp.*, 2002 WL 31253750 at \*11; *Mizco*, 2009 WL 890550 at \*13.

A comparison of the overall design shown in the figures of the Design Patents with the Sonicision design, without more, demonstrates as a matter of law that the designs are plainly dissimilar. Despite their arguments to the contrary, the Design Patents do not entitle Plaintiffs to preclude others from using all styles or placements of open triggers, fluted rotation knobs, or activation buttons. In short, the Sonicision does not practice any of the alleged ornamental design features of the Design Patents as the designs simply do not look alike except for the fact that both are hand-held surgical devices with open trigger handles. The most obvious difference is the overall contoured shape of the device elements shown in the Design Patents as compared to the overall linear shape of the Sonicision (see below).

26

 

Fig. 1 of the '804 Patent            Sonicision (Perspective View)

Figure 1 of the '804 Patent shows a contoured handle and rounded button. These design features are not practiced by, and do not appear in the design of the Sonicision, making the designs "plainly dissimilar." *Cf. Minka Lighting*, 2009 WL 691594 at *6 ("Similar silhouettes or comparable contours between a patented and accused design can make them 'not plainly dissimilar'"). In the present case, the "silhouette" and "contours" of the Design Patents and the Sonicision are "plainly dissimilar." This distinction alone is sufficient to support a finding that the Design Patents and the Sonicision are not "substantially similar." *See Rainworks*, 2009 WL 863993 at *4.

Moreover, a side-by-side comparison of the images of the Sonicision against the figures of the Design Patents shows that there is no issue of genuine material fact that the Sonicision does not infringe. (Doc. 104-1 at 3; Doc. 104-4 at 147). Since the '804 Patent contains all the claimed features of the Design Patents (*i.e.*, the U-Shaped Trigger,

27

Torque Knob and Rounded Button), a comparison of the figures of that patent to the Sonicision suffices to show non-infringement.

Even if Plaintiffs' design patents had some non-functional scope as they pertain to the U-Shaped Trigger, which this Court has found they do not, it could only be on the ornamental design associated with the trigger as specifically shown in the patent drawings and no more. The Sonicision does not practice the ornamental design of the U-Shaped Trigger shown in the Design Patents. The trigger handle in the Sonicision is linear throughout, and has a forward (distal) portion which is parallel to a rear (proximal) portion. (Doc. 104-4 at 156). Conversely, the U-Shaped Trigger of the Design Patents is contoured throughout, with a distal portion which curves away from the device and a proximal portion which curves toward the device. (*Id.* at 155). Additionally, the U-Shaped Trigger includes a continuously curved portion which connects the distal and proximal portions, whereas the Sonicision has a linear and downwardly angled portion connecting the distal and proximal portions. (*Id.* at 148-49).

28



FIG. 2

Fig. 2 of the '804 Patent



Sonicision (Right Side View)

Beyond those differences, the distal portion of the Sonicision trigger has a width which is substantially less than the width of the proximal portion (as shown below). (Doc. 104-1 at 3; Doc. 104-4 at 152-53). The Design Patents' U-Shaped Trigger, quite differently, has a distal portion which is at least as wide as the proximal portion (if not wider). (*Id.*) The proximal portion of the Design Patents' U-Shaped Trigger is also much longer than the proximal portion of the trigger in the Sonicision. (*Id.*) From this front view, it is also clear that the proximal portion of the trigger handle of the Sonicision is straight and remains consistent in width throughout, while the corresponding element of the Design Patents tapers along its length, becoming more narrow with an inward curve at the bottom. (Doc. 104-4 at 155).

29







Fig. 6 of the '804 Patent                    Sonicision (Front View)

Lastly, the continuously curved portion of the claimed designs' U-Shaped Trigger

connecting the proximal and distal portions is narrowed in the center, and widest at the

ends. (Doc. 104-1 at 3; Doc. 104-4 at 151). This portion of the Sonicision has a

configuration which is widest at the end closest to the proximal portion, and narrowest at

the end closest to the distal portion. (*Id.*)





Fig. 5 of the '804 Patent                    Sonicision (Bottom View)

In the same way, even if Plaintiffs' design patents had some non-functional scope

as they pertain to the Rounded Button, which this Court has found they do not, it could

30

**A0139**

only be on the ornamental design associated with the button as specifically shown in the patent drawings and no more. The Sonicision does not practice the ornamental design of the Rounded Button shown in the Design Patents. The activation button in the Sonicision is rectangular with a flat front face and flat side faces. (Doc. 104-4 at 149). By contrast, the Rounded Button of the Design Patents is curved across its front, and is overall football-shaped. (*Id.*) The Rounded Button is also placed directly above, and in contact with, the upper portion of the U-Shaped Trigger, whereas the Sonicision activation button is separated from the upper portion of the trigger and placed behind it. (*Id.*)

 

<u>Fig. 2 of the '804 Patent</u>          <u>Sonicision (Right Side View)</u>

Additionally, the Rounded Button appears to wrap around the sides of the device in the Design Patents, and is much wider and more football-shaped than the activation button of the Sonicision, which is overall rectangular in shape and does not appear to wrap around the device. (Doc. 104-1 at 3; Doc. 104-4 at 149).

31





Fig. 6 of the '804 Patent          Sonicision (Front View)



In the same way, even if Plaintiffs' design patents had some non-functional scope as they pertain to the Torque Knob, which this Court has found they do not, it could only be on the ornamental design associated with the knob as specifically shown in the patent drawings and no more.  The Sonicision does not practice the ornamental design of the Torque Knob shown in the Design Patents.  The knob in the Sonicision is made of a solid piece of material which is rounded across the front.  (Doc. 104-4 at 149-50).  The Rounded Button of the Design Patents, on the other hand, has a flat front face.  (*Id.*)  The Sonicision's knob begins to curve in the front and tapers evenly, ending in a wide base.  (*Id.*)  By contrast, the Torque Knob of the Design Patents has a curve from the front that clearly peaks before curving inward again; the widest portion of the '804 Torque Knob is not at its base, but at approximately one-third of the overall distance from the back of the Torque Knob to the front.  (*Id.*)

32





Fig. 2 of the '804 Patent            Sonicision (Right Side View)

The front face of the Torque Knob of the Design Patents is also very different; it has a larger circular recess at its center which reveals elements inside the knob. (Doc. 104-1 at 3; Doc. 104-4 at 153-54). The Sonicision knob is smooth across its front face and has no such circular recess. (*Id.*)





Fig. 6 of the '804 Patent            Sonicision (Front View)

33

At deposition, lead designer Daniel Price generally agreed that there were visual differences between the claimed design and the Sonicision:

> Q. … what I want to know is that the elements that are shown in solid lines in those design patents, where did they exist in the Sonicision, if at all?
>
> A. They're not the same. I mean, they're different devices.

(Doc. 104-1 at 4; Doc. 104-3 at 225-37).

In conclusion, based on the foregoing, the Sonicision is "plainly dissimilar" from the surgical device shown in the '804 Patent, and this ends the inquiry into infringement. *Keurig*, 2013 WL 2304171 at *9.

## V. CONCLUSION

Accordingly, for the reasons stated here, there being no genuine issues of material fact in dispute, Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement (Doc. 104) is hereby **GRANTED**.

**IT IS SO ORDERED.**

Date: 1/22/14

*/s/ Timothy S. Black*
Timothy S. Black
United States District Judge

34

**A0143**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

ETHICON ENDO-SURGERY, INC. and
ETHICON ENDO-SURGERY, LLC,

        Plaintiffs,

v.

COVIDIEN, INC. and COVIDIEN LP,

        Defendants.

Civil Action No.: 1:11-cv-871

**Judge Timothy S. Black**

## **JUDGMENT**

In accordance with the Orders of this Court, dated January 22, 2014 (Dkt. Nos. 130, 131,

132, and 133), granting certain motions for summary judgment filed by Defendants Covidien,

Inc. and Covidien LP (collectively "Covidien" or "Defendants") (Dkt. Nos 101, 103, 104, and

105, respectfully):

    1.    Judgment is hereby entered in favor of Covidien and against Plaintiffs Ethicon

Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC (collectively "Ethicon" or "Plaintiffs") on

Ethicon's claims set forth in its Amended Complaint for Patent Infringement dated June 13, 2012

(the "Amended Complaint") that Covidien has infringed, either directly or indirectly, the asserted

claims of U.S. Patent No. 5,989,275 (the "'275 patent") (Dkt. No. 45, Counts X-XII). Judgment

is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim

that Defendants have not infringed and do not currently infringe, either directly or indirectly, any

valid claim of the '275 patent, as set forth in Defendants' First Amended Answer to Plaintiffs'

Amended Complaint for Patent Infringement and Counterclaims (the "Amended Answer"), dated

October 3, 2013 (Dkt. No. 99, Ninth Defense and Count VII). Accordingly, Counts X-XII of

1

A0144

Ethicon's Amended Complaint for direct and indirect infringement of the '275 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 5,989,275, Dkt. No. 130.)

2.    Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's claims set forth in the Amended Complaint that Covidien has infringed, either directly or indirectly, the asserted claims of U.S. Patent No. 8,182,501 (the "'501 patent) (Dkt. No. 45, Counts XIII-XV). Judgment is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that Defendants have not infringed and do not currently infringe, either directly or indirectly, any valid claim of the '501 patent, as set forth in the Amended Answer (Dkt. No. 99, Eleventh Defense and Count IX). Accordingly, Counts XIII-XV of Ethicon's Amended Complaint for direct and indirect infringement of the '501 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 8,182,501, Dkt. No. 131.)

3.    Judgment is hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that the claims of the '501 patent are invalid for failure to satisfy the conditions of patentability under Title 35 of the U.S. Code. (Dkt. No. 99, Twelfth Defense and Count X). Accordingly, for this additional reason, Counts XIII-XV of Ethicon's Amended Complaint for direct and indirect infringement of the '501 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 8,182,501, Dkt. No. 131.)

4.    Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's claims set forth in the Amended Complaint that Covidien has infringed, either directly or

2

indirectly, U.S. Patent D661,801 (the "'801 patent) (Dkt. No. 45, Counts XVI-XVIII). Judgment

is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim

that Defendants have not infringed and do not currently infringe, either directly or indirectly, any

valid claim of the '801 patent, as set forth in the Amended Answer (Dkt. No. 99, Fourteenth

Defense and Count XII). Accordingly, Counts XVI-XVIII of Ethicon's Amended Complaint for

direct and indirect infringement of the '801 patent are hereby dismissed with prejudice. (*See*

Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs'

Claims of Design Patent Infringement, Dkt. No. 132.)

     5.     Judgment is hereby entered in favor of Covidien in regard to its affirmative

defense and counterclaim that the claims of the '801 patent are invalid for failure to satisfy the

conditions of patentability under Title 35 of the U.S. Code. (Dkt. No. 99, Fifteenth Defense and

Count XIII). Accordingly, for this additional reason, Counts XVI-XVIII of Ethicon's Amended

Complaint for direct and indirect infringement of the '801 patent are hereby dismissed with

prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect

to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

     6.     Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's

claims set forth in the Amended Complaint that Covidien has infringed, either directly or

indirectly, U.S. Patent D661,802 (the "'802 patent) (Dkt. No. 45, Counts XIX-XXI). Judgment

is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim

that Defendants have not infringed and do not currently infringe, either directly or indirectly, any

valid claim of the '802 patent, as set forth in the Amended Answer (Dkt. No. 99, Sixteenth

Defense and Count XIV). Accordingly, Counts XIX-XXI of Ethicon's Amended Complaint for

3

direct and indirect infringement of the '802 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

7.      Judgment is hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that the claims of the '802 patent are invalid for failure to satisfy the conditions of patentability under Title 35 of the U.S. Code. (Dkt. No. 99, Seventeenth Defense and Count XV). Accordingly, for this additional reason, Counts XIX-XXI of Ethicon's Amended Complaint for direct and indirect infringement of the '802 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

8.      Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's claims set forth in the Amended Complaint that Covidien has infringed, either directly or indirectly, U.S. Patent D661,803 (the "'803 patent) (Dkt. No. 45, Counts XXII-XXIV). Judgment is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that Defendants have not infringed and do not currently infringe, either directly or indirectly, any valid claim of the '803 patent, as set forth in the Amended Answer. (Dkt. No. 99, Eighteenth Defense and Count XVI). Accordingly, Counts XXII-XXIV of Ethicon's Amended Complaint for direct and indirect infringement of the '803 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

9.      Judgment is hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that the claims of the '803 patent are invalid for failure to satisfy the

4

**A0147**

conditions of patentability under Title 35 of the U.S. Code. (Dkt. No. 99, Nineteenth Defense and Count XVII). Accordingly, for this additional reason, Counts XXII-XXIV of Ethicon's Amended Complaint for direct and indirect infringement of the '803 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

10.     Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's claims set forth in the Amended Complaint that Covidien has infringed, either directly or indirectly, U.S. Patent D661,804 (the "'804 patent) (Dkt. No. 45, Counts XXV-XXVII). Judgment is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that Defendants have not infringed and do not currently infringe, either directly or indirectly, any valid claim of the '804 patent, as set forth in the Amended Answer. (Dkt. No. 99, Twentieth Defense and Count XVIII). Accordingly, Counts XXV-XXVII of Ethicon's Amended Complaint for direct and indirect infringement of the '804 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

11.     Judgment is hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that the claims of the '804 patent are invalid for failure to satisfy the conditions of patentability under Title 35 of the U.S. Code. (Dkt. No. 99, Twenty-First Defense and Count XIX). Accordingly, for this additional reason, Counts XXV-XXVII of Ethicon's Amended Complaint for direct and indirect infringement of the '804 patent are hereby dismissed with prejudice. (*See* Order Granting Defendants' Motion for Partial Summary Judgment with Respect to Plaintiffs' Claims of Design Patent Infringement, Dkt. No. 132.)

5

12.     Judgment is hereby entered in favor of Covidien and against Ethicon on Ethicon's claims set forth in the Amended Complaint that Covidien has infringed, either directly or indirectly, the asserted claims of U.S. Patent No. 5,897,569 (the "'569 patent) (Dkt. No. 45, Counts IV-VI). Judgment is also hereby entered in favor of Covidien in regard to its affirmative defense and counterclaim that Defendants have not infringed and do not currently infringe, either directly or indirectly, any valid claim of the '569 patent, as set forth in the Amended Answer. (Dkt. No. 99, Fifth Defense and Count III). Accordingly, Counts IV-VI of Ethicon's Amended Complaint for direct and indirect infringement of the '569 patent are hereby dismissed with prejudice. (*See* Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity of Claim 30 of U.S. Patent 5,897,569, Dkt. No. 133.)

**IT IS SO ORDERED.**

Date: 2/18/14

Timothy S. Black
United States District Judge

KTBH: 4828-1429-6600, v. 1

6

A0149

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

ETHICON ENDO-SURGERY, INC. and
ETHICON ENDO-SURGERY, LLC,

        Plaintiffs,

        v.

COVIDIEN, INC. and COVIDIEN LP,

        Defendants.

Civil Action No.: 1:11-cv-871

**Judge Timothy S. Black**

**FINAL JUDGMENT**

In accordance with the Stipulation of the Parties Regarding Defendants' Affirmative Defenses and Counterclaims, filed on February 14, 2014, (Doc. 136), resolving the remaining claims pending for adjudication in this action, final judgment is hereby entered as follows:

1.    The affirmative defenses, counterclaims and prayers for relief, asserted by Defendants in their First Amended Answer to Plaintiffs' Amended Complaint for Patent Infringement and Counterclaims (Doc. 99) set forth below are dismissed, without prejudice.

        a.  Invalidity of U.S. Patent No. 5,897,569 (Sixth Defense and Count IV),

        b.  Invalidity of U.S. Patent No. 5,989,275 (Tenth Defense and Count VIII),

        c.  Invalidity of U.S. Patent No. 8,182,501, for reasons other than indefiniteness pursuant to 35 U.S.C. § 112, (Twelfth Defense and Count X),

d. Unenforceability of U.S. Patent No. 8,182,501 (Thirteenth Defense and Count XI),

e. Invalidity of U.S. Patent No. D661,801, for reasons other than functionality, (Fifteenth Defense and Count VIII),

f. Invalidity of U.S. Patent No. D661,802, for reasons other than functionality, (Seventeenth Defense and Count XV),

g. Invalidity of U.S. Patent No. D661,803, for reasons other than functionality, (Nineteenth Defense and Count XVII),

h. Invalidity of U.S. Patent No. D661,804, for reasons other than functionality, (Twenty-First Defense and Count XIX), and

i. A finding that this case is "exceptional" within the meaning of 28 U.S.C. § 285 and an award to Defendants of their reasonable attorneys' fees and expenses (Prayer for Relief).

2. The January 22, 2014, orders on Defendants' motions for summary judgment (Docs. 130, 131, 132, 133 & 134) are unsealed and made public and the clerk is directed to change the electronic restriction on these orders to make them accessible for viewing on the Court's CM/ECF system.

3. All previous orders and judgments of the Court in this action that adjudicated claims and/or counterclaims of the parties are reaffirmed and made final and appealable.

2

      4.     This action, together with Plaintiffs' claims for relief, is hereby dismissed.

**IT IS SO ORDERED.**

Date: _3/4/14_

Timothy S. Black
United States District Judge

3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**ETHICON ENDO-SURGERY, INC.,** *et al.*,  **Case No. 1:11-CV-871**

      Plaintiffs,  **Judge Timothy S. Black**

**-vs-**

**COVIDIEN, INC.,** *et al.*,

      Defendants.

---

## JUDGMENT IN A CIVIL CASE

---

    **[ ]**   **Jury Verdict:** This action came before the Court for a trial by jury. The issues have been tried and the Jury has rendered its verdict.

    **[X]**   **Decision by Court:**

    **IT IS ORDERED AND ADJUDGED** that the parties' Joint Motion for Final Judgment (Doc. 138) is **GRANTED**; and the case is **CLOSED** on the docket of the Court.

Date: 3/4/2014  **JOHN P. HEHMAN, CLERK**

                                    By: *s/M. Rogers, D.C.*
                                    Deputy Clerk

**A0153**



US005989275A

# United States Patent [19]

## Estabrook et al.

[11] **Patent Number:** **5,989,275**

[45] **Date of Patent:** *****Nov. 23, 1999**

[54] **DAMPING ULTRASONIC TRANSMISSION COMPONENTS**

[75] Inventors: **Brian Estabrook**, Foxboro; **Stephen DiMatteo**, Seekonk, both of Mass.; **Paul Smith**, West Kingston, R.I.

[73] Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, Ohio

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/808,652**

[22] Filed: **Feb. 28, 1997**

[51] Int. Cl.$^6$ .................................... **A61B 17/00**
[52] U.S. Cl. ................................. **606/169**; 604/22
[58] Field of Search ........................... 606/167, 169–171, 606/180; 604/22; 601/2

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re. 30,536 | 3/1981 | Perdreaux, Jr. . |
| 2,845,072 | 7/1958 | Shafer . |
| 2,874,470 | 2/1959 | Richards . |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1098003 | 9/1977 | Canada . |
| 0 495 634 A2 | 1/1992 | European Pat. Off. . |
| 0 624 346 A2 | 5/1994 | European Pat. Off. . |
| 0 624 346 A3 | 5/1994 | European Pat. Off. . |
| 2032-501 | 7/1970 | Germany . |
| 76-18881 | 6/1976 | Germany . |
| 77-05-069 | 2/1977 | Germany . |
| 29 22 239 | 5/1979 | Germany . |
| 37 07 921 A1 | 3/1987 | Germany . |
| 19534618 A1 | 3/1997 | Germany . |

| | | |
|---|---|---|
| 56-38931 | 5/1981 | Japan . |
| 56-108085 | 8/1981 | Japan . |
| 61-265136 | 4/1986 | Japan . |
| 61-128954 | 6/1986 | Japan . |
| 63-61609 | 3/1988 | Japan . |
| 63-61609 | 4/1988 | Japan . |
| 63-61609 | 11/1988 | Japan . |
| 2-99049 | 4/1990 | Japan . |
| 8-275951 | 4/1995 | Japan . |
| 8-275948 | 10/1996 | Japan . |
| 8-275949 | 10/1996 | Japan . |
| 9-98980 | 4/1997 | Japan . |
| 1388002 A1 | 4/1988 | Russian Federation . |

(List continued on next page.)

OTHER PUBLICATIONS

UltraCision Incorporated, The harmonic Scalpel® For Gynecological Surgery, Product Sheet, Sep. 1992.
UltraCision Incorporated, The Harmonic Scalpel® For General Surgery, Product Sheet, Jan. 1993.
Snowden–Pencer, Inc., Endoscopic Plastic Surgery, 1993.
UltraCision Incorporated, Harmonic Scalpel® Price List, 1995.
UltraCision Incorporated, Harmonic Scalpel® Operating Manual, Mar. 1995.
Ethicon Endo–Surgery, Inc., Ultracision CS/LCS Layout Brochure, 1996.
Cooper LaserSonics, Inc., Ultrasonic Surgical Aspirator NS–100 Operator Manual, 1984, pp. 12, 13, 16, 17, and 29–33.

*Primary Examiner*—Michael Buiz
*Assistant Examiner*—William Lewis

[57] **ABSTRACT**

An ultrasonic surgical device in accordance with the present invention includes a transmission component adapted to receive ultrasonic vibration from a transducer assembly and to transmit the ultrasonic vibration from a first end to a second end. An inner damping member surrounds at least a portion of the transmission component. The dampening member is adapted to contact the transmission component to dampen undesired vibration during ultrasonic transmission.

**26 Claims, 6 Drawing Sheets**



**5,989,275**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,053,124 | 9/1962 | Balamuth et al. . |
| 3,075,288 | 1/1963 | Balamuth et al. . |
| 3,076,904 | 2/1963 | Kleesattel et al. . |
| 3,213,537 | 10/1965 | Balamuth et al. . |
| 3,368,280 | 2/1968 | Fridman et al. . |
| 3,375,583 | 4/1968 | Blank et al. . |
| 3,433,226 | 3/1969 | Boyd . |
| 3,488,851 | 1/1970 | Haydu . |
| 3,489,930 | 1/1970 | Shoh . |
| 3,518,766 | 7/1970 | Burt . |
| 3,526,036 | 9/1970 | Goof . |
| 3,526,792 | 9/1970 | Shoh . |
| 3,589,012 | 6/1971 | Richman . |
| 3,589,363 | 6/1971 | Banko et al. . |
| 3,593,425 | 7/1971 | Robinson . |
| 3,636,943 | 1/1972 | Balamuth . |
| 3,636,947 | 1/1972 | Balamuth . |
| 3,645,255 | 2/1972 | Robinson . |
| 3,654,502 | 4/1972 | Carmona et al. . |
| 3,654,540 | 4/1972 | Honig et al. . |
| 3,657,056 | 4/1972 | Winston et al. . |
| 3,703,037 | 11/1972 | Robinson . |
| 3,792,701 | 2/1974 | Kloz et al. . |
| 3,809,977 | 5/1974 | Balamuth et al. . |
| 3,819,961 | 6/1974 | Bourgeois et al. . |
| 3,842,340 | 10/1974 | Brandquist . |
| 3,930,173 | 12/1975 | Banko . |
| 3,956,826 | 5/1976 | Perdreaux, Jr. . |
| 3,967,143 | 6/1976 | Watanabe et al. . |
| 4,156,157 | 5/1979 | Mabille . |
| 4,169,984 | 10/1979 | Parisi . |
| 4,175,242 | 11/1979 | Kleinschmidt . |
| 4,188,952 | 2/1980 | Loschilov et al. . |
| 4,223,676 | 9/1980 | Wuchinich et al. . |
| 4,227,110 | 10/1980 | Douglas et al. . |
| 4,370,131 | 1/1983 | Banko . |
| 4,371,816 | 2/1983 | Wieser . |
| 4,375,961 | 3/1983 | Brooks . |
| 4,406,284 | 9/1983 | Banko . |
| 4,491,132 | 1/1985 | Aikins . |
| 4,492,574 | 1/1985 | Warrin et al. . |
| 4,522,206 | 6/1985 | Whipple et al. . |
| 4,655,216 | 4/1987 | Tischer . |
| 4,723,545 | 2/1988 | Nixon et al. . |
| 4,750,488 | 6/1988 | Wuchinich et al. . |
| 4,808,153 | 2/1989 | Parisi . |
| 4,816,018 | 3/1989 | Parisi . |
| 4,820,152 | 4/1989 | Warrin et al. . |
| 4,825,865 | 5/1989 | Zelman . |
| 4,832,683 | 5/1989 | Idemoto et al. . |
| 4,867,141 | 9/1989 | Nakada et al. . |
| 4,870,953 | 10/1989 | Michael et al. . |
| 4,897,079 | 1/1990 | Zaleski et al. . |
| 4,920,954 | 5/1990 | Alliger et al. . |
| 4,922,902 | 5/1990 | Wuchinich et al. . |
| 4,931,047 | 6/1990 | Broadwin et al. . |
| 4,936,281 | 6/1990 | Stasz . |
| 4,974,590 | 12/1990 | Saito . |
| 4,979,952 | 12/1990 | Kubota et al. . |
| 5,011,471 | 4/1991 | Miyazaki et al. . |
| 5,026,387 | 6/1991 | Thomas . |
| 5,047,043 | 9/1991 | Kubota et al. . |
| 5,057,119 | 10/1991 | Clark et al. . |
| 5,059,210 | 10/1991 | Clark et al. . |
| 5,069,664 | 12/1991 | Guess et al. . |
| 5,112,300 | 5/1992 | Ureche . |
| 5,123,903 | 6/1992 | Quaid et al. . |
| 5,151,084 | 9/1992 | Khek . |
| 5,151,085 | 9/1992 | Sakurai et al. . |
| 5,160,317 | 11/1992 | Costin . |
| 5,167,725 | 12/1992 | Clark et al. . |
| 5,180,363 | 1/1993 | Idemoto et al. . |
| 5,190,517 | 3/1993 | Zieve et al. . |
| 5,248,296 | 9/1993 | Alliger . |
| 5,263,957 | 11/1993 | Davison . |
| 5,269,309 | 12/1993 | Fort et al. . |
| 5,322,055 | 6/1994 | Davison et al. . |
| 5,324,299 | 6/1994 | Davison et al. . |
| 5,342,292 | 8/1994 | Nita et al. . |
| 5,344,420 | 9/1994 | Hilal et al. . |
| 5,346,502 | 9/1994 | Estabrook et al. . |
| 5,380,274 | 1/1995 | Nita . |
| 5,382,162 | 1/1995 | Sharp . |
| 5,397,269 | 3/1995 | Beaty et al. . |
| 5,397,293 | 3/1995 | Alliger et al. . |
| 5,413,107 | 5/1995 | Oakley et al. . |
| 5,417,672 | 5/1995 | Nita et al. . |
| 5,425,704 | 6/1995 | Sakurai et al. . |
| 5,438,554 | 8/1995 | Seyed-Bolorforosh et al. . |
| 5,449,370 | 9/1995 | Vaitekunas . |
| 5,472,447 | 12/1995 | Abrams et al. . |
| 5,507,738 | 4/1996 | Ciervo . |
| 5,507,743 | 4/1996 | Edwards et al. . |
| 5,509,916 | 4/1996 | Taylor . |
| 5,526,815 | 6/1996 | Granz et al. . |
| 5,540,656 | 7/1996 | Pflueger et al. . |
| 5,542,917 | 8/1996 | Nita et al. . |
| 5,546,947 | 8/1996 | Yagami et al. . |
| 5,562,609 | 10/1996 | Brumbach . |
| 5,562,610 | 10/1996 | Brumbach . |
| 5,582,588 | 12/1996 | Sakurai et al. . |
| 5,591,202 | 1/1997 | Slater et al. . |
| 5,606,974 | 3/1997 | Castellano et al. . |
| 5,628,743 | 5/1997 | Cimino . |
| 5,634,466 | 6/1997 | Gruner . |
| 5,653,721 | 8/1997 | Knodel et al. . |
| 5,688,235 | 11/1997 | Sakurai et al. . |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 91/13591 | 3/1991 | WIPO . |
| WO 92/02658 | 7/1991 | WIPO . |
| 0 495 634 A3 | 1/1992 | WIPO . |
| WO 92/14514 | 2/1992 | WIPO . |
| WO 93/14708 | 1/1993 | WIPO . |
| WO 93/16646 | 1/1993 | WIPO . |
| WO 96/29935 | 4/1996 | WIPO . |
| WP 96/34561 | 5/1996 | WIPO . |





## FIG. 3



## FIG. 4

Case: 14-1370   Case: 14-1370   Document: 24   Page: 226   Filed: 07/21/2014



**FIG. 5**



FIG. 6

FIG. 7

FIG. 8

FIG. 9

FIG. 10

Case: 14-1370 CASE PARTICIPANTS ONLY Document: 24 Page: 223 Filed: 07/21/2014

## FIG. 11



## FIG. 12





**FIG. 13**



**FIG. 14**

5,989,275

1

## DAMPING ULTRASONIC TRANSMISSION COMPONENTS

### FIELD OF THE INVENTION

The present invention generally relates to ultrasonic devices. More particularly, the present invention relates to damping undesired ultrasonic vibration along an ultrasonic transmission component.

### BACKGROUND OF THE INVENTION

Ultrasonic transmission devices are well known for use in a variety of applications, such as surgical operations and procedures. In a typical ultrasonic transmission device, a generator sends electrical energy to a transducer. The transducer converts the electrical energy into vibrational motion at ultrasonic frequencies. The vibrational motion is transmitted to the distal end of an acoustical assembly of the transmission device.

The acoustical assembly, when tuned to the frequency of the generator, maintains a standing wave therethrough. The standing wave causes the acoustical assembly to expand and contract in a continuous manner. However, as the ultrasonic energy is transmitted through the acoustical assembly, unwanted transverse motion may reduce axial (i.e. forward and backward) motion of the distal end of the acoustical assembly and may produce fatigue in the assembly. In addition, the transmission of the ultrasonic energy through the acoustical assembly can generate undesirable heat which, if not controlled, could damage the ultrasonic transmission device or prevent optimal performance of the device.

Isolation mounts, such as O-rings, may be mounted around the periphery of the acoustic assembly at positions of minimal axial ultrasonic activity (i.e. nodes) to dissipate or dampen the unwanted ultrasonic energy transmitted through the assembly. For example, U.S. Pat. Nos. 5,346,502 and 5,322,055, which are herein incorporated by reference, disclose ultrasonic instruments each including a working member having a shaft and a blade. The shaft of each working member has a plurality of silicone rings disposed near nodes of the shaft to isolate the shaft from a sheath and to dampen undesired vibration. However, these silicone rings tend to dissipate too much desirable resonance ultrasonic energy and may not eliminate unwanted vibrations. In addition, waste heat may be generated in various locations along the shaft which may heat the surface of the sheath.

Conventional ultrasonic devices may also dampen unwanted vibration by the use of a water layer between a transmission component and a sheath. For example, U.S. Pat. No. 5,248,296 discloses an ultrasonic device having sheath that surrounds a wire. A small annular space or passageway is formed between the sheath and the wire. The passageway is filled with a pressurized fluid, such as water or saline solution. Although the fluid may effectively dampen unwanted vibrations of the wire, the fluid usually tends to cause dissipation of desired longitudinal vibration. In addition, because the fluid increases in temperature, the fluid has to be circulated or discharged in order to remove the heat. Furthermore, the use of fluids in certain ultrasonic devices may be inconvenient or impractical.

Accordingly, there is a need for an improved apparatus to dampen unwanted vibration of a transmission component. It would be beneficial to allow the desired ultrasonic energy to propagate to the distal end of the transmission component while dissipating unwanted vibrational energy without the use of a fluid. It would also be desirable to provide a damping apparatus that was simple and inexpensive to manufacture.

2

### SUMMARY OF THE INVENTION

In view of the above, the present invention relates to a surgical instrument that effectively dampens undesired or unwanted vibration of a transmission component while allowing desired ultrasonic energy to propagate to the distal end of the transmission component. The surgical instrument dissipates unwanted vibration along the transmission component without a damping fluid and minimal energy is lost as the desired ultrasonic energy is transmitted to the distal end of the transmission component.

The surgical instrument also dissipates unwanted vibration such that no hot spots are created along the ultrasonic transmission component. The surgical instrument further removes energy from the more active regions of the transmission component.

The surgical instrument is simple in design and economical to manufacture. The surgical instrument can be an integrated surgical assembly to enable medical personnel to quickly, easily, and conveniently exchange instruments, (i.e. with respect to a handpiece) during an operation. The surgical instrument may also be disposed after each use, thus eliminating the need for time consuming and costly resterilization techniques.

An ultrasonic surgical device in accordance with the present invention includes a transmission component adapted to receive ultrasonic vibration from a transducer assembly and to transmit the ultrasonic vibration from a first end to a second end. An inner damping member surrounds at least a portion of the transmission component. The dampening member is adapted to contact the transmission component along substantially the entire length of the dampening member to dampen undesired vibration. The dampening member contacts the transmission component near at least one antinode of transverse vibration.

An ultrasonic surgical device in accordance with the present invention includes a transducer assembly adapted to vibrate at an ultrasonic frequency in response to electrical energy. A transmission rod is adapted to receive ultrasonic vibration from the transducer assembly and to transmit the ultrasonic vibration from a first end to a second end of the transmission rod. A damping member surrounds at least a portion of the transmission rod. The damping member is adapted to contact the transmission rod near at least one antinode of transverse vibration and configured to absorb undesired vibration without the use of a fluid. An end effector is adapted to receive the ultrasonic vibration from the transmission rod and to transmit the ultrasonic vibration from a first end to a second end of the end effector. The second end of the end effector is disposed near an antinode and the first end of the end effector is coupled to the second end of the transmission rod.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory and are intended to provide further explanation of the invention as claimed.

The invention, together with attendant advantages, will best be understood by reference to the following detailed description of the preferred embodiments of the invention, taken in conjunction with the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cutaway view and in partial cross-section of an embodiment of a surgical system in accordance with the present invention;

FIG. 2 is a cross-sectional view of a surgical instrument of the surgical system of FIG. 1 taken about line 2—2;

A0162

5,989,275

3

FIG. **3** is a perspective view of a handpiece assembly of the surgical system of FIG. **1**;

FIG. **4** is a perspective view of the surgical instrument of the surgical system of FIG. **1**;

FIG. **5** is an exploded view of the surgical instrument of FIG. **4**;

FIG. **6** is a partial cutaway perspective view of the surgical instrument of FIG. **3**;

FIG. **7** is a partial cross-sectional view of another embodiment of the surgical instrument of FIG. **4** having an outer sheath of surgical instrument removed;

FIG. **8** is a partial perspective view of another embodiment of the surgical instrument of FIG. **3** with the outer sheath removed;

FIG. **9** is a partial cross-sectional view of a hub of the surgical instrument of FIG. **4**;

FIG. **10** is a partial cross-sectional view of another embodiment of the hub of the surgical instrument of FIG. **4**;

FIG. **11** is a partial cross-sectional view of the hub of FIG. **9** after the hub has been exposed to heat;

FIG. **12** is a perspective view of a wrench configured to tighten an surgical instrument to a handpiece assembly;

FIG. **13** is a partial perspective view of another embodiment of the surgical instrument of FIG. **3**; and

FIG. **14** is a cross-sectional view of the surgical instrument of FIG. **13** taken about line **14**.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Before explaining the present invention in detail, it should be noted that the invention is not limited in its application or use to the details of construction and arrangement of parts illustrated in the accompanying drawings and description, because the illustrative embodiments of the invention may be implemented or incorporated in other embodiments, variations and modifications, and may be practiced or carried out in various ways. Furthermore, unless otherwise indicated, the terms and expressions employed herein have been chosen for the purpose of describing the illustrative embodiments of the present invention for the convenience of the reader and are not for the purpose of limiting the invention.

Referring now to FIG. **1**, a presently preferred embodiment of the surgical system **10** is illustrated. The surgical system **10** generally includes a generator **30**, a handpiece assembly **50**, an acoustic or transmission assembly **80**, an adapter **120**, and a surgical instrument or a sheath blade system **150**. The generator **30** sends an electrical signal through a cable **32** at a selected amplitude, frequency, and phase determined by a control system of the generator **30**. As will be further described, the signal causes one or more piezoelectric elements of the acoustic assembly **80** to expand and contract, thereby converting the electrical energy into mechanical motion. The mechanical motion results in longitudinal waves of ultrasonic energy that propagate through the acoustic assembly **80** in an acoustic standing wave to vibrate the acoustic assembly **80** at a selected frequency and amplitude. An end effector **88** at the distal end of the acoustic assembly **80** is placed in contact with tissue of the patient to transfer the ultrasonic energy to the tissue. The cells of the tissue in contact with the end effector **88** of the acoustic assembly **80** will move with the end effector **88** and vibrate.

As the end effector **88** couples with the tissue, thermal energy or heat is generated as a result of internal cellular

4

friction within the tissue. The heat is sufficient to break protein hydrogen bonds, causing the highly structured protein (i.e., collagen and muscle protein) to denature (i.e., become less organized). As the proteins are denatured, a sticky coagulum forms to seal or coagulate small blood vessels when the coagulum is below 100° C. Deep coagulation of larger blood vessels results when the effect is prolonged.

The transfer of the ultrasonic energy to the tissue causes other effects including mechanical tearing, cutting, cavitation, cell disruption, and emulsification. The amount of cutting as well as the degree of coagulation obtained varies with the vibrational amplitude of the end effector **88**, the amount of pressure applied by the user, and the sharpness of the end effector **88**. The end effector **88** of the acoustic assembly **80** in the surgical system **10** tends to focus the vibrational energy of the system **10** onto tissue in contact with the end effector **88**, intensifying and localizing thermal and mechanical energy delivery.

As illustrated in FIG. **1**, the generator **30** includes a control system integral to the generator **30**, a power switch **34**, and a triggering mechanism **36**. The power switch **34** controls the electrical power to the generator **30**, and when activated by the triggering mechanism **36**, the generator **30** provides energy to drive the acoustic assembly **80** of the surgical system **10** at a predetermined frequency and to drive the end effector **88** at a predetermined vibrational amplitude level. The generator **30** may drive or excite the acoustic assembly **80** at any suitable resonant frequency of the acoustic assembly **80**.

When the generator **30** is activated via the triggering mechanism **36**, electrical energy is continuously applied by the generator **30** to a transducer assembly **82** of the acoustic assembly **80**. A phase locked loop in the control system of the generator **30** monitors feedback from the acoustic assembly **80**. The phase lock loop adjusts the frequency of the electrical energy sent by the generator **30** to match a preselected harmonic frequency of the acoustic assembly **80**. In addition, a second feedback loop in the control system maintains the electrical current supplied to the acoustic assembly **80** at a preselected constant level in order to achieve substantially constant vibrational amplitude at the end effector **88** of the acoustic assembly **80**.

The electrical signal supplied to the acoustic assembly **80** will cause the distal end to vibrate longitudinally in the range of, for example, approximately 20 kHz to 100 kHz, and preferably in the range of about 54 kHz to 56 kHz, and most preferably at about 55.5 kHz. The amplitude of the acoustic vibrations at the end effector **88** may be controlled by, for example, controlling the amplitude of the electrical signal applied to the transducer assembly **82** of the acoustic assembly **80** by the generator **30**.

As noted above, the triggering mechanism **36** of the generator **30** allows a user to activate the generator **30** so that electrical energy may be continuously supplied to the acoustic assembly **80**. In one embodiment, the triggering mechanism **36** preferably comprises a foot activating switch that is detachably coupled or attached to the generator **30** by a cable or cord. In another embodiment, a hand switch may be incorporated in the handpiece assembly **50** to allow the generator **30** to be activated by a user.

The generator **30** also has a power line **38** for insertion in an electrosurgical unit or conventional electrical outlet. It is contemplated that the generator **30** may also be powered by a direct current (DC) source, such as a battery. The generator **30** may be any suitable generator, such as Model No. GENO1, available from Ethicon Endo-Surgery, Inc.

5,989,275

5

Referring to FIGS. 1 and 3, the handpiece assembly 50 of the surgical system 10 includes a multi-piece housing or outer casing 52 adapted to isolate the operator from the vibrations of the acoustic assembly 80. The housing 52 is preferably cylindrically shaped and is adapted to be held by a user in a conventional manner, but may be any suitable shape and size which allows it to be grasped by the user. While a multi-piece housing 52 is illustrated, the housing 52 may comprise a single or unitary component.

The housing 52 of the handpiece assembly 50 is preferably constructed from a durable plastic, such as Ultem®. It is also contemplated that the housing 52 may be made from a variety of materials including other plastics (i.e. liquid crystal polymer (LCP), nylon, or polycarbonate). A suitable handpiece assembly 50 is Model No. HP050, available from Ethicon Endo-Surgery, Inc.

Referring now FIG. 1, the handpiece assembly 50 generally includes a proximal end 54, a distal end 56, and centrally disposed axial opening or cavity 58 extending longitudinally therein. The distal end 56 of the handpiece assembly 50 includes an opening 60 configured to allow the acoustic assembly 80 of the surgical system 10 to extend therethrough, and the proximal end 54 of the handpiece assembly 50 is coupled to the generator 30 by a cable 32. The cable 32 may include ducts or vents 62 to allow air to be introduced into the handpiece assembly 50 to cool the transducer assembly 82 of the acoustic assembly 80.

As shown in FIG. 1, the acoustic assembly 80 generally includes a transducer stack or assembly 82 and a transmission component or working member. The transmission component may include a mounting device 84, a transmission rod or waveguide 86, and an end effector or applicator 88. The transmission rod 86 and end effector 88 are preferably part of the surgical instrument 150 as further described below.

The components of the acoustic assembly 80 are preferably acoustically tuned such that the length of each component is an integral number of one-half system wavelengths (nλ/2) where the system wavelength λ is the wavelength of a preselected or operating longitudinal vibration frequency f of the acoustic assembly 80. It is also contemplated that the acoustic assembly 80 may incorporate any suitable arrangement of acoustic elements. For example, the acoustic assembly 80 may comprise a transducer assembly and an end effector (i.e., the acoustic assembly 80 may be configured without a mounting device and a transmission rod).

The transducer assembly 82 of the acoustic assembly 80 converts the electrical signal from the generator 30 into mechanical energy that results in longitudinal vibratory motion of the end effector 88 at ultrasonic frequencies. When the acoustic assembly 80 is energized, a vibratory motion standing wave is generated through the acoustic assembly 80. The amplitude of the vibratory motion at any point along the acoustic assembly 80 depends on the location along the acoustic assembly 80 at which the vibratory motion is measured. A minimum or zero crossing in the vibratory motion standing wave is generally referred to as a node (i.e., where axial motion is usually minimal and radial motion is usually small), and an absolute value maximum or peak in the standing wave is generally referred to as an antinode. The distance between an antinode and its nearest node is one-quarter wavelength (λ/4).

As shown in FIG. 1, the transducer assembly 82 of the acoustic assembly 80, which is known as a "Langevin stack", generally includes a transduction portion 90, a first resonator 92, and a second resonator 94. The transducer

6

assembly 82 is preferably an integral number of one-half system wavelengths (nλ/2) in length. It is to be understood that the present invention may be alternatively configured to include a transducer assembly comprising a magnetostrictive, electromagnetic or electrostatic transducer.

The distal end of the first resonator 92 is connected to the proximal end of transduction section 90, and the proximal end of the second resonator 94 is connected to the distal end of transduction portion 90. The first and second resonators 92 and 94 are preferably fabricated from titanium, aluminum, steel, or any other suitable material. The first and second resonators 92 and 94 have a length determined by a number of variables, including the thickness of the transduction section 90, the density and modulus of elasticity of material used in the resonators 92 and 94, and the fundamental frequency of the transducer assembly 82. The second resonator 94 may be tapered inwardly from its proximal end to its distal end to amplify the ultrasonic vibration amplitude.

The transduction portion 90 of the transducer assembly 82 preferably comprises a piezoelectric section of alternating positive electrodes 96 and negative electrodes 98, with piezoelectric elements 100 alternating between the electrodes 96 and 98. The piezoelectric elements 100 may be fabricated from any suitable material, such as, for example, lead zirconatetitanate, lead meta-niobate, lead titanate, or ceramic piezoelectric crystal material. Each of the positive electrodes 96, negative electrodes 98, and piezoelectric elements 100 may have a bore extending through the center. The positive and negative electrodes 96 and 98 are electrically coupled to wires 102 and 104, respectfully. The wires 102 and 104 transmit the electrical signal from the generator 30 to electrodes 96 and 98.

As illustrated in FIG. 1, the piezoelectric elements 100 are held in compression between the first and second resonators 92 and 94 by a bolt 106. The bolt 106 preferably has a head, a shank, and a threaded distal end. The bolt 106 is inserted from the proximal end of the first resonator 92 through the bores of the first resonator 92, the electrodes 96 and 98, and piezoelectric elements 100. The threaded distal end of the bolt 106 is screwed into a threaded bore in the proximal end of second resonator 94.

The piezoelectric elements 100 are energized in response to the electrical signal supplied from the generator 30 to produce an acoustic standing wave in the acoustic assembly 80. The electrical signal causes disturbances in the piezoelectric elements 100 in the form of repeated small displacements resulting in large compression forces within the material. The repeated small displacements cause the piezoelectric elements 100 to expand and contract in a continuous manner along the axis of the voltage gradient, producing high frequency longitudinal waves of ultrasonic energy. The ultrasonic energy is transmitted through the acoustic assembly 80 to the end effector 88.

The mounting device 84 of the acoustic assembly 80 has a proximal end, a distal end, and may have a length substantially equal to an integral number of one-half system wavelengths. The proximal end of the mounting device 84 is preferably axially aligned and coupled to the distal end of the second resonator 94 by an internal threaded connection near an antinode. (For purposes of this disclosure, the term "near" is defined as "exactly at" or "in close proximity to".) It is also contemplated that the mounting device 84 may be attached to the second resonator 94 by any suitable means, and the second resonator 94 and mounting device 84 may be formed as a single or unitary component.

5,989,275

7

The mounting device 84 is coupled to the housing 52 of the handpiece assembly 50 near a node. The mounting device 84 may include an integral ring 108 disposed around its periphery. The integral ring 108 is preferably disposed in an annular groove 110 formed in the housing 52 of the handpiece assembly 50 to couple the mounting device 84 to the housing 58. A compliant member or material 112, such as a pair of silicone rubber O-rings attached by stand-offs, may be placed between the annular groove 110 of the housing 52 and the integral ring 108 of the mounting device 86 to reduce or prevent ultrasonic vibration from being transmitted from the mounting device 84 to the housing 52.

The mounting device 84 may be secured in a predetermined axial position by a plurality of pins 114, preferably four. The pins 114 are disposed in a longitudinal direction 90 degrees apart from each other around the outer periphery of the mounting device 84. The pins 114 are coupled to the housing 52 of the handpiece assembly 50 and are disposed through notches in the integral ring 108 of the mounting device 84. The pins 114 are preferably fabricated from stainless steel.

The mounting device 84 is preferably configured to amplify the ultrasonic vibration amplitude that is transmitted through the acoustic assembly 80 to the distal end of the end effector 88. In one preferred embodiment, the mounting device 84 comprises a solid, tapered horn. As ultrasonic energy is transmitted through the mounting device 84, the velocity of the acoustic wave transmitted through the mounting device 84 is amplified. It is contemplated that the mounting device 84 may be any suitable shape, such as, for example, a stepped horn, a conical horn, an exponential horn, a unitary gain horn, or the like.

The distal end of the mounting device 84 may be coupled to the proximal end of the surgical instrument 150 by an internal threaded connection. It is contemplated that the surgical instrument 150 be attached to the mounting device 84 by any suitable means. The mounting device 84 is preferably coupled to the surgical instrument 150.

As illustrated in FIGS. 2 and 4, the surgical instrument 150 preferably includes transmission rod 86, end effector 88, an inner sleeve or damping sheath 160, and an outer sheath or sleeve 170. The surgical instrument 150 is preferably attached to and removed from the handpiece assembly 50 as a unit. The surgical instrument 150 is preferably Model No. HDH05, HSH05 or HBC05, available from Ethicon Endo-Surgery, Inc.

The proximal end of the transmission rod 86 of the surgical instrument 150 is preferably detachably coupled to the mounting device 84 of the handpiece assembly 50 near an antinode. The transmission rod 86 may, for example, have a length substantially equal to an integer number of one-half system wavelengths $(n\lambda/2)$. The transmission rod 86 is preferably fabricated from a solid core shaft constructed out of material which propagates ultrasonic energy efficiently, such as titanium alloy (i.e., Ti—6Al—4V) or an aluminum alloy. It is contemplated that the transmission rod 86 may be fabricated from any suitable material.

The transmission rod 86 is preferably substantially semi-flexible. It will be recognized that the transmission rod 86 may be substantially rigid or may be a flexible wire. The transmission rod 86 may include one or more opposing flats and may also amplify the mechanical vibrations transmitted through the transmission rod 86 to the end effector 88 as is well known in the art. The transmission rod 86 may further have features to control the gain of the longitudinal vibration along the transmission rod 86 and features to tune the transmission rod to the resonant frequency of the system.

8

Referring now to FIG. 5, the transmission rod 86 generally has a first section 86a, a second section 86b, and a third section 86c. The first section 86a of the transmission rod 86 extends distally from the proximal end of the transmission rod 86. The first section 86a has a substantially continuous cross-section dimension. The first section 86a preferably has a radial hole or aperture 86e extending therethrough. The aperture 86e extends substantially perpendicular to the axis of the transmission rod. The aperture 86e is preferably positioned at a node but may be positioned at any other suitable point along the acoustic assembly 80. It will be recognized that the aperture 86e may have any suitable depth and may be any suitable shape.

The second section 86b of the transmission rod 86 extends distally from the first section 86a. The second section 86b has a substantially continuous cross-section dimension. The diameter of the second section 86b is smaller than the diameter of the first section 86a and larger than the diameter of the third section 86c. As ultrasonic energy passes from the first section 86a of the transmission rod into the second section 86b, the narrowing of the second section 86b will result in an increased amplitude of the ultrasonic energy passing therethrough.

The third section 86c extends distally from the distal end of the second section 86b. The third section 86c has a substantially continuous cross-section dimension. The third section 86c may also include small diameter changes along its length. As ultrasonic energy passes from the second section 86b of the transmission rod 86 into the third section 86c, the narrowing of the third section 86c will result in an increased amplitude of the ultrasonic energy passing therethrough.

The third section 86c preferably has a plurality of grooves or notches formed in its outer circumference. Preferably, three grooves 86f, 86g, and 86h are formed in the third section 86c of the transmission rod 86. The grooves 86f, 86g, and 86h may be located at nodes of the transmission rod 86 or any other suitable point along the transmission rod 86 to act as alignment indicators for the installation of the damping sheath 160 and compliant members 190a, 190b, and 190c during manufacturing. It is contemplated that any suitable number of grooves may be formed in the transmission rod 86.

It will be recognized that the transmission rod 86 may have any suitable cross-sectional dimension. For example, the transmission rod 86 may have a substantially uniform cross-section or the transmission rod 86 may be tapered at various sections or may be tapered along its entire length.

The distal end of the transmission rod 86 may be coupled to the proximal end of the end effector 88 by an internal threaded connection, preferably near an antinode. It is contemplated that the end effector 88 may be attached to the transmission rod 86 by any suitable means, such as a welded joint or the like. Although the end effector 88 may be detachable from the transmission rod 86, the end effector 88 and transmission rod 86 are preferably formed as a single unit.

The end effector 88 preferably has a length substantially equal to an integral multiple of one-half system wavelengths $(n\lambda/2)$. The distal end of the end effector 88 is disposed near an antinode in order to produce the maximum longitudinal deflection of the distal end. When the transducer assembly 82 is energized, the distal end of the end effector 88 is configured to move longitudinally in the range of, for example, approximately 10 to 500 microns peak-to-peak, and preferably in the range of about 30 to 100 microns at a

5,989,275

9 10

predetermined vibrational frequency, and most preferably at about 90 microns.

The end effector **88** of the acoustic assembly **80** generally has a first section **88a** and a second section **88b**. The first section **88a** of the end effector **88** extends distally from the distal end of the third section **86c** of the transmission rod **86**. The first section **88a** has a substantially continuous cross-section dimension. The diameter of the first section **88a** of the end effector **88** is larger than the diameter of the second section **88b**. The first section **88a** may also have a sealing ring **89** disposed near its distal end, preferably near a node. As the ultrasonic energy passes from the first section **88a** into the second section **88b**, the magnitude of the ultrasonic vibration transmitted increases. It will be recognized that the end effector **88** may have any suitable cross-section dimension.

The end effector **88** is preferably made from a solid core shaft constructed of material such as, for example, a titanium alloy (i.e., Ti—6Al—4V) or an aluminum alloy which propagates ultrasonic energy. It is contemplated that the end effector **88** may be fabricated from other suitable materials. The distal end of the end effector **88** may have a surface treatment to improve the delivery of energy and desired tissue effect. For example, the end effector **88** may be micro-finished, coated, plated, etched, grit-blasted, roughened or scored to enhance coagulation in tissue or to reduce adherence of tissue and blood to the end effector. Additionally, the distal end of the effector **88** may be sharpened or shaped to enhance its energy transmission characteristics. For example, the end effector **88** may be blade shaped, hook shaped, ball shaped, or any other suitable shape.

Referring now to FIGS. 5 and 6, the damping sheath **160** of the surgical instrument **150** loosely surrounds at least a portion of the transmission rod **86**. The damping sheath **160** may be positioned around the transmission rod **86** to dampen or limit transverse side-to-side vibration of the transmission rod **86** during operation. The damping sheath **160** preferably surrounds part of the third section **86c** of the transmission rod **86** and is coupled or attached to the transmission rod **86** near one or more nodes. The damping sheath **160** is only attached to the transmission rod at the nodal points thereby preventing the sheath from otherwise adhering to the outer surface of the transmission rod **86**.

In a present embodiment, the damping sheath extends along substantially the entire length of the transmission rod **86**. The damping sheath **160** may extend less than half the entire length of the transmission rod **86** and may be positioned around any suitable portion of the transmission rod **86**. The sheath **160** preferably extends over at least one antinode of transverse vibration, and more preferably, a plurality of antinodes of transverse vibration. The damping sheath **160** preferably has a substantially circular cross-section. It will be recognized that the damping sheath **160** may have any suitable shape to fit over the transmission rod and may be any suitable length.

The damping sheath **160** is preferably in light contact with the transmission rod **86** to absorb unwanted ultrasonic energy from the transmission rod **86**. The damping sheath **160** reduces the amplitude of non-axial vibrations of the transmission rod **86**, such as, unwanted transverse vibrations associated with the longitudinal frequency of 55,500 Hz as well as other higher and lower frequencies.

The damping sheath **160** is constructed of a polymeric material, preferably with a low coefficient of friction to minimize dissipation of energy from the axial motion or longitudinal vibration of the transmission rod **86**. The polymeric material is preferably floura-ethylene propene (FEP) which resists degradation when sterilized using gamma radiation. It will be recognized that the damping sheath be fabricated from any suitable material, such as, for example, polytetra-floura ethylene (PTFE).

The damping sheath **160** is more effective than using silicone rubber rings located only at nodes of longitudinal vibration because the damping sheath **160** can dampen transverse motion occurring near multiple antinodes of the unwanted vibration which are located randomly along the length of the transmission rod **86** relative to the nodes and antinodes of the desired longitudinal vibration. The damping sheath **160** can also effectively absorb the unwanted ultrasonic energy without using a damping fluid, which is more efficient and is advantageous in situations where the use of fluid may be inconvenient or impractical.

Referring now to FIGS. **2, 5** and **6**, the damping sheath **160** has an opening **161** extending therethrough, one or more pairs of diametrically opposed openings **162a, 162b,** and **162c,** and a longitudinal slit or slot **164**. The openings **162a, 162b,** and **162c** are positioned over or near the grooves **86f, 86g,** and **86h** of the transmission rod **86**, respectively. The openings **162a, 162b,** and **162c** of the damping sheath **160** are preferably cylindrically shaped and have a diameter of about 0.078 inches. It is contemplated that the damping sheath **160** may have any suitable number of openings, and the openings may be any suitable shape and size without departing from the spirit and scope of the present invention.

The length of the damping sheath **160** is preferably between about 9.73–9.93 inches, when the transmission rod has a length of about 12 inches. The distance from the proximal end of the damping sheath **160** to the opening **162a** of the damping sheath is about 0.675 inches, and the distance from the proximal end of the damping sheath **160** to the opening **162b** is about 4.125 inches. The distance from the proximal end of the damping sheath **160** to the opening **162c** is about 9.325 inches. It is contemplated that the damping sheath **160** may have any suitable length and the openings can be at any suitable position along the damping sheath **160**.

The thickness of the damping sheath **160** is preferably between about 0.007 and 0.009, and the opening **161** (see FIG. **5**) of the damping sheath **160** has a diameter between about 0.112–0.116. It is contemplated that the thickness of the damping sheath and the diameter of the opening **161** may be any suitable size without departing from the spirit and scope of the present invention.

The slit **164** of the damping sheath **160** allows the damping sheath **160** to be assembled over the transmission rod **86** from either end. Without the slit **164**, the sheath may not fit over the larger cross-sectional diameters of the transmission rod **86** and the damping sheath **160** may not be able to loosely contact the transmission rod **86**. It will be recognized that the damping sheath **160** may have any suitable configuration to allow the damping sheath **160** to fit over the transmission rod **86**. For example, the damping sheath **160** may be formed as a coil or spiral or may have patterns of longitudinal and/or circumferential slits or slots. It is also contemplated that the damping sheath may be fabricated without a slit and the transmission rod may be fabricated from two or more parts to fit within the damping sheath.

The slit **164** of the damping sheath **160** preferably runs parallel to the axis of the damping sheath **160** and extends from the proximal end of the damping sheath **160** to its distal

A0166

5,989,275

11

end. The width of the slit 164 preferably is about 0 to 0.010 inches. A center line $C_s$ extending through the slit 164 is preferably about 75 to 105 degrees from a center line $C_o$ extending through the center of the openings 162$a$ of the damping sheath 160 as illustrated in FIG. 2. It will be recognized that the width of the slit 164 may be any suitable size.

Referring now to FIGS. 5 and 6, the damping sheath 160 is coupled to or maintained on the transmission rod 86 by compliant members such as, for example, fenders or O-rings. The compliant members 190$a$, 190$b$, and 190$c$ may be fabricated from polymeric material, such as, for example, silicone rubber. It will be recognized that the compliant members may be constructed from any suitable material.

The compliant members 190$a$, 190$b$, and 190$c$ are disposed around the periphery of the damping sheath 160 and are circumferentially spaced from one another. The compliant members 190$a$, 190$b$, and 190$c$ extend across the openings 162$a$, 162$b$, and 162$c$ of the damping sheath 160, respectively, to allow the compliant members 190$a$, 190$b$, and 190$c$ to be attached to the transmission rod 86. The compliant members 190$a$, 190$b$, and 190$c$ are preferably disposed around the transmission rod 86 near nodes in order to minimize damping of the desired longitudinal vibration energy.

The compliant members 190$a$, 190$b$, and 190$c$ are preferably secured to the transmission rod 86 by an adhesive 196, such as, for example, cyanoacrylate. The compliant members 190$a$, 190$b$, and 190$c$ are joined to the transmission rod 86 at the points where the openings 162$a$, 162$b$, and 162$c$ of the damping sheath 160 allow the transmission rod 86 to be exposed. It is contemplated that the compliant members 190$a$, 190$b$, and 190$c$ may be secured to the transmission rod 86 by any suitable means.

The contact between the compliant members 190$a$, 190$b$, and 190$c$ and the damping sheath 160 improves the damping effectiveness by preventing large amplitude vibrations or rattling of the damping sheath 160 itself. The compliant members also prevent loss of vibrational energy from the transmission rod 86 which might occur under side loading or bending conditions which would otherwise cause indirect contact between the transmission rod 86 and the outer sheath 170 through the damping sheath.

Referring now to FIG. 7, another embodiment of a damping sheath 260 to dampen unwanted vibration along a transmission rod 286 is illustrated. The damping sheath 260 preferably includes one or more compliant members 280 (one being shown) and one or more sleeves 289$a$ and 289$b$ (two being shown). The compliant members 280 are preferably simultaneously created and attached to the transmission rod 286 using an insert molding process as known in the art. Each sleeve of the damping sheath 260 is captured longitudinally between the compliant members 280 so that the damping sheath 260 is maintained loosely in place around the transmission rod 286. The compliant members 280 are preferably positioned at nodes of longitudinal vibration of the transmission rod 286 and are constructed of polymeric material, preferably silicone rubber. It is contemplated that the compliant members may be constructed of any suitable material and may be positioned at any suitable point along the transmission rod.

Referring now to FIG. 8, another embodiment of a damping sheath 360 to dampen unwanted vibration along a transmission rod 360 is illustrated. The damping sheath 360 preferably includes at least one sleeve or sheath 350 anchored by one or more compliant members 380$a$ and 380$b$

12

(two being shown). The compliant members 380$a$ and 380$b$ are substantially similar in construction and function as the compliant members described above except that the compliant members 380$a$ and 380$b$ are created by insert molding over the transmission rod with the sleeve 350 already in place. The sleeve 350 preferably has a pair of flanges or projections 351$a$ and 351$b$ extending longitudinally from each end that are captured in longitudinal slots 385$a$ and 385$b$, respectfully, of the compliant members 380$a$ and 380$b$.

Referring now to FIGS. 4 and 5, the outer sheath 170 of the surgical instrument 150 surrounds the transmission rod 86 and the damping sheath 160. As shown in FIG. 5, the outer sheath 170 preferably has an opening 171 extending longitudinally therethrough. The inside diameter of the opening 171 is spaced at a predetermined distance from the transmission rod 86 and damping sheath 160. The compliant members 190$a$, 190$b$, and 190$c$ are positioned between the outer sheath 170 and the damping sheath 160 to reduce the transmission of vibration to the outer sheath.

The outer sheath 170 generally includes a hub 172 and an elongated tubular member 174. The tubular member 174 may be fabricated from stainless steel. It will be recognized that the tubular member may be constructed from any suitable material and may be any suitable shape.

The hub 172 of the outer sheath 170 is preferably constructed of a material which is designed to soften, melt, or otherwise deform or distort, when exposed to a heated environment, such as, for example, in a steam sterilizer or autoclave. The hub 172 may be fabricated from polycarbonate, preferably an Eastman Estalloy (DA003) copolyester/polycarbonate alloy available from Eastman. It is contemplated that the hub may be fabricated from any other suitable material. It will be recognized that the hub or deformable material may be positioned at any point along the transmission rod to prevent an adapter 120 from sliding over the surgical instrument 150 as further described below. It is also contemplated that the adapter 120 may alternatively be configured to fit within a hub.

The hub 172 preferably has a substantially circular cross-section and fits snugly within the lumen 122 of the adapter 120. The snug fit of hub within the lumen of the adapter 120 provides lateral support to the hub 172 and sheath 174 from the handpiece assembly. This protects the transmission rod 86 from bearing large forces when side loads are placed on the surgical instrument 150. An O-ring 199 is also preferably disposed in the hub at a node to isolate the hub 172 from the transmission rod 86.

As shown in FIGS. 4 and 9, the hub 172 preferably has a pair of holes or openings 178 on opposite sides of the hub 172 to allow the hub 172 to be coupled to the transmission rod 86 so that the transmission rod will rotate when the hub is turned. The holes 178 of the hub 172 are aligned with the hole 86$e$ in the transmission rod 86 to form a passageway as illustrated in FIG. 9. A coupling member 195, such as, for example, a pin, may be positioned within the passageway. The coupling member 195 may be held in the passageway of the transmission rod 86 and hub 172 by any suitable means, such as, for example, a cyanoacrylate adhesive, or the coupling member may be detachable from the transmission rod 86 and hub 172. The coupling member 195 allows rotational torque applied to the hub 172 of the outer sheath 170 to be transmitted to the transmission rod 86 in order to tighten it onto the mounting device of the handpiece assembly 50. The coupling member 195 may also hold the outer sheath 170 in place with respect to the transmission rod 86.

5,989,275

13

As illustrated in FIG. 4, the hub 172 of the outer sheath 170 includes wrench flats 176 on opposites sides of the hub 172. The wrench flats 176 are preferably formed near the distal end of the hub 172. The wrench flats 176 of the hub 172 allow torque to be applied to the hub 172 to tighten the transmission rod 86 mounting device of the handpiece assembly.

The coupling member 195 may be vibrationally isolated from the transmission rod 86. As shown in FIG. 9, a compliant or isolation member 197 surrounds the coupling member 195. The compliant member 197 may be a thin silicone rubber layer, a sleeve of silicone rubber, or any other suitable compliant material. The compliant member 197 prevents conduction of vibration from the transmission rod 86 to the coupling member 195. As a result, the compliant member 197 prevents audible noise and power loss from the vibration of the coupling member 195. The compliant member 197 is preferably thin enough so that torque can be applied from the outer sheath 170 to rotate the transmission rod 86.

It will also be recognized that the coupling member and a compliant cushion can be permanently attached to the surgical instrument, as described above, and such that the coupling member extends radially beyond the outside diameter of the transmission rod, to allow the coupling member to engage an integral or a separate and removable wrench handle.

Referring now to FIG. 10, another embodiment of a hub of a surgical instrument 450 is illustrated. The surgical instrument 450 is substantially similar to the construction and function of the surgical instrument 150 described above except that a compliant member 460 is formed within an aperture or passageway 462 of the transmission rod. The compliant member 460 is preferably insert molded over the transmission member and extends through the aperture through the transmission rod to reduce the transmission of vibration from the transmission rod to the coupling member 470. The compliant member 460 may be formed with shoulders 480a and 480b between a hub 490 of a sheath and the transmission rod to support against radial movement of the transmission rod versus the hub.

The coupling member may also be attached to a tool, such as, for example, a wrench, so that a user may insert the coupling member into an aperture of the transmission rod of the surgical instrument in order to tighten it to the handpiece assembly. As shown in FIG. 12, a wrench handle 500 may be used to tighten a surgical instrument 510 onto a handpiece assembly. The wrench handle 500 preferably has a coupling member 502, such as a pin, attached thereto. The surgical instrument 510 is substantially similar in construction and function of the surgical instrument 510 except that the hub 512 may not have wrench flats.

The coupling member 502 is inserted through a hole or aperture 520 that extends through an upper portion of the hub 572 and into an aperture of the transmission rod. Torque may then be applied to the transmission rod via the wrench handle 500. After torque is applied, the wrench handle 500 may be removed from the surgical instrument 510 prior to activating the wrench. Accordingly, the coupling member 502 may not have a compliant member or coating since it is not attached during ultrasonic actuation. It is also contemplated that a torque limiting device may be incorporated into the wrench handle 500. For example, U.S. Pat. Nos. 5,507, 119 and 5,059,210, which are herein incorporated by reference, disclose torque wrenches for attaching and detaching a transmission rod to a handpiece assembly.

14

Referring now to FIGS. 1–4, the procedure to attach and detach the surgical instrument 150 from the handpiece assembly 50 will be described below. When the physician is ready to use the surgical instrument, the physician simply attaches the surgical instrument 150 onto the handpiece assembly. To attach the surgical instrument 150 to a handpiece assembly 50, the distal end of the mounting device 84 is threadedly connected to the proximal end of the transmission rod 86. The surgical instrument 150 is then manually rotated in a conventional screw-threading direction to interlock the threaded connection between the mounting device 80 and the transmission rod 86.

Once the transmission rod 86 is threaded onto the mounting device 84, a tool, such as, for example, a torque wrench, may be placed over the surgical instrument 150 to tighten the transmission rod 86 to the mounting device 84. The tool may be configured to engage the wrench flats 176 of the hub 172 of the outer sheath 170 or the tool may have a coupling member or pin that is inserted into a hole or aperture 86e of the transmission rod in order to tighten the transmission rod 86 onto the mounting device 84. As a result, the rotation of the hub 172 will rotate the transmission rod 86 until the transmission rod 86 is tightened against the mounting device 84 at a desired and predetermined torque.

When the transmission rod 86 of the surgical instrument 150 is attached to the mounting device 84 of the handpiece assembly 50, the junction between the transmission rod 86 and the mounting device 84 produces a relatively high axial compression force that is substantially uniformly distributed symmetrically about the longitudinal axis of the threaded connection of the mounting device and transmission rod 86 to efficiently transfer mechanical or ultrasonic vibrations across the junction. As a result, the ultrasonic vibrational motion may travel along the longitudinal axis of the joined components with minimal losses and minimal conversion of longitudinal energy into transverse vibrations.

Once the transmission rod 86 is tightened onto the mounting device, the adapter 120 of the surgical system 10 is axially slipped over the surgical instrument 150 and attached to the distal end of the handpiece assembly 50. The adapter 120 may be threaded or snapped onto the distal end of the housing 52.

The adapter 120 includes an axial bore or lumen 122 configured to snugly fit over the hub 172 of the surgical instrument 150. The lumen 122 has an inner surface having a selected geometric configuration, such as, for example, substantially cylindrically or elliptically shaped. Preferably, the lumen 122 has substantially the same shape as the hub 172 of the outer sheath 170, but has a slightly larger diameter than the hub 172 to allow the lumen 122 of the adapter 120 to pass over the hub 172. The hub 172 allows precise engagement with the inner diameter of the lumen of the adapter 120 in order to ensure alignment of the transmission rod 86 the handpiece assembly 50.

The adapter 122 may be fabricated from Ultem® or liquid crystal polymer (LCP). The adapter 132 may also be made from a variety of materials including other plastics, such as a polyetherimide, nylon or polycarbonate, or any other suitable material.

To detach the surgical instrument 150 from the mounting device 84 of the handpiece assembly 50, the tool may be slipped over the transmission rod 86 and rotated in the opposite direction, i.e., in a direction to unthread the transmission rod 86 from the mounting device 84. When the tool is rotated, the hub 172 allows torque to be applied to the transmission rod 86 through the coupling member 195, such

A0168

5,989,275

15

as, for example, a pin, to allow a relatively high disengaging torque to be applied to rotate the transmission rod 86 in the unthreading direction. As a result, the transmission rod 86 loosens from the mounting device 84. Once the transmission rod 86 is removed from the mounting device 84, the entire surgical instrument 150 may be thrown away.

Since the hub of the surgical instrument 150 is constructed of a material which distorts at temperatures normally used for heat sterilization in hospitals, any attempt to heat sterilize the surgical instrument 150 for reuse results in a deformed hub to prevent the surgical instrument 150 from being used again. As shown in FIG. 11, when the hub 172 is sterilized with steam or otherwise exposed to heat and/or high humidity, the outside diameter of the hub 172 deforms or becomes irregular upon resterilization in, for example, a steam sterilizer or autoclave. As a result, the lumen 122 of the adapter 120 cannot pass or slide over the hub 172 of the surgical instrument 150. Thus, the adapter 122 cannot be attached to the handpiece assembly thereby preventing a user from reusing the surgical instrument 120.

Referring now to FIG. 13 and 14, another embodiment of a single use surgical instrument 550 is illustrated. The surgical instrument 550 preferably includes a transmission component 552, a sheath 554, and one or more support members 560 (one being shown), such as, for example, an O-ring. The transmission component 552 may be substantially similar in construction and function as the transmission components as described above. It is contemplated that the transmission component 552 may be any suitable transmission component.

The sheath 554 of the surgical instrument 550 generally includes a hub 556 and an elongated tubular member 558. The hub 556 and the tubular member 558 may be substantially similar in construction and function as the hub and tubular member as described above. It will be recognized that the hub 556 and tubular member 558 may be constructed from any suitable material and may be any suitable shape.

The support member 560 is disposed around the outer periphery of the transmission component 552. The support member 560 positions the transmission component 552 with the hub 556 and reduces vibration from being transmitted from the transmission component 552 to the hub 556. The support member 560 is preferably positioned at a node of longitudinal vibration of the transmission component 552 and is constructed of polymeric material, preferably silicone rubber. It is contemplated that the support member may be constructed of any suitable material and may be positioned at any suitable point along the transmission rod.

The support member 560 preferably has one or more sections of varying diameter. As illustrated in FIG. 14, the support member 560 has four sections 562 of a first diameter and four sections 564 of a second diameter. The second diameter of the four sections 564 is smaller than the first diameter of the four sections 562. The four sections 564 create spaces or channels 570 between the support member 560 and the hub 556 and the support member 560 and the transmission component 560. The channels 570 allow the surgical instrument to be initially sterilized by the manufacturer with, for example, ethylene oxide (ETO). However, when resterilized, the channels 570 allow sterilizing agents, such as, for example, gases and fluids, to pass by the support member 560 to enter a gap or space 580 between the sheath and transmission component 560. For example, the channels 570 allow sterilizing fluids to enter the gap 580 between the sheath and transmission component 560 when the surgical

16

instrument is submersed in cleaning fluids. Once the sterilizing agents have entered into the gap 580, the agents become trapped because of the close fit of the components. As a result, significant loading will be added to the ultrasonic transmission component and the ultrasonic transmission rod will not be able to resonate, thereby preventing reuse of the surgical instrument. It is contemplated that the support member 560 may be any suitable shape to allow fluid to flow into the space between the hub and the transmission component. It will be recognized that the transmission component may have grooves or slots on its outer surface and the sheath may have grooves or slots on its inner surface to allow the passage of gases and fluid into the gap.

The surgical instruments of the present invention are preferably configured and constructed to permit passage of ultrasonic energy through the ultrasonic transmission rod with minimal lateral side-to-side movement of the ultrasonic transmission rod while, at the same time, permitting unrestricted longitudinal forward/backward vibrational or movement of the ultrasonic transmission rod.

The surgical instruments allow torque to be applied to the transmission component by a non-vibratory member. The surgical instruments also allow use of the existing torque wrenches without requiring large diameter wrench flats or surfaces. Since no large wrench flat features are needed, the transmission rod can be machined from small diameter stock. Accordingly, the ultrasonic transmission rod can be made smaller reducing the size of the entire ultrasonic package.

The surgical instruments allow medical personnel to quickly and easily attach the surgical instruments to the handpiece. The surgical instrument is desirably and beneficially applied to and removed from a handpiece as a unit. The surgical instruments can be disposed of after a single use.

Although the present invention has been described in detail by way of illustration and example, it should be understood that a wide range of changes and modifications can be made to the preferred embodiments described above without departing in any way from the scope and spirit of the invention. Thus, the described embodiments are to be considered in all aspects only as illustrative and not restrictive, and the scope of the invention is, therefore, indicated by the appended claims rather than the foregoing description. All changes that come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

1. An ultrasonic surgical device comprising:

a transducer assembly adapted to vibrate at an ultrasonic frequency in response to electrical energy;

a mounting device having a first end and a second end, the mounting device adapted to receive ultrasonic vibration from the transducer assembly and to transmit the ultrasonic vibration from the first end to the second end of the mounting device, the first end of the mounting device coupled to the transducer assembly;

a transmission rod having a first end and a second end, the transmission rod adapted to receive ultrasonic vibration from the mounting device and to transmit the ultrasonic vibration from the first end to the second end of the transmission rod;

a damping member surrounding at least a portion of the transmission rod, the damping member configured to loosely contact the transmission rod over a portion of the transmission rod, the damping member adapted to

A0169

5,989,275

17

absorb undesired vibrations along the transmission rod without the use of a fluid; and

an end effector having a first end and a second end, the end effector adapted to receive the ultrasonic vibration from the transmission rod and to transmit the ultrasonic vibration from the first end to the second end of the end effector, the second end of the end effector being disposed near an antinode and the first end of the end effector coupled to the second end of the transmission rod.

2. The device of claim 1 wherein the dampening member includes a longitudinal slit, the slit extending substantially the entire length of the dampening member.

3. The device of claim 1 further comprising an outer sheath radially spaced from the transmission rod to form a space therebetween, the outer sheath surrounding substantially the entire length of the transmission rod.

4. An ultrasonic surgical device comprising:

a transducer assembly adapted to vibrate at an ultrasonic frequency in response to electrical energy;

a transmission rod having a first end and a second end, the transmission rod adapted to receive ultrasonic vibration from the transducer assembly and to transmit the ultrasonic vibration from the first end to the second end of the transmission rod;

a damping member surrounding a portion of the transmission rod, the damping member adapted to contact the transmission rod near at least one antinode of transverse vibration and configured to absorb undesired vibration without the use of a fluid; and

an end effector having a first end and a second end, the end effector adapted to receive the ultrasonic vibration from the transmission rod and to transmit the ultrasonic vibration from the first end to the second end of the end effector, the second end of the end effector disposed near an antinode and the first end of the end effector coupled to the second end of the transmission rod.

5. The device of claim 4 further comprising a plurality of axially spaced compliant members disposed around the periphery of the damping member, the compliant members being disposed substantially near nodes of the transmission rod.

6. The device of claim 4 further comprising at least two compliant members, the damping member extending longitudinally between the at least two compliant members.

7. The device of claim 6 wherein the at least two members are attached to the dampening member by an insert molding process.

8. The device of claim 4 wherein the dampening member has a first flange extending from one end and a second flange extending from the opposite end; and

wherein the first and second flanges are coupled to a respective compliant member near a node a vibration.

9. The device of claim 4 wherein the damping member is coupled to the transmission component near at least one node.

10. The device of claim 4 wherein the damping member includes at least one slit.

11. The device of claim 4 wherein the transmission rod is substantially semi-flexible.

12. The device of claim 4 wherein the damping member has a length of less that half of the length of the transmission rod.

13. The device of claim 4 wherein the diameter of the transmission rod is greater than 0.04 inches.

14. The device of claim 4 wherein the ultrasonic device includes an endoscopic instrument.

18

15. The device of claim 4 further comprising a generator to energize the transducer assembly.

16. The device of claim 4 further comprising a handpiece assembly to carry the transducer assembly.

17. The device of claim 4 wherein the inside diameter of the damping member is smaller than the outside diameter of the transmission rod in an unassembled state.

18. The device of claim 4 wherein the inside diameter of the damping member is larger than the outside diameter of the transmission rod.

19. The device of claim 4 wherein the ultrasonic device includes an angioplasty catheter assembly.

20. The device of claim 4 wherein the damping member is formed of a polymeric material.

21. The device of claim 5 further comprising an adhesive to attach the compliant members to the transmission component.

22. The device of claim 4 wherein the transmission component is a wire.

23. An ultrasonic surgical device comprising:

a transmission component having a first end and a second end, the first transmission component adapted to receive ultrasonic vibration from a transducer assembly and to transmit the ultrasonic vibration from the first end to the second end; and

an inner damping member surrounding at least a portion of the transmission component, the dampening member adapted to contact the transmission component along the entire length of the damping member to dampen undesired vibrations during ultrasonic transmission, wherein the dampening member contacts the transmission component near least one antinode of transverse vibration.

24. The device of claim 23 further including an outer sheath radially spaced from the inner sheath, the outer sheath extending over the entire length of the inner sheath.

25. An ultrasonic surgical instrument comprising:

a working member having a shaft;

the shaft having a first end and a second end, the shaft adapted to receive ultrasonic vibration and to transmit the ultrasonic vibration from the first end to the second end of the shaft; and

an inner damping sheath surrounding a portion of the shaft, the inner member adapted to contact at least one antinode of transverse vibration to dampen undesired ultrasonic vibration without the use of a fluid; and

an outer damping sheath surrounding at least a portion of the length of the shaft, the outer sheath radially spaced from the inner sheath and the shaft.

26. A damping device for an ultrasonic transmission component comprising:

a tubular member to absorb unwanted ultrasonic vibration along the transmission component while permitting axial vibration of the transmission component during transmission of an ultrasonic waveform along the transmission component, the tubular member having an inner surface and outer surface, the tubular member formed from a polymeric material;

the inner surface of the tubular member defining a longitudinal opening extending therethrough, and adapted to loosely surround at least a portion of the transmission component; and

wherein the tubular member has at least one longitudinal slit.

\* \* \* \* \*

### UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,989,275
DATED       : Nov. 23, 1999
INVENTOR(S) : Brian Estabrook,and Stephen Di Matteo and Paul Smith

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

In claim 8, line 5, kindly delete "node a vibration" and insert
    --node of vibration--.

In claim 12, line 3, kindly delete "that" and insert --than--.

In claim 23, line 13, kindly insert --at-- between "near" and "least".

Signed and Sealed this

Twenty-ninth Day of August, 2000

Attest:

Q. TODD DICKINSON

Attesting Officer        Director of Patents and Trademarks

US008182501B2

(12) **United States Patent**
Houser et al.

(10) Patent No.: **US 8,182,501 B2**
(45) Date of Patent: **May 22, 2012**

(54) **ULTRASONIC SURGICAL SHEARS AND METHOD FOR SEALING A BLOOD VESSEL USING SAME**

(75) Inventors: **Kevin L. Houser**, Springboro, OH (US); **Sarah A. Noschang**, Mason, OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 613 days.

(21) Appl. No.: **11/065,671**

(22) Filed: **Feb. 24, 2005**

(65) **Prior Publication Data**

US 2005/0192612 A1      Sep. 1, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/548,308, filed on Feb. 27, 2004.

(51) **Int. Cl.**
      *A61B 17/32*          (2006.01)
(52) **U.S. Cl.** ......................................... **606/169**; 606/205
(58) **Field of Classification Search** .................. 606/169, 606/205–208
      See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,322,055 A * | 6/1994 | Davison et al. | ..................... 601/2 |
| 6,024,750 A * | 2/2000 | Mastri et al. | .............. 606/169 |
| 6,254,623 B1 * | 7/2001 | Haibel et al. | ................. 606/169 |
| 6,325,811 B1 * | 12/2001 | Messerly | ................. 606/169 |
| 6,669,690 B1 | 12/2003 | Okada et al. | |
| 2002/0026184 A1 | 2/2002 | Witt et al. | |
| 2002/0120306 A1 | 8/2002 | Zhu et al. | |
| 2002/0183785 A1 * | 12/2002 | Howell et al. | ................. 606/207 |
| 2003/0114874 A1 | 6/2003 | Craig et al. | |
| 2003/0120306 A1 * | 6/2003 | Burbank et al. | .............. 606/205 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0908152 A | 4/1999 |
| EP | 1362555 A | 11/2003 |
| JP | 8-503621 | 4/1996 |
| JP | 11-197157 | 7/1999 |
| JP | 2003-510158 | 3/2003 |
| WO | 01/24713 | 4/2001 |

OTHER PUBLICATIONS

McCarus, Steven D., MD; Physiologic Mechanism of the Ultrasonically Activated Scalpel; Journal of the American Ass'n of Gynecologic Laparoscopists; Aug. 1996; vol. 3 No. 4 p. 601ff.
Feil, Wolfgang, MD et al.; Ultrasonic Energy for Cutting, Coagulating, and Dissecting; p. IV, 17, 21, 23; Theime; Stuttgart-New York ISBN 3-13-127521-9.
European Search Report dated Sep. 25, 2009 corresponding to the European Patent Application No. 05723929.

* cited by examiner

*Primary Examiner* — Ryan Severson
(74) *Attorney, Agent, or Firm* — Verne E. Kreger, Jr.

(57)          **ABSTRACT**

An ultrasonic surgical shears includes an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm. A method for sealing a blood vessel of a patient includes obtaining an ultrasonic surgical shears and positioning the blood vessel between the blade and the tissue pad. The clamping arm is operated to exert an average coaptation pressure on the blood vessel between and including 60 psi and 210 psi. The blade is ultrasonically vibrated to transect and seal the blood vessel.

**23 Claims, 4 Drawing Sheets**





FIG. 1

Case: 14-1370    Case: 14-1370    Document: 24    Page: 242    Filed: 07/21/2014



FIG. 2



FIG. 3



FIG. 4



FIG. 5

US 8,182,501 B2

1

# ULTRASONIC SURGICAL SHEARS AND METHOD FOR SEALING A BLOOD VESSEL USING SAME

## REFERENCE TO RELATED APPLICATIONS

The present application claims the priority benefit of U.S. provisional patent application Ser. No. 60/548,308, filed on Feb. 27, 2004, the contents of which are incorporated herein by reference.

This application contains subject matter related to co-owned patent application no. 10/289,787, filed on Nov. 7, 2002, entitled "Ultrasonic Clamp Coagulator Apparatus Having an Improved Clamping End-Effector", Publication No. US20030114874(A1), the contents of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention is related generally to surgical instruments, and more particularly to an ultrasonic surgical shears and to a method for sealing a blood vessel using an ultrasonic surgical shears.

## BACKGROUND OF THE INVENTION

Ultrasonic surgical instruments are known which include ultrasonic surgical shears having an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, a tissue pad attached to the clamping arm and including a 0.033 square-inch clamping surface area, and a device for exerting a 1.5 pound clamping force on the clamping arm which creates a clamping pressure of 45 psi (pounds per square inch) on a blood vessel which is positioned between the clamping surface area of the tissue pad and the blade. It is noted that the clamping surface area is the area where the blade and the tissue pad are in close proximity when the clamping arm is in a closed position. Exemplary devices are described in U.S. Pat. Nos. 5,322,055 and 6,325,811, the contents of which are incorporated herein by reference. The result of the ultrasonically-vibrating ultrasonic surgical blade and the clamping pressure on the blood vessel is a coaptation of the blood vessel (a bringing together of the walls of the blood vessel), a transection (a cutting) of the coaptated blood vessel, and a coagulation (a sealing) of the coaptated cut ends of the blood vessel. It is known that blood-vessel transection times can be decreased with the application of a higher clamping force. However, this is not done because conventional thought is that decreasing the blood-vessel transection time using a higher clamping force will lead to a degradation in coagulation performance (i.e., a lowering of the burst pressure of a sealed end of the transected blood vessel). Conventional ultrasonic surgical shears are not used on blood vessels larger than 3mm because the clamping force used is inadequate for proper coaptation.

Still, there is a need in the medical device industry for improved ultrasonic surgical shears and improved methods for sealing a blood vessel using an ultrasonic surgical shears.

## SUMMARY OF THE INVENTION

A first method of the invention is for sealing a blood vessel of a patient and includes steps a) through d). Step a) includes obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm. Step b) includes positioning the blood vessel

2

between the blade and the tissue pad. Step c) includes operating the clamping arm to exert an average coaptation pressure on the blood vessel between and including 60 psi and 210 psi. Step d) includes ultrasonically vibrating the blade to transect and seal the blood vessel.

A first embodiment of the invention is for an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm, and a tissue pad. The clamping arm is operable to open and close toward the blade. The tissue pad is attached to the clamping arm. The ultrasonic surgical shears also includes a device for exerting a clamping force on the clamping arm creating an average clamping pressure between and including 60 psi and 210 psi on tissue positioned between the tissue pad and the blade.

A second embodiment of the invention is for an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm, and a tissue pad. The clamping arm is operable to open and close toward the blade. The tissue pad is attached to the clamping arm. The ultrasonic surgical shears also includes a mechanism for limiting a user-applied clamping force on the clamping arm creating an average clamping pressure between and including 60 psi and 210 psi on tissue positioned between the tissue pad and the blade.

Several benefits and advantages are obtained from one or more of the method and the embodiments of the invention. Exerting an ultrasonic surgical shears coaptation pressure from 60 psi to 210 psi provides for improved blood vessel sealing with shorter transection times on 3 mm or smaller blood vessels than conventionally is possible and provides for blood vessel sealing with acceptable transection times and burst pressures on blood vessels larger than 3 mm, which is not conventionally possible.

Applicants experimentally found that applying an ultrasonic surgical shears coaptation pressure ranging from 60 psi to 210 psi (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force ranging from 2 to 7 pounds) on 4.5 mm to 5 mm diameter blood vessels resulted in successful blood-vessel sealing with transection times of 2 to 4 seconds and with burst pressures of generally 500 to 700 mmHg compared to a transection time of over 9 seconds and a burst pressure of generally 100 mmHg for a 45 psi clamping pressure (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force of 1.5 pounds). Applicants also experimentally found that applying an ultrasonic surgical shears coaptation pressure ranging from 120 psi to 180 psi (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force ranging from 4 to 6 pounds) on 5 mm to 7 mm diameter blood vessels resulted in successful blood-vessel sealing with transection times of 1.5 to 2.0 seconds and with burst pressures of generally 500 mmHg compared to a transection time of generally 4.5 seconds and a burst pressure of generally 30 mmHg for a 45 psi clamping pressure (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force of 1.5 pounds).

The present invention has, without limitation, application with straight or curved ultrasonic surgical blades as disclosed in the patents incorporated by reference for use in open or endoscopic procedures as well as in robotic-assisted instruments.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a block diagram of a method of the invention;

FIG. 2 is a schematic side elevational view of a portion of a first embodiment of an ultrasonic surgical shears of the invention which, in one application, is used to perform the method of FIG. 1;

US 8,182,501 B2

3

FIG. **3** is a schematic side elevational view of a portion of a second embodiment of an ultrasonic surgical shears of the invention;

FIG. **4** is a cross sectional view of the ultrasonic surgical shears of FIG. **2**, taken along lines 4-4 of FIG. **2**; and

FIG. **5** is a view, as in FIG. **4**, but of a different construction of the ultrasonic surgical shears of FIG. **2**.

DETAILED DESCRIPTION OF THE INVENTION

Before explaining the present invention in detail, it should be noted that the invention is not limited in its application or use to the details of construction and arrangement of parts illustrated in the accompanying drawings and description. The illustrative embodiments of the invention may be implemented or incorporated in other embodiments, variations and modifications, and may be practiced or carried out in various ways. Furthermore, unless otherwise indicated, the terms and expressions employed herein have been chosen for the purpose of describing the illustrative embodiments of the present invention for the convenience of the reader and are not for the purpose of limiting the invention.

It is understood that any one or more of the following-described embodiments, examples, etc. can be combined with any one or more of the other following-described embodiments, examples, etc.

Referring now to the Figures, in which like numerals indicate like elements, FIG. **1** illustrates a method of the invention. The method is for sealing a blood vessel of a patient and includes steps a) through d). Step a) is labeled as "Obtain Ultrasonic Surgical Shears" in block **10** of FIG. **1**. Step a) includes obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm. Step b) is labeled as "Position Blood Vessel" in block **12** of FIG. **1**. Step b) includes disposing the blood vessel between the blade and the tissue pad. Step c) is labeled as "Exert Coaptation Pressure" in block **14** of FIG. **1**. Step c) includes operating the clamping arm to exert an average coaptation pressure on the blood vessel between and including 60 psi and 210 psi. Step d) is labeled as "Operate Blade" in block **16** of FIG. **1**. Step d) includes ultrasonically vibrating the blade to transect and seal the blood vessel.

In one illustration of the method of the invention, step b) includes positioning the blade and the clamping arm with the blade and the tissue pad surrounding the blood vessel so that the blood vessel is disposed between the blade and the tissue pad.

In one application of the method of the invention, the average coaptation pressure in step c) is between and including 120 psi and 180 psi. In one variation, the average coaptation pressure in step c) is substantially 150 psi. In one example of the method, the blood vessel has an outside diameter greater than substantially 3 mm. In one variation, the blood vessel has an outside diameter between and including 4.5 mm and 5.0 mm. In another variation, the blood vessel has an outside diameter between and including 5.0 mm and 7.0 mm. In another example, the blood vessel has an outside diameter less than or equal to substantially 3 mm.

In one exemplary construction employing the method of the invention, as shown in FIG. **4**, the blade **20** has a portion which opposes the tissue pad **24** and which has a substantially round transverse cross section, and the tissue pad **24**, which is attached to the clamping arm **22**, has a substantially "T" shape transverse cross section with the bottom of the "T" defining a clamping surface area **26**, the clamping surface area **26** faces substantially toward the blade **20**, and step b) disposes the

4

blood vessel between the blade **20** and the clamping surface area **26**. In a different construction, as shown in FIG. **5**, the blade **120** has a portion which opposes the tissue pad **124** and which has a substantially square transverse cross section with a rounded edge defining a clamping surface area **127**, the tissue pad **124**, which is attached to the clamping arm **122**, has a substantially rectangular transverse cross section, the clamping surface area **127** of the blade **120** faces substantially toward the tissue pad **124**, and step b) disposes the blood vessel between the clamping surface area **127** and the tissue pad **124**. Other blades, known to those skilled in the art, are equally useful to practice this invention.

In one implementation of the method of the invention, the tissue pad has a clamping surface area of substantially 0.033 square inches. In one variation, step c) exerts a clamping force on the clamping arm between and including 2 pounds and 7 pounds. It is noted that pressure is force per unit area, and that for the same force applied by the clamping arm, the pressure on the engaged portion of a blood vessel that fully engages the entire clamping surface area is less than the pressure on the engaged portion of a blood vessel that, because of smaller diameter, engages only a fraction of the clamping surface area. The pressures discussed herein are pressures seen by tissue when the entire clamping surface area is in contact with the tissue. As previously mentioned, a clamping surface area is the area where the blade and the tissue pad are in close proximity when the clamping arm is in a closed position.

A first embodiment of the invention is for an ultrasonic surgical shears **18** and is shown in FIG. **2**. The ultrasonic surgical shears **18** includes an ultrasonic surgical blade **20**, a clamping arm **22**, and a tissue pad **24**. The clamping arm **22** is operable to open and close toward the blade **20**. The tissue pad **24** is attached to the clamping arm **22**. The ultrasonic surgical shears **18** also includes means **28** for exerting a clamping force on the clamping arm **22** creating a clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad **24** and the blade **20**.

In one enablement of the first embodiment of FIG. **2**, the clamping-force-creating means **28** includes a motor which rotates one of the clamping arm and the blade relative to the other of the clamping arm and the blade, wherein the motor is preselected to cause a known-size clamping surface area to exert the desired pressure on tissue large enough to cover the clamping surface area. In another enablement, the clamping-force-creating means **28** includes user-settings to set the value or range of the force or pressure, such settings operating to select a voltage or current to control a variable torque motor to cause a known-size clamping surface to exert the desired pressure or a pressure within a range of desired pressures. In a further enablement, the clamping-force-creating means **28** includes a substantially constant force spring, which applies a predetermined force to the clamping arm. In one variation, the spring is torsional in its application of force. In another variation, the spring is axial in its application of force. It is noted that U.S. Pat. No. 6,325,811 describes one embodiment of a constant force spring design. Other equivalent enablements are left to the artisan.

In one application of the first embodiment of FIG. **2**, the clamping pressure is between and including 120 psi and 180 psi. In one variation, the clamping pressure is substantially 150 psi. In one implementation of the first embodiment of FIG. **2**, the tissue pad **24** has a clamping surface area **26** of substantially 0.033 square inches. In one variation of this implementation, the clamping force on the clamping arm **22** is between and including 2 pounds and 7 pounds.

A second embodiment of the invention is for an ultrasonic surgical shears **30** and is shown in FIG. **3**. The ultrasonic

US 8,182,501 B2

5

surgical shears **30** includes an ultrasonic surgical blade **32**, a clamping arm **34**, and a tissue pad **36**. The clamping arm **34** is operable to open and close toward the blade **32**. The tissue pad **36** is attached to the clamping arm **34**. The ultrasonic surgical shears **30** also includes means **40** for limiting a user-applied clamping force on the clamping arm **34** creating a clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad **36** and the blade **32**.

In one enablement of the second embodiment of FIG. **3**, the force-limitation means **40** includes a torque-limiting mechanism as in a conventional torque wrench. Other equivalent enablements are left to the artisan.

In one application of the second embodiment of FIG. **3**, the clamping pressure is between and including 120 psi and 180 psi. In one variation, the clamping pressure is substantially 150 psi. In one implementation of the second embodiment of FIG. **3**, the tissue pad **36** has a clamping surface area **38** of substantially 0.033 square inches. In one variation of this implementation, the clamping force on the clamping arm is between and including 2 pounds and 7 pounds.

Other embodiments of ultrasonic surgical shears (not shown) which can be used in the method of the invention include, without limitation, those which include a force and/or pressure sensor and a user-sensed indication of the user-applied force and/or pressure measured by the force and/or pressure sensor allowing the user to control the force or pressure. User-sensed indications include, without limitation, a visually-observed value or range on a gauge, a visually-observed value or range on a computer monitor display, a visually observed color or colors, an audibly heard signal or communication, a tactile-felt vibration, etc.

Several benefits and advantages are obtained from one or more of the method and the embodiments of the invention. Exerting an ultrasonic surgical shears coaptation pressure from 60 psi to 210 psi provides for improved blood vessel sealing with shorter transection times on 3 mm or smaller blood vessels than conventionally is possible and provides for blood vessel sealing with acceptable transection times and burst pressures on blood vessels larger than 3 mm, which is not conventionally possible.

Applicants experimentally found that applying an ultrasonic surgical shears coaptation pressure ranging from 60 psi to 210 psi (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force ranging from 2 to 7 pounds) on 4.5 mm to 5 mm diameter blood vessels resulted in successful blood-vessel sealing with transection times of 2 to 4 seconds and with burst pressures of generally 500 to 700 mmHg compared to a transaction time of over 9 seconds and a burst pressure of generally 100 mmHg for a 45 psi clamping pressure (corresponding to a fully-engaged clamping surface area of 0.033 square inches and a clamping force of 1.5 pounds). Applicants also experimentally found that applying an ultrasonic surgical shears coaptation pressure ranging from 120 psi to 180 psi (corresponding to a fully-engaged clamping surface area of 0.003 square inches and a clamping force ranging from 4 to 6 pounds) on 5 mm to 7 mm diameter blood vessels resulted in successful blood-vessel sealing with transection times of 1.5 to 2.0 seconds and with burst pressures of generally 500 mmHg compared to a transaction time of generally 4.5 seconds and a burst pressure of generally 30 mmHg for a 45 psi clamping pressure (corresponding to a fully-engaged clamping surface area of 0.003 square inches and a clamping force of 1.5 pounds).

While the present invention has been illustrated by a description of several embodiments and a method, it is not the intention of the applicants to restrict or limit the spirit and

6

scope of the appended claims to such detail. Numerous other variations, changes, and substitutions will occur to those skilled in the art without departing from the scope of the invention. For instance, the ultrasonic surgical shears and the method for sealing a blood vessel of the invention have application in robotic assisted surgery taking into account the obvious modifications of such systems, components and methods to be compatible with such a robotic system. It will be understood that the foregoing description is provided by way of example, and that other modifications may occur to those skilled in the art without departing from the scope and spirit of the appended Claims.

What is claimed is:

**1**. A method for sealing a blood vessel of a patient comprising the steps of:

a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, a tissue pad attached to the clamping arm, means for providing a clamp force and means for limiting a user applied clamp force, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area;

b) disposing the blood vessel between the blade and the tissue pad;

c) operating the clamping arm to exert a predetermined average coaptation pressure on the blood vessel between and including 60 psi and 210 psi; and

d) ultrasonically vibrating the blade to transect and seal the blood vessel.

**2**. The method of claim **1**, wherein the average coaptation pressure in step c) is between and including 120 psi and 180 psi.

**3**. The method of claim **2**, wherein the average coaptation pressure in step c) is substantially 150 psi.

**4**. The method of claim **1**, wherein the blood vessel has an outside diameter larger than substantially 3 mm.

**5**. The method of claim **4**, wherein the blood vessel has an outside diameter between and including 4.5 mm and 5.0 mm.

**6**. The method of claim **4**, wherein the blood vessel has an outside diameter between and including 5.0 mm and 7.0 mm.

**7**. The method of claim **1**, wherein the clamping surface area is substantially 0.033 square inches.

**8**. The method of claim **7**, wherein step c) exerts a clamping force on the clamping arm between and including 2 pounds and 7 pounds.

**9**. The method of claim **1**, wherein the blade has a portion which opposes the tissue pad and which has a substantially square transverse cross section with a rounded edge defining a clamping surface area, wherein the tissue pad has a substantially rectangular transverse cross section, wherein the clamping surface area faces substantially toward the tissue pad, and wherein step b) disposes the blood vessel between the clamping surface area and the tissue pad.

**10**. The method of claim **1**, wherein the means for providing a clamp force is a motor.

**11**. The method of claim **1**, wherein the means for providing a clamp force is a spring.

**12**. An ultrasonic surgical shears comprising:

a) an ultrasonic surgical blade;

b) a clamping arm operable to open and close toward the blade;

c) a tissue pad attached to the clamping arm;

d) means for exerting a predetermined clamping force on the clamping arm, wherein the blade and tissue pad

A0179

US 8,182,501 B2

7

define a clamping surface area so that the clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; and

e) means for limiting a user applied clamping force.

**13**. The ultrasonic surgical shears of claim **12**, wherein the average clamping pressure is between and including 120 psi and 180 psi.

**14**. The ultrasonic surgical shears of claim **13**, wherein the average clamping pressure is substantially 150 psi.

**15**. The ultrasonic surgical shears of claim **12**, wherein the clamping surface area is substantially 0.033 square inches.

**16**. The ultrasonic surgical shears of claim **15**, wherein the clamping force is between and including 2 pounds and 7 pounds.

**17**. An ultrasonic surgical shears comprising:

a) an ultrasonic surgical blade;

b) a clamping arm operable to open and close toward the blade;

c) a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area; and

d) means for limiting a user applied clamping force on the clamping arm creating an average predetermined clamping pressure between and including 60 psi and 210 psi on tissue disposed between the tissue pad and the blade.

**18**. The ultrasonic surgical shears of claim **17**, wherein the average clamping pressure is between and including 120 psi and 180 psi.

**19**. The ultrasonic surgical shears of claim **18**, wherein the average clamping pressure is substantially 150 psi.

**20**. The ultrasonic surgical shears of claim **17**, wherein the clamping surface area is substantially 0.033 square inches.

8

**21**. The ultrasonic surgical shears of claim **20**, wherein the clamping force is between and including 2 pounds and 7 pounds.

**22**. A method for sealing a blood vessel of a patient comprising the steps of:

a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a clamping surface area so that the applied clamp force does not exceed a predetermined clamping pressure of 210 psi at the clamping surface area;

b) disposing the blood vessel between the blade and the tissue pad;

c) limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel; and

d) ultrasonically vibrating the blade to transect and seal the blood vessel.

**23**. A method for sealing a blood vessel of a patient comprising the steps of:

a) obtaining an ultrasonic surgical shears including an ultrasonic surgical blade, a clamping arm operable to open and close toward the blade, and a tissue pad attached to the clamping arm, wherein the blade and tissue pad define a predetermined clamping surface area so that the applied clamp force does not exceed a clamping pressure of 210 psi at the clamping surface area;

b) disposing the blood vessel between the blade and the tissue pad;

c) limiting the clamping arm to exert between and including 60 psi and 210 psi on the blood vessel; and

d) ultrasonically vibrating the blade to transect and seal the blood vessel for no more than 4.5 secs.

\* \* \* \* \*

US00D661801S

## (12) United States Design Patent
Price et al.

(10) Patent No.: **US D661,801 S**
(45) Date of Patent: ** **Jun. 12, 2012**

(54) **USER INTERFACE FOR A SURGICAL INSTRUMENT**

(75) Inventors: **Daniel W. Price**, Loveland, OH (US);
**Galen C. Robertson**, Apex, NC (US);
**Cory G. Kimball**, Cincinnati, OH (US);
**Scott A. Woodruff**, Boston, MA (US);
**Matthew C. Miller**, Cincinnati, OH
(US); **Carrie I. Fihe**, Ponte Vedra Beach,
FL (US); **Carl J. Draginoff, Jr.**, Mason,
OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati,
OH (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/402,697**

(22) Filed: **Sep. 26, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. 12/245,158, filed on
Oct. 3, 2008.

(51) **LOC (9) Cl.** .................................................. **24-02**
(52) **U.S. Cl.** .................................... **D24/145**; D24/133
(58) **Field of Classification Search** ................. D24/133,
D24/143–149; 606/1, 45, 52, 51, 142–145,
606/167, 170–171, 205–207, 34
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,736,960 A | 3/1956 | Armstrong |
| 2,849,788 A | 9/1958 | Creek |
| 3,015,961 A | 1/1962 | Roney |
| 3,513,848 A | 5/1970 | Winston et al. |
| 3,526,219 A | 9/1970 | Balamuth |
| 3,614,484 A | 10/1971 | Shoh |
| 3,636,943 A | 1/1972 | Balamuth |
| 3,776,238 A | 12/1973 | Peyman et al. |
| 3,805,787 A | 4/1974 | Banko |
| 3,862,630 A | 1/1975 | Balamuth |

| | | | |
|---|---|---|---|
| 3,900,823 A | 8/1975 | Sokal et al. |
| 3,918,442 A | 11/1975 | Nikolaev et al. |
| 3,946,738 A | 3/1976 | Newton et al. |
| 3,955,859 A | 5/1976 | Stella et al. |
| 3,956,826 A | 5/1976 | Perdreaux, Jr. |
| 4,156,187 A | 5/1979 | Murry et al. |
| 4,188,927 A | 2/1980 | Harris |
| 4,200,106 A | 4/1980 | Douvas et al. |
| 4,445,063 A | 4/1984 | Smith |
| 4,491,132 A | 1/1985 | Aikins |
| 4,574,615 A | 3/1986 | Bower et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1634601 A | 7/2005 |

(Continued)

OTHER PUBLICATIONS

Technology Overview, printed from www.harmonicscalpel.com,
Internet site, website accessed on Jun. 13, 2007, (3 pages).

(Continued)

*Primary Examiner* — Wan Laymon
(74) *Attorney, Agent, or Firm* — Verne E. Kreger, Jr.

(57) **CLAIM**

The ornamental design for a user interface for a surgical
instrument, as shown and described.

**DESCRIPTION**

FIG. **1** is a left perspective view of a user interface for a
surgical instrument showing our design.
FIG. **2** is a left side view thereof.
FIG. **3** is a right side view thereof.
FIG. **4** is a top view thereof.
FIG. **5** is a bottom view thereof.
FIG. **6** is a front view thereof; and,
FIG. **7** is a rear view thereof.
Portions of the user interface for a surgical instrument shown
in broken lines form no part of the claimed design.

**1 Claim, 3 Drawing Sheets**



# US D661,801 S

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,617,927 | A | 10/1986 | Manes |
| 4,633,119 | A | 12/1986 | Thompson |
| 4,634,420 | A | 1/1987 | Spinosa et al. |
| 4,640,279 | A | 2/1987 | Beard |
| 4,708,127 | A | 11/1987 | Abdelghani |
| 4,712,722 | A | 12/1987 | Hood et al. |
| 4,827,911 | A | 5/1989 | Broadwin et al. |
| 4,832,683 | A | 5/1989 | Idemoto et al. |
| 4,838,853 | A | 6/1989 | Parisi |
| 4,850,354 | A | 7/1989 | McGurk-Burleson et al. |
| 4,865,159 | A | 9/1989 | Jamison |
| 4,896,009 | A | 1/1990 | Pawlowski |
| 4,922,902 | A | 5/1990 | Wuchinich et al. |
| 4,965,532 | A | 10/1990 | Sakurai |
| 4,981,756 | A | 1/1991 | Rhandhawa |
| 5,026,387 | A | 6/1991 | Thomas |
| 5,112,300 | A | 5/1992 | Ureche |
| 5,123,903 | A | 6/1992 | Quaid et al. |
| 5,126,618 | A | 6/1992 | Takahashi et al. |
| 5,162,044 | A | 11/1992 | Gahn et al. |
| 5,167,725 | A | 12/1992 | Clark et al. |
| D332,660 | S | 1/1993 | Rawson et al. |
| 5,176,695 | A | 1/1993 | Dulebohn |
| 5,184,605 | A | 2/1993 | Grezeszykowski |
| 5,213,569 | A | 5/1993 | Davis |
| 5,221,282 | A | 6/1993 | Wuchinich |
| 5,226,910 | A | 7/1993 | Kajiyama et al. |
| 5,241,236 | A | 8/1993 | Sasaki et al. |
| 5,257,988 | A | 11/1993 | L'Esperance, Jr. |
| 5,261,922 | A | 11/1993 | Hood |
| 5,263,957 | A | 11/1993 | Davison |
| 5,275,609 | A | 1/1994 | Pingleton et al. |
| 5,282,800 | A | 2/1994 | Foshee et al. |
| 5,304,115 | A | 4/1994 | Pflueger et al. |
| D347,474 | S | 5/1994 | Olson |
| 5,322,055 | A | 6/1994 | Davison et al. |
| 5,324,299 | A | 6/1994 | Davison et al. |
| 5,344,420 | A | 9/1994 | Hilal et al. |
| 5,346,502 | A | 9/1994 | Estabrook et al. |
| 5,366,466 | A | 11/1994 | Christian et al. |
| D354,564 | S | 1/1995 | Medema |
| 5,381,067 | A | 1/1995 | Greenstein et al. |
| 5,403,312 | A | 4/1995 | Yates et al. |
| 5,411,481 | A | 5/1995 | Allen et al. |
| 5,419,761 | A | 5/1995 | Narayanan et al. |
| 5,421,829 | A | 6/1995 | Olichney et al. |
| 5,449,370 | A | 9/1995 | Vaitekunas |
| 5,483,501 | A | 1/1996 | Park et al. |
| 5,486,162 | A | 1/1996 | Brumbach |
| 5,500,216 | A | 3/1996 | Julian et al. |
| 5,501,654 | A | 3/1996 | Failla et al. |
| 5,505,693 | A | 4/1996 | Mackool |
| 5,562,609 | A | 10/1996 | Brumbach |
| 5,562,610 | A | 10/1996 | Brumbach |
| 5,601,601 | A | 2/1997 | Tal et al. |
| 5,607,436 | A | 3/1997 | Pratt et al. |
| 5,618,492 | A | 4/1997 | Auten et al. |
| 5,628,760 | A | 5/1997 | Knoepfler |
| 5,630,420 | A | 5/1997 | Vaitekunas |
| D381,077 | S | 7/1997 | Hunt |
| 5,651,780 | A | 7/1997 | Jackson et al. |
| 5,653,713 | A | 8/1997 | Michelson |
| 5,669,922 | A | 9/1997 | Hood |
| 5,674,235 | A | 10/1997 | Parisi |
| 5,690,269 | A | 11/1997 | Bolanos et al. |
| 5,694,936 | A | 12/1997 | Fujimoto et al. |
| 5,713,896 | A | 2/1998 | Nardella |
| 5,733,074 | A | 3/1998 | Stöck et al. |
| 5,741,226 | A | 4/1998 | Strukel et al. |
| 5,810,859 | A | 9/1998 | DiMatteo et al. |
| 5,827,323 | A | 10/1998 | Klieman et al. |
| 5,828,160 | A | 10/1998 | Sugishita |
| 5,843,109 | A | 12/1998 | Mehta et al. |
| 5,879,364 | A | 3/1999 | Bromfield et al. |
| 5,893,835 | A | 4/1999 | Witt et al. |
| 5,897,569 | A | 4/1999 | Kellogg et al. |
| 5,935,143 | A | 8/1999 | Hood |
| 5,935,144 | A | 8/1999 | Estabrook |

| | | | |
|---|---|---|---|
| 5,938,633 | A | 8/1999 | Beaupre |
| 5,944,718 | A | 8/1999 | Austin et al. |
| 5,944,737 | A | 8/1999 | Tsonton et al. |
| 5,954,736 | A | 9/1999 | Bishop et al. |
| 5,954,746 | A | 9/1999 | Holthaus et al. |
| 5,957,882 | A | 9/1999 | Nita et al. |
| 5,957,943 | A | 9/1999 | Vaitekunas |
| 5,968,007 | A | 10/1999 | Simon et al. |
| 5,968,060 | A | 10/1999 | Kellogg |
| D416,089 | S | 11/1999 | Barton et al. |
| 5,980,510 | A | 11/1999 | Tsonton et al. |
| 5,989,274 | A | 11/1999 | Davison et al. |
| 5,989,275 | A | 11/1999 | Estabrook et al. |
| 5,993,972 | A | 11/1999 | Reich et al. |
| 6,024,741 | A | 2/2000 | Williamson, IV et al. |
| 6,033,375 | A | 3/2000 | Brumbach |
| 6,063,098 | A | 5/2000 | Houser et al. |
| 6,066,132 | A | 5/2000 | Chen et al. |
| 6,068,647 | A | 5/2000 | Witt et al. |
| 6,077,285 | A | 6/2000 | Boukhny |
| 6,083,191 | A | 7/2000 | Rose |
| 6,086,584 | A | 7/2000 | Miller |
| 6,090,120 | A | 7/2000 | Wright et al. |
| 6,109,500 | A | 8/2000 | Alli et al. |
| 6,110,127 | A | 8/2000 | Suzuki |
| 6,113,594 | A | 9/2000 | Savage |
| 6,139,320 | A | 10/2000 | Hahn |
| 6,152,902 | A | 11/2000 | Christian et al. |
| 6,159,160 | A | 12/2000 | Hsei et al. |
| 6,159,175 | A | 12/2000 | Strukel et al. |
| 6,204,592 | B1 | 3/2001 | Hur |
| 6,206,844 | B1 | 3/2001 | Reichel et al. |
| 6,210,403 | B1 | 4/2001 | Klicek |
| 6,214,023 | B1 | 4/2001 | Whipple et al. |
| 6,233,476 | B1 | 5/2001 | Strommer et al. |
| 6,238,366 | B1 | 5/2001 | Savage et al. |
| D444,365 | S | 7/2001 | Bass et al. |
| 6,254,623 | B1 | 7/2001 | Haibel, Jr. et al. |
| 6,258,034 | B1 | 7/2001 | Hanafy |
| 6,267,761 | B1 | 7/2001 | Ryan |
| 6,270,831 | B2 | 8/2001 | Kumar et al. |
| 6,273,852 | B1 | 8/2001 | Lehe et al. |
| 6,274,963 | B1 | 8/2001 | Estabrook et al. |
| 6,277,115 | B1 | 8/2001 | Saadat |
| 6,278,218 | B1 | 8/2001 | Madan et al. |
| 6,283,981 | B1 | 9/2001 | Beaupre |
| 6,309,400 | B2 | 10/2001 | Beaupre |
| 6,319,221 | B1 | 11/2001 | Savage et al. |
| 6,325,811 | B1 | 12/2001 | Messerly |
| 6,328,751 | B1 | 12/2001 | Beaupre |
| 6,352,532 | B1 | 3/2002 | Kramer et al. |
| 6,379,320 | B1 | 4/2002 | Lafon et al. |
| D457,958 | S | * | 5/2002 | Dycus et al. .............. D24/144 |
| 6,383,194 | B1 | 5/2002 | Pothula |
| 6,387,109 | B1 | 5/2002 | Davison et al. |
| 6,388,657 | B1 | 5/2002 | Natoli |
| 6,391,042 | B1 | 5/2002 | Cimino |
| 6,405,733 | B1 | 6/2002 | Fogarty et al. |
| 6,416,486 | B1 | 7/2002 | Wampler |
| 6,423,073 | B2 | 7/2002 | Bowman |
| 6,423,082 | B1 | 7/2002 | Houser et al. |
| 6,432,118 | B1 | 8/2002 | Messerly |
| 6,436,114 | B1 | 8/2002 | Novak et al. |
| 6,436,115 | B1 | 8/2002 | Beaupre |
| 6,443,969 | B1 | 9/2002 | Novak et al. |
| 6,454,781 | B1 | 9/2002 | Witt et al. |
| 6,454,782 | B1 | 9/2002 | Schwemberger |
| 6,458,142 | B1 | 10/2002 | Faller et al. |
| 6,480,796 | B2 | 11/2002 | Wiener |
| 6,485,490 | B2 | 11/2002 | Wampler et al. |
| 6,491,708 | B2 | 12/2002 | Madan et al. |
| 6,497,715 | B2 | 12/2002 | Satou |
| 6,500,176 | B1 | 12/2002 | Truckai et al. |
| 6,500,188 | B2 | 12/2002 | Harper et al. |
| 6,524,316 | B1 | 2/2003 | Nicholson et al. |
| 6,533,784 | B2 | 3/2003 | Truckai et al. |
| 6,537,291 | B2 | 3/2003 | Friedman et al. |
| 6,543,452 | B1 | 4/2003 | Lavigne |
| 6,543,456 | B1 | 4/2003 | Freeman |

## US D661,801 S
Page 3

| | | | |
|---|---|---|---|
| 6,544,260 B1 | 4/2003 | Markel et al. | |
| 6,561,983 B2 | 5/2003 | Cronin et al. | |
| 6,572,632 B2 | 6/2003 | Zisterer et al. | |
| 6,575,969 B1 | 6/2003 | Rittman, III et al. | |
| 6,582,451 B1 | 6/2003 | Marucci et al. | |
| 6,589,200 B1 | 7/2003 | Schwemberger et al. | |
| 6,589,239 B2 | 7/2003 | Khandkar et al. | |
| 6,616,450 B2 | 9/2003 | Mossle et al. | |
| 6,623,501 B2 | 9/2003 | Heller et al. | |
| 6,626,926 B2 | 9/2003 | Friedman et al. | |
| 6,633,234 B2 | 10/2003 | Wiener et al. | |
| 6,656,177 B2 | 12/2003 | Truckai et al. | |
| 6,662,127 B2 | 12/2003 | Wiener et al. | |
| 6,663,941 B2 | 12/2003 | Brown et al. | |
| 6,676,660 B2 | 1/2004 | Wampler et al. | |
| 6,678,621 B2 | 1/2004 | Wiener et al. | |
| 6,679,899 B2 | 1/2004 | Wiener et al. | |
| 6,682,544 B2 | 1/2004 | Mastri et al. | |
| 6,716,215 B1 | 4/2004 | David et al. | |
| 6,731,047 B2 | 5/2004 | Kauf et al. | |
| 6,733,506 B1 | 5/2004 | McDevitt et al. | |
| 6,762,535 B2 | 7/2004 | Take et al. | |
| 6,770,072 B1 | 8/2004 | Truckai et al. | |
| 6,773,444 B2 | 8/2004 | Messerly | |
| 6,786,382 B1 | 9/2004 | Hoffman | |
| 6,786,383 B2 | 9/2004 | Stegelmann | |
| 6,790,216 B1 | 9/2004 | Ishikawa | |
| 6,802,843 B2 | 10/2004 | Truckai et al. | |
| 6,828,712 B2 | 12/2004 | Battaglin et al. | |
| 6,869,439 B2 | 3/2005 | White et al. | |
| 6,875,220 B2 | 4/2005 | Du et al. | |
| 6,905,497 B2 | 6/2005 | Truckai et al. | |
| 6,908,472 B2 | 6/2005 | Wiener et al. | |
| 6,913,579 B2 | 7/2005 | Truckai et al. | |
| 6,926,716 B2 | 8/2005 | Baker et al. | |
| 6,929,632 B2 | 8/2005 | Nita et al. | |
| 6,929,644 B2 | 8/2005 | Truckai et al. | |
| D509,589 S | 9/2005 | Wells | |
| 6,945,981 B2 | 9/2005 | Donofrio et al. | |
| D511,145 S | 11/2005 | Donofrio et al. | |
| 6,976,844 B2 | 12/2005 | Hickok et al. | |
| 6,976,969 B2 | 12/2005 | Messerly | |
| 6,977,495 B2 | 12/2005 | Donofrio | |
| 6,984,220 B2 | 1/2006 | Wuchinich | |
| 7,011,657 B2 | 3/2006 | Truckai et al. | |
| 7,041,083 B2 | 5/2006 | Chu et al. | |
| 7,041,088 B2 | 5/2006 | Nawrocki et al. | |
| 7,041,102 B2 | 5/2006 | Truckai et al. | |
| 7,070,597 B2 | 7/2006 | Truckai et al. | |
| 7,074,219 B2 | 7/2006 | Levine et al. | |
| 7,077,039 B2 | 7/2006 | Gass et al. | |
| 7,077,853 B2 | 7/2006 | Kramer et al. | |
| 7,083,619 B2 | 8/2006 | Truckai et al. | |
| 7,087,054 B2 | 8/2006 | Truckai et al. | |
| 7,108,695 B2 | 9/2006 | Witt et al. | |
| 7,112,201 B2 | 9/2006 | Truckai et al. | |
| 7,118,564 B2 | 10/2006 | Ritchie et al. | |
| 7,124,932 B2 | 10/2006 | Isaacson et al. | |
| 7,125,409 B2 | 10/2006 | Truckai et al. | |
| 7,135,018 B2 | 11/2006 | Ryan et al. | |
| 7,135,030 B2 | 11/2006 | Schwemberger et al. | |
| 7,153,315 B2 | 12/2006 | Miller | |
| D536,093 S * | 1/2007 | Nakajima et al. | D24/138 |
| 7,156,189 B1 | 1/2007 | Bar-Cohen et al. | |
| 7,156,853 B2 | 1/2007 | Muratsu | |
| 7,157,058 B2 | 1/2007 | Marhasin et al. | |
| 7,159,750 B2 | 1/2007 | Racenet et al. | |
| 7,163,548 B2 | 1/2007 | Stulen et al. | |
| 7,169,146 B2 | 1/2007 | Truckai et al. | |
| 7,179,271 B2 | 2/2007 | Friedman et al. | |
| 7,186,253 B2 | 3/2007 | Truckai et al. | |
| 7,189,233 B2 | 3/2007 | Truckai et al. | |
| 7,204,820 B2 | 4/2007 | Akahoshi | |
| 7,220,951 B2 | 5/2007 | Truckai et al. | |
| 7,223,229 B2 | 5/2007 | Inman et al. | |
| 7,229,455 B2 | 6/2007 | Sakurai et al. | |
| 7,273,483 B2 | 9/2007 | Wiener et al. | |
| 7,309,849 B2 | 12/2007 | Truckai et al. | |
| 7,311,709 B2 | 12/2007 | Truckai et al. | |
| 7,317,955 B2 | 1/2008 | McGreevy | |
| 7,326,236 B2 | 2/2008 | Andreas et al. | |
| 7,331,410 B2 | 2/2008 | Yong et al. | |
| 7,353,068 B2 | 4/2008 | Tanaka et al. | |
| 7,354,440 B2 | 4/2008 | Truckai et al. | |
| 7,380,695 B2 | 6/2008 | Doll et al. | |
| 7,381,209 B2 | 6/2008 | Truckai et al. | |
| 7,390,317 B2 | 6/2008 | Taylor et al. | |
| 7,408,288 B2 | 8/2008 | Hara | |
| D576,725 S | 9/2008 | Shumer et al. | |
| D578,643 S | 10/2008 | Shumer et al. | |
| D578,644 S | 10/2008 | Shumer et al. | |
| D578,645 S | 10/2008 | Shumer et al. | |
| 7,431,704 B2 | 10/2008 | Babaev | |
| 7,472,815 B2 | 1/2009 | Shelton, IV et al. | |
| 7,479,148 B2 | 1/2009 | Beaupre | |
| 7,479,160 B2 | 1/2009 | Branch et al. | |
| 7,494,468 B2 | 2/2009 | Rabiner et al. | |
| 7,503,893 B2 | 3/2009 | Kucklick | |
| 7,534,243 B1 | 5/2009 | Chin et al. | |
| D594,983 S * | 6/2009 | Price et al. | D24/145 |
| 7,567,012 B2 | 7/2009 | Namikawa | |
| D618,797 S | 6/2010 | Price et al. | |
| 7,751,115 B2 | 7/2010 | Song | |
| 7,770,774 B2 | 8/2010 | Mastri et al. | |
| 7,780,659 B2 | 8/2010 | Okada et al. | |
| D631,155 S * | 1/2011 | Peine et al. | D24/133 |
| 7,876,030 B2 | 1/2011 | Taki et al. | |
| D631,965 S * | 2/2011 | Price et al. | D24/145 |
| 7,892,606 B2 | 2/2011 | Thies et al. | |
| 7,901,423 B2 | 3/2011 | Stulen et al. | |
| 7,959,050 B2 | 6/2011 | Smith et al. | |
| 7,959,626 B2 | 6/2011 | Hong et al. | |
| 7,976,544 B2 | 7/2011 | McClurken et al. | |
| 8,057,498 B2 | 11/2011 | Robertson | |
| 8,058,771 B2 | 11/2011 | Giordano et al. | |
| 2001/0025184 A1 | 9/2001 | Messerly | |
| 2001/0031950 A1 | 10/2001 | Ryan | |
| 2001/0039419 A1 | 11/2001 | Francischelli et al. | |
| 2002/0002377 A1 | 1/2002 | Cimino | |
| 2002/0019649 A1 | 2/2002 | Sikora et al. | |
| 2002/0022836 A1 | 2/2002 | Goble et al. | |
| 2002/0077550 A1 | 6/2002 | Rabiner et al. | |
| 2002/0156493 A1 | 10/2002 | Houser et al. | |
| 2003/0055443 A1 | 3/2003 | Spotnitz | |
| 2003/0204199 A1 | 10/2003 | Novak et al. | |
| 2003/0212332 A1 | 11/2003 | Fenton et al. | |
| 2004/0030254 A1 | 2/2004 | Babaev | |
| 2004/0047485 A1 | 3/2004 | Sherrit et al. | |
| 2004/0092921 A1 | 5/2004 | Kadziauskas et al. | |
| 2004/0097919 A1 | 5/2004 | Wellman et al. | |
| 2004/0097996 A1 | 5/2004 | Rabiner et al. | |
| 2004/0199193 A1 | 10/2004 | Hayashi et al. | |
| 2004/0204728 A1 | 10/2004 | Haefner | |
| 2004/0243157 A1 | 12/2004 | Connor et al. | |
| 2004/0260300 A1 | 12/2004 | Gorensek et al. | |
| 2005/0033337 A1 | 2/2005 | Muir et al. | |
| 2005/0049546 A1 | 3/2005 | Messerly et al. | |
| 2005/0143769 A1 | 6/2005 | White et al. | |
| 2005/0149108 A1 | 7/2005 | Cox | |
| 2005/0165345 A1 | 7/2005 | Laufer et al. | |
| 2005/0177184 A1 | 8/2005 | Easley | |
| 2005/0192610 A1 | 9/2005 | Houser et al. | |
| 2005/0209620 A1 | 9/2005 | Du et al. | |
| 2005/0261581 A1 | 11/2005 | Hughes et al. | |
| 2005/0261588 A1 | 11/2005 | Makin et al. | |
| 2005/0288659 A1 | 12/2005 | Kimura et al. | |
| 2006/0030797 A1 | 2/2006 | Zhou et al. | |
| 2006/0063130 A1 | 3/2006 | Hayman et al. | |
| 2006/0079878 A1 | 4/2006 | Houser | |
| 2006/0084963 A1 | 4/2006 | Messerly | |
| 2006/0190034 A1 | 8/2006 | Nishizawa et al. | |
| 2006/0211943 A1 | 9/2006 | Beaupre | |
| 2006/0235306 A1 | 10/2006 | Cotter et al. | |
| 2006/0253050 A1 | 11/2006 | Yoshimine et al. | |
| 2007/0016235 A1 | 1/2007 | Tanaka et al. | |
| 2007/0016236 A1 | 1/2007 | Beaupre | |
| 2007/0055228 A1 | 3/2007 | Berg et al. | |
| 2007/0060915 A1 | 3/2007 | Kucklick | |

**US D661,801 S**

Page 4

| | | | |
|---|---|---|---|
| 2007/0063618 | A1 | 3/2007 | Bromfield |
| 2007/0129716 | A1 | 6/2007 | Daw et al. |
| 2007/0130771 | A1 | 6/2007 | Ehlert et al. |
| 2007/0131034 | A1 | 6/2007 | Ehlert et al. |
| 2007/0149881 | A1 | 6/2007 | Rabin |
| 2007/0162050 | A1 | 7/2007 | Sartor |
| 2007/0173872 | A1 | 7/2007 | Neuenfeldt |
| 2007/0185380 | A1 | 8/2007 | Kucklick |
| 2007/0219481 | A1 | 9/2007 | Babaev |
| 2007/0249941 | A1 | 10/2007 | Salehi et al. |
| 2007/0260234 | A1 | 11/2007 | McCullagh et al. |
| 2007/0265560 | A1 | 11/2007 | Soltani et al. |
| 2007/0275348 | A1 | 11/2007 | Lemon |
| 2007/0282335 | A1 | 12/2007 | Young et al. |
| 2007/0287933 | A1 | 12/2007 | Phan et al. |
| 2008/0009848 | A1 | 1/2008 | Paraschiv et al. |
| 2008/0058585 | A1 | 3/2008 | Novak et al. |
| 2008/0058775 | A1 | 3/2008 | Darian et al. |
| 2008/0058845 | A1 | 3/2008 | Shimizu et al. |
| 2008/0082039 | A1 | 4/2008 | Babaev |
| 2008/0082098 | A1 | 4/2008 | Tanaka et al. |
| 2008/0172051 | A1 | 7/2008 | Masuda et al. |
| 2008/0177268 | A1 | 7/2008 | Daum et al. |
| 2008/0188878 | A1 | 8/2008 | Young |
| 2008/0200940 | A1 | 8/2008 | Eichmann et al. |
| 2008/0208231 | A1 | 8/2008 | Ota et al. |
| 2008/0234708 | A1 | 9/2008 | Houser et al. |
| 2008/0234709 | A1 | 9/2008 | Houser |
| 2008/0234710 | A1 | 9/2008 | Neurohr et al. |
| 2008/0234711 | A1 | 9/2008 | Houser et al. |
| 2008/0262490 | A1 | 10/2008 | Williams |
| 2008/0281200 | A1 | 11/2008 | Voic et al. |
| 2008/0287948 | A1 | 11/2008 | Newton et al. |
| 2009/0030311 | A1 | 1/2009 | Stulen et al. |
| 2009/0030351 | A1 | 1/2009 | Wiener et al. |
| 2009/0030437 | A1 | 1/2009 | Houser et al. |
| 2009/0030438 | A1 | 1/2009 | Stulen |
| 2009/0030439 | A1 | 1/2009 | Stulen |
| 2009/0036911 | A1 | 2/2009 | Stulen |
| 2009/0036912 | A1 | 2/2009 | Wiener et al. |
| 2009/0036913 | A1 | 2/2009 | Wiener et al. |
| 2009/0036914 | A1 | 2/2009 | Houser |
| 2009/0076506 | A1 | 3/2009 | Baker |
| 2009/0082716 | A1 | 3/2009 | Akahoshi |
| 2009/0105750 | A1* | 4/2009 | Price et al. ................... 606/206 |
| 2009/0118802 | A1 | 5/2009 | Mioduski et al. |
| 2009/0143806 | A1 | 6/2009 | Witt et al. |
| 2009/0270853 | A1 | 10/2009 | Yachi et al. |
| 2010/0036370 | A1 | 2/2010 | Mirel et al. |
| 2010/0036405 | A1 | 2/2010 | Giordano et al. |
| 2010/0158307 | A1 | 6/2010 | Kubota et al. |
| 2010/0179577 | A1 | 7/2010 | Houser |
| 2010/0187283 | A1 | 7/2010 | Crainich et al. |
| 2010/0298743 | A1 | 11/2010 | Nield et al. |
| 2010/0298851 | A1 | 11/2010 | Nield |
| 2010/0331869 | A1 | 12/2010 | Voegele et al. |
| 2010/0331870 | A1 | 12/2010 | Wan et al. |
| 2010/0331871 | A1 | 12/2010 | Nield et al. |
| 2010/0331872 | A1 | 12/2010 | Houser et al. |
| 2011/0009850 | A1* | 1/2011 | Main et al. ........................ 606/1 |
| 2011/0015627 | A1 | 1/2011 | DiNardo et al. |
| 2011/0015631 | A1 | 1/2011 | Wiener et al. |
| 2011/0015660 | A1 | 1/2011 | Wiener et al. |
| 2011/0082486 | A1 | 4/2011 | Messerly et al. |
| 2011/0087212 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087213 | A1 | 4/2011 | Messerly et al. |
| 2011/0087214 | A1 | 4/2011 | Giordano et al. |
| 2011/0087215 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087216 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087217 | A1 | 4/2011 | Yates et al. |
| 2011/0087218 | A1* | 4/2011 | Boudreaux et al. ............ 606/45 |
| 2011/0087256 | A1 | 4/2011 | Wiener et al. |
| 2011/0092972 | A1* | 4/2011 | Allen ................................ 606/45 |
| 2011/0125175 | A1 | 5/2011 | Stulen et al. |
| 2011/0196286 | A1 | 8/2011 | Robertson et al. |
| 2011/0196287 | A1 | 8/2011 | Robertson et al. |
| 2011/0196398 | A1 | 8/2011 | Robertson et al. |
| 2011/0196399 | A1 | 8/2011 | Robertson et al. |
| 2011/0196400 | A1 | 8/2011 | Robertson et al. |

| | | | |
|---|---|---|---|
| 2011/0196401 | A1 | 8/2011 | Robertson et al. |
| 2011/0196402 | A1 | 8/2011 | Robertson et al. |
| 2011/0196403 | A1 | 8/2011 | Robertson et al. |
| 2011/0196404 | A1 | 8/2011 | Dietz et al. |
| 2011/0196405 | A1 | 8/2011 | Dietz |
| 2011/0288452 | A1 | 11/2011 | Houser et al. |
| 2012/0029546 | A1 | 2/2012 | Robertson |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1640365 A | 7/2005 |
| CN | 1694669 A | 11/2005 |
| CN | 1922563 A | 2/2007 |
| CN | 101040799 A | 9/2007 |
| EP | 0171967 A2 | 2/1986 |
| EP | 0443256 A1 | 8/1991 |
| EP | 0456470 A1 | 11/1991 |
| EP | 0482195 B1 | 1/1996 |
| EP | 0612570 B1 | 6/1997 |
| EP | 0908148 B1 | 1/2002 |
| EP | 0908155 B1 | 6/2003 |
| EP | 1199044 B1 | 12/2005 |
| EP | 1844250 A1 | 10/2007 |
| EP | 1862133 A1 | 12/2007 |
| EP | 1974771 A1 | 10/2008 |
| EP | 1832259 B1 | 6/2009 |
| EP | 2074959 A1 | 7/2009 |
| GB | 2032221 A | 4/1980 |
| GB | 2447767 B | 8/2011 |
| WO | WO 92/22259 A2 | 12/1992 |
| WO | WO 93/14708 A1 | 8/1993 |
| WO | WO 98/37815 A1 | 9/1998 |
| WO | WO 01/54590 A1 | 8/2001 |
| WO | WO 2005/122917 A1 | 12/2005 |
| WO | WO 2006/042210 A2 | 4/2006 |
| WO | WO 2006/058223 A2 | 6/2006 |
| WO | WO 2006/129465 A1 | 12/2006 |
| WO | WO 2007/047531 A2 | 4/2007 |
| WO | WO 2007/143665 A2 | 12/2007 |
| WO | WO 2008/016886 A2 | 2/2008 |
| WO | WO 2008/130793 A1 | 10/2008 |
| WO | WO 2009/018406 A2 | 2/2009 |
| WO | WO 2009/027065 A1 | 3/2009 |

OTHER PUBLICATIONS

Sherrit et al., "Novel Horn Designs for Ultrasonic/Sonic Cleaning Welding, Soldering, Cutting and Drilling," Proc. SPIE Smart Structures Conference, vol. 4701, Paper No. 34, San Diego, CA, pp. 353-360, Mar. 2002.

AST Products, Inc., "Principles of Video Contact Angle Analysis," 20 pages, (2006).

Lim et al., "A Review of Mechanism Used in Laparoscopic Surgical Instruments," Mechanism and Machine Theory, vol. 38, pp. 1133-1147, (2003).

Gooch et al., "Recommended Infection-Control Practices for Dentistry, 1993," Published: May 28, 1993; [retrieved on Aug. 23, 2008]. Retrieved from the internet: URL: http://wonder.cdc.gov/wonder/prevguid/p0000191/p0000191.asp (15 pages).

Huston et al., "Magnetic and Magnetostrictive Properties of Cube Textured Nickel for Magnetostrictive Transducer Applications," IEEE Transactions on Magnetics, vol. 9(4), pp. 636-640 (Dec. 1973).

Incropera et al., Fundamentals of Heat and Mass Transfer, Wiley, New York (1990). (Book—not attached).

F. A. Duck, "Optical Properties of Tissue Including Ultraviolet and Infrared Radiation," pp. 43-71 in Physical Properties of Tissue (1990).

Orr et al., "Overview of Bioheat Transfer," pp. 367-384 in Optical-Thermal Response of Laser-Irradiated Tissue, A. J. Welch and M. J. C. van Gemert, eds., Plenum, New York (1995).

Campbell et al., "Thermal Imaging in Surgery," p. 19-3, in Medical Infrared Imaging, N. A. Diakides and J. D. Bronzino, Eds. (2008).

U.S. Appl. No. 12/896,351, filed Oct. 1, 2010.

U.S. Appl. No. 12/896,411, filed Oct. 1, 2010.

U.S. Appl. No. 12/896,420, filed Oct. 1, 2010.

U.S. Appl. No. 13/270,459, filed Oct. 11, 2011.

U.S. Appl. No. 13/251,766, filed Oct. 3, 2011.

**US D661,801 S**

Page 5

U.S. Appl. No. 29/404,676, filed Oct. 24, 2011.
U.S. Appl. No. 13/296,829, filed Nov. 15, 2011.
Partial International Search Report for PCT/US2008/078645, Mar. 10, 2009 (2 pages).
International Preliminary Report on Patentability for PCT/US2008/078645, Apr. 15, 2010 (9 pages).

U.S. Appl. No. 29/402,699, filed Sep. 26, 2011.
U.S. Appl. No. 29/402,700, filed Sep. 26, 2011.
U.S. Appl. No. 29/402,701, filed Sep. 26, 2011.

* cited by examiner

Case: 14-1370 CASE PARTICIPANTS ONLY Document: 24 Page: 254 Filed: 07/21/2014



FIG. 1

A0186



FIG. 3

FIG. 2



FIG. 7

FIG. 6

FIG. 4

FIG. 5

US00D661802S

## (12) United States Design Patent
Price et al.

(10) Patent No.: **US D661,802 S**
(45) Date of Patent: ** **Jun. 12, 2012**

(54) **USER INTERFACE FOR A SURGICAL INSTRUMENT**

(75) Inventors: **Daniel W. Price**, Loveland, OH (US); **Galen C. Robertson**, Cincinnati, OH (US); **Cory G. Kimball**, Cincinnati, OH (US); **Scott A. Woodruff**, Cincinnati, OH (US); **Matthew C. Miller**, Cincinnati, OH (US); **Carrie I. Fihe**, Cincinnati, OH (US); **Carl J. Draginoff, Jr.**, Mason, OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, OH (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/402,699**

(22) Filed: **Sep. 26, 2011**

### Related U.S. Application Data

(63) Continuation of application No. 12/245,158, filed on Oct. 3, 2008.

(51) LOC (9) Cl. ................................. **24-02**
(52) U.S. Cl. ..................................... **D24/145**; D24/133
(58) Field of Classification Search .............. D24/133, D24/143–149; 606/1, 45, 52, 51, 142–145, 606/167, 170–171, 205–207, 34
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,736,960 A | 3/1956 | Armstrong | |
| 2,849,788 A | 9/1958 | Creek | |
| 3,015,961 A | 1/1962 | Roney | |
| 3,513,848 A | 5/1970 | Winston et al. | |
| 3,526,219 A | 9/1970 | Balamuth | |
| 3,614,484 A | 10/1971 | Shoh | |
| 3,636,943 A | 1/1972 | Balamuth | |
| 3,776,238 A | 12/1973 | Peyman et al. | |
| 3,805,787 A | 4/1974 | Banko | |
| 3,862,630 A | 1/1975 | Balamuth | |
| 3,900,823 A | 8/1975 | Sokal et al. | |
| 3,918,442 A | 11/1975 | Nikolaev et al. | |
| 3,946,738 A | 3/1976 | Newton et al. | |
| 3,955,859 A | 5/1976 | Stella et al. | |
| 3,956,826 A | 5/1976 | Perdreaux, Jr. | |
| 4,156,187 A | 5/1979 | Murry et al. | |
| 4,188,927 A | 2/1980 | Harris | |
| 4,200,106 A | 4/1980 | Douvas et al. | |
| 4,445,063 A | 4/1984 | Smith | |
| 4,491,132 A | 1/1985 | Aikins | |
| 4,574,615 A | 3/1986 | Bower et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

CN 1634601 A 7/2005

(Continued)

OTHER PUBLICATIONS

*Technology Overview*, printed from www.harmonicscalpel.com, Internet site, website accessed on Jun. 13, 2007, (3 pages).

(Continued)

*Primary Examiner* — Wan Laymon
(74) *Attorney, Agent, or Firm* — Verne E. Kreger, Jr.

(57) **CLAIM**
The ornamental design for a user interface for a surgical instrument, as shown and described.

**DESCRIPTION**

FIG. 1 is a left perspective view of a user interface for a surgical instrument showing our design.
FIG. 2 is a left side view thereof.
FIG. 3 is a right side view thereof.
FIG. 4 is a top view thereof.
FIG. 5 is a bottom view thereof.
FIG. 6 is a front view thereof; and,
FIG. 7 is a rear view thereof.
Portions of the user interface for a surgical instrument shown in broken lines form no part of the claimed design.

**1 Claim, 3 Drawing Sheets**



U.S. PATENT DOCUMENTS

4,617,927 A 10/1986 Manes
4,633,119 A 12/1986 Thompson
4,634,420 A 1/1987 Spinosa et al.
4,640,279 A 2/1987 Beard
4,708,127 A 11/1987 Abdelghani
4,712,722 A 12/1987 Hood et al.
4,827,911 A 5/1989 Broadwin et al.
4,832,683 A 5/1989 Idemoto et al.
4,838,853 A 6/1989 Parisi
4,850,354 A 7/1989 McGurk-Burleson et al.
4,865,159 A 9/1989 Jamison
4,896,009 A 1/1990 Pawlowski
4,922,902 A 5/1990 Wuchinich et al.
4,965,532 A 10/1990 Sakurai
4,981,756 A 1/1991 Rhandhawa
5,026,387 A 6/1991 Thomas
5,112,300 A 5/1992 Ureche
5,123,903 A 6/1992 Quaid et al.
5,126,618 A 6/1992 Takahashi et al.
5,162,044 A 11/1992 Gahn et al.
5,167,725 A 12/1992 Clark et al.
D332,660 S 1/1993 Rawson et al.
5,176,695 A 1/1993 Dulebohn
5,184,605 A 2/1993 Grzeszykowski
5,213,569 A 5/1993 Davis
5,221,282 A 6/1993 Wuchinich
5,226,910 A 7/1993 Kajiyama et al.
5,241,236 A 8/1993 Sasaki et al.
5,257,988 A 11/1993 L'Esperance, Jr.
5,261,922 A 11/1993 Hood
5,263,957 A 11/1993 Davison
5,275,609 A 1/1994 Pingleton et al.
5,282,800 A 2/1994 Foshee et al.
5,304,115 A 4/1994 Pflueger et al.
D347,474 S 5/1994 Olson
5,322,055 A 6/1994 Davison et al.
5,324,299 A 6/1994 Davison et al.
5,344,420 A 9/1994 Hilal et al.
5,346,502 A 9/1994 Estabrook et al.
5,366,466 A 11/1994 Christian et al.
D354,564 S 1/1995 Medema
5,381,067 A 1/1995 Greenstein et al.
5,403,312 A 4/1995 Yates et al.
5,411,481 A 5/1995 Allen et al.
5,419,761 A 5/1995 Narayanan et al.
5,421,829 A 6/1995 Olichney et al.
5,449,370 A 9/1995 Vaitekunas
5,483,501 A 1/1996 Park et al.
5,486,162 A 1/1996 Brumbach
5,500,216 A 3/1996 Julian et al.
5,501,654 A 3/1996 Failla et al.
5,505,693 A 4/1996 Mackool
5,562,609 A 10/1996 Brumbach
5,562,610 A 10/1996 Brumbach
5,601,601 A 2/1997 Tal et al.
5,607,436 A 3/1997 Pratt et al.
5,618,492 A 4/1997 Auten et al.
5,628,760 A 5/1997 Knoepfler
5,630,420 A 5/1997 Vaitekunas
D381,077 S 7/1997 Hunt
5,651,780 A 7/1997 Jackson et al.
5,653,713 A 8/1997 Michelson
5,669,922 A 9/1997 Hood
5,674,235 A 10/1997 Parisi
5,690,269 A 11/1997 Bolanos et al.
5,694,936 A 12/1997 Fujimoto et al.
5,713,896 A 2/1998 Nardella
5,733,074 A 3/1998 Stöck et al.
5,741,226 A 4/1998 Strukel et al.
5,810,859 A 9/1998 DiMatteo et al.
5,827,323 A 10/1998 Klieman et al.
5,828,160 A 10/1998 Sugishita
5,843,109 A 12/1998 Mehta et al.
5,879,364 A 3/1999 Bromfield et al.
5,893,835 A 4/1999 Witt et al.
5,897,569 A 4/1999 Kellogg et al.
5,935,143 A 8/1999 Hood
5,935,144 A 8/1999 Estabrook
5,938,633 A 8/1999 Beaupre
5,944,718 A 8/1999 Austin et al.
5,944,737 A 8/1999 Tsonton et al.
5,954,736 A 9/1999 Bishop et al.
5,954,746 A 9/1999 Holthaus et al.
5,957,882 A 9/1999 Nita et al.
5,957,943 A 9/1999 Vaitekunas
5,968,007 A 10/1999 Simon et al.
5,968,060 A 10/1999 Kellogg
D416,089 S 11/1999 Barton et al.
5,980,510 A 11/1999 Tsonton et al.
5,989,274 A 11/1999 Davison et al.
5,989,275 A 11/1999 Estabrook et al.
5,993,972 A 11/1999 Reich et al.
6,024,741 A 2/2000 Williamson, IV et al.
6,033,375 A 3/2000 Brumbach
6,063,098 A 5/2000 Houser et al.
6,066,132 A 5/2000 Chen et al.
6,068,647 A 5/2000 Witt et al.
6,077,285 A 6/2000 Boukhny
6,083,191 A 7/2000 Rose
6,086,584 A 7/2000 Miller
6,090,120 A 7/2000 Wright et al.
6,109,500 A 8/2000 Alli et al.
6,110,127 A 8/2000 Suzuki
6,113,594 A 9/2000 Savage
6,139,320 A 10/2000 Hahn
6,152,902 A 11/2000 Christian et al.
6,159,160 A 12/2000 Hsei et al.
6,159,175 A 12/2000 Strukel et al.
6,204,592 B1 3/2001 Hur
6,206,844 B1 3/2001 Reichel et al.
6,210,403 B1 4/2001 Klicek
6,214,023 B1 4/2001 Whipple et al.
6,233,476 B1 5/2001 Strommer et al.
6,238,366 B1 5/2001 Savage et al.
D444,365 S 7/2001 Bass et al.
6,254,623 B1 7/2001 Haibel, Jr. et al.
6,258,034 B1 7/2001 Hanafy
6,267,761 B1 7/2001 Ryan
6,270,831 B2 8/2001 Kumar et al.
6,273,852 B1 8/2001 Lehe et al.
6,274,963 B1 8/2001 Estabrook et al.
6,277,115 B1 8/2001 Saadat
6,278,218 B1 8/2001 Madan et al.
6,283,981 B1 9/2001 Beaupre
6,309,400 B2 10/2001 Beaupre
6,319,221 B1 11/2001 Savage et al.
6,325,811 B1 12/2001 Messerly
6,328,751 B1 12/2001 Beaupre
6,352,532 B1 3/2002 Kramer et al.
6,379,320 B1 4/2002 Lafon et al.
D457,958 S * 5/2002 Dycus et al. ................ D24/144
6,383,194 B1 5/2002 Pothula
6,387,109 B1 5/2002 Davison et al.
6,388,657 B1 5/2002 Natoli
6,391,042 B1 5/2002 Cimino
6,405,733 B1 6/2002 Fogarty et al.
6,416,486 B1 7/2002 Wampler
6,423,073 B2 7/2002 Bowman
6,423,082 B1 7/2002 Houser et al.
6,432,118 B1 8/2002 Messerly
6,436,114 B1 8/2002 Novak et al.
6,436,115 B1 8/2002 Beaupre
6,443,969 B1 9/2002 Novak et al.
6,454,781 B1 9/2002 Witt et al.
6,454,782 B1 9/2002 Schwemberger
6,458,142 B1 10/2002 Faller et al.
6,480,796 B2 11/2002 Wiener
6,485,490 B2 11/2002 Wampler et al.
6,491,708 B2 12/2002 Madan et al.
6,497,715 B2 12/2002 Satou
6,500,176 B1 12/2002 Truckai et al.
6,500,188 B2 12/2002 Harper et al.
6,524,316 B1 2/2003 Nicholson et al.
6,533,784 B2 3/2003 Truckai et al.
6,537,291 B2 3/2003 Friedman et al.
6,543,452 B1 4/2003 Lavigne
6,543,456 B1 4/2003 Freeman

| | | |
|---|---|---|
| 6,544,260 | B1 | 4/2003 | Markel et al. |
| 6,561,983 | B2 | 5/2003 | Cronin et al. |
| 6,572,632 | B2 | 6/2003 | Zisterer et al. |
| 6,575,969 | B1 | 6/2003 | Rittman, III et al. |
| 6,582,451 | B1 | 6/2003 | Marucci et al. |
| 6,589,200 | B1 | 7/2003 | Schwemberger et al. |
| 6,589,239 | B2 | 7/2003 | Khandkar et al. |
| 6,616,450 | B2 | 9/2003 | Mossle et al. |
| 6,623,501 | B2 | 9/2003 | Heller et al. |
| 6,626,926 | B2 | 9/2003 | Friedman et al. |
| 6,633,234 | B2 | 10/2003 | Wiener et al. |
| 6,656,177 | B2 | 12/2003 | Truckai et al. |
| 6,662,127 | B2 | 12/2003 | Wiener et al. |
| 6,663,941 | B2 | 12/2003 | Brown et al. |
| 6,676,660 | B2 | 1/2004 | Wampler et al. |
| 6,678,621 | B2 | 1/2004 | Wiener et al. |
| 6,679,899 | B2 | 1/2004 | Wiener et al. |
| 6,682,544 | B2 | 1/2004 | Mastri et al. |
| 6,716,215 | B1 | 4/2004 | David et al. |
| 6,731,047 | B2 | 5/2004 | Kauf et al. |
| 6,733,506 | B1 | 5/2004 | McDevitt et al. |
| 6,762,535 | B2 | 7/2004 | Take et al. |
| 6,770,072 | B1 | 8/2004 | Truckai et al. |
| 6,773,444 | B2 | 8/2004 | Messerly |
| 6,786,382 | B1 | 9/2004 | Hoffman |
| 6,786,383 | B2 | 9/2004 | Stegelmann |
| 6,790,216 | B1 | 9/2004 | Ishikawa |
| 6,802,843 | B2 | 10/2004 | Truckai et al. |
| 6,828,712 | B2 | 12/2004 | Battaglin et al. |
| 6,869,439 | B2 | 3/2005 | White et al. |
| 6,875,220 | B2 | 4/2005 | Du et al. |
| 6,905,497 | B2 | 6/2005 | Truckai et al. |
| 6,908,472 | B2 | 6/2005 | Wiener et al. |
| 6,913,579 | B2 | 7/2005 | Truckai et al. |
| 6,926,716 | B2 | 8/2005 | Baker et al. |
| 6,929,632 | B2 | 8/2005 | Nita et al. |
| 6,929,644 | B2 | 8/2005 | Truckai et al. |
| D509,589 | S | 9/2005 | Wells |
| 6,945,981 | B2 | 9/2005 | Donofrio et al. |
| D511,145 | S | 11/2005 | Donofrio et al. |
| 6,976,844 | B2 | 12/2005 | Hickok et al. |
| 6,976,969 | B2 | 12/2005 | Messerly |
| 6,977,495 | B2 | 12/2005 | Donofrio |
| 6,984,220 | B2 | 1/2006 | Wuchinich |
| 7,011,657 | B2 | 3/2006 | Truckai et al. |
| 7,041,083 | B2 | 5/2006 | Chu et al. |
| 7,041,088 | B2 | 5/2006 | Nawrocki et al. |
| 7,041,102 | B2 | 5/2006 | Truckai et al. |
| 7,070,597 | B2 | 7/2006 | Truckai et al. |
| 7,074,219 | B2 | 7/2006 | Levine et al. |
| 7,077,039 | B2 | 7/2006 | Gass et al. |
| 7,077,853 | B2 | 7/2006 | Kramer et al. |
| 7,083,619 | B2 | 8/2006 | Truckai et al. |
| 7,087,054 | B2 | 8/2006 | Truckai et al. |
| 7,108,695 | B2 | 9/2006 | Witt et al. |
| 7,112,201 | B2 | 9/2006 | Truckai et al. |
| 7,118,564 | B2 | 10/2006 | Ritchie et al. |
| 7,124,932 | B2 | 10/2006 | Isaacson et al. |
| 7,125,409 | B2 | 10/2006 | Truckai et al. |
| 7,135,018 | B2 | 11/2006 | Ryan et al. |
| 7,135,030 | B2 | 11/2006 | Schwemberger et al. |
| 7,153,315 | B2 | 12/2006 | Miller |
| D536,093 | S * | 1/2007 | Nakajima et al. ............ D24/138 |
| 7,156,189 | B1 | 1/2007 | Bar-Cohen et al. |
| 7,156,853 | B2 | 1/2007 | Muratsu |
| 7,157,058 | B2 | 1/2007 | Marhasin et al. |
| 7,159,750 | B2 | 1/2007 | Racenet et al. |
| 7,163,548 | B2 | 1/2007 | Stulen et al. |
| 7,169,146 | B2 | 1/2007 | Truckai et al. |
| 7,179,271 | B2 | 2/2007 | Friedman et al. |
| 7,186,253 | B2 | 3/2007 | Truckai et al. |
| 7,189,233 | B2 | 3/2007 | Truckai et al. |
| 7,204,820 | B2 | 4/2007 | Akahoshi |
| 7,220,951 | B2 | 5/2007 | Truckai et al. |
| 7,223,229 | B2 | 5/2007 | Inman et al. |
| 7,229,455 | B2 | 6/2007 | Sakurai et al. |
| 7,273,483 | B2 | 9/2007 | Wiener et al. |
| 7,309,849 | B2 | 12/2007 | Truckai et al. |
| 7,311,709 | B2 | 12/2007 | Truckai et al. |
| 7,317,955 | B2 | 1/2008 | McGreevy |
| 7,326,236 | B2 | 2/2008 | Andreas et al. |
| 7,331,410 | B2 | 2/2008 | Yong et al. |
| 7,353,068 | B2 | 4/2008 | Tanaka et al. |
| 7,354,440 | B2 | 4/2008 | Truckai et al. |
| 7,380,695 | B2 | 6/2008 | Doll et al. |
| 7,381,209 | B2 | 6/2008 | Truckai et al. |
| 7,390,317 | B2 | 6/2008 | Taylor et al. |
| 7,408,288 | B2 | 8/2008 | Hara |
| D576,725 | S | 9/2008 | Shumer et al. |
| D578,643 | S | 10/2008 | Shumer et al. |
| D578,644 | S | 10/2008 | Shumer et al. |
| D578,645 | S | 10/2008 | Shumer et al. |
| 7,431,704 | B2 | 10/2008 | Babaev |
| 7,472,815 | B2 | 1/2009 | Shelton, IV et al. |
| 7,479,148 | B2 | 1/2009 | Beaupre |
| 7,479,160 | B2 | 1/2009 | Branch et al. |
| 7,494,468 | B2 | 2/2009 | Rabiner et al. |
| 7,503,893 | B2 | 3/2009 | Kucklick |
| 7,534,243 | B1 | 5/2009 | Chin et al. |
| D594,983 | S * | 6/2009 | Price et al. .................. D24/145 |
| 7,567,012 | B2 | 7/2009 | Namikawa |
| D618,797 | S | 6/2010 | Price et al. |
| 7,751,115 | B2 | 7/2010 | Song |
| 7,770,774 | B2 | 8/2010 | Mastri et al. |
| 7,780,659 | B2 | 8/2010 | Okada et al. |
| D631,155 | S * | 1/2011 | Peine et al. .............. D24/133 |
| 7,876,030 | B2 | 1/2011 | Taki et al. |
| D631,965 | S * | 2/2011 | Price et al. .................. D24/145 |
| 7,892,606 | B2 | 2/2011 | Thies et al. |
| 7,901,423 | B2 | 3/2011 | Stulen et al. |
| 7,959,050 | B2 | 6/2011 | Smith et al. |
| 7,959,626 | B2 | 6/2011 | Hong et al. |
| 7,976,544 | B2 | 7/2011 | McClurken et al. |
| 8,057,498 | B2 | 11/2011 | Robertson |
| 8,058,771 | B2 | 11/2011 | Giordano et al. |
| 2001/0025184 | A1 | 9/2001 | Messerly |
| 2001/0031950 | A1 | 10/2001 | Ryan |
| 2001/0039419 | A1 | 11/2001 | Francischelli et al. |
| 2002/0002377 | A1 | 1/2002 | Cimino |
| 2002/0019649 | A1 | 2/2002 | Sikora et al. |
| 2002/0022836 | A1 | 2/2002 | Goble et al. |
| 2002/0077550 | A1 | 6/2002 | Rabiner et al. |
| 2002/0165493 | A1 | 10/2002 | Houser et al. |
| 2003/0055643 | A1 | 3/2003 | Spotnitz |
| 2003/0204199 | A1 | 10/2003 | Novak et al. |
| 2003/0212332 | A1 | 11/2003 | Fenton et al. |
| 2004/0030254 | A1 | 2/2004 | Babaev |
| 2004/0047485 | A1 | 3/2004 | Sherrit et al. |
| 2004/0092921 | A1 | 5/2004 | Kadziauskas et al. |
| 2004/0097919 | A1 | 5/2004 | Wellman et al. |
| 2004/0097996 | A1 | 5/2004 | Rabiner et al. |
| 2004/0199193 | A1 | 10/2004 | Hayashi et al. |
| 2004/0204728 | A1 | 10/2004 | Haefner |
| 2004/0243157 | A1 | 12/2004 | Connor et al. |
| 2004/0260300 | A1 | 12/2004 | Gorensek et al. |
| 2005/0033337 | A1 | 2/2005 | Muir et al. |
| 2005/0049546 | A1 | 3/2005 | Messerly et al. |
| 2005/0143769 | A1 | 6/2005 | White et al. |
| 2005/0149108 | A1 | 7/2005 | Cox |
| 2005/0165345 | A1 | 7/2005 | Laufer et al. |
| 2005/0177184 | A1 | 8/2005 | Easley |
| 2005/0192610 | A1 | 9/2005 | Houser et al. |
| 2005/0209620 | A1 | 9/2005 | Du et al. |
| 2005/0261581 | A1 | 11/2005 | Hughes et al. |
| 2005/0261588 | A1 | 11/2005 | Makin et al. |
| 2005/0288659 | A1 | 12/2005 | Kimura et al. |
| 2006/0030797 | A1 | 2/2006 | Zhou et al. |
| 2006/0063130 | A1 | 3/2006 | Hayman et al. |
| 2006/0079878 | A1 | 4/2006 | Houser |
| 2006/0084963 | A1 | 4/2006 | Messerly |
| 2006/0190034 | A1 | 8/2006 | Nishizawa et al. |
| 2006/0211943 | A1 | 9/2006 | Beaupre |
| 2006/0235306 | A1 | 10/2006 | Cotter et al. |
| 2006/0253050 | A1 | 11/2006 | Yoshimine et al. |
| 2007/0016235 | A1 | 1/2007 | Tanaka et al. |
| 2007/0016236 | A1 | 1/2007 | Beaupre |
| 2007/0055228 | A1 | 3/2007 | Berg et al. |
| 2007/0060915 | A1 | 3/2007 | Kucklick |

US D661,802 S

Page 4

| | | | |
|---|---|---|---|
| 2007/0063618 | A1 | 3/2007 | Bromfield |
| 2007/0129716 | A1 | 6/2007 | Daw et al. |
| 2007/0130771 | A1 | 6/2007 | Ehlert et al. |
| 2007/0131034 | A1 | 6/2007 | Ehlert et al. |
| 2007/0149881 | A1 | 6/2007 | Rabin |
| 2007/0162050 | A1 | 7/2007 | Sartor |
| 2007/0173872 | A1 | 7/2007 | Neuenfeldt |
| 2007/0185380 | A1 | 8/2007 | Kucklick |
| 2007/0219481 | A1 | 9/2007 | Babaev |
| 2007/0249941 | A1 | 10/2007 | Salehi et al. |
| 2007/0260234 | A1 | 11/2007 | McCullagh et al. |
| 2007/0265560 | A1 | 11/2007 | Soltani et al. |
| 2007/0275348 | A1 | 11/2007 | Lemon |
| 2007/0282335 | A1 | 12/2007 | Young et al. |
| 2007/0287933 | A1 | 12/2007 | Phan et al. |
| 2008/0009848 | A1 | 1/2008 | Paraschiv et al. |
| 2008/0058585 | A1 | 3/2008 | Novak et al. |
| 2008/0058775 | A1 | 3/2008 | Darian et al. |
| 2008/0058845 | A1 | 3/2008 | Shimizu et al. |
| 2008/0082039 | A1 | 4/2008 | Babaev |
| 2008/0082098 | A1 | 4/2008 | Tanaka et al. |
| 2008/0172051 | A1 | 7/2008 | Masuda et al. |
| 2008/0177268 | A1 | 7/2008 | Daum et al. |
| 2008/0188878 | A1 | 8/2008 | Young |
| 2008/0200940 | A1 | 8/2008 | Eichmann et al. |
| 2008/0208231 | A1 | 8/2008 | Ota et al. |
| 2008/0234708 | A1 | 9/2008 | Houser et al. |
| 2008/0234709 | A1 | 9/2008 | Houser |
| 2008/0234710 | A1 | 9/2008 | Neurohr et al. |
| 2008/0234711 | A1 | 9/2008 | Houser et al. |
| 2008/0262490 | A1 | 10/2008 | Williams |
| 2008/0281200 | A1 | 11/2008 | Voic et al. |
| 2008/0287948 | A1 | 11/2008 | Newton et al. |
| 2009/0030311 | A1 | 1/2009 | Stulen et al. |
| 2009/0030351 | A1 | 1/2009 | Wiener et al. |
| 2009/0030437 | A1 | 1/2009 | Houser et al. |
| 2009/0030438 | A1 | 1/2009 | Stulen |
| 2009/0030439 | A1 | 1/2009 | Stulen |
| 2009/0036911 | A1 | 2/2009 | Stulen |
| 2009/0036912 | A1 | 2/2009 | Wiener et al. |
| 2009/0036913 | A1 | 2/2009 | Wiener et al. |
| 2009/0036914 | A1 | 2/2009 | Houser |
| 2009/0076506 | A1 | 3/2009 | Baker |
| 2009/0082716 | A1 | 3/2009 | Akahoshi |
| 2009/0105750 | A1* | 4/2009 | Price et al. .................... 606/206 |
| 2009/0118802 | A1 | 5/2009 | Mioduski et al. |
| 2009/0143806 | A1 | 6/2009 | Witt et al. |
| 2009/0270853 | A1 | 10/2009 | Yachi et al. |
| 2010/0036370 | A1 | 2/2010 | Mirel et al. |
| 2010/0036405 | A1 | 2/2010 | Giordano et al. |
| 2010/0158307 | A1 | 6/2010 | Kubota et al. |
| 2010/0179577 | A1 | 7/2010 | Houser |
| 2010/0187283 | A1 | 7/2010 | Crainich et al. |
| 2010/0298743 | A1 | 11/2010 | Nield et al. |
| 2010/0298851 | A1 | 11/2010 | Nield |
| 2010/0331869 | A1 | 12/2010 | Voegele et al. |
| 2010/0331870 | A1 | 12/2010 | Wan et al. |
| 2010/0331871 | A1 | 12/2010 | Nield et al. |
| 2010/0331872 | A1 | 12/2010 | Houser et al. |
| 2011/0009850 | A1* | 1/2011 | Main et al. ......................... 606/1 |
| 2011/0015627 | A1 | 1/2011 | DiNardo et al. |
| 2011/0015631 | A1 | 1/2011 | Wiener et al. |
| 2011/0015660 | A1 | 1/2011 | Wiener et al. |
| 2011/0082486 | A1 | 4/2011 | Messerly et al. |
| 2011/0087212 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087213 | A1 | 4/2011 | Messerly et al. |
| 2011/0087214 | A1 | 4/2011 | Giordano et al. |
| 2011/0087215 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087216 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087217 | A1 | 4/2011 | Yates et al. |
| 2011/0087218 | A1* | 4/2011 | Boudreaux et al. ............ 606/45 |
| 2011/0087256 | A1 | 4/2011 | Wiener et al. |
| 2011/0092972 | A1* | 4/2011 | Allen ............................. 606/45 |
| 2011/0125175 | A1 | 5/2011 | Stulen et al. |
| 2011/0196286 | A1 | 8/2011 | Robertson et al. |
| 2011/0196287 | A1 | 8/2011 | Robertson et al. |
| 2011/0196398 | A1 | 8/2011 | Robertson et al. |
| 2011/0196399 | A1 | 8/2011 | Robertson et al. |
| 2011/0196400 | A1 | 8/2011 | Robertson et al. |

| | | | |
|---|---|---|---|
| 2011/0196401 | A1 | 8/2011 | Robertson et al. |
| 2011/0196402 | A1 | 8/2011 | Robertson et al. |
| 2011/0196403 | A1 | 8/2011 | Robertson et al. |
| 2011/0196404 | A1 | 8/2011 | Dietz et al. |
| 2011/0196405 | A1 | 8/2011 | Dietz |
| 2011/0288452 | A1 | 11/2011 | Houser et al. |
| 2012/0029546 | A1 | 2/2012 | Robertson |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1640365 A | 7/2005 |
| CN | 1694469 A | 11/2005 |
| CN | 1922563 A | 2/2007 |
| CN | 101040799 A | 9/2007 |
| EP | 0171967 A2 | 2/1986 |
| EP | 0443256 A1 | 8/1991 |
| EP | 0456470 A1 | 11/1991 |
| EP | 0482195 B1 | 1/1996 |
| EP | 0612570 B1 | 6/1997 |
| EP | 0908148 B1 | 1/2002 |
| EP | 0908155 B1 | 6/2003 |
| EP | 1199044 B1 | 12/2005 |
| EP | 1844720 A1 | 10/2007 |
| EP | 1862133 A1 | 12/2007 |
| EP | 1974771 A1 | 10/2008 |
| EP | 1832259 B1 | 6/2009 |
| EP | 2074959 A1 | 7/2009 |
| GB | 2032221 A | 4/1980 |
| GB | 2447767 B | 8/2011 |
| WO | WO 92/22259 A2 | 12/1992 |
| WO | WO 93/14708 A1 | 8/1993 |
| WO | WO 98/37815 A1 | 9/1998 |
| WO | WO 01/54590 A1 | 8/2001 |
| WO | WO 2005/122917 A1 | 12/2005 |
| WO | WO 2006/042210 A2 | 4/2006 |
| WO | WO 2006/058223 A2 | 6/2006 |
| WO | WO 2006/129465 A1 | 12/2006 |
| WO | WO 2007/047531 A2 | 4/2007 |
| WO | WO 2007/143665 A2 | 12/2007 |
| WO | WO 2008/016886 A2 | 2/2008 |
| WO | WO 2008/130793 A1 | 10/2008 |
| WO | WO 2009/018406 A2 | 2/2009 |
| WO | WO 2009/027065 A1 | 3/2009 |

OTHER PUBLICATIONS

Sherrit et al., "Novel Horn Designs for Ultrasonic/Sonic Cleaning Welding, Soldering, Cutting and Drilling," Proc. SPIE Smart Structures Conference, vol. 4701, Paper No. 34, San Diego, CA, pp. 353-360, Mar. 2002.

AST Products, Inc., "Principles of Video Contact Angle Analysis," 20 pages, (2006).

Lim et al., "A Review of Mechanism Used in Laparoscopic Surgical Instruments," Mechanism and Machine Theory, vol. 38, pp. 1133-1147, (2003).

Gooch et al., "Recommended Infection-Control Practices for Dentistry, 1993," Published: May 28, 1993; [retrieved on Aug. 23, 2008]. Retrieved from the internet: URL: http://wonder.cdc.gov/wonder/prevguid/p0000191/p0000191.asp (15 pages).

Huston et al., "Magnetic and Magnetostrictive Properties of Cube Textured Nickel for Magnetostrictive Transducer Applications," IEEE Transactions on Magnetics, vol. 9(4), pp. 636-640 (Dec. 1973).

Incropera et al., Fundamentals of Heat and Mass Transfer, Wiley, New York (1990). (Book—not attached).

F. A. Duck, "Optical Properties of Tissue Including Ultraviolet and Infrared Radiation," pp. 43-71 in Physical Properties of Tissue (1990).

Orr et al., "Overview of Bioheat Transfer," pp. 367-384 in Optical-Thermal Response of Laser-Irradiated Tissue, A. J. Welch and M. J. C. van Gemert, eds., Plenum, New York (1995).

Campbell et al., "Thermal Imaging in Surgery," p. 19-3, in Medical Infrared Imaging, N. A. Diakides and J. D. Bronzino, Eds. (2008).

U.S. Appl. No. 12/896,351, filed Oct. 1, 2010.
U.S. Appl. No. 12/896,411, filed Oct. 1, 2010.
U.S. Appl. No. 12/896,420, filed Oct. 1, 2010.
U.S. Appl. No. 13/270,459, filed Oct. 11, 2011.
U.S. Appl. No. 13/251,766, filed Oct. 3, 2011.

**US D661,802 S**

Page 5

U.S. Appl. No. 29/404,676, filed Oct. 24, 2011.
U.S. Appl. No. 13/296,829, filed Nov. 15, 2011.
Partial International Search Report for PCT/US2008/078645, Mar. 10, 2009 (2 pages).
International Preliminary Report on Patentability for PCT/US2008/078645, Apr. 15, 2010 (9 pages).

U.S. Appl. No. 29/402,697, filed Sep. 26, 2011.
U.S. Appl. No. 29/402,700, filed Sep. 26, 2011.
U.S. Appl. No. 29/402,701, filed Sep. 26, 2011.

* cited by examiner



FIG. 1



FIG. 3

FIG. 2



US00D661803S

(12) **United States Design Patent**
Price et al.

(10) Patent No.: **US D661,803 S**
(45) Date of Patent: ** **Jun. 12, 2012**

(54) **USER INTERFACE FOR A SURGICAL INSTRUMENT**

(75) Inventors: **Daniel W. Price**, Loveland, OH (US); **Galen C. Robertson**, Cincinnati, OH (US); **Cory G. Kimball**, Cincinnati, OH (US); **Scott A. Woodruff**, Cincinnati, OH (US); **Matthew C. Miller**, Cincinnati, OH (US); **Carrie I. Fihe**, Cincinnati, OH (US); **Carl J. Draginoff, Jr.**, Mason, OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, OH (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/402,700**

(22) Filed: **Sep. 26, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. 12/245,158, filed on Oct. 3, 2008.

(51) LOC (9) Cl. .................................................. **24-02**
(52) U.S. Cl. ...................................... **D24/145**; D34/133
(58) **Field of Classification Search** ................. D24/133, D24/143–149; 606/1, 45, 52, 51, 142–145, 606/167, 170–171, 205–207, 34
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,736,960 | A | 3/1956 | Armstrong |
| 2,849,788 | A | 9/1958 | Creek |
| 3,015,961 | A | 1/1962 | Roney |
| 3,513,848 | A | 5/1970 | Winston et al. |
| 3,526,219 | A | 9/1970 | Balamuth |
| 3,614,484 | A | 10/1971 | Shoh |
| 3,636,943 | A | 1/1972 | Balamuth |
| 3,776,238 | A | 12/1973 | Peyman et al. |
| 3,805,787 | A | 4/1974 | Banko |
| 3,862,630 | A | 1/1975 | Balamuth |

| | | | |
|---|---|---|---|
| 3,900,823 | A | 8/1975 | Sokal et al. |
| 3,918,442 | A | 11/1975 | Nikolaev et al. |
| 3,946,738 | A | 3/1976 | Newton et al. |
| 3,955,859 | A | 5/1976 | Stella et al. |
| 3,956,826 | A | 5/1976 | Perdreaux, Jr. |
| 4,156,187 | A | 5/1979 | Murry et al. |
| 4,188,927 | A | 2/1980 | Harris |
| 4,200,106 | A | 4/1980 | Douvas et al. |
| 4,445,063 | A | 4/1984 | Smith |
| 4,491,132 | A | 1/1985 | Aikins |
| 4,574,615 | A | 3/1986 | Bower et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1634601 A | 7/2005 |

(Continued)

OTHER PUBLICATIONS

Partial International Search Report for PCT/US2008/078645, Mar. 10, 2009 (2 pages).

(Continued)

*Primary Examiner* — Wan Laymon
(74) *Attorney, Agent, or Firm* — Verne E. Kreger, Jr.

(57) **CLAIM**

The ornamental design for a user interface for a surgical instrument, as shown and described.

**DESCRIPTION**

FIG. **1** is a left perspective view of a user interface for a surgical instrument showing our design.
FIG. **2** is a left side view thereof.
FIG. **3** is a right side view thereof.
FIG. **4** is a top view thereof.
FIG. **5** is a bottom view thereof.
FIG. **6** is a front view thereof; and,
FIG. **7** is a rear view thereof.
Portions of the user interface for a surgical instrument shown in broken lines form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



**US D661,803 S**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,617,927 | A | 10/1986 | Manes |
| 4,633,119 | A | 12/1986 | Thompson |
| 4,634,420 | A | 1/1987 | Spinosa et al. |
| 4,640,279 | A | 2/1987 | Beard |
| 4,708,127 | A | 11/1987 | Abdelghani |
| 4,712,722 | A | 12/1987 | Hood et al. |
| 4,827,911 | A | 5/1989 | Broadwin et al. |
| 4,832,683 | A | 5/1989 | Idemoto et al. |
| 4,838,853 | A | 6/1989 | Parisi |
| 4,850,354 | A | 7/1989 | McGurk-Burleson et al. |
| 4,865,159 | A | 9/1989 | Jamison |
| 4,896,009 | A | 1/1990 | Pawlowski |
| 4,922,902 | A | 5/1990 | Wuchinich et al. |
| 4,965,532 | A | 10/1990 | Sakurai |
| 4,981,756 | A | 1/1991 | Rhandhawa |
| 5,026,387 | A | 6/1991 | Thomas |
| 5,112,300 | A | 5/1992 | Ureche |
| 5,123,903 | A | 6/1992 | Quaid et al. |
| 5,126,618 | A | 6/1992 | Takahashi et al. |
| 5,162,044 | A | 11/1992 | Gahn et al. |
| 5,167,725 | A | 12/1992 | Clark et al. |
| D332,660 | S | 1/1993 | Rawson et al. |
| 5,176,695 | A | 1/1993 | Dulebohn |
| 5,184,605 | A | 2/1993 | Grezeszykowski |
| 5,213,569 | A | 5/1993 | Davis |
| 5,221,282 | A | 6/1993 | Wuchinich |
| 5,226,910 | A | 7/1993 | Kajiyama et al. |
| 5,241,236 | A | 8/1993 | Sasaki et al. |
| 5,257,988 | A | 11/1993 | L'Esperance, Jr. |
| 5,261,922 | A | 11/1993 | Hood |
| 5,263,957 | A | 11/1993 | Davison |
| 5,275,609 | A | 1/1994 | Pingleton et al. |
| 5,282,800 | A | 2/1994 | Foshee et al. |
| 5,304,115 | A | 4/1994 | Pflueger et al. |
| D347,474 | S | 5/1994 | Olson |
| 5,322,055 | A | 6/1994 | Davison et al. |
| 5,324,299 | A | 6/1994 | Davison et al. |
| 5,344,420 | A | 9/1994 | Hilal et al. |
| 5,346,502 | A | 9/1994 | Estabrook et al. |
| 5,366,466 | A | 11/1994 | Christian et al. |
| D354,564 | S | 1/1995 | Medema |
| 5,381,067 | A | 1/1995 | Greenstein et al. |
| 5,403,312 | A | 4/1995 | Yates et al. |
| 5,411,481 | A | 5/1995 | Allen et al. |
| 5,419,761 | A | 5/1995 | Narayanan et al. |
| 5,421,829 | A | 6/1995 | Olichney et al. |
| 5,449,370 | A | 9/1995 | Vaitekunas |
| 5,483,501 | A | 1/1996 | Park et al. |
| 5,486,162 | A | 1/1996 | Brumbach |
| 5,500,216 | A | 3/1996 | Julian et al. |
| 5,501,654 | A | 3/1996 | Failla et al. |
| 5,505,693 | A | 4/1996 | Mackool |
| 5,562,609 | A | 10/1996 | Brumbach |
| 5,562,610 | A | 10/1996 | Brumbach |
| 5,601,601 | A | 2/1997 | Tal et al. |
| 5,607,436 | A | 3/1997 | Pratt et al. |
| 5,618,492 | A | 4/1997 | Auten et al. |
| 5,628,760 | A | 5/1997 | Knoepfler |
| 5,630,420 | A | 5/1997 | Vaitekunas |
| D381,077 | S | 7/1997 | Hunt |
| 5,651,780 | A | 7/1997 | Jackson et al. |
| 5,653,713 | A | 8/1997 | Michelson |
| 5,669,922 | A | 9/1997 | Hood |
| 5,674,235 | A | 10/1997 | Parisi |
| 5,690,269 | A | 11/1997 | Bolanos et al. |
| 5,694,936 | A | 12/1997 | Fujimoto et al. |
| 5,713,896 | A | 2/1998 | Nardella |
| 5,733,074 | A | 3/1998 | Stöck et al. |
| 5,741,226 | A | 4/1998 | Strukel et al. |
| 5,810,859 | A | 9/1998 | DiMatteo et al. |
| 5,827,323 | A | 10/1998 | Klieman et al. |
| 5,828,160 | A | 10/1998 | Sugishita |
| 5,843,109 | A | 12/1998 | Mehta et al. |
| 5,879,364 | A | 3/1999 | Bromfield et al. |
| 5,893,835 | A | 4/1999 | Witt et al. |
| 5,897,569 | A | 4/1999 | Kellogg et al. |
| 5,935,143 | A | 8/1999 | Hood |
| 5,935,144 | A | 8/1999 | Estabrook |
| 5,938,633 | A | 8/1999 | Beaupre |
| 5,944,718 | A | 8/1999 | Austin et al. |
| 5,944,737 | A | 8/1999 | Tsonton et al. |
| 5,954,736 | A | 9/1999 | Bishop et al. |
| 5,954,746 | A | 9/1999 | Holthaus et al. |
| 5,957,882 | A | 9/1999 | Nita et al. |
| 5,957,943 | A | 9/1999 | Vaitekunas |
| 5,968,007 | A | 10/1999 | Simon et al. |
| 5,968,060 | A | 10/1999 | Kellogg |
| D416,089 | S | 11/1999 | Barton et al. |
| 5,980,510 | A | 11/1999 | Tsonton et al. |
| 5,989,274 | A | 11/1999 | Davison et al. |
| 5,989,275 | A | 11/1999 | Estabrook et al. |
| 5,993,972 | A | 11/1999 | Reich et al. |
| 6,024,741 | A | 2/2000 | Williamson, IV et al. |
| 6,033,375 | A | 3/2000 | Brumbach |
| 6,063,098 | A | 5/2000 | Houser et al. |
| 6,066,132 | A | 5/2000 | Chen et al. |
| 6,068,647 | A | 5/2000 | Witt et al. |
| 6,077,285 | A | 6/2000 | Boukhny |
| 6,083,191 | A | 7/2000 | Rose |
| 6,086,584 | A | 7/2000 | Miller |
| 6,090,120 | A | 7/2000 | Wright et al. |
| 6,109,500 | A | 8/2000 | Alli et al. |
| 6,110,127 | A | 8/2000 | Suzuki |
| 6,113,594 | A | 9/2000 | Savage |
| 6,139,320 | A | 10/2000 | Hahn |
| 6,152,902 | A | 11/2000 | Christian et al. |
| 6,159,160 | A | 12/2000 | Hsei et al. |
| 6,159,175 | A | 12/2000 | Strukel et al. |
| 6,204,592 | B1 | 3/2001 | Hur |
| 6,206,844 | B1 | 3/2001 | Reichel et al. |
| 6,210,403 | B1 | 4/2001 | Klicek |
| 6,214,023 | B1 | 4/2001 | Whipple et al. |
| 6,233,476 | B1 | 5/2001 | Strommer et al. |
| 6,238,366 | B1 | 5/2001 | Savage et al. |
| D444,365 | S | 7/2001 | Bass et al. |
| 6,254,623 | B1 | 7/2001 | Haibel, Jr. et al. |
| 6,258,034 | B1 | 7/2001 | Hanafy |
| 6,267,761 | B1 | 7/2001 | Ryan |
| 6,270,831 | B2 | 8/2001 | Kumar et al. |
| 6,273,852 | B1 | 8/2001 | Lehe et al. |
| 6,274,963 | B1 | 8/2001 | Estabrook et al. |
| 6,277,115 | B1 | 8/2001 | Saadat |
| 6,278,218 | B1 | 8/2001 | Madan et al. |
| 6,283,981 | B1 | 9/2001 | Beaupre |
| 6,309,400 | B2 | 10/2001 | Beaupre |
| 6,319,221 | B1 | 11/2001 | Savage et al. |
| 6,325,811 | B1 | 12/2001 | Messerly |
| 6,328,751 | B1 | 12/2001 | Beaupre |
| 6,352,532 | B1 | 3/2002 | Kramer et al. |
| 6,379,320 | B1 | 4/2002 | Lafon et al. |
| D457,958 | S * | 5/2002 | Dycus et al. ................ D24/144 |
| 6,383,194 | B1 | 5/2002 | Pothula |
| 6,387,109 | B1 | 5/2002 | Davison et al. |
| 6,388,657 | B1 | 5/2002 | Natoli |
| 6,391,042 | B1 | 5/2002 | Cimino |
| 6,405,733 | B1 | 6/2002 | Fogarty et al. |
| 6,416,486 | B1 | 7/2002 | Wampler |
| 6,423,073 | B2 | 7/2002 | Bowman |
| 6,423,082 | B1 | 7/2002 | Houser et al. |
| 6,432,118 | B1 | 8/2002 | Messerly |
| 6,436,114 | B1 | 8/2002 | Novak et al. |
| 6,436,115 | B1 | 8/2002 | Beaupre |
| 6,443,969 | B1 | 9/2002 | Novak et al. |
| 6,454,781 | B1 | 9/2002 | Witt et al. |
| 6,454,782 | B1 | 9/2002 | Schwemberger |
| 6,458,142 | B1 | 10/2002 | Faller et al. |
| 6,480,796 | B2 | 11/2002 | Wiener |
| 6,485,490 | B2 | 11/2002 | Wampler et al. |
| 6,491,708 | B2 | 12/2002 | Madan et al. |
| 6,497,715 | B2 | 12/2002 | Satou |
| 6,500,176 | B1 | 12/2002 | Truckai et al. |
| 6,500,188 | B2 | 12/2002 | Harper et al. |
| 6,524,316 | B1 | 2/2003 | Nicholson et al. |
| 6,533,784 | B2 | 3/2003 | Truckai et al. |
| 6,537,291 | B2 | 3/2003 | Friedman et al. |
| 6,543,452 | B1 | 4/2003 | Lavigne |
| 6,543,456 | B1 | 4/2003 | Freeman |

**US D661,803 S**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 6,544,260 | B1 | 4/2003 | Markel et al. | 7,317,955 | B2 | 1/2008 | McGreevy |
| 6,561,983 | B2 | 5/2003 | Cronin et al. | 7,326,236 | B2 | 2/2008 | Andreas et al. |
| 6,572,632 | B2 | 6/2003 | Zisterer et al. | 7,331,410 | B2 | 2/2008 | Yong et al. |
| 6,575,969 | B1 | 6/2003 | Rittman, III et al. | 7,353,068 | B2 | 4/2008 | Tanaka et al. |
| 6,582,451 | B1 | 6/2003 | Marucci et al. | 7,354,440 | B2 | 4/2008 | Truckai et al. |
| 6,589,200 | B1 | 7/2003 | Schwemberger et al. | 7,380,695 | B2 | 6/2008 | Doll et al. |
| 6,589,239 | B2 | 7/2003 | Khandkar et al. | 7,381,209 | B2 | 6/2008 | Truckai et al. |
| 6,616,450 | B2 | 9/2003 | Mossle et al. | 7,390,317 | B2 | 6/2008 | Taylor et al. |
| 6,623,501 | B2 | 9/2003 | Heller et al. | 7,408,288 | B2 | 8/2008 | Hara |
| 6,626,926 | B2 | 9/2003 | Friedman et al. | D576,725 | S | 9/2008 | Shumer et al. |
| 6,633,234 | B2 | 10/2003 | Wiener et al. | D578,643 | S | 10/2008 | Shumer et al. |
| 6,656,177 | B2 | 12/2003 | Truckai et al. | D578,644 | S | 10/2008 | Shumer et al. |
| 6,662,127 | B2 | 12/2003 | Wiener et al. | D578,645 | S | 10/2008 | Shumer et al. |
| 6,663,941 | B2 | 12/2003 | Brown et al. | 7,431,704 | B2 | 10/2008 | Babaev |
| 6,676,660 | B2 | 1/2004 | Wampler et al. | 7,472,815 | B2 | 1/2009 | Shelton, IV et al. |
| 6,678,621 | B2 | 1/2004 | Wiener et al. | 7,479,148 | B2 | 1/2009 | Beaupre |
| 6,679,899 | B2 | 1/2004 | Wiener et al. | 7,479,160 | B2 | 1/2009 | Branch et al. |
| 6,682,544 | B2 | 1/2004 | Mastri et al. | 7,494,468 | B2 | 2/2009 | Rabiner et al. |
| 6,716,215 | B1 | 4/2004 | David et al. | 7,503,893 | B2 | 3/2009 | Kucklick |
| 6,731,047 | B2 | 5/2004 | Kauf et al. | 7,534,243 | B1 | 5/2009 | Chin et al. |
| 6,733,506 | B1 | 5/2004 | McDevitt et al. | D594,983 | S * | 6/2009 | Price et al. .................. D24/145 |
| 6,762,535 | B2 | 7/2004 | Take et al. | 7,567,012 | B2 | 7/2009 | Namikawa |
| 6,770,072 | B1 | 8/2004 | Truckai et al. | D618,797 | S | 6/2010 | Price et al. |
| 6,773,444 | B2 | 8/2004 | Messerly | 7,751,115 | B2 | 7/2010 | Song |
| 6,786,382 | B1 | 9/2004 | Hoffman | 7,770,774 | B2 | 8/2010 | Mastri et al. |
| 6,786,383 | B2 | 9/2004 | Stegelmann | 7,780,659 | B2 | 8/2010 | Okada et al. |
| 6,790,216 | B1 | 9/2004 | Ishikawa | D631,155 | S * | 1/2011 | Peine et al. ................ D24/133 |
| 6,802,843 | B2 | 10/2004 | Truckai et al. | 7,876,030 | B2 | 1/2011 | Taki et al. |
| 6,828,712 | B2 | 12/2004 | Battaglin et al. | D631,965 | S * | 2/2011 | Price et al. ................ D24/145 |
| 6,869,439 | B2 | 3/2005 | White et al. | 7,892,606 | B2 | 2/2011 | Thies et al. |
| 6,875,220 | B2 | 4/2005 | Du et al. | 7,901,423 | B2 | 3/2011 | Stulen et al. |
| 6,905,497 | B2 | 6/2005 | Truckai et al. | 7,959,050 | B2 | 6/2011 | Smith et al. |
| 6,908,472 | B2 | 6/2005 | Wiener et al. | 7,959,626 | B2 | 6/2011 | Hong et al. |
| 6,913,579 | B2 | 7/2005 | Truckai et al. | 7,976,544 | B2 | 7/2011 | McClurken et al. |
| 6,926,716 | B2 | 8/2005 | Baker et al. | 8,057,498 | B2 | 11/2011 | Robertson |
| 6,929,632 | B2 | 8/2005 | Nita et al. | 8,058,771 | B2 | 11/2011 | Giordano et al. |
| 6,929,644 | B2 | 8/2005 | Truckai et al. | 2001/0025184 | A1 | 9/2001 | Messerly |
| D509,589 | S | 9/2005 | Wells | 2001/0031950 | A1 | 10/2001 | Ryan |
| 6,945,981 | B2 | 9/2005 | Donofrio et al. | 2001/0039419 | A1 | 11/2001 | Francischelli et al. |
| D511,145 | S | 11/2005 | Donofrio et al. | 2002/0002377 | A1 | 1/2002 | Cimino |
| 6,976,844 | B2 | 12/2005 | Hickok et al. | 2002/0019649 | A1 | 2/2002 | Sikora et al. |
| 6,976,969 | B2 | 12/2005 | Messerly | 2002/0022836 | A1 | 2/2002 | Goble et al. |
| 6,977,495 | B2 | 12/2005 | Donofrio | 2002/0077550 | A1 | 6/2002 | Rabiner et al. |
| 6,984,220 | B2 | 1/2006 | Wuchinich | 2002/0156493 | A1 | 10/2002 | Houser et al. |
| 7,011,657 | B2 | 3/2006 | Truckai et al. | 2003/0055443 | A1 | 3/2003 | Spotnitz |
| 7,041,083 | B2 | 5/2006 | Chu et al. | 2003/0204199 | A1 | 10/2003 | Novak et al. |
| 7,041,088 | B2 | 5/2006 | Nawrocki et al. | 2003/0212332 | A1 | 11/2003 | Fenton et al. |
| 7,041,102 | B2 | 5/2006 | Truckai et al. | 2004/0030254 | A1 | 2/2004 | Babaev |
| 7,070,597 | B2 | 7/2006 | Truckai et al. | 2004/0047485 | A1 | 3/2004 | Sherrit et al. |
| 7,074,219 | B2 | 7/2006 | Levine et al. | 2004/0092921 | A1 | 5/2004 | Kadziauskas et al. |
| 7,077,039 | B2 | 7/2006 | Gass et al. | 2004/0097919 | A1 | 5/2004 | Wellman et al. |
| 7,077,853 | B2 | 7/2006 | Kramer et al. | 2004/0097996 | A1 | 5/2004 | Rabiner et al. |
| 7,083,619 | B2 | 8/2006 | Truckai et al. | 2004/0199193 | A1 | 10/2004 | Hayashi et al. |
| 7,087,054 | B2 | 8/2006 | Truckai et al. | 2004/0204728 | A1 | 10/2004 | Haefner |
| 7,108,695 | B2 | 9/2006 | Witt et al. | 2004/0243157 | A1 | 12/2004 | Connor et al. |
| 7,112,201 | B2 | 9/2006 | Truckai et al. | 2004/0260300 | A1 | 12/2004 | Gorensek et al. |
| 7,118,564 | B2 | 10/2006 | Ritchie et al. | 2005/0033337 | A1 | 2/2005 | Muir et al. |
| 7,124,932 | B2 | 10/2006 | Isaacson et al. | 2005/0049546 | A1 | 3/2005 | Messerly et al. |
| 7,125,409 | B2 | 10/2006 | Truckai et al. | 2005/0143769 | A1 | 6/2005 | White et al. |
| 7,135,018 | B2 | 11/2006 | Ryan et al. | 2005/0149108 | A1 | 7/2005 | Cox |
| 7,135,030 | B2 | 11/2006 | Schwemberger et al. | 2005/0165345 | A1 | 7/2005 | Laufer et al. |
| 7,153,315 | B2 | 12/2006 | Miller | 2005/0177184 | A1 | 8/2005 | Easley |
| D536,093 | S * | 1/2007 | Nakajima et al. ............ D24/138 | 2005/0192610 | A1 | 9/2005 | Houser et al. |
| 7,156,189 | B1 | 1/2007 | Bar-Cohen et al. | 2005/0209620 | A1 | 9/2005 | Du et al. |
| 7,156,853 | B2 | 1/2007 | Muratsu | 2005/0261581 | A1 | 11/2005 | Hughes et al. |
| 7,157,058 | B2 | 1/2007 | Marhasin et al. | 2005/0261588 | A1 | 11/2005 | Makin et al. |
| 7,159,750 | B2 | 1/2007 | Racenet et al. | 2005/0288659 | A1 | 12/2005 | Kimura et al. |
| 7,163,548 | B2 | 1/2007 | Stulen et al. | 2006/0030797 | A1 | 2/2006 | Zhou et al. |
| 7,169,146 | B2 | 1/2007 | Truckai et al. | 2006/0063130 | A1 | 3/2006 | Hayman et al. |
| 7,179,271 | B2 | 2/2007 | Friedman et al. | 2006/0079878 | A1 | 4/2006 | Houser |
| 7,186,253 | B2 | 3/2007 | Truckai et al. | 2006/0084963 | A1 | 4/2006 | Messerly |
| 7,189,233 | B2 | 3/2007 | Truckai et al. | 2006/0190034 | A1 | 8/2006 | Nishizawa et al. |
| 7,204,820 | B2 | 4/2007 | Akahoshi | 2006/0211943 | A1 | 9/2006 | Beaupre |
| 7,220,951 | B2 | 5/2007 | Truckai et al. | 2006/0235306 | A1 | 10/2006 | Cotter et al. |
| 7,223,229 | B2 | 5/2007 | Inman et al. | 2006/0253050 | A1 | 11/2006 | Yoshimine et al. |
| 7,229,455 | B2 | 6/2007 | Sakurai et al. | 2007/0016235 | A1 | 1/2007 | Tanaka et al. |
| 7,273,483 | B2 | 9/2007 | Wiener et al. | 2007/0016236 | A1 | 1/2007 | Beaupre |
| 7,309,849 | B2 | 12/2007 | Truckai et al. | 2007/0055228 | A1 | 3/2007 | Berg et al. |
| 7,311,709 | B2 | 12/2007 | Truckai et al. | 2007/0060915 | A1 | 3/2007 | Kucklick |

A0199

| | | | |
|---|---|---|---|
| 2007/0063618 | A1 | 3/2007 | Bromfield |
| 2007/0129716 | A1 | 6/2007 | Daw et al. |
| 2007/0130771 | A1 | 6/2007 | Ehlert et al. |
| 2007/0131034 | A1 | 6/2007 | Ehlert et al. |
| 2007/0149881 | A1 | 6/2007 | Rabin |
| 2007/0162050 | A1 | 7/2007 | Sartor |
| 2007/0173872 | A1 | 7/2007 | Neuenfeldt |
| 2007/0185380 | A1 | 8/2007 | Kucklick |
| 2007/0219481 | A1 | 9/2007 | Babaev |
| 2007/0249941 | A1 | 10/2007 | Salehi et al. |
| 2007/0260234 | A1 | 11/2007 | McCullagh et al. |
| 2007/0265560 | A1 | 11/2007 | Soltani et al. |
| 2007/0275348 | A1 | 11/2007 | Lemon |
| 2007/0282335 | A1 | 12/2007 | Young et al. |
| 2007/0287933 | A1 | 12/2007 | Phan et al. |
| 2008/0009848 | A1 | 1/2008 | Paraschiv et al. |
| 2008/0058585 | A1 | 3/2008 | Novak et al. |
| 2008/0058775 | A1 | 3/2008 | Darian et al. |
| 2008/0058845 | A1 | 3/2008 | Shimizu et al. |
| 2008/0082039 | A1 | 4/2008 | Babaev |
| 2008/0082098 | A1 | 4/2008 | Tanaka et al. |
| 2008/0172051 | A1 | 7/2008 | Masuda et al. |
| 2008/0177268 | A1 | 7/2008 | Daum et al. |
| 2008/0188878 | A1 | 8/2008 | Young |
| 2008/0200940 | A1 | 8/2008 | Eichmann et al. |
| 2008/0208231 | A1 | 8/2008 | Ota et al. |
| 2008/0234708 | A1 | 9/2008 | Houser et al. |
| 2008/0234709 | A1 | 9/2008 | Houser |
| 2008/0234710 | A1 | 9/2008 | Neurohr et al. |
| 2008/0234711 | A1 | 9/2008 | Houser et al. |
| 2008/0262490 | A1 | 10/2008 | Williams |
| 2008/0281200 | A1 | 11/2008 | Voic et al. |
| 2008/0287948 | A1 | 11/2008 | Newton et al. |
| 2009/0030311 | A1 | 1/2009 | Stulen et al. |
| 2009/0030351 | A1 | 1/2009 | Wiener et al. |
| 2009/0030437 | A1 | 1/2009 | Houser et al. |
| 2009/0030438 | A1 | 1/2009 | Stulen |
| 2009/0030439 | A1 | 1/2009 | Stulen |
| 2009/0036911 | A1 | 2/2009 | Stulen |
| 2009/0036912 | A1 | 2/2009 | Wiener et al. |
| 2009/0036913 | A1 | 2/2009 | Wiener et al. |
| 2009/0036914 | A1 | 2/2009 | Houser |
| 2009/0076506 | A1 | 3/2009 | Baker |
| 2009/0082716 | A1 | 3/2009 | Akahoshi |
| 2009/0105750 | A1* | 4/2009 | Price et al. ................... 606/206 |
| 2009/0118802 | A1 | 5/2009 | Mioduski et al. |
| 2009/0143806 | A1 | 6/2009 | Witt et al. |
| 2009/0270853 | A1 | 10/2009 | Yachi et al. |
| 2010/0036370 | A1 | 2/2010 | Mirel et al. |
| 2010/0036405 | A1 | 2/2010 | Giordano et al. |
| 2010/0158307 | A1 | 6/2010 | Kubota et al. |
| 2010/0179577 | A1 | 7/2010 | Houser |
| 2010/0187283 | A1 | 7/2010 | Crainich et al. |
| 2010/0298743 | A1 | 11/2010 | Nield et al. |
| 2010/0298851 | A1 | 11/2010 | Nield |
| 2010/0331869 | A1 | 12/2010 | Voegele et al. |
| 2010/0331870 | A1 | 12/2010 | Wan et al. |
| 2010/0331871 | A1 | 12/2010 | Nield et al. |
| 2010/0331872 | A1 | 12/2010 | Houser et al. |
| 2011/0009850 | A1* | 1/2011 | Main et al. .......................... 606/1 |
| 2011/0015627 | A1 | 1/2011 | DiNardo et al. |
| 2011/0015631 | A1 | 1/2011 | Wiener et al. |
| 2011/0015660 | A1 | 1/2011 | Wiener et al. |
| 2011/0082486 | A1 | 4/2011 | Messerly et al. |
| 2011/0087212 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087213 | A1 | 4/2011 | Messerly et al. |
| 2011/0087214 | A1 | 4/2011 | Giordano et al. |
| 2011/0087215 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087216 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087217 | A1 | 4/2011 | Yates et al. |
| 2011/0087218 | A1* | 4/2011 | Boudreaux et al. ............. 606/41 |
| 2011/0087256 | A1 | 4/2011 | Wiener et al. |
| 2011/0092972 | A1* | 4/2011 | Allen ............................. 606/45 |
| 2011/0125175 | A1 | 5/2011 | Stulen et al. |
| 2011/0196286 | A1 | 8/2011 | Robertson et al. |
| 2011/0196287 | A1 | 8/2011 | Robertson et al. |
| 2011/0196398 | A1 | 8/2011 | Robertson et al. |
| 2011/0196399 | A1 | 8/2011 | Robertson et al. |
| 2011/0196400 | A1 | 8/2011 | Robertson et al. |

| | | | |
|---|---|---|---|
| 2011/0196401 | A1 | 8/2011 | Robertson et al. |
| 2011/0196402 | A1 | 8/2011 | Robertson et al. |
| 2011/0196403 | A1 | 8/2011 | Robertson et al. |
| 2011/0196404 | A1 | 8/2011 | Dietz et al. |
| 2011/0196405 | A1 | 8/2011 | Dietz |
| 2011/0288452 | A1 | 11/2011 | Houser et al. |
| 2012/0029546 | A1 | 2/2012 | Robertson |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1640365 A | 7/2005 |
| CN | 1694649 A | 11/2005 |
| CN | 1922563 A | 2/2007 |
| CN | 101040799 A | 9/2007 |
| EP | 0171967 A2 | 2/1986 |
| EP | 0443256 A1 | 8/1991 |
| EP | 0456470 A1 | 11/1991 |
| EP | 0482195 B1 | 1/1996 |
| EP | 0612570 B1 | 6/1997 |
| EP | 0908148 B1 | 1/2002 |
| EP | 0908155 B1 | 6/2003 |
| EP | 1199044 B1 | 12/2005 |
| EP | 1844720 A1 | 10/2007 |
| EP | 1862133 A1 | 12/2007 |
| EP | 1974771 A1 | 10/2008 |
| EP | 1832259 B1 | 6/2009 |
| EP | 2074959 A1 | 7/2009 |
| GB | 2032221 A | 4/1980 |
| GB | 2447767 B | 8/2011 |
| WO | WO 92/22259 A2 | 12/1992 |
| WO | WO 93/14708 A1 | 8/1993 |
| WO | WO 98/37815 A1 | 9/1998 |
| WO | WO 01/54590 A1 | 8/2001 |
| WO | WO 2005/122917 A1 | 12/2005 |
| WO | WO 2006/042210 A2 | 4/2006 |
| WO | WO 2006/058223 A2 | 6/2006 |
| WO | WO 2006/129465 A1 | 12/2006 |
| WO | WO 2007/047531 A2 | 4/2007 |
| WO | WO 2007/143665 A2 | 12/2007 |
| WO | WO 2008/016886 A2 | 2/2008 |
| WO | WO 2008/130793 A1 | 10/2008 |
| WO | WO 2009/018406 A2 | 2/2009 |
| WO | WO 2009/027065 A1 | 3/2009 |

OTHER PUBLICATIONS

International Preliminary Report on Patentability for PCT/US2008/078645, Apr. 15, 2010 (9 pages).

U.S. Appl. No. 29/402,697, filed Sep. 26, 2011.

U.S. Appl. No. 29/402,699, filed Sep. 26, 2011.

U.S. Appl. No. 29/402,701, filed Sep. 26, 2011.

Technology Overview, printed from www.harmonicscalpel.com, Internet site, website accessed on Jun. 13, 2007, (3 pages).

Sherrit et al., "Novel Horn Designs for Ultrasonic/Sonic Cleaning Welding, Soldering, Cutting and Drilling," Proc. SPIE Smart Structures Conference, vol. 4701, Paper No. 34, San Diego, CA, pp. 353-360, Mar. 2002.

AST Products, Inc., "Principles of Video Contact Angle Analysis," 20 pages, (2006).

Lim et al., "A Review of Mechanism Used in Laparoscopic Surgical Instruments," Mechanism and Machine Theory, vol. 38, pp. 1133-1147, (2003).

Gooch et al., "Recommended Infection-Control Practices for Dentistry, 1993," Published: May 28, 1993; [retrieved on Aug. 23, 2008]. Retrieved from the internet: URL: http://wonder.cdc.gov/wonder/prevguid/p0000191/p0000191.asp (15 pages).

Huston et al., "Magnetic and Magnetostrictive Properties of Cube Textured Nickel for Magnetostrictive Transducer Applications," IEEE Transactions on Magnetics, vol. 9(4), pp. 636-640 (Dec. 1973).

Incropera et al., Fundamentals of Heat and Mass Transfer, Wiley, New York (1990). (Book—not attached).

F. A. Duck, "Optical Properties of Tissue Including Ultraviolet and Infrared Radiation," pp. 43-71 in *Physical Properties of Tissue* (1990).

Orr et al., "Overview of Bioheat Transfer," pp. 367-384 in Optical-Thermal Response of Laser-Irradiated Tissue, A. J. Welch and M. J. C. van Gemert, eds., Plenum, New York (1995).

## US D661,803 S
Page 5

Campbell et al, "Thermal Imaging in Surgery," p. 19-3, in *Medical Infrared Imaging*, N. A. Diakides and J. D. Bronzino, Eds. (2008).

U.S. Appl. No. 12/896,351, filed Oct. 1, 2010.

U.S. Appl. No. 12/896,411, filed Oct. 1, 2010.

U.S. Appl. No. 12/896,420, filed Oct. 1, 2010.

U.S. Appl. No. 13/270,459, filed Oct. 11, 2011.

U.S. Appl. No. 13/251,766, filed Oct. 3, 2011.

U.S. Appl. No. 29/404,676, filed Oct. 24, 2011.

U.S. Appl. No. 13/296,829, filed Nov. 15, 2011.

* cited by examiner

Case: 14-1370 CASE PARTICIPANTS ONLY Document: 24 Page: 270 Filed: 07/21/2014



FIG. 1



FIG. 3

FIG. 2



FIG. 4

FIG. 5



FIG. 7



FIG. 6

US00D661804S

(12) **United States Design Patent**  (10) Patent No.: **US D661,804 S**
Price et al.  (45) Date of Patent: ** **Jun. 12, 2012**

(54) **USER INTERFACE FOR A SURGICAL INSTRUMENT**

(75) Inventors: **Daniel W. Price**, Loveland, OH (US); **Galen C. Robertson**, Apex, NC (US); **Cory G. Kimball**, Cincinnati, OH (US); **Scott A. Woodruff**, Boston, MA (US); **Matthew C. Miller**, Cincinnati, OH (US); **Carrie I. Fihe**, Ponte Vedra Beach, FL (US); **Carl J. Draginoff, Jr.**, Mason, OH (US)

(73) Assignee: **Ethicon Endo-Surgery, Inc.**, Cincinnati, OH (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/402,701**

(22) Filed: **Sep. 26, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. 12/245,158, filed on Oct. 3, 2008.

(51) **LOC (9) Cl.** .................................................. **24-02**
(52) **U.S. Cl.** ...................................... **D24/145**; D24/133
(58) **Field of Classification Search** ................. D24/133, D24/143–149; 606/1, 45, 52, 51, 142–145, 606/167, 170–171, 205–207, 34
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,736,960 | A | 3/1956 | Armstrong |
| 2,849,788 | A | 9/1958 | Creek |
| 3,015,961 | A | 1/1962 | Roney |
| 3,513,848 | A | 5/1970 | Winston et al. |
| 3,526,219 | A | 9/1970 | Balamuth |
| 3,614,484 | A | 10/1971 | Shoh |
| 3,636,943 | A | 1/1972 | Balamuth |
| 3,776,238 | A | 12/1973 | Peyman et al. |
| 3,805,787 | A | 4/1974 | Banko |
| 3,862,630 | A | 1/1975 | Balamuth |
| 3,900,823 | A | 8/1975 | Sokal et al. |
| 3,918,442 | A | 11/1975 | Nikolaev et al. |
| 3,946,738 | A | 3/1976 | Newton et al. |
| 3,955,859 | A | 5/1976 | Stella et al. |
| 3,956,826 | A | 5/1976 | Perdreaux, Jr. |
| 4,156,187 | A | 5/1979 | Murry et al. |
| 4,188,927 | A | 2/1980 | Harris |
| 4,200,106 | A | 4/1980 | Douvas et al. |
| 4,445,063 | A | 4/1984 | Smith |
| 4,491,132 | A | 1/1985 | Aikins |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1634601 A | 7/2005 |

(Continued)

OTHER PUBLICATIONS

Partial International Search Report for PCT/US2008/078645, Mar. 10, 2009 (2 pages).

(Continued)

*Primary Examiner* — Wan Laymon
(74) *Attorney, Agent, or Firm* — Verne E. Kreger, Jr.

(57) **CLAIM**

The ornamental design for a user interface for a surgical instrument, as shown and described.

**DESCRIPTION**

FIG. **1** is a left perspective view of a user interface for a surgical instrument showing our design.
FIG. **2** is a left side view thereof.
FIG. **3** is a right side view thereof.
FIG. **4** is a top view thereof.
FIG. **5** is a bottom view thereof.
FIG. **6** is a front view thereof; and,
FIG. **7** is a rear view thereof.
Portions of the user interface for a surgical instrument shown in broken lines form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



## US D661,804 S

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,574,615 | A | 3/1986 | Bower et al. |
| 4,617,927 | A | 10/1986 | Manes |
| 4,633,119 | A | 12/1986 | Thompson |
| 4,634,420 | A | 1/1987 | Spinosa et al. |
| 4,640,279 | A | 2/1987 | Beard |
| 4,708,127 | A | 11/1987 | Abdelghani |
| 4,712,722 | A | 12/1987 | Hood et al. |
| 4,827,911 | A | 5/1989 | Broadwin et al. |
| 4,832,683 | A | 5/1989 | Idemoto et al. |
| 4,838,853 | A | 6/1989 | Parisi |
| 4,850,354 | A | 7/1989 | McGurk-Burleson et al. |
| 4,865,159 | A | 9/1989 | Jamison |
| 4,896,009 | A | 1/1990 | Pawlowski |
| 4,922,902 | A | 5/1990 | Wuchinich et al. |
| 4,965,532 | A | 10/1990 | Sakurai |
| 4,981,756 | A | 1/1991 | Rhandhawa |
| 5,026,387 | A | 6/1991 | Thomas |
| 5,112,300 | A | 5/1992 | Ureche |
| 5,123,903 | A | 6/1992 | Quaid et al. |
| 5,126,618 | A | 6/1992 | Takahashi et al. |
| 5,162,044 | A | 11/1992 | Gahn et al. |
| 5,167,725 | A | 12/1992 | Clark et al. |
| D332,660 | S | 1/1993 | Rawson et al. |
| 5,176,695 | A | 1/1993 | Dulebohn |
| 5,184,605 | A | 2/1993 | Grezeszykowski |
| 5,213,569 | A | 5/1993 | Davis |
| 5,221,282 | A | 6/1993 | Wuchinich |
| 5,226,910 | A | 7/1993 | Kajiyama et al. |
| 5,241,236 | A | 8/1993 | Sasaki et al. |
| 5,257,988 | A | 11/1993 | L'Esperance, Jr. |
| 5,261,922 | A | 11/1993 | Hood |
| 5,263,957 | A | 11/1993 | Davison |
| 5,275,609 | A | 1/1994 | Pingleton et al. |
| 5,282,800 | A | 2/1994 | Foshee et al. |
| 5,304,115 | A | 4/1994 | Pflueger et al. |
| D347,474 | S | 5/1994 | Olson |
| 5,322,055 | A | 6/1994 | Davison et al. |
| 5,324,299 | A | 6/1994 | Davison et al. |
| 5,344,420 | A | 9/1994 | Hilal et al. |
| 5,346,502 | A | 9/1994 | Estabrook et al. |
| 5,366,466 | A | 11/1994 | Christian et al. |
| D354,564 | S | 1/1995 | Medema |
| 5,381,067 | A | 1/1995 | Greenstein et al. |
| 5,403,312 | A | 4/1995 | Yates et al. |
| 5,411,481 | A | 5/1995 | Allen et al. |
| 5,419,761 | A | 5/1995 | Narayanan et al. |
| 5,421,829 | A | 6/1995 | Olichney et al. |
| 5,449,370 | A | 9/1995 | Vaitekunas |
| 5,483,501 | A | 1/1996 | Park et al. |
| 5,486,162 | A | 1/1996 | Brumbach |
| 5,500,216 | A | 3/1996 | Julian et al. |
| 5,501,654 | A | 3/1996 | Failla et al. |
| 5,505,693 | A | 4/1996 | Mackool |
| 5,562,609 | A | 10/1996 | Brumbach |
| 5,562,610 | A | 10/1996 | Brumbach |
| 5,601,601 | A | 2/1997 | Tal et al. |
| 5,607,436 | A | 3/1997 | Pratt et al. |
| 5,618,492 | A | 4/1997 | Auten et al. |
| 5,628,760 | A | 5/1997 | Knoepfler |
| 5,630,420 | A | 5/1997 | Vaitekunas |
| D381,077 | S | 7/1997 | Hunt |
| 5,651,780 | A | 7/1997 | Jackson et al. |
| 5,653,713 | A | 8/1997 | Michelson |
| 5,669,922 | A | 9/1997 | Hood |
| 5,674,235 | A | 10/1997 | Parisi |
| 5,690,269 | A | 11/1997 | Bolanos et al. |
| 5,694,936 | A | 12/1997 | Fujimoto et al. |
| 5,713,896 | A | 2/1998 | Nardella |
| 5,733,074 | A | 3/1998 | Stöck et al. |
| 5,741,226 | A | 4/1998 | Strukel et al. |
| 5,810,859 | A | 9/1998 | DiMatteo et al. |
| 5,827,323 | A | 10/1998 | Klieman et al. |
| 5,828,160 | A | 10/1998 | Sugishita |
| 5,843,109 | A | 12/1998 | Mehta et al. |
| 5,879,364 | A | 3/1999 | Bromfield et al. |
| 5,893,835 | A | 4/1999 | Witt et al. |
| 5,897,569 | A | 4/1999 | Kellogg et al. |
| 5,935,143 | A | 8/1999 | Hood |
| 5,935,144 | A | 8/1999 | Estabrook |
| 5,938,633 | A | 8/1999 | Beaupre |
| 5,944,718 | A | 8/1999 | Austin et al. |
| 5,944,737 | A | 8/1999 | Tsonton et al. |
| 5,954,736 | A | 9/1999 | Bishop et al. |
| 5,954,746 | A | 9/1999 | Holthaus et al. |
| 5,957,882 | A | 9/1999 | Nita et al. |
| 5,957,943 | A | 9/1999 | Vaitekunas |
| 5,968,007 | A | 10/1999 | Simon et al. |
| 5,968,060 | A | 10/1999 | Kellogg |
| D416,089 | S | 11/1999 | Barton et al. |
| 5,980,510 | A | 11/1999 | Tsonton et al. |
| 5,989,274 | A | 11/1999 | Davison et al. |
| 5,989,275 | A | 11/1999 | Estabrook et al. |
| 5,993,972 | A | 11/1999 | Reich et al. |
| 6,024,741 | A | 2/2000 | Williamson, IV et al. |
| 6,033,375 | A | 3/2000 | Brumbach |
| 6,063,098 | A | 5/2000 | Houser et al. |
| 6,066,132 | A | 5/2000 | Chen et al. |
| 6,068,647 | A | 5/2000 | Witt et al. |
| 6,077,285 | A | 6/2000 | Boukhny |
| 6,083,191 | A | 7/2000 | Rose |
| 6,086,584 | A | 7/2000 | Miller |
| 6,090,120 | A | 7/2000 | Wright et al. |
| 6,109,500 | A | 8/2000 | Alli et al. |
| 6,110,127 | A | 8/2000 | Suzuki |
| 6,113,594 | A | 9/2000 | Savage |
| 6,139,320 | A | 10/2000 | Hahn |
| 6,152,902 | A | 11/2000 | Christian et al. |
| 6,159,160 | A | 12/2000 | Hsei et al. |
| 6,159,175 | A | 12/2000 | Strukel et al. |
| 6,204,592 | B1 | 3/2001 | Hur |
| 6,206,844 | B1 | 3/2001 | Reichel et al. |
| 6,210,403 | B1 | 4/2001 | Klicek |
| 6,214,023 | B1 | 4/2001 | Whipple et al. |
| 6,233,476 | B1 | 5/2001 | Strommer et al. |
| 6,238,366 | B1 | 5/2001 | Savage et al. |
| D444,365 | S | 7/2001 | Bass et al. |
| 6,254,623 | B1 | 7/2001 | Haibel, Jr. et al. |
| 6,258,034 | B1 | 7/2001 | Hanafy |
| 6,267,761 | B1 | 7/2001 | Ryan |
| 6,270,831 | B2 | 8/2001 | Kumar et al. |
| 6,273,852 | B1 | 8/2001 | Lehe et al. |
| 6,274,963 | B1 | 8/2001 | Estabrook et al. |
| 6,277,115 | B1 | 8/2001 | Saadat |
| 6,278,218 | B1 | 8/2001 | Madan et al. |
| 6,283,981 | B1 | 9/2001 | Beaupre |
| 6,309,400 | B2 | 10/2001 | Beaupre |
| 6,319,221 | B1 | 11/2001 | Savage et al. |
| 6,325,811 | B1 | 12/2001 | Messerly |
| 6,328,751 | B1 | 12/2001 | Beaupre |
| 6,352,532 | B1 | 3/2002 | Kramer et al. |
| 6,379,320 | B1 | 4/2002 | Lafon et al. |
| D457,958 | S * | 5/2002 | Dycus et al. ............. D24/144 |
| 6,383,194 | B1 | 5/2002 | Pothula |
| 6,387,109 | B1 | 5/2002 | Davison et al. |
| 6,388,657 | B1 | 5/2002 | Natoli |
| 6,391,042 | B1 | 5/2002 | Cimino |
| 6,405,733 | B1 | 6/2002 | Fogarty et al. |
| 6,416,486 | B1 | 7/2002 | Wampler |
| 6,423,073 | B2 | 7/2002 | Bowman |
| 6,423,082 | B1 | 7/2002 | Houser et al. |
| 6,432,118 | B1 | 8/2002 | Messerly |
| 6,436,114 | B1 | 8/2002 | Novak et al. |
| 6,436,115 | B1 | 8/2002 | Beaupre |
| 6,443,969 | B1 | 9/2002 | Novak et al. |
| 6,454,781 | B1 | 9/2002 | Witt et al. |
| 6,454,782 | B1 | 9/2002 | Schwemberger |
| 6,458,142 | B1 | 10/2002 | Faller et al. |
| 6,480,796 | B2 | 11/2002 | Wiener |
| 6,485,490 | B2 | 11/2002 | Wampler et al. |
| 6,491,708 | B2 | 12/2002 | Madan et al. |
| 6,497,715 | B2 | 12/2002 | Satou |
| 6,500,176 | B1 | 12/2002 | Truckai et al. |
| 6,500,188 | B2 | 12/2002 | Harper et al. |
| 6,524,316 | B1 | 2/2003 | Nicholson et al. |
| 6,533,784 | B2 | 3/2003 | Truckai et al. |
| 6,537,291 | B2 | 3/2003 | Friedman et al. |
| 6,543,452 | B1 | 4/2003 | Lavigne |

**US D661,804 S**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 6,543,456 | B1 | 4/2003 | Freeman | 7,311,709 | B2 | 12/2007 | Truckai et al. |

6,543,456 B1 4/2003 Freeman
6,544,260 B1 4/2003 Markel et al.
6,561,983 B2 5/2003 Cronin et al.
6,572,632 B2 6/2003 Zisterer et al.
6,575,969 B1 6/2003 Rittman, III et al.
6,582,451 B1 6/2003 Marucci et al.
6,589,200 B1 7/2003 Schwemberger et al.
6,589,239 B2 7/2003 Khandkar et al.
6,616,450 B2 9/2003 Mossle et al.
6,623,501 B2 9/2003 Heller et al.
6,626,926 B2 9/2003 Friedman et al.
6,633,234 B2 10/2003 Wiener et al.
6,656,177 B2 12/2003 Truckai et al.
6,662,127 B2 12/2003 Wiener et al.
6,663,941 B2 12/2003 Brown et al.
6,676,660 B2 1/2004 Wampler et al.
6,678,621 B2 1/2004 Wiener et al.
6,679,899 B2 1/2004 Wiener et al.
6,682,544 B2 1/2004 Mastri et al.
6,716,215 B1 4/2004 David et al.
6,731,047 B2 5/2004 Kauf et al.
6,733,506 B1 5/2004 McDevitt et al.
6,762,535 B2 7/2004 Take et al.
6,770,072 B1 8/2004 Truckai et al.
6,773,444 B2 8/2004 Messerly
6,786,382 B1 9/2004 Hoffman
6,786,383 B2 9/2004 Stegelmann
6,790,216 B1 9/2004 Ishikawa
6,802,843 B2 10/2004 Truckai et al.
6,828,712 B2 12/2004 Battaglin et al.
6,869,439 B2 3/2005 White et al.
6,875,220 B2 4/2005 Du et al.
6,905,497 B2 6/2005 Truckai et al.
6,908,472 B2 6/2005 Wiener et al.
6,913,579 B2 7/2005 Truckai et al.
6,926,716 B2 8/2005 Baker et al.
6,929,632 B2 8/2005 Nita et al.
6,929,644 B2 8/2005 Truckai et al.
D509,589 S 9/2005 Wells
6,945,981 B2 9/2005 Donofrio et al.
D511,145 S 11/2005 Donofrio et al.
6,976,844 B2 12/2005 Hickok et al.
6,976,969 B2 12/2005 Messerly
6,977,495 B2 12/2005 Donofrio
6,984,220 B2 1/2006 Wuchinich
7,011,657 B2 3/2006 Truckai et al.
7,041,083 B2 5/2006 Chu et al.
7,041,088 B2 5/2006 Nawrocki et al.
7,041,102 B2 5/2006 Truckai et al.
7,070,597 B2 7/2006 Truckai et al.
7,074,219 B2 7/2006 Levine et al.
7,077,039 B2 7/2006 Gass et al.
7,077,853 B2 7/2006 Kramer et al.
7,083,619 B2 8/2006 Truckai et al.
7,087,054 B2 8/2006 Truckai et al.
7,108,695 B2 9/2006 Witt et al.
7,112,201 B2 9/2006 Truckai et al.
7,118,564 B2 10/2006 Ritchie et al.
7,124,932 B2 10/2006 Isaacson et al.
7,125,409 B2 10/2006 Truckai et al.
7,135,018 B2 11/2006 Ryan et al.
7,135,030 B2 11/2006 Schwemberger et al.
7,153,315 B2 12/2006 Miller
D536,093 S * 1/2007 Nakajima et al. ............ D24/138
7,156,189 B1 1/2007 Bar-Cohen et al.
7,156,853 B2 1/2007 Muratsu
7,157,058 B2 1/2007 Marhasin et al.
7,159,750 B2 1/2007 Racenet et al.
7,163,548 B2 1/2007 Stulen et al.
7,169,146 B2 1/2007 Truckai et al.
7,179,271 B2 2/2007 Friedman et al.
7,186,253 B2 3/2007 Truckai et al.
7,189,233 B2 3/2007 Truckai et al.
7,204,820 B2 4/2007 Akahoshi
7,220,951 B2 5/2007 Truckai et al.
7,223,229 B2 5/2007 Inman et al.
7,229,455 B2 6/2007 Sakurai et al.
7,273,483 B2 9/2007 Wiener et al.
7,309,849 B2 12/2007 Truckai et al.

Right column:

7,311,709 B2 12/2007 Truckai et al.
7,317,955 B2 1/2008 McGreevy
7,326,236 B2 2/2008 Andreas et al.
7,331,410 B2 2/2008 Yong et al.
7,353,068 B2 4/2008 Tanaka et al.
7,354,440 B2 4/2008 Truckai et al.
7,380,695 B2 6/2008 Doll et al.
7,381,209 B2 6/2008 Truckai et al.
7,390,317 B2 6/2008 Taylor et al.
7,408,288 B2 8/2008 Hara
D576,725 S 9/2008 Shumer et al.
D578,643 S 10/2008 Shumer et al.
D578,644 S 10/2008 Shumer et al.
D578,645 S 10/2008 Shumer et al.
7,431,704 B2 10/2008 Babaev
7,472,815 B2 1/2009 Shelton, IV et al.
7,479,148 B2 1/2009 Beaupre
7,479,160 B2 1/2009 Branch et al.
7,494,468 B2 2/2009 Rabiner et al.
7,503,893 B2 3/2009 Kucklick
7,534,243 B1 5/2009 Chin et al.
D594,983 S * 6/2009 Price et al. .................... D24/145
7,567,012 B2 7/2009 Namikawa
D618,797 S 6/2010 Price et al.
7,751,115 B2 7/2010 Song
7,770,774 B2 8/2010 Mastri et al.
7,780,659 B2 8/2010 Okada et al.
D631,155 S * 1/2011 Peine et al. .................. D24/133
7,876,030 B2 1/2011 Taki et al.
D631,965 S * 2/2011 Price et al. .................... D24/145
7,892,606 B2 2/2011 Thies et al.
7,901,423 B2 3/2011 Stulen et al.
7,959,050 B2 6/2011 Smith et al.
7,959,626 B2 6/2011 Hong et al.
7,976,544 B2 7/2011 McClurken et al.
8,057,498 B2 11/2011 Robertson
8,058,771 B2 11/2011 Giordano et al.
2001/0025184 A1 9/2001 Messerly
2001/0031950 A1 10/2001 Ryan
2001/0039419 A1 11/2001 Francischelli et al.
2002/0002377 A1 1/2002 Cimino
2002/0019649 A1 2/2002 Sikora et al.
2002/0022836 A1 2/2002 Goble et al.
2002/0077550 A1 6/2002 Rabiner et al.
2002/0156493 A1 10/2002 Houser et al.
2003/0055443 A1 3/2003 Spotnitz
2003/0204199 A1 10/2003 Novak et al.
2003/0212332 A1 11/2003 Fenton et al.
2004/0030254 A1 2/2004 Babaev
2004/0047485 A1 3/2004 Sherrit et al.
2004/0092921 A1 5/2004 Kadziauskas et al.
2004/0097919 A1 5/2004 Wellman et al.
2004/0097996 A1 5/2004 Rabiner et al.
2004/0199193 A1 10/2004 Hayashi et al.
2004/0204728 A1 10/2004 Haefner
2004/0243157 A1 12/2004 Connor et al.
2004/0260300 A1 12/2004 Gorensek et al.
2005/0033337 A1 2/2005 Muir et al.
2005/0049546 A1 3/2005 Messerly et al.
2005/0143769 A1 6/2005 White et al.
2005/0149108 A1 7/2005 Cox
2005/0165345 A1 7/2005 Laufer et al.
2005/0177184 A1 8/2005 Easley
2005/0192610 A1 9/2005 Houser et al.
2005/0209620 A1 9/2005 Du et al.
2005/0261581 A1 11/2005 Hughes et al.
2005/0261588 A1 11/2005 Makin et al.
2005/0288659 A1 12/2005 Kimura et al.
2006/0030797 A1 2/2006 Zhou et al.
2006/0063130 A1 3/2006 Hayman et al.
2006/0079878 A1 4/2006 Houser
2006/0084963 A1 4/2006 Messerly
2006/0190034 A1 8/2006 Nishizawa et al.
2006/0211943 A1 9/2006 Beaupre
2006/0235306 A1 10/2006 Cotter et al.
2006/0253050 A1 11/2006 Yoshimine et al.
2007/0016235 A1 1/2007 Tanaka et al.
2007/0016236 A1 1/2007 Beaupre
2007/0055228 A1 3/2007 Berg et al.

| | | | |
|---|---|---|---|
| 2007/0060915 | A1 | 3/2007 | Kucklick |
| 2007/0063618 | A1 | 3/2007 | Bromfield |
| 2007/0129716 | A1 | 6/2007 | Daw et al. |
| 2007/0130771 | A1 | 6/2007 | Ehlert et al. |
| 2007/0131034 | A1 | 6/2007 | Ehlert et al. |
| 2007/0149881 | A1 | 6/2007 | Rabin |
| 2007/0162050 | A1 | 7/2007 | Sartor |
| 2007/0173872 | A1 | 7/2007 | Neuenfeldt |
| 2007/0185380 | A1 | 8/2007 | Kucklick |
| 2007/0219481 | A1 | 9/2007 | Babaev |
| 2007/0249941 | A1 | 10/2007 | Salehi et al. |
| 2007/0260234 | A1 | 11/2007 | McCullagh et al. |
| 2007/0265560 | A1 | 11/2007 | Soltani et al. |
| 2007/0275348 | A1 | 11/2007 | Lemon |
| 2007/0282335 | A1 | 12/2007 | Young et al. |
| 2007/0287933 | A1 | 12/2007 | Phan et al. |
| 2008/0009848 | A1 | 1/2008 | Paraschiv et al. |
| 2008/0058585 | A1 | 3/2008 | Novak et al. |
| 2008/0058775 | A1 | 3/2008 | Darian et al. |
| 2008/0058845 | A1 | 3/2008 | Shimizu et al. |
| 2008/0082039 | A1 | 4/2008 | Babaev |
| 2008/0082098 | A1 | 4/2008 | Tanaka et al. |
| 2008/0172051 | A1 | 7/2008 | Masuda et al. |
| 2008/0177268 | A1 | 7/2008 | Daum et al. |
| 2008/0188878 | A1 | 8/2008 | Young |
| 2008/0200940 | A1 | 8/2008 | Eichmann et al. |
| 2008/0208231 | A1 | 8/2008 | Ota et al. |
| 2008/0234708 | A1 | 9/2008 | Houser et al. |
| 2008/0234709 | A1 | 9/2008 | Houser |
| 2008/0234710 | A1 | 9/2008 | Neurohr et al. |
| 2008/0234711 | A1 | 9/2008 | Houser et al. |
| 2008/0262490 | A1 | 10/2008 | Williams |
| 2008/0281200 | A1 | 11/2008 | Voic et al. |
| 2008/0287948 | A1 | 11/2008 | Newton et al. |
| 2009/0030311 | A1 | 1/2009 | Stulen et al. |
| 2009/0030351 | A1 | 1/2009 | Wiener et al. |
| 2009/0030437 | A1 | 1/2009 | Houser et al. |
| 2009/0030438 | A1 | 1/2009 | Stulen |
| 2009/0030439 | A1 | 1/2009 | Stulen |
| 2009/0036911 | A1 | 2/2009 | Stulen |
| 2009/0036912 | A1 | 2/2009 | Wiener et al. |
| 2009/0036913 | A1 | 2/2009 | Wiener et al. |
| 2009/0036914 | A1 | 2/2009 | Houser |
| 2009/0076506 | A1 | 3/2009 | Baker |
| 2009/0082716 | A1 | 3/2009 | Akahoshi |
| 2009/0105750 | A1* | 4/2009 | Price et al. ................... 606/206 |
| 2009/0118802 | A1 | 5/2009 | Mioduski et al. |
| 2009/0143806 | A1 | 6/2009 | Witt et al. |
| 2009/0270853 | A1 | 10/2009 | Yachi et al. |
| 2010/0036370 | A1 | 2/2010 | Mirel et al. |
| 2010/0036405 | A1 | 2/2010 | Giordano et al. |
| 2010/0158307 | A1 | 6/2010 | Kubota et al. |
| 2010/0179577 | A1 | 7/2010 | Houser |
| 2010/0187283 | A1 | 7/2010 | Crainich et al. |
| 2010/0298743 | A1 | 11/2010 | Nield et al. |
| 2010/0298851 | A1 | 11/2010 | Nield |
| 2010/0331869 | A1 | 12/2010 | Voegele et al. |
| 2010/0331870 | A1 | 12/2010 | Wan et al. |
| 2010/0331871 | A1 | 12/2010 | Nield et al. |
| 2010/0331872 | A1 | 12/2010 | Houser et al. |
| 2011/0009850 | A1* | 1/2011 | Main et al. ........................ 606/1 |
| 2011/0015627 | A1 | 1/2011 | DiNardo et al. |
| 2011/0015631 | A1 | 1/2011 | Wiener et al. |
| 2011/0015660 | A1 | 1/2011 | Wiener et al. |
| 2011/0082486 | A1 | 4/2011 | Messerly et al. |
| 2011/0087212 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087213 | A1 | 4/2011 | Messerly et al. |
| 2011/0087214 | A1 | 4/2011 | Giordano et al. |
| 2011/0087215 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087216 | A1 | 4/2011 | Aldridge et al. |
| 2011/0087217 | A1 | 4/2011 | Yates et al. |
| 2011/0087218 | A1* | 4/2011 | Boudreaux et al. ............ 606/1 |
| 2011/0087256 | A1 | 4/2011 | Wiener et al. |
| 2011/0092972 | A1* | 4/2011 | Allen .............................. 606/45 |
| 2011/0125175 | A1 | 5/2011 | Stulen et al. |
| 2011/0196286 | A1 | 8/2011 | Robertson et al. |
| 2011/0196287 | A1 | 8/2011 | Robertson et al. |
| 2011/0196398 | A1 | 8/2011 | Robertson et al. |
| 2011/0196399 | A1 | 8/2011 | Robertson et al. |
| 2011/0196400 | A1 | 8/2011 | Robertson et al. |
| 2011/0196401 | A1 | 8/2011 | Robertson et al. |
| 2011/0196402 | A1 | 8/2011 | Robertson et al. |
| 2011/0196403 | A1 | 8/2011 | Robertson et al. |
| 2011/0196404 | A1 | 8/2011 | Dietz et al. |
| 2011/0196405 | A1 | 8/2011 | Dietz |
| 2011/0288452 | A1 | 11/2011 | Houser et al. |
| 2012/0029546 | A1 | 2/2012 | Robertson |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1640365 A | 7/2005 |
| CN | 1694649 A | 11/2005 |
| CN | 1922563 A | 2/2007 |
| CN | 101040799 A | 9/2007 |
| EP | 0171967 A2 | 2/1986 |
| EP | 0443256 A1 | 8/1991 |
| EP | 0456470 A1 | 11/1991 |
| EP | 0482195 B1 | 1/1996 |
| EP | 0612570 B1 | 6/1997 |
| EP | 0908148 B1 | 1/2002 |
| EP | 0908155 B1 | 6/2003 |
| EP | 1199044 B1 | 12/2005 |
| EP | 1844720 A1 | 10/2007 |
| EP | 1862133 A1 | 12/2007 |
| EP | 1974771 A1 | 10/2008 |
| EP | 1832259 B1 | 6/2009 |
| EP | 2074959 A1 | 7/2009 |
| GB | 2032221 A | 4/1980 |
| GB | 2447767 B | 8/2011 |
| WO | WO 92/22259 A2 | 12/1992 |
| WO | WO 93/14708 A1 | 8/1993 |
| WO | WO 98/37815 A1 | 9/1998 |
| WO | WO 01/54590 A1 | 8/2001 |
| WO | WO 2005/122917 A1 | 12/2005 |
| WO | WO 2006/042210 A2 | 4/2006 |
| WO | WO 2006/058223 A2 | 6/2006 |
| WO | WO 2006/129465 A1 | 12/2006 |
| WO | WO 2007/047531 A2 | 4/2007 |
| WO | WO 2007/143665 A2 | 12/2007 |
| WO | WO 2008/016886 A2 | 2/2008 |
| WO | WO 2008/130793 A1 | 10/2008 |
| WO | WO 2009/018406 A2 | 2/2009 |
| WO | WO 2009/027065 A1 | 3/2009 |

## OTHER PUBLICATIONS

International Preliminary Report on Patentability for PCT/US2008/078645, Apr. 15, 2010 (9 pages).

U.S. Appl. No. 29/402,697, filed Sep. 26, 2011.

U.S. Appl. No. 29/402,699, filed Sep. 26, 2011.

U.S. Appl. No. 29/402,700, filed Sep. 26, 2011.

U.S. Appl. No. 29/404,676, filed Oct. 24, 2011.

U.S. Appl. No. 13/296,829, filed Nov. 15, 2011.

Technology Overview, printed from www.harmonicscalpel.com, Internet site, website accessed on Jun. 13, 2007, (3 pages).

Sherrit et al., "Novel Horn Designs for Ultrasonic/Sonic Cleaning Welding, Soldering, Cutting and Drilling," Proc. SPIE Smart Structures Conference, vol. 4701, Paper No. 34, San Diego, CA, pp. 353-360, Mar. 2002.

AST Products, Inc., "Principles of Video Contact Angle Analysis," 20 pages, (2006).

Lim et al., "A Review of Mechanism Used in Laparoscopic Surgical Instruments," Mechanism and Machine Theory, vol. 38, pp. 1133-1147, (2003).

Gooch et al., "Recommended Infection-Control Practices for Dentistry, 1993," Published: May 28, 1993; [retrieved on Aug. 23, 2008]. Retrieved from the internet: URL: http://wonder.cdc.gov/wonder/prevguid/p0000191/p0000191.asp (15 pages).

Huston et al., "Magnetic and Magnetostrictive Properties of Cube Textured Nickel for Magnetostrictive Transducer Applications," IEEE Transactions on Magnetics, vol. 9(4), pp. 636-640 (Dec. 1973).

Incropera et al., Fundamentals of Heat and Mass Transfer, Wiley, New York (1990). (Book—not attached).

F. A. Duck, "Optical Properties of Tissue Including Ultraviolet and Infrared Radiation," pp. 43-71 in Physical Properties of Tissue (1990).

**US D661,804 S**

Page 5

Orr et al., "Overview of Bioheat Transfer," pp. 367-384 in Optical-Thermal Response of Laser-Irradiated Tissue, A. J. Welch and M. J. C. van Gernert, eds., Plenum, New York (1995).

Campbell et al, "Thermal Imaging in Surgery," p. 19-3, in *Medical Infrared Imaging*, N. A. Diakides and J. D. Bronzino, Eds. (2008).

U.S. Appl. No. 12/896,351, filed Oct. 1, 2010.

U.S. Appl. No. 12/896,411, filed Oct. 1, 2010.
U.S. Appl. No. 12/896,420, filed Oct. 1, 2010.
U.S. Appl. No. 13/270,459, filed Oct. 11, 2011.
U.S. Appl. No. 13/251,766, filed Oct. 3, 2011.

* cited by examiner



FIG. 1



FIG. 3

FIG. 2

FIG. 4

FIG. 5



FIG. 7



FIG. 6